**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, <br><br> *Plaintiff*, <br><br> v. <br><br> ALEX M. AZAR II, in his official capacity as the Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; DIANE FOLEY, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; OFFICE OF POPULATION AFFAIRS, <br><br> *Defendants*. | Case No.  1:19-cv-01103 |

**COMPLAINT FOR VACATUR OF UNLAWFUL AGENCY RULE
AND DECLARATORY AND INJUNCTIVE RELIEF**

1.      This is an action pursuant to the Administrative Procedure Act ("APA") challenging a U.S. Department of Health and Human Services ("HHS") final rule ("Final Rule") that would fundamentally alter the Title X family planning program—a federal grant program that currently provides over $286 million annually in vital family planning and preventive health services to low-income individuals, and affects over four million low-income women.  The Program provides $1,430,000 each year to the City of Baltimore and serves over 16,000 patients per year at 23 sites in the City, some operated by the City and some by subgrantees.  The Final Rule would impose burdensome and unnecessary restrictions that would reduce access to care, interfere with the patient-provider relationship, and undermine Congress's intent in enacting Title X of the Public Health Service Act nearly fifty years ago.

2.      Congress enacted Title X in 1970 to equalize access to voluntary family planning services, giving low-income women the ability to exercise control over their reproductive

functions, and thereby their economic lives and health, by offering federally funded access to effective contraception and reproductive health care already available to wealthier women. Congress authorized HHS to award grants to public and non-profit entities to provide a "broad range of acceptable and effective family planning methods and services" to patients in need, 42 U.S.C. § 300(a), and in 2010, through the Affordable Care Act, specifically prohibited interference with, *inter alia*, doctor-patient communications about treatment options. Notwithstanding these prior directives, under the guise of requiring the separation already required between Title X program services and abortion services, the Final Rule that is the subject of this suit undermines the equality promise of Title X itself and threatens access to medically accepted vital contraceptive services, allowing the funds to be redirected to those who do not provide contraception but counsel only abstinence or the so-called rhythm method. *See* Kenneth P. Vogel and Robert Pear, *Trump Administration Gives Family Planning Grant to Anti-Abortion Group*, N.Y. TIMES, Mar. 29, 2019 (Title X grant awarded to The Obria Group); Sarah Varney, 'Contraception deserts' likely to widen under new Trump administration policy (Sept. 28, 2018), https://abcnews.go.com/amp/Health/contraception-deserts-widen-trump-administration-policy/story?id=58151312 (Obria medical clinics do not provide contraception beyond so-called "natural family planning methods").

3.      On March 4, 2019, HHS published the Final Rule in the Federal Register amending the regulations developed to administer Title X.  *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7,714 (Mar. 4, 2019).  In this suit, the Mayor and City Council of Baltimore (the "City of Baltimore," or the "City") seeks an order vacating the Final Rule as contrary to the U.S. Constitution, contrary to other relevant statutes, and arbitrary and

capricious.  The City of Baltimore also seeks an injunction against the implementation of the

Final Rule to prevent irreparable injury to the City and its residents.

4.      If allowed to take effect, the Final Rule will irreparably harm the City and its

residents because it is contrary to its laws, policies, and sovereign and quasi-sovereign interests,

interferes with the relationship between City medical providers and their patients, forcing

medical professionals to violate basic tenets of medical ethics.  It will cause the City financial

injury from decreased health care funding while correspondingly increasing health care costs as a

result of an increase in unintended pregnancies, cancers not detected in early stages, the spread

of sexually transmitted infections ("STIs"), delayed prenatal care, and patient diversion as other

Title X providers opt out of the program and shut down.  These costs—and significant public

health impacts—will be caused by the Final Rule's restriction of access to and interference with

the high-quality family planning and related preventive services for low-income individuals that

Title X has funded for decades.

5.      The Final Rule restricts access to high-quality health care in numerous ways, but

two are especially important.

6.      **The "Gag Rule" denying patient access to medical facts.**  The Final Rule

includes a "Gag Rule" that singles out abortion information from all other health care topics by,

among other things, prohibiting health professionals from providing their patients with abortion

referral information even if patients directly request it.

7.      At most, the provider is permitted to give the patient a misleading list of providers

consisting primarily of those who *do not* offer abortion and excluding specialized abortion and

reproductive health care providers; in addition the provider is prohibited from identifying which

providers do provide abortion.  Even if the patient makes clear that her decision is to have an

abortion and she needs help, the Final Rule would require the provider not only to refuse to answer but also to give a government-mandated referral for prenatal care, instead of a referral for the care the patient needs and wants. The Final Rule violates basic tenets of medical ethics and undermines patients' trust in the patient-provider relationship. This does irreparable harm to the provider-patient relationship.

8.     At the same time, the Final Rule mandates that the patient be referred for prenatal services, regardless of whether such a referral is wanted or appropriate.

9.     In Baltimore, where patients frequently have nowhere to go for reproductive health care other than Title X-funded health care clinics, and where many women are misinformed about or unaware of their abortion options, the Gag Rule will burden access to abortion by further confusing and delaying patients seeking such care.

10.     **The Separation Requirements.** The Final Rule also requires that all abortion services, *and* any medical services that do not comply with the Gag Rule, like the prohibited full and complete referrals, be *physically* separated from clinics that provide Title X services, *see* 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. §§ 59.14, 59.15), regardless of the fact that Title X funds are not now, and have never been, used to provide abortion at those sites.

11.     Since the Title X program's inception, family planning practices have been able to share facilities with abortion practices with clear separation of funding streams, pro-rating and proper allocation of costs. Providers have employed this structure and built their practices around the program's requirements without issue. But the Final Rule now mandates that abortion services be cut off from other reproductive health services, in contravention of decades-old care-delivery models and good medical practice, and without any acknowledgment that it is functionally impossible for many providers to meet these requirements.

12.     The Separation Requirements also require complete separation of, among other things, phone numbers, email addresses, websites, personnel, and paper and electronic health records—not only between a Title X project and an abortion provider, but also between a Title X project and any referral services that do not fully comply with the Gag Rule.

13.     The Final Rule's unworkable new Gag Rule and Separation Requirements will disqualify almost all of the Title X network providers in and around Baltimore, including services provided by the City's own Department of Health—an outcome HHS ignores, and will harm Baltimore's residents, the patients in its health system, and the City itself.

14.     **Other requirements.**  Along with the coercive counseling and separation provisions, the Final Rule imposes numerous additional new requirements that further undermine the quality of medical care, interfere with the provider-patient relationship, reduce access to services, and contravene Title X's purposes.

15.     The Final Rule violates three distinct statutory mandates—the Nondirective Mandate, the ACA, and Title X itself.  The Final Rule also violates the Administrative Procedure Act (APA) in numerous respects, both substantively and procedurally, and the Religious Freedom Restoration Act (RFRA).  The Final Rule also violates key constitutional provisions, including the First Amendment and the equal protection component of the Due Process Clause.

16.     **Nondirective Mandate.**  At the threshold, the Final Rule violates the "Nondirective  Mandate," a provision that has appeared in every appropriations statute authorizing Title X since 1996.  The Nondirective Mandate provides that all pregnancy counseling in a Title X program "shall be nondirective" (hence "the nondirective mandate"). *See, e.g.*, Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 ("2019 Health and Human

Servs. Appropriations Act"), Pub. Law. No. 115-245, Title II, 132 Stat. 2981 (September 28, 2018).  "Nondirective counseling" is commonly understood in medicine to mean counseling to enable a patient to make their own informed and autonomous decision about their own health care and life direction, without a physician providing a solution to what the physician perceives as the problem.  The service involves the physician undertaking a safe, confidential process that helps the patient explore concerns they have about a pregnancy.  This includes providing unbiased, evidence-based information about all options and services available to the patient, where requested.  *See* 42 C.F.R. § 59.5(a)(5) (current) (implementing nondirective counseling).

17.      **ACA's Non-Interference Mandate.**  Additionally, the Final Rule violates a key provision of the Patient Protection and Affordable Care Act (ACA) that prohibits HHS from enacting any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;" "interferes with communications regarding a full range of treatment options between the patient and the provider;" "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;" or "violates the principles of informed consent and the ethical standards of health care professionals."  42 U.S.C. § 18114 (the "ACA Non-Interference Mandate").

18.      **Title X.**  Moreover, in several key places, the Final Rule violates Title X itself by making it harder or impossible for the vast majority of people intended to benefit from the program to use it.  For example, an entire subsection of the Title X statute is dedicated to funding the development and dissemination of "Informational and Educational Materials," 42 U.S.C. § 300a-3, because education about the availability of Title X resources is critical to improving health outcomes and is an integral part of the delivery of family planning services to those in need.  Yet, the Final Rule suggests that Title X funds should not be used for community outreach

or other efforts to inform individuals of the availability of Title X resources. *See* 84 Fed. Reg. at 7,790 (to be codified at 42 C.F.R. § 59.18(a)) (requiring that "[g]rantees must use the majority of grant funds to provide direct services to clients" and not for "infrastructure"); 84 Fed. Reg. at 7,774 (defining infrastructure broadly to include "community outreach and recruiting"). Moreover, the Gag Rule contravenes the requirement in Title X itself that services be strictly voluntary and never coercive. *See* 84 Fed. Reg. at 7,731.

19.     **APA.**  The Final Rule also violates the APA in numerous respects.  It reverses HHS's longstanding policies and interpretations of Title X with no evidentiary basis or cogent rationale, requires deviation from evidence-backed standards of care, medical ethics and fiduciary obligations, needlessly jeopardizes patients' lives, health, and well-being, disregards or is contrary to evidence before the agency, ignores many important aspects of the problem and the significant new problems it will create, relies on factors Congress did not intend the agency to consider, and is illogical and counterproductive.  HHS also adds a new, unsupported and illogical rationale for the Final Rule's mandatory prenatal care referral requirement without having given the public notice or an opportunity to comment on this new rationale.

20.     **The Constitution.**  The Final Rule imposes an unconstitutional condition on Title X providers by conditioning Title X funding on the relinquishment of the right to engage in speech and expression with private non-Title-X funds, and constitutes unlawful sex discrimination against women under the equal protection component of the Due Process Clause.

21.     Particularly with respect to the First Amendment, the Final Rule transgresses decades of Supreme Court precedent, strengthened and reaffirmed as recently as last year, prohibiting the government from meddling in the provider-patient relationship in this way. Indeed, the First Amendment's free speech protections are at their zenith when the government

seeks to control the form and content of individuals' protected speech.  The Supreme Court recently warned against this very thing—"government[] . . . 'manipulat[ion]'" of the "'content of doctor-patient discourse'"—emphasizing that this tactic has been used "[t]hroughout history" to "increase state power and suppress minorities[.]"  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374 (2018) ("*NIFLA*").

22.     **Religious Freedom and Restoration Act.**  The Final Rule violates rights of religious conscience recognized by the Religious Freedom Restoration Act ("RFRA") by prohibiting physicians from counseling patients on comprehensive reproductive health services even when their religious exercise requires them to engage in such counseling.

23.     The Final Rule's new requirements are likely to discourage current Title X providers from participating in Title X.  The Final Rule would, if implemented, force clinics to close or reduce their services to the detriment of their patients, because many clinics could not or would not restructure as required and would not deliver services in violation of ethical mandates, but could no longer remain open or maintain service levels without Title X funds.

24.     Because compliance with the Final Rule would require providers to compromise their professional responsibilities to their patients, the Final Rule's changes would cause a dramatic nationwide reduction of the number of high-quality providers who remain in the Title X program.  And those providers who do remain would be prohibited from providing the same high-quality medical advice and care that they have always provided.  The Final Rule will strip providers of their ability to provide factual, neutral, nondirective medical counseling and referrals for all pregnancy options.

25.     The Final Rule will necessarily shrink access to high-quality care at Title X clinics for underserved individuals in Baltimore and around the country, to the detriment of the

public health.  That will directly harm the City of Baltimore by requiring the City's health system to provide more services to patients who no longer have access to readily available Title X providers.  Even if the City were not a Title X provider, the Final Rule's dramatic impact on the availability of existing Title X services both in Maryland and in neighboring states will cause the City significant harm.

26.     As a Title X provider, the City of Baltimore will be placed in an untenable no-win situation.  The City could choose to *accept* Title X funds, but then it will be forced to comply with unethical, unlawful and unconstitutional restrictions.  The City could choose to *reject* Title X funds, but then it will lose access to funds that make it possible to deliver necessary medical advice and services to thousands of patients (or be forced to divert scarce funds from other priorities to cover the shortfall).  The unlawful Final Rule leaves the City of Baltimore  with two bad options, both of which would cause the City and its residents irreparable harm.

27.     HHS's Final Rule should be declared unlawful, vacated, and enjoined.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

29.     Defendants' issuance of the Final Rule on March 4, 2019 constitutes a final agency action and is therefore judicially reviewable within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 704, 706.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a judicial district in which the City of Baltimore is located and this action seeks relief against federal agencies and officials acting in their official capacities.

## PARTIES

31.     Plaintiff Mayor and City Council of Baltimore ("the City of Baltimore," or "the City") is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution.

32.     The Baltimore City Department of Health is a City agency, *see* Baltimore City Charter, Article VII, §§ 54-56, that has wide-ranging responsibilities for providing health services to residents of Baltimore, including those related to chronic disease prevention, HIV/STI prevention, maternal-child health, including pregnancy prevention, and school health services. Baltimore's Department of Health serves Baltimore's more than 600,000 residents.

33.     The Baltimore City Health Department is the oldest continuously operating health department in the United States, formed in 1793, when the governor appointed the City's first health officers in response to a yellow fever outbreak in the Fells Point neighborhood.  During the more than 220 years since then, the Baltimore City Health Department has been working to improve the health and well-being of Baltimore residents.  The Baltimore City Health Department strives to make Baltimore a city where all residents realize their full health potential.

34.     The Baltimore City Health Department's vision is for an equitable, just, and well Baltimore where everyone has the opportunity to be healthy and to thrive.  The Baltimore City Health Department's mission is to protect health, eliminate disparities, and ensure the well-being of every Baltimorean through education, advocacy, and direct service delivery.  In collaboration with other city agencies, health care providers, community organizations and funders, the

Baltimore City Health Department aims to empower all Baltimoreans with the knowledge, access, and environment that will enable healthy living.

35.     The Health Department has a wide-ranging area of responsibility, including acute communicable diseases, animal control, chronic disease prevention, emergency preparedness, HIV/STI testing, maternal-child health, restaurant inspections, school health, senior services, and youth violence prevention.  The agency includes a workforce of approximately 800 employees and has a budget of approximately $126 million.

36.     Baltimore City health clinics served 7,670 Title X clients in 2017, of which nearly one in five—19.6%—were under the age of 18 and almost 84% (6,437) were female.  Of the women, 376 of them were pregnant or seeking to get pregnant; while of the remaining 6,061 women, 88% reported using some form of contraception. In all, 69% of patients at clinics were women using some form of contraception. 99.8% of patients served in Title X centers in Baltimore had incomes below 250% of the federal poverty line, and 86% had incomes below the poverty line.

37.     The City  will be harmed by the Final Rule  as a Title X provider and provider of Title X grants.  The Final Rule's requirements are fundamentally at odds with the ethical and professional obligations of health care professionals—as the American Medical Association forcefully made clear in comments on the Proposed Rule.  The Final Rule's requirements are also at odds with the Baltimore Health Department's mission and its "patient centered" strategy as a best practice for health care delivery in Baltimore.  The City will have no choice but to withdraw from the Title X entirely, requiring the City to divert scarce funds from other critical City services, and/or to curtail reproductive health services. Thus, as a freestanding health care provider, the City of Baltimore will be harmed because the Final Rule will dramatically reduce

the availability of Title X services in Maryland and in neighboring jurisdictions such as Pennsylvania, Delaware, West Virginia, Virginia, and Washington, D.C.  Consequently, the Baltimore Health Department will experience increased costs to provide medical services to patients who no longer receive the preventive care that would have otherwise been readily available under Title X.

38.     The City will also be harmed by the Final Rule because its requirement to violate ethical and professional dictates will cause vast swaths of providers to also withdraw from Title X entirely.  The resulting exodus will cause major gaps in access to care, harm public health, and produce significant, unnecessary costs.

39.     Moreover, Baltimore's residents, physicians, and patients will be harmed by the reduction in access to Title X services.

40.     It is well established that the City of Baltimore has standing to assert not only its right to redress of injury to its coffers, but also to prevent and seek redress for injury to the public health which it is empowered to protect.  In addition, the City has standing to assert the rights of its physicians and other medical providers, and its patients because there is a close relationship between the City and its medical providers and patients, and physicians and patients face genuine obstacles to asserting their own rights, including because of privacy concerns.

41.     In addition, Baltimore City Health Department employs physicians and those physicians have standing to assert the rights of their patients in this case because of the close relationship between, and aligned interests of, physicians and their patients seeking reproductive health services.

42.     Defendant United States Department of Health and Human Services ("HHS") is an agency of the United States government, located at 200 Independence Avenue, S.W.,

Washington, D.C. 20546.  It is the federal agency responsible for, among other things, administering and regulating the family-planning program created by Title X of the Public Health Service Act.

43.     Defendant Alex M. Azar II is the United States Secretary of Health and Human Services.  He is sued in his official capacity.

44.     Defendant Office of Population Affairs is the office within HHS that administers the Title X program.

45.     Defendant Diane Foley, M.D., is the Deputy Assistant Secretary for the Office of Population Affairs.  She is responsible for administering and implementing the Title X program. She is sued in her official capacity.

## BACKGROUND

**A.     The Creation of the Title X Family Planning Program**

46.     Title X originated as a response to a growing body of evidence in the 1960s that demonstrated adverse health and economic outcomes caused by low-income individuals' unequal access to modern, effective contraception.  Low-income women had twice the rates of unwanted pregnancies compared to more affluent women, and their more closely spaced pregnancies led to poor health outcomes for themselves and their children.  Unintended, mistimed, and unwanted childbearing worsened poverty levels and educational attainment, limiting women's control over their lives.  At the same time, evidence showed that newly available and highly effective contraceptive options, such as "the Pill," were unaffordable for too many.  In light of these findings, there was bipartisan agreement that the federal government should support voluntary family planning programs as a means of equalizing access to modern, effective contraceptive methods and improving public health outcomes.

47.     In July 1969, President Richard Nixon wrote in a message to Congress that "no American woman should be denied access to family planning assistance because of her economic condition" and that therefore "we should establish as a national goal the provision of adequate family planning services within the next five years to all those who want them but cannot afford them."

48.     Congress responded to President Nixon's call in 1970 by enacting Title X of the Public Health Services Act (PHSA), 42 U.S.C. §§ 300-300a-6 (the Act), a bipartisan effort to provide federal funding for family planning services.  The basic function of Title X is to fund family planning services for people who are unable to pay for them.  The Act authorizes the Secretary to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of volunteer family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)."  42 U.S.C. § 300(a). In addition to establishing the federal Office of Population Affairs (OPA), the division of HHS that administers Title X, Congress's stated intentions included:

> (l) to assist in making comprehensive voluntary family planning services readily available to all persons desiring services;
>
> (2) to coordinate domestic population and family planning research with the present and future needs of family planning programs;
>
> (3) to improve administrative and operational supervision of domestic family planning services and of population research programs related to such services;
>
> (4) to enable public and nonprofit private entities to plan and develop comprehensive programs of family planning services;
>
> (5) to develop and make readily available information (including educational materials) on family planning and population growth to all persons desiring such information;

(6) to evaluate and improve the effectiveness of family planning service programs and of population research; [and]

(7) to assist in providing trained manpower needed to effectively carry out programs of population research and family planning services[.]

Pub. L. No. 91-572 § 2, 84 Stat. 1504 (1970).

## B.  The Impact of the Title X Family Planning Program

49.     Almost fifty years after its passage, Title X is a public health triumph, having helped create a strong network of providers committed to supporting the delivery of quality preventive health services, including reproductive care.

50.     According to OPA, Title X is the only federal program dedicated solely to supporting the delivery of family planning and related preventive health care.  It is designed to provide contraceptive supplies and information to all who want and need them, with priority given to persons from low-income families.  In addition to offering a broad range of effective and acceptable contraceptive methods on a voluntary and confidential basis, Title X-funded service sites provide contraceptive education and counseling; breast and cervical cancer screening; testing, referral, and prevention education for sexually transmitted infection (STI) and human immunodeficiency virus (HIV); and pregnancy diagnosis and counseling.

51.     Nationally, in 2017, the more than 3,800 individual Title X health center sites around the country served more than 4 million patients, with more than 6.6 million family planning visits.  Title X providers have succeeded in reaching the low-income patients that are the program's priority.  In 2017, 67% of Title X patients had household incomes at or below 100% of the federal poverty level, and 23% of patients had incomes ranging from 101% to 250% of that threshold.  The federal poverty level was $12,060 for a single person in 2017 and $20,420 for a household of three.

52.     While the greatest proportion of Title X patients are young adults in their twenties, Title X providers serve individuals throughout their reproductive years.  In 2017, 47% of Title X patients were aged 20 to 29, 35% were 30 or older, and 17% were younger than 20. Title X patients are disproportionately Black or Latino/a.  In 2017, 22% of Title X patients self-identified as Black or African American and 33% as Hispanic or Latino, compared to 12% and 8% of the nation, respectively.

51.     The Title X low-income patient population includes many who are marginalized by society and who experience multiple challenges accessing health care, but whom the Title X network has succeeded in reaching and serving by offering vital, voluntary family planning information and services.  For example, 14% of Title X patients reported having limited English language proficiency.  Title X patients also include people who are homeless and people who are uninsured.

**C.     The Structure of Title X Grants and Grantees' Title X Projects**

53.     Each year, HHS distributes Title X funding to support care in geographic service areas throughout the country.  In recent years, this funding for Title X services has totaled approximately $260 million, spread among approximately 90 grantees to fund their Title X "projects."

54.     Each Title X project supplements its federal funding with service reimbursement payments (such as from Medicaid or private insurance), patient-paid fees (for those with incomes above the poverty line), and/or state, local, or private sources (subject to Title X's schedule of discounts (or "sliding fee scale")).  All care within any Title X project is bound by the federal law, regulations, and clinical and administrative standards that apply under Title X.

55.     Within each Title X project, there are typically three levels:  (i) the grantee entity, (ii) subrecipient organizations, and (iii) individual service sites run by either grantees or subrecipients (or subrecipients of subrecipients).

56.     In some states, the state health department is the sole grantee; other states have a non-profit organization as the sole grantee; and in other states there may be multiple Title X grantees.  Some grantees handle only overall program direction, funding, administration, and oversight, and the subrecipients include all of the service sites.  In other instances, the grantee itself operates service sites and may also have subrecipients who operate additional sites.

57.     Baltimore City has been a Title X participant since the program's inception in 1970.  The City of Baltimore receives its Title X funding as subgrants through the Maryland Department of Health, and it also subgrants Title X funds to nonprofit providers within Baltimore. Planned Parenthood receives Title X funds as subgrants directly from the Maryland Department of Health and not from the City.

58.     While the total number of sites may vary year to year, in 2017, Title X sites in Baltimore, including Planned Parenthood and City subgrantees, served over 16,000 patients, providing over 22,000 clinical visits.

59.     The City directly operates three community clinics and four school-based health centers that provide Title X services.  It also oversees the Title X grant for ten other subgrantee health clinics in the community, including clinics at John Hopkins University, Baltimore Medical System, Family Health Centers of Baltimore, and University of Maryland, as well as clinics that offer comprehensive care in middle and high schools.  These clinics offer comprehensive patient-centered reproductive health care to Baltimore  residents.  Family planning care helps patients

prevent sexually transmitted diseases and plan the timing of their pregnancies, which helps them meet their educational and economic goals and, ultimately, have better health outcomes.

**D.      Baltimore's Participation in the Title X Family Planning Program**

60.      Title X is a competitive grant program, meaning that eligible entities must apply to OPA to be awarded funds.  State, county, and local health departments make up roughly half of the current cohort of Title X grantees, with hospitals, family planning councils, Planned Parenthood health centers, federally qualified health centers ("FQHCs"), and other private non-profit organizations making up the rest of the network.  Title X programs are not funded exclusively by Title X—indeed, by law they cannot be.  Rather, in 2017, Title X funding itself accounted nationwide for only 19% of Title X project revenue, with the remainder coming from fees for service and other government grants.

61.      The Title X program has a significant impact on the City and the public health of Baltimore's residents.  Title X centers serve as the final safety net for the one out of every three women in Baltimore  who are in need of publicly funded contraceptive services.  These women represent some of the most vulnerable segments of the population, including teens, immigrants and refugees, those struggling with substance abuse, and members of the incarcerated population.

62.      In 2017, 86% of the 16,000 patients served in Baltimore Title X centers had incomes below the federal poverty line ($12,060 for an individual), and 99.8% had incomes below 250% of that line;  50% of patients were enrolled in Medicaid, while 25% identified as uninsured.  Title X centers in Maryland are often some of the only family planning providers that accept Medicaid in a state where, as of 2017, 22% of residents are enrolled in Medicaid or the Children's Health Insurance Program, 6% are uninsured, and 8% have incomes below the federal

poverty line.  In Baltimore the percentage of residents with income below the federal poverty line is closer to 25%.

63.     The Final Rule would place these vulnerable Baltimore residents at severe risk. In 2017 alone, cuts or restrictions to City Title X funding could have resulted in 2,800 missed annual exams and 132 missed referrals to health services.  The Final Rule could also dramatically impact diagnosis and treatment of STIs.  In 2017, funding cuts or restrictions may have meant failure to diagnose or treat 8,746 cases of chlamydia, 18,925 cases of gonorrhea, 5,283 cases of syphilis, and 8,174 cases of HIV.  The Final Rule will also interfere with adolescents' ability to obtain confidential care and could potentially force the closure of eight City school-based health centers.  This may reverse the 55% reduction in teen pregnancy that Baltimore's existing health programs have accomplished over the past ten years and will lead to poorer health outcomes overall for the Baltimore's teenagers and young people.

64.     The Final Rule also modifies the definition of "low-income" to include women who receive health insurance through an employer who refuses to cover contraceptives due to religious or moral objections. The Rule does not provide any additional funding to expand access to Title X services for this population and thus will further burden Baltimore's Title X providers, who already struggle with limited resources. This modification could harm Baltimore's more vulnerable residents by forcing clinics to divert resources toward a more advantaged population.

65.     The neighboring District of Columbia, only 44 miles south of Baltimore and connected by fast, affordable public transportation, also crucially depends on Title X-funded providers.  Harms to the availability of Title X services in the District of Columbia directly harm Baltimore because of the close proximity of the two jurisdictions.  Patients who cannot obtain access to health care in Washington, D.C. often rely on Baltimore for their health services.

66.     In the District of Columbia, Title X-funded providers are a critical part of the health-care safety net.  Title X funds comprise 14% of public funding for family planning services in the District, while 85% of public funding comes from Medicaid.  The District's Title X providers served more than 58,000 individuals in the District in 2018, 60% of whom had incomes at or below 100% of the FPL.  These patients included male, female, and transgender adolescents, adults, and families, as well as persons with chronic conditions such as mental illness, diabetes, hypertension, and HIV/AIDS, and hard-to-reach populations such as the homeless, substance users, and the formerly incarcerated.

67.     The loss of Title X funding for Title X providers in neighboring Pennsylvania (Philadelphia is 100 miles from Baltimore), Virginia (Richmond is 150 miles from Baltimore) and Delaware (Wilmington is 70 miles from Baltimore) will similarly put tremendous pressure on Baltimore's health system.  Patients are mobile, and Baltimore's health care system is one of the best in the United States.

68.     In 2017, Title X funding provided services to more than 200,000 patients across Pennsylvania, the third-highest number of Title X patients in the nation.  As a result of the Title X program, approximately 60,000 unintended pregnancies are avoided in Pennsylvania each year.  In 2017, 50,575 patients received Title X services in Virginia, and the program prevented 10,870 unintended pregnancies.  In 2017 Delaware's Title X providers served 19,132 patients.  In 2010, the 57% rate of unintended pregnancies in Delaware was the highest in the nation, at 62 per 1,000 women ages 15 to 44.  In 2010, 3,300, or 71.3%, of unplanned births in Delaware were publicly funded, compared with 68% nationally.  That same year the federal and state governments spent $94.2 million on unintended pregnancies in Delaware alone; of this, the federal government paid $58.2 million and $36 million was paid by the state.  In 2010 Title X

funding prevented 2,900 unplanned pregnancies saving the state and federal governments

millions of dollars.

69.    The closure of Title X clinics in neighboring jurisdictions will surely result in

greater reliance on the City of Baltimore's health services.  Studies show that when specialized

family planning clinics are forced to reduce their services, patients lose access to care, and

clinics that remain are required to take on as many of those patients as they can.  *See* Kari White

et al., *The Impact of Reproductive Health Legislation on Family Planning Clinic Services in*

*Texas*, 105 Am. J. of Public Health 851 (May 2015); Amanda J. Stevenson et al., *Effect of*

*Removal of Planned Parenthood from the Texas Women's Health Program*, 374 New Eng. J. of

Med. 853 (2016).

70.    Thus, as a consequence of fewer providers providing Title X services in

Baltimore, Maryland, and neighboring States, as well as a decrease in the quality of the Title X

program, the City will be required to shoulder the costs of an increased number of unintended

pregnancies, pregnancy complications, and worse birth outcomes, including maternal and infant

mortality.  In addition, loss of preventive care will increase costs resulting from STIs and

cervical cancers, to name just a few of the likely economic and public health impacts that will

fall on the City of Baltimore because of the Final Rule.

**E.**    **The Regulatory History of the Title X Family Planning Program**

71.    Title X gives the Secretary authority to promulgate grant-making regulations, 42

U.S.C. § 300a-4(a). In 1971, the Department issued its first regulations implementing Title X.  It

required each grantee of Title X funds to provide assurances that, among other things, priority

will be given to low-income individuals, services will be provided "solely on a voluntary basis"

and "in such a manner as to protect the dignity of the individual," and the "project will not

provide abortions as a method of family planning." 36 Fed. Reg. 18,465, 18,466 (Sept. 15, 1971),

*codified at* 42 C.F.R. § 59.5(9) (1972).  Each program was to provide "medical services related

to family planning including physician's consultation, examination, prescription, continuing

supervision, laboratory examination, contraceptive supplies, and necessary referral to other

medical facilities when medically indicated" and include "[p]rovision for the effective usage of

contraceptive devices and practices." *Id.*

72.     The regulatory requirement that abortion not be a method of family planning

stems from a provision of the statute.  Section 1008 of Title X provides that no Title X funds

"shall be used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6.

But that provision says exactly what it means.  It was never intended to interfere with

communications concerning abortion between a Title X provider and a patient—as Congress and

HHS have repeatedly made clear.

73.     Representative John Dingell, the sponsor of the amendment adding Section 1008,

opposed "restrictions on [abortion] counseling and referral."  *Statutory Prohibition on Use of*

*Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of*

*Compliance for Family Planning Services Projects*, 53 Fed. Reg. 2,922, 2,930 (Feb. 2, 1988).

This amendment was added, instead, in recognition of the fact that in 1971 the criminal laws of

many states prohibited abortion, and that federal funds should not be used to perform procedures

that would violate state criminal law.  As Representative Gerry Studds later stated:  "When we

created the Title X program 20 years ago, we did not intend to muzzle health care providers . . . .

[L]et there be no mistake.  Title X providers must be able to inform individuals of all pregnancy

management options."  138 Cong. Rec. 9,872 (1992) (statement of Rep. Studds).

74.     Through the first 18 years of Title X's existence, HHS never took a contrary view.

In 1980, for example, HHS promulgated new regulations that retained many of the same

provisions as those in the 1971 regulations, including those discussed above. 45 Fed. Reg. 37,433, 37,437 (June 3, 1980), *codified at* 42 C.F.R. § 59.5(5) (1980). The following year, the Department issued "Program Guidelines" "to assist current and prospective grantees in understanding and utilizing the Title X family planning services grants program." These guidelines provided that Title X projects were to provide nondirective pregnancy counseling, including on the option of abortion if a patient wanted such counseling.

**F.**     **The History of the "Gag" and "Separation" Rules**

75.     In 1988, the Reagan Administration promulgated extensive new regulations related primarily to section 1008. The 1988 regulations provided, for the first time in the program's history, that Title X covers "preconceptional" services only. 53 Fed. Reg. 2922 (Feb. 2, 1988), *codified at* 42 C.F.R. § 59.2 (1988).

76.     The 1988 regulations established a broad prohibition on abortion counseling and referral, including a "gag rule" applicable to all Title X project personnel that prohibited them from providing "counseling concerning the use of abortion as a method of family planning" and "referral for abortion as a method of family planning." *Id.* § 59.8. The 1988 regulations also imposed a new requirement that a "Title X project must be organized so that it is physically and financially separate" from abortion-related services. *Id.* § 59.9. Whether adequate separation existed was based on a set of factors that included the degree of separation between treatment, consultation, examination, and waiting rooms, and separate personnel. *See id.*

77.     The 1988 Gag Rule faced vast opposition and was also the subject of extensive litigation. It was swiftly enjoined and was never fully implemented due to ongoing litigation and bipartisan concern over its invasion of the medical provider-patient relationship. Only four years after it was promulgated, the 1988 Gag Rule was suspended and then revoked.

78.     The Supreme Court upheld the 1988 regulations against a facial challenge in *Rust v. Sullivan*, 500 U.S. 173 (1991).  As the Supreme Court recognized, however, Title X "expressly distinguishes between a Title X *grantee* and a Title X *project*." *Rust*, 500 U.S. at 196 (emphasis in the original).  The Court explained that the "Title X grantee can continue to perform abortions, provide abortion-related services [ . . . ]; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds." *Id.* (citing 42 C.F.R. § 59.9 (1989)).  But the Rule at issue in *Rust* did not require the level of separation required by the current rule, such as a separation of phone numbers, email addresses, websites, personnel, and paper and electronic health records.  And the Supreme Court's recent decisions in *Agency for International Development v. Alliance for Open Society International, Inc.*, 133 S. Ct. 2321 (2013) ("AOSI"), and *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("NIFLA"), affirm the narrowness of *Rust*'s holding.

79.     On November 5, 1991, responding to widespread concerns (both before and after *Rust*) that the 1988 Gag Rule unduly interfered in the medical provider-patient relationship, President George H.W. Bush issued a memorandum to the Secretary of HHS attempting to undo the Gag Rule.  President Bush urged that the "confidentiality" of the doctor-patient relationship be preserved, and that operation of the Title X program be "compatible with free speech and the highest standards of medical care."  George H.W. Bush, *Message to the Senate Returning Without Approval the Family Planning Amendments Act of 1992* (Sept. 25, 1992).  President Bush directed that the implementation of the regulations adhere to four principles:

> (l) Nothing in these regulations is to prevent a woman from receiving complete medical information about her condition from a physician.

> (2) Title X projects are to provide necessary referrals to appropriate health care facilities where medically indicated.

(3) If a woman is found to be pregnant and to have a medical problem, she should be referred for complete medical care, even if the ultimate result may be termination of her pregnancy.

(4) Referrals may be made by Title X programs to full-service health care providers that perform abortions, but not to providers whose principal activity is providing abortion services.

In a press conference, the President stated: "[U]nder my directive, they can go ahead—patients and doctors can talk about absolutely anything they want, and they should be able to do that." *See Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 230 (D.C. Cir. 1992).

80.     The D.C. Circuit (Judges Wald, Mikva, and Edwards) held that President Bush's directive effectively repealed the Gag Rule and thus required notice and comment rulemaking to implement. *See id.* at 241. The Court enjoined HHS from implementing President Bush's directives. *See id.*

### G.    The Current Statutory and Regulatory Landscape

81.     In 1993, President Clinton issued a memorandum to the Secretary of Health and Human Services directing her to suspend the 1988 rule's prohibition on abortion counseling and referral because, among other reasons, it "endanger[ed] women's lives and health by preventing them from receiving complete and accurate medical information and interfere[d] with the doctor-patient relationship by prohibiting information that medical professionals are otherwise ethically and legally required to provide to their patients." *Memorandum for the Secretary of Health and Human Services*, 58 Fed. Reg. 7,455 (Feb. 5, 1993).

82.     Starting in 1996, Congress clarified the law by enacting the nondirective mandate— requiring thereafter as part of Title X appropriations that "all pregnancy counseling shall be nondirective." *See, e.g.*, Continuing Appropriations Act, 2019, P.L. 115-245, Div. B, Title II, §§ 207 and 208 (2018); Consolidated Appropriations Act, 2018, P.L. 115-141, Div. H,

Title II, 132 Stat. 348, 716-17 (2018); Consolidated Appropriations Act, 2017, P.L. 115-31, Div. H, Title II, 131 Stat. 521 (2017).

83.     The 1993 regulations were finalized in 2000, memorializing the same regulatory approaches as had governed since Title X's inception, and have been in place ever since. *Standards of Compliance for Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41,270 (July 3, 2000), *codified at* 42 C.F.R. Part 59 (Current Regulations). Moreover, consistent with longstanding interpretations of Section 1008, as well as Congress's repeated directives in annual appropriations acts, the 2000 rule requires—upon a patient's request—nondirective counseling for all pregnancy options.  42 C.F.R. § 59.5(a)(5).  As the 2000 rule makes clear, the policies and interpretations set forth therein "have been used by the program for virtually its entire history; indeed, they have been in effect during the pendency of this rulemaking." *Standards of Compliance for Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. at 41,271.

84.     In finalizing the current regulations in 2000, HHS explained that the 1988 regulations lacked any evidentiary or experiential support. *Id.* at 41,271.  Because the 1988 regulations had never gone fully into effect, no evidence or experience suggested that such rules could "work operationally on a national basis in the Title X program." *Id.*  Moreover, HHS concluded that the audits relied on in the 1988 regulations "showed only minor compliance problems" that did not justify "new interpretations of the law." *Id.* at 41,272.  With respect to nondirective counseling and referrals, HHS found that the restriction on counseling and referrals set forth in the 1988 regulations "endangers women's lives and health by preventing them from receiving complete and accurate medical information and interferes with the doctor-patient relationship by prohibiting information that medical professionals are otherwise ethically and

26

legally required to provide to their patients." *Id.* at 41,270.  HHS also determined that "requiring

a referral for prenatal care and delivery or adoption where the client rejected those options would

seem coercive and inconsistent with" Congress's nondirective counseling requirement.  *Id.* at

41,275.

85.     With respect to the separation of Title X-funded activities and abortion services,

HHS found that the 1988 regulations' physical and financial separation requirements lacked any

evidentiary or experiential support. *Id.* at 41,275-76.  As HHS explained, the physical and

financial separation requirements, including the "facts and circumstances" test for determining

such separation, were "ambiguous," had caused "practical difficulties," and had "little relevance

or applicability in the Title X program." *Id.*  HHS further determined that such requirements

were "not likely ever to result in an enforceable compliance policy that is consistent with the

efficient and cost-effective delivery of family planning services." *Id.* at 41,276.

86.     Thus, according to HHS's current regulations, issued in 2000, Title X grantees

may share facilities that host Title X programs and provide for abortion care "so long as it is

possible to distinguish between the Title X supported activities and non-Title X abortion-related

activities." *Id.* at 41,282.  Common waiting rooms, common staff, and maintenance of a single

filing system are all permissible as long as costs are properly prorated or allocated between Title

X projects and other programs.

87.     OPA provides strict oversight of projects that receive Title X grants to ensure that

federal funds are used in a manner consistent with the regulations and funds are not used for any

ineligible activities, such as abortion services.  Existing safeguards to maintain this separation

include:  (1) careful review of grant applications to ensure that the applicant understands and has

the capacity to comply with all requirements; (2) independent financial audits to examine

whether there is a system to account for program-funded activities and non-allowable program activities; (3) yearly comprehensive reviews of the grantees' financial status and budget report; and (4) periodic and comprehensive program reviews and site visits by OPA regional offices.

88.     The 2000 regulations are still in effect today.  It is the 2000 regulations that HHS seeks to drastically change with the Final Rule that is the subject of this lawsuit.

89.     In addition to the existing regulations, Title X grantees are also required to follow the "QFP"—a 2014 publication entitled "Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs" that is incorporated into the Program Requirements.  The QFP, prepared by the Centers for Disease Control and Prevention (CDC) and the Office of Population Affairs (OPA), both of which are housed within HHS, is a careful, extensive, evidence-based description of the best practices for providing family planning services in the United States.  Its recommendations were "developed jointly under the auspices of CDC's Division of Reproductive Health (DRH) and the Office of Population Affairs (OPA), in consultation with a wide range of experts and key stakeholders," which included a "multistage process that drew on established procedures for using clinical guidelines" developed by "family planning clinical providers, program administrators, representatives from relevant federal agencies, and representatives from professional medical organizations."

90.     This process included "[s]ystematic reviews of the published literature from January 1985 through December 2010," and the report itself (excluding its appendices) contains over 150 citations to scholarly publications.  The American College of Obstetricians and Gynecologists, the American College of Physicians, and the American Academy of Family Physicians all endorse nondirective options counseling, including referral to appropriate

28

providers, as the most clinically appropriate role for providers caring for a patient who is facing

an unexpected pregnancy.  The QFP reflects this consensus.  The QFP requires that for pregnant

patients, "[o]ptions counseling should be provided in accordance with recommendations from

professional medical associations, such as ACOG [the American College of Obstetricians and

Gynecologists] and AAP [the American Academy of Pediatrics]."  ACOG and AAP's *Guidelines*

*for Perinatal Care* state that providers should "[a]ssess all patients' desire for pregnancy.  If the

patient indicates that the pregnancy is unwanted, she should be fully informed in a balanced

manner about all options, including raising the child herself, placing the child for adoption, and

abortion."  These standards allow patients to trust their Title X providers and ensure the delivery

of unbiased information regarding their reproductive and sexual health.  This high standard of

care respects the dignity and autonomy of patients and helps them make the best decisions for

themselves and their loved ones when facing an unintended pregnancy or other time-sensitive

decisions about their reproductive health.

     91.     On December 22, 2017, the CDC published an update to the QFP ("QFP

Update"), which stated that after a thorough review, "CDC and the Office of Population Affairs

determined that none of the newly published recommendations [since 2014] marked a substantial

shift in how family planning care should be provided."  That is, as of December 2017, the

Defendants acknowledged that no new evidence supported any significant changes to the QFP.

     92.     In 2010, as part of the Affordable Care Act, Congress included a provision

emphasizing the importance of nondirective counseling and uninhibited patient access to all

information that health care professionals determine is ethically and medically necessary for

informed consent.  Section 1554 ("Access to Therapies") of the Patient Protection and

Affordable Care Act (ACA), reaffirmed the core principles underlying the existing regulations

and statutory requirement for nondirective counseling, and provides that the Secretary of HHS

"shall not promulgate any regulation" that, among other things,

> "(l) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
>
> (2) impedes timely access to health care services;
>
> (3) interferes with communications regarding a full range of treatment options between the patient and the provider;
>
> (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; [or]
>
> (5) violates the principles of informed consent and the ethical standards of health care professionals."

42 U.S.C. § 18114 ("Non-Interference Requirement").

### H.    The Proposed Rule

93.    On June 1, 2018, HHS issued a proposed rule that would overhaul the

longstanding Title X regulations in numerous respects.  *Compliance With Statutory Program*

*Integrity Requirements*, 83 Fed. Reg. 25,502 (Jun. 1, 2018) (the "Proposed Rule").  HHS

received over 500,000 public comments opposing the Proposed Rule—including extensive

comments from major medical associations, major Title X providers and policy and research

organizations, nearly 200 members of Congress, and several states.

94.    California, along with Delaware, Hawai'i, Illinois, Iowa, Maine, Maryland,

Minnesota, New Jersey, New Mexico, North Carolina, and the District of Columbia filed a

multistate comment letter explaining that the Rule, if implemented, would create barriers to

women's health care, including abortion.

95.    Policy and research organizations such as the Guttmacher Institute, the American

Civil Liberties Union, and the National Family Planning & Reproductive Health Association  (of

which Baltimore City Health Department is a member) described the significant negative

impacts that the Proposed Rule would likely have on patients, particularly members of vulnerable populations, including women of color, LGBTQ+ women, and victims of intimate partner violence.  These comments—like many others—cited to myriad empirical studies, case studies, and other research indicating the dramatically unfavorable outcomes likely to result from the Proposed Rule.  In addition, a number of organizations representing public health professionals and community health centers, along with thousands of individual Americans from across the country, submitted comments expressing grave concerns about the Proposed Rule as drafted.

96.     The following leading American health organizations also submitted comment letters strongly condemning the proposal:  the AMA, Planned Parenthood, the American College of Obstetricians and Gynecologists, the American College of Physicians, the American Academy of Family Physicians, the American Academy of Nursing, and the American Academy of Pediatrics.

97.     In a nearly 100-page comment letter, Planned Parenthood urged HHS to withdraw the Proposed Rule in its entirety, challenging virtually all of its provisions and arguing that the proposal was legally flawed and would harm patient care.  *See* PPFA, Comment Letter on Proposed Rule for Compliance with Statutory Program Integrity Requirements (July 31, 2018).  Planned Parenthood warned that the Gag Rule alone would result in a mass exodus of providers from the Title X program—including all Planned Parenthood affiliates and numerous states—leading to reduced patient care on a vast scale.  *Id.* at 15-16.  Planned Parenthood also explained that the Separation Requirements were extremely onerous and vague, and effectively disqualified it from the Title X program because of its speech and conduct outside of the Title X program.  *See id.* at 26-40.

98.     The AMA also voiced its strong opposition to the Proposed Rule.  *See* AMA, *Comment Letter on Proposed Rule for Compliance with Statutory Program Integrity Requirements*, at 1-5 (July 31, 2018).  Its letter urged HHS to abandon its attack on family planning services, explaining that it would undermine patients' access to high-quality medical care and information, dangerously interfere with the patient-physician relationship, conflict with physicians' ethical obligations, exclude qualified providers, and jeopardize public health.  *See id.*

99.     As the AMA made clear in its comments on the Proposed Rule, "frank and confidential communications with . . . patients ha[ve] always been a fundamental tenet of high quality medical care." *Id.* at 1.  "A physician must always have the ability to freely communicate with his or her patient, providing information to patients about their health and safety, without fear of intrusion by government and/or other third parties." *Id.* at 2.  "Regulations that restrict the ability of physicians to explain all options to their patients and refer them, whatever their health care needs, compromise this relationship and force physicians and other health care providers to withhold information that their patients need to make decisions about their care."  *Id.*

**I.      The Final Rule**

100.    On March 4, 2019, HHS published the Final Rule entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714"").  Despite the outpouring of opposition through public comments, the Final Rule retains key provisions of the Proposed Rule, significantly altering HHS's previous interpretation of Title X.  It also includes new provisions, such as the speaker-based ban on pregnancy counseling, on which the public did not have an opportunity to offer comment.  The Final Rule introduces numerous changes to the Title X regulations that have been in place for decades.

101.    HHS ignored or otherwise failed to meaningfully respond to the numerous fundamental flaws of the Proposed Rule.  Moreover, it issued the Final Rule after an

"unconventional and nontransparent" regulatory review process marked by "troubling irregularities." Congressman Elijah E. Cummings et al.  Letter to Director Mick Mulvaney and Administrator Neomi Rao, at 1-2 (Feb. 14, 2019).  Among other things, these irregularities included ramming the Final Rule through the last stage of the regulatory review process (review by the Office of Information and Regulatory Affairs) in less than two weeks, despite numerous requests for stakeholder meetings and the fact that the average review period is 45 days.

102.    This inflexible, unresponsive, and truncated approach—in the face of vast opposition to the Proposed Rule—is substantively unreasonable and likely the result of HHS's "unalterably closed mind," *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1467 (9th Cir. 1987).

103.    As with the Proposed Rule, the Final Rule consists of two central, integrated provisions—the Gag Requirement and the Separation Requirements—as well as a series of additional, related requirements.

### 1.    The Gag Rule

104.    The Rule prohibits Title X recipients from providing their patients with necessary referrals for abortion care, even for patients who specifically request such a referral.  The Final Rule injects the government between a medical provider and patient, imposing a gag on medical speech.  Put simply, it imposes an unconstitutional content-based and viewpoint-based proscription on medical professionals concerning abortion-related speech that would have practitioners in the Title X program direct women toward continuing a pregnancy to term.

105.    The Final Rule implements this directive Gag Rule in several ways.  First, HHS affirmatively *prohibits* referrals for abortion while *mandating* referrals for prenatal care— regardless of what a patient actually wants.  At most, providers may give their patients an incomplete and misleading list that includes, but does not identify, abortion providers.  Second,

HHS eliminated the previously settled regulatory requirement that Title X providers offer pregnant patients the opportunity to receive nondirective, comprehensive counseling regarding their pregnancy options and, if patients so request it, actually provide that counseling.  Instead, HHS authorizes and encourages biased and incomplete counseling in which the interests of the patient are no longer paramount; and compels speech from those who would counsel on abortion. Third, without explanation the Final Rule imposes an additional speaker-based ban on medical speech—in particular, a ban on who can provide "nondirective pregnancy" counseling—that was nowhere hinted in the Proposed Rule, limiting those who may provide nondirective pregnancy counseling to physicians or advanced practice providers.

<div align="center">

**(a)      Prohibiting Abortion Referrals and Mandating Prenatal
Referrals**

</div>

106.      In a section of the Rule captioned "Prohibition on referral for abortion," the Rule states that "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." *Compliance With Statutory Program Integrity Requirements*, 84 Fed. Reg. at 7,778–89.  Under this provision, even when a pregnant patient explicitly requests a referral for abortion, a health care provider is prohibited from speaking to that patient about her referral options.  The provider cannot even provide a list of the available abortion providers, much less speak to his or her patient about which abortion provider could meet the patient's particular needs and why.

107.      In the Proposed Rule, HHS purported to justify this prohibition on the proposition that "[r]eferrals for abortion are, by definition, directive." 83 Fed. Reg. at 25,506.  HHS abandoned that purported justification in the Final Rule, nowhere reprising the point.  Instead, HHS simply invoked in the Final Rule its "belie[fs]" that, "in most instances when a referral is

<div align="center">

34

</div>

provided for abortion, that referral necessarily treats abortion as a method of family planning," and that "both the referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning." 84 Fed. Reg. at 7,717.  HHS provided no further explanation for these "belie[fs]."

108.     At most, the Rule allows the medical professional to provide the patient "a list" of "licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some, but not the majority, of which also provide abortion as part of their comprehensive services." *Id*. at 7,789.  The list thus may include abortion providers, but only if those abortion providers also offer comprehensive primary health care services—therefore excluding specialized abortion providers who may be the highest-quality and most appropriate providers.  Health professionals are prohibited from including on the list any providers who only offer abortion services, even if those are the only abortion providers in the region.  Further, while the list "may" include abortion providers, it does not need to include any, even if a patient explicitly asks for a referral to an abortion provider. *Id.*  And it affirmatively *must not* identify which of the providers actually provide abortion services. *Id.*.  The Final Rule provided no justification for this incomplete and misleading scavenger-hunt form of a "list."

109.     By these terms, the Rule compels Title X providers to withhold the identities of most abortion providers, since most abortion providers do not also offer a full spectrum of primary care.  The Rule further requires providers to withhold medical advice about which abortion providers are most appropriate for their patients' needs and medical circumstances.  In sum, when a patient seeks an abortion referral, the list she can receive at best must:  (1) include a majority of health care providers who will not offer the patient the care she seeks; and (2)

exclude providers who can offer that necessary care because they do not also offer other services that are unnecessary for the patient.

110.    Moreover, even to the extent that there may sometimes be an abortion provider on the allowable "list" a patient receives, the list "cannot be used to indirectly refer for abortion or to identify abortion providers to a client," *id.* at 7,761, and the Rule makes explicit that "[n]either the list nor project staff may identify which providers on the list perform abortion," *id.* at 7,789. This means that medical professionals cannot even tell their patients that the list is responsive to their request for a referral to an abortion provider in the first place, much less which provider on the list performs abortions or that there are other, more appropriate abortion care options available—even if the patient specifically asks for this information.  The patient will be left to locate publicly available information, much of which is unreliable with respect to abortion, without any guidance from a medical professional, much less one who is familiar with her medical history.  The low-income patients who lack internet access will be left at a particular disadvantage.

The Final Rule provides a limited exception for abortion referrals in the case of "emergenc[ies]." The Final Rule purports to allow for "medically necessary" referrals. *Id.* at 7,788.  But such referrals must be "consistent with [the new] § 59.14(a)," *id.*— under which referrals for abortions are banned—and the Final Rule otherwise states that only an abortion referral for an "emergency medical situation" would fall outside the "restrictions concerning abortion as a method of family planning," *id.* at 7,762.  And "in cases involving rape and/or incest," the Final Rule would prohibit Title X providers from referring a patient to a specialized abortion provider, instead permitting only a referral to a "qualified, comprehensive health service provider who also provides abortion." *Id.* at

7,747 n.76.  In sum, the Final Rule not only limits what medical professionals can and

cannot say to patients, but also attempts to take the place of the physician by dictating,

without ever examining a patient, what is and is not a medical emergency, medically

necessary, or comprehensive medical care.

111.    Even as it gags providers from speaking about abortion, the Rule also compels the

staff of Title X recipients to provide all pregnant patients with directive counseling by giving

them a referral for prenatal services.  These medical professionals must provide that prenatal

referral regardless of whether the patient has requested such a referral, and even if it is against

the medical judgment of the health professional to provide that prenatal referral to that particular

patient absent any such request.  The preamble to the Rule purports to justify this requirement on

the incongruous basis that prenatal referrals are "medically necessary for the health of the

pregnant mother, as well as the unborn baby."  *Id.* at 7,728.  The Rule does not explain why or

how prenatal care is "medically necessary" for a woman seeking an abortion.

### (b)      Permitting Directive Counseling Related to Social Services and Adoption Services

112.    In addition to mandating directive counseling by requiring referrals for prenatal

care and prohibiting referrals for abortion, the Rule also allows further directive options

counseling for prenatal care and post-conception adoption.  The Rule provides that a Title X

provider may opt to provide only "[r]eferral to social services or adoption agencies; and/or

[i]nformation about maintaining the health of the mother and unborn child during pregnancy."

*Id.* at 7,789.  In other words, a Title X provider can selectively inform pregnant patients solely

about their options for prenatal care and adoption, without providing any information about

abortion, including, but not limited to, the availability of abortion and whether it is an option for

that patient.

113.    Before HHS issued the Final Rule, Title X providers were required to advise their

patients about their health care options according to their patients' interests, best medical

practices, and accepted standards of professional ethics.  Under the Final Rule, however, Title X

providers are no longer held to such standards.  They may, if they choose, tell pregnant patients

about only some of their options; that is, they may exclude any information about abortion,

regardless of what a patient wants, needs, or requests, and regardless of accepted medical

practices and professional standards.  Indeed, even if a patient says she is only interested in

information and counseling on abortion, the Final Rule would require practitioners to ignore that

patient decision entirely and mandate additional information beyond the patient's desires or

needs.

114.    As HHS previously and wisely cautioned in promulgating the 2000 regulations,

"If projects were to counsel on an option even where a client indicated that she did not want to

consider that option, there would be a real question as to whether the counseling was truly

nondirective or whether the client was being steered to choose a particular option."  65 Fed. Reg.

at 41,273.

### (c)    Limiting "Nondirective Counseling" Only to "Physicians or Advanced Practice Providers"

115.    The Final Rule further dramatically limits who can provide nondirective

counseling on pregnancy options (as HHS would impermissibly define it)—authorizing only

"physicians or advanced practice providers" to do so.  84 Fed. Reg. at 7,789; *see also id.* at

7,761.  The Final Rule defines "advanced practice providers" (or advanced practice practitioners)

as follows:  "a medical professional who receives at least a graduate level degree in the relevant

medical field and maintains a license to diagnose, treat, and counsel patients." *Id.* at 7,787.

116.    The Rule states that a Title X provider "may also choose to provide" "nondirective pregnancy counseling," but only when provided by physicians or advanced practice practitioners, 84 Fed. Reg. at 7,789, and then only if the physician or advanced practice practitioner also provides information about at least one other option (prenatal care or adoption) in conjunction with any counseling about abortion. *Id.* at 7,747. The doctor or advanced practice practitioner is required to provide information about prenatal care or adoption, regardless of whether the patient wants or needs that additional information, and even if the patient explicitly asks that it not be provided. What is more, in all instances—including when counseling on abortion—the Final Rule would compel practitioners to tell pregnant patients about the "risks and side effects to [her] unborn child." *Id.*

117.    Thus, under the Final Rule, all medical professionals other than doctors or advanced practice practitioners—for example, registered nurses and health care assistants—cannot provide the nondirective counseling on abortion that the rule allows of doctors and advanced practice practitioners. The Final Rule provides no explanation for this speaker-based ban on medical speech, much less the specific distinction that it draws between health care professionals. Nor does it address any consequences of this ban—on Title X providers, patients, or public health more generally. For example, one consequence not addressed is that Title X providers are safety-net providers, typically operating with limited means and offering as appropriate direct patient services through registered nurses and other medical professionals who do not fall within the definition of advanced practice practitioners. These other professionals often have more experience and expertise in this form of nondirective counseling than doctors or other advanced practice providers. Thus, imposing burdensome and costly impediments to the provision of services—as this speaker-based ban clearly does—will substantially reduce

providers' ability to provide those services.  Yet the Final Rule nowhere explains why HHS imposed this ban, much less how it would affect Title X providers and their patients.

118.    Moreover, notwithstanding the Rule's purported allowance for "nondirective pregnancy counseling" that presents abortion as one of several options, the Gag Rule provides no guidance as to how a physician or an advanced practice practitioner can actually provide information about abortion without violating the Gag Rule.  The Rule bans any speech that could be interpreted to "promote" or "support abortion as a method of family planning," as well as any speech during counseling or in connection with the permitted list of "comprehensive primary health care providers" that could be interpreted "as an indirect means of encouraging or promoting abortion as a method of family planning." *Id.* at 7,788-89.  The Rule fails to adequately define or explain these terms, and it is entirely unclear how a doctor or advanced practice practitioner could explain the availability of abortion to a patient in a manner that would not be interpreted as a violation.

119.    Indeed, the preamble to the Rule even recognizes the vague and overbroad nature of its restrictions, warning that "providers must be careful that nondirective counseling related to abortion does not diverge from providing neutral, nondirective information into encouraging or promoting abortion as a method of family planning, or into referral for abortion as a method of family planning." *Id.* at 7,746.  It goes on to state that "[t]he Department anticipates that it may provide further guidance to grantees on this issue" without any timeline for delivery of such guidance. *Id.*

120.    The Gag Rule not only violates the First Amendment, but basic medical ethics. Doctors, physicians' assistants, and nurses all have affirmative ethical duties to give patients complete information about all care options and to make medically appropriate referrals.  For

example, the American Medical Association (AMA) advises that patients have a right to "receive information from their physicians and to have an opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives[.]"  ACOG specifically advises that after a pregnancy is confirmed, "[t]he patient should be fully informed in a balanced manner about all options, including raising the child herself, placing the child for adoption and abortion."  And when the care that patients seek is beyond the scope of clinicians' practice area, clinicians fulfill their obligations to patients through referral to other professionals who have the appropriate skills and expertise to address the situations.

121.    The Rule's provisions endanger patients' lives and health by interfering in the provider-patient relationship and unreasonably restrict patients' timely access to wanted and needed information and medical care.  They contradict HHS's own evidence-based assessment of the importance of nondirective counseling and medically appropriate referrals as reflected in the QFP, which HHS reaffirmed in the December 2017 QFP Update.  HHS offers no new evidence to support this departure from the extensively evidence-backed QFP standards, and never mentions the QFP in the Supplementary Information accompanying the Final Rule.

## 2.    The Separation Requirements

122.    Citing zero evidence of misuse of Title X funds over the past half century, the Final Rule would impose new, drastic, and vague "physical and financial" separation requirements—including separate facilities, separate personnel and workstations, and separate health care records—between Title X projects and any medical services that do not fully comply with the Gag Rule.

123.    Specifically, the Final Rule states, "A Title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and §§ 59.13,

59.14 [i.e., the Gag Rule], and 59.16 of these regulations from inclusion in the Title X program."

84 Fed. Reg. at 7,789.  HHS identified "relevant factors" that it would review in order to

determine whether "objective integrity and independence from prohibited activities" exists.  The

factors include: "(a) The existence of separate, accurate accounting records; (b) The degree of

separation from facilities . . . in which prohibited activities occur and the extent of such

prohibited activities; (c) The existence of separate personnel, electronic or paper-based health

care records, and workstations; and (d) The extent to which signs and other forms of

identification of the Title X project are present, and signs and material referencing or promoting

abortion are absent." *Id.*

124.     In the Final Rule, HHS cited *no* evidence of misuse of Title X funds to justify the

Separation Requirements.  The Proposed Rule had principally relied on purported misuse of

funds under the *Medicaid* program—a separate federal program.  83 Fed. Reg. at 25,509.  The

Final Rule abandoned reliance even on that, conceding that any "demonstrated abuses of

Medicaid funds do not necessarily mean Title X grants are being abused." 84 Fed. Reg. at 7,725.

125.     Instead of evidence, in support of the Separation Requirement, HHS relied on

"risk[s]" of "appearance[s]" and "perception[s]." *Id.* at 7,764.  HHS claimed that permitting Title

X providers to use shared facilities for "Title X services . . . and non-Title X services involving

abortion" "create[s] a risk of the intentional or unintentional use of Title X funds for

impermissible purposes, the co-mingling of Title X funds, [and] the appearance and perception

that Title X funds being used in a given program may also be supporting that program's abortion

activities[.]" *Id.* at 7,764-65.

126.     Not only did HHS promulgate the separate requirements despite the fact that there

is no evidence of any need for it, HHS ignored the substantial evidence in the record that the

Separation Requirements would cause well-qualified providers *to leave* the Title X program and that this loss would impede women's access to reproductive health services.  HHS's actions are the very definition of arbitrary and capricious.

### 3.   Other Requirements

127.   The Final Rule includes a series of additional provisions which, while generally disguised by vague or otherwise bland terms, would shift the Title X program away from its emphasis on providing high-quality family-planning methods and services to low-income patients toward policy preferences with no grounding in the law or public health.

128.   Starting with the definitions section, for example, the Final Rule rewrites the definition of "low income family" to accomplish an unrelated political goal—an attempt to fix problems that the Administration created by exempting employers that cite a "religious or moral" objection to the Affordable Care Act's requirement that health plans include coverage for contraception.

129.   Accordingly, "for contraceptive services only," the Final Rule would allow Title X providers to include within the definition of "low income" those women who "ha[ve] health insurance coverage through an employer that does not provide the contraceptive services sought by the woman because the employer has a sincerely held religious or moral objection to providing such coverage[.]" 84 Fed. Reg. at 7,787.

130.   As another example, the Final Rule also alters the eligibility and selection criteria HHS uses to decide which Title X projects to fund in an evident attempt to shift funds away from established, effective Title X providers such as Planned Parenthood that have long served Title X's mission.  To that end, for example, the Final Rule would emphasize an applicant's "ability to procure a broad range of diverse subrecipients[.]" *Id.* at 7,788.  Congress, however, did not prioritize "broad" or "diverse" groups of Title X providers over maximizing the reproductive

health care offered to Title X beneficiaries.  And giving special priority to such providers is especially problematic because experienced Title X providers are likely to be those who have spent the most time and effort developing programs serving Title X's goals and requirements—some for 40 years or more.

131.    The Final Rule also adds a new provision that Title X providers "should" either offer "comprehensive primary health services onsite" or "have a robust referral linkage with primary health providers who are in close physical proximity to the Title X site[.]" *Id.* at 7,788. Requiring Title X clinics to offer "comprehensive primary health services" is beyond the scope of Title X, which specifically and exclusively concerns "family planning" services.

132.    As yet another example, the Final Rule imposes "infrastructure" restrictions on Title X providers, requiring that "[g]rantees must use the majority of grant funds to provide direct services to clients[.]" *Id.* at 7,790.  But, without explanation, the Final Rule defines "infrastructure" so broadly as to include "bulk purchasing of contraceptives or other clinic supplies" and what have long been core Title X services—including "clinical training for staff" and "community outreach and recruitment"—thereby further unnecessarily restricting access to care under Title X.  *Id.* at 7,774.

133.    The Final Rule also removes the requirement that family planning methods and services be "medically approved," encourages less-effective contraceptive care such as fertility-awareness-based methods, and allows projects not to include "every acceptable and effective family planning method or service." 84 Fed. Reg. at 7,787.

134.    The Final Rule requires Title X projects to "encourage family participation" in the decision of minors to seek family planning services by requiring specific recordkeeping regarding such "encouragement' in the minors' medical records, regardless of state laws that

protect the rights of minors to consent to confidential services for STIs, abortion, and family planning.  *Id.* at 7,788.

135.    The Final Rule imposes extensive new requirements for grant applications that incorporate substantive requirements found nowhere else in the regulations, and that create new hurdles for applicants to even qualify for consideration as Title X grantees.

### 4.    Justifications for the Rule

136.    Given  the dramatic and unprecedented negative impact of the Final Rule on the provision of Title X services to at least 4 million Americans, HHS's analysis and justifications in support of the rule are shockingly insubstantial.

137.    HHS's justification for the Rule fails to assess its true costs; ignores its health consequences; and is based upon unfounded assumptions that the Rule will expand coverage and patient access to services, will improve quality of service, and will not cause an increase in unintended pregnancies.  84 Fed. Reg. 7,732, 7,741, 7,782.  HHS's cost-benefit analysis of the Rule is astonishingly deficient.

138.    HHS dramatically underestimates the costs of the Separation Requirements, asserting that it will be $36.08 million nationwide, or between $20,000 and $40,000 per site.  *Id.* 7,781-82.  At a minimum, the costs of one-time physical separation alone—which on its face requires two entrances, two waiting rooms, two sets of examination rooms, and more—will significantly exceed this amount.  Given the number of Title X providers who will essentially have to duplicate their staff to provide both Title X and non-Title X services at the same site, the number is patently incorrect.

139.    HHS also assumes, without evidence, that there will be no reduction in Title X services, asserting without basis that current providers will not be driven out of the program and

that, in any event, new grantees will take the place of any grantees that leave.  *Id.* at 7,723, 7,749, 7,782.

140.    Planned Parenthood and at least four states explained in comments *that they will withdraw from the program* if the Rule goes into effect, and experience and academic studies show that new grantees will not provide a sufficient substitute in quantity or quality.  In areas like Baltimore, there are shortages of primary and specialty health care providers.  It is unlikely that Baltimore will see a proliferation of new family planning organizations to take the place of current Title X grantees leaving the program.  Moreover, while HHS indicates that "new providers who previously were unable to participate in Title X projects due to conscience concerns" will now apply to and participate in a Title X project, experience suggests instead that new organizations are unlikely to apply to and become successful Title X grantees, particularly without significant transition costs.

141.    Because HHS assumed there would be no reduction in Title X services provided under the Rule, HHS did not consider any costs related to the reduction in services the Rule will cause.  HHS somehow does not expect an increase in unintended pregnancies, stating that HHS is unaware of "actual data that could demonstrate a causal connection between" the Rule and "an increase in unintended pregnancies, births, or costs associated with either[.]"  *Id.* at 7,775.  That statement defies belief.  It does not account for evidence in the record that the loss even of just Planned Parenthood alone from the Title X program is likely to lead to a "decline in the use of the most effective methods of birth control and an increase in births among women who previously used long-acting reversible contraception."  American Academy of Nursing, Comment Letter on Proposed Rule for Compliance with Statutory Program Integrity Requirements at 3 (Jul. 26, 2018).

142.     Likewise, HHS claims there will be no costs associated with either the Rule's removal of the nondirective pregnancy counseling requirement or the Rule's prohibition on abortion referral.  84 Fed. Reg. at 7,719.  Defendants justify both changes by claiming the Rule will provide more "flexibility" for applicants that may not have applied to Title X due to purported "burdens on conscience" imposed by the requirement to provide nondirective pregnancy counseling and referrals for abortion.  But Defendants acknowledge that "[t]he Title X statute has coexisted with federal conscience laws for over 40 years," *id.* at 7,747, without incident, and again cite no evidence to demonstrate that there will be an expanded number of medical providers participating in Title X after removing the abortion counseling and referral requirements.  *Id.* at 7,777.

143.     HHS acknowledges that there are *zero quantified benefits* associated with the Rule, pointing only to non-quantified benefits such as the "program integrity of Title X."  *Id.*

144.     HHS's massive changes to the Title X program stand to irreparably harm Baltimore, its physicians, and its residents; some of the United States' most respected medical associations oppose such changes.  Against those concrete harms, there is not an iota of evidence pointing to a quantifiable benefit from the changes wrought by the Final Rule.  Not only is HHS's Final Rule contrary to law and constitutional right, it is exactly the kind of unreasoned, unsupported, and arbitrary and capricious agency action that the Administrative Procedure Act was enacted to prevent.

### CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF APA § 706—CONTRARY TO LAW—
### CONTRARY TO AFFORDABLE CARE ACT'S NON-INTERFERENCE PROVISION

145.     Plaintiff re-alleges each and every allegation in paragraphs 1-144 above as if fully set forth herein.

146.    The APA requires courts to "hold unlawful and set aside" agency action that is

"not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

147.    The Final Rule is not in accordance with Section 1554 of the Affordable Care

Act, which forbids the HHS Secretary from promulgating "any regulation" that:

> (1) creates any unreasonable barriers to the ability of individuals to obtain
> appropriate medical care; (2) impedes timely access to health care
> services; (3) interferes with communications regarding a full range of
> treatment options between the patient and provider; (4) restricts the ability
> of health care providers to provide full disclosure of all relevant
> information to patients making health care decisions; [or] (5) violates the
> principles of informed consent and the ethical standards of health care
> professionals.

42 U.S.C. § 18114 ("Non-Interference Provision").

148.    The Final Rule is contrary to 42 U.S.C. § 18114 in multiple ways.

149.    The Gag Rule does not allow providers to discuss a full range of treatment options

or fully disclose all relevant information by preventing health care providers from providing

appropriate referrals to their patients to address the possibility of an abortion and preventing

medical professionals from engaging in an open dialogue with their patients about abortion.  The

Gag Rule similarly interferes with patient-provider communications by forcing health care

providers to arrange for unnecessary and unwanted prenatal care referrals.

150.    Accordingly, the Gag Rule explicitly and expressly would "interfere[] with

communications regarding a full range of treatment options between the patient and the

provider" and "restrict[] the ability of health care providers to provide full disclosure of all

relevant information to patients making health care decisions," and is fundamentally at odds with

the ethical and professional standards of health care professionals, all in violation of § 18114.

151.    The Final Rule's physical separation requirements would also violate 42 U.S.C.

§ 18114.  Compliance with the Separation Requirements, at minimum, would require Title X

providers to make unnecessary and prohibitively expensive renovations to their health care

centers, purchase new facilities, duplicate staff positions, and duplicate administrative systems,

such as bookkeeping and health records.

152.    Because the Final Rule's Separation Requirements require Title X providers to

physically segregate their Title X family planning services from both abortion services and any

other medical services that do not fully comply with the Gag Rule, it would force patients to seek

care at multiple locations, thus creating unreasonable barriers for patients with unwanted

pregnancies to obtain care, and impede timely access to abortion services.  The Final Rule's ban

on referring Title X patients for abortion care will cause the same harms.  The Rule also creates

unreasonable barriers and impedes timely access to health care services by imposing restrictions

and costs that will be effectively impossible for providers to bear, causing them to exit the Title

X program or otherwise limit services to patients.

153.    Thus, the Final Rule's Separation Requirements would "create[] . . . unreasonable

barriers to the ability of individuals to obtain appropriate medical care," and "impede[] timely

access to health care services" by imposing extremely onerous and vague "physical and

financial" separation requirements on Title X providers.

154.    The Final Rule is therefore not in accordance with law or is in excess of statutory

authority.  Pursuant to 5 U.S.C. §§ 706(2)(A) and (C), Plaintiff is entitled to an order vacating

the Final Rule and declaratory and injunctive relief against Defendants taking any action to

implement the Final Rule.

155.    Absent injunctive and declaratory relief vacating the Final Rule and prohibiting it from going into effect, Plaintiff and its residents, physicians, and its patients will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

**COUNT II**
**VIOLATION OF APA § 706—CONTRARY TO LAW—**
**CONTRARY TO NONDIRECTIVE MANDATE**

156.    Plaintiff re-alleges each and every allegation in paragraphs 1-155 above as if fully set forth herein.

157.    The APA requires that agency action that is "not in accordance with law" be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

158.    The Final Rule is not in accordance with law because, without limitation, the Consolidated Appropriations Act of 2018, like each preceding appropriations act since 1996, requires "that all pregnancy counseling shall be nondirective."  2019 Health and Human Servs. Act, 132 Stat. 2981, 3070-71 ("Nondirective Mandate").  Nondirective pregnancy counseling requires the presentation of neutral, factual, and nondirective information about all legal and medically indicated options for pregnancy, including abortion.  Nondirective pregnancy counseling also requires nondirective referrals for particular pregnancy services at the request of the patient.

159.    The Final Rule violates the Nondirective Mandate by eliminating the Current Regulations' nondirective pregnancy counseling requirement, permitting providers to offer only biased, one-sided information about "maintaining the health of the mother and unborn child during pregnancy," and affirmatively requiring directive referral for one option (carrying the pregnancy to term) while broadly prohibiting referral for another option (abortion).

160.    Specifically, the Final Rule prohibits nondirective counseling, including counseling for abortion, by any medical professionals such as registered nurses who do not both

have graduate degrees and a license to diagnose, treat, and counsel patients.  And what the Final

Rule designates as "nondirective counseling" is not in reality nondirective because it requires

prenatal counseling regardless of a patient's request for information only about abortion.  84 Fed.

Reg. at 7,747.  Finally, the Final Rule prohibits referrals for abortion even if such referrals are

nondirective.  The Final Rule thus *requires directive counseling toward* prenatal care and away

from abortion, in violation of law.

161.    Pursuant to 5 U.S.C. § 706(2)(A), Plaintiff is entitled to an order vacating the

Final Rule and declaratory and injunctive relief against Defendants taking any action to

implement the Final Rule.

162.    Absent injunctive and declaratory relief vacating the Final Rule and prohibiting it

from going into effect, Plaintiff and its residents, its physicians, and its patients will be

immediately, continuously, and irreparably harmed by Defendants' illegal actions.

### COUNT III
### VIOLATION OF APA § 706—CONTRARY TO LAW—
### CONTRARY TO TITLE X

163.    Plaintiff re-alleges each and every allegation in paragraphs 1-144 above as if fully

set forth herein.

164.    The APA requires courts to "hold unlawful and set aside" agency action that is "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §

706(2)(C).

165.    The Final Rule exceeds Defendants' authority under the Title X statute, which

requires that grants for Title X programs "shall offer a broad range of acceptable and effective

family planning methods and services" and a "comprehensive program of family planning

services." 42 U.S.C. §§ 300(a), 300a(a).  The Final Rule, by contrast, directs that fund recipients

may *not* offer a comprehensive program of family planning services, directly contrary to law.

The Final Rule is also fundamentally inconsistent with Title X's purpose of expanding and equalizing access to a broad range of acceptable and effective family planning methods and services regardless of income, because it imposes unjustified requirements that will have the effect of reducing such access.

166.    By promulgating the Final Rule, Defendants have acted in excess of their statutory authority under Title X.  The Final Rule should be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(C).

### COUNT IV
### VIOLATION OF APA § 706—CONTRARY TO LAW—
### CONTRARY TO RELIGIOUS FREEDOM RESTORATION ACT OF 1993

167.    Plaintiff re-alleges each and every allegation in paragraphs 1-144 above as if fully set forth herein.

168.    The Religious Freedom Restoration Act of 1993 ("RFRA") aims to ensure broad protection for religious liberty and provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability[.]" 42 U.S.C. § 2000bb-1(a).  If the government substantially burdens a person's exercise of religion, RFRA provides that the person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb-1(b).

169.    The Final Rule violates rights of religious conscience recognized by RFRA by prohibiting physicians and other health care providers from counseling patients about comprehensive reproductive health services, and making complete and appropriate referrals, even when their religious beliefs require them to fully inform their patients about *all* their medical options and to make appropriate referrals.  This includes physicians and other health

care providers whose religious beliefs require them to inform patients of their religious views against abortion as well as physicians and other health care providers whose religious beliefs require them to inform patients of information necessary for patients to make informed decisions about their health care in light of the importance certain faiths place on individual self-determination.

170. The Final Rule provides no exception whatsoever to the Gag Rule for physicians and other medical providers and professionals whose religious exercise would be substantially burdened by the inability to mention abortion or to honestly counsel patients and provide options, support, and counseling for their patients' best interests.

171. The Final Rule provides no exception whatsoever to the Gag Rule for patients whose religious exercise would be substantially burdened by the inability of their physician to provide honest counseling.

172. Absent injunctive and declaratory relief vacating the Final Rule and prohibiting it from going into effect, physicians and other health care providers who object to the Gag Rule as a matter of religious conscience, and patients who would benefit from their religious exercise, will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

173. Similarly, patients who object to the Gag Rule as a matter of religious conscience will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

## COUNT V
## VIOLATION OF APA § 706—CONTRARY TO CONSTITUTIONAL RIGHT—FIRST AMENDMENT

174. Plaintiff re-alleges each and every allegation in paragraphs 1-173 above as if fully set forth herein.

175.     A court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).  The Final Rule exceeds Defendants' power under the U.S. Constitution because it induces Title X recipients to violate the First Amendment in order to secure Title X funding.

176.     Providers of family planning services, including those funded by Title X, are medical providers who are obliged by their training, their codes of ethics, and their duties toward their patients to provide appropriate and complete information to those patients.  These providers help their patients make deeply personal decisions and their candor is crucial.

177.     The relationship between health care professionals and patients is a traditional sphere of free expression that is entitled to protection under the First Amendment, even when subsidized by the government.

178.     The First Amendment provides a right to be free from governmental prohibitions on speech as well as from compelled speech by the government.

179.     The First Amendment further provides a right to be free from governmental regulations of speech that prefer one particular viewpoint over other perspectives on the same topic.

180.     The First Amendment protects the rights of Plaintiff and its residents, its physicians, and its patients to speak about abortion, including providing patients with counseling and referrals for abortion, and patients' right to receive it.  *See, e.g.*, *NIFLA*, 138 S. Ct. at 2371, 2374.

181.     Defendants have violated, and will continue to violate, the rights of Plaintiff and its residents, its physicians, and its patients under the First Amendment, including in the following ways:

182. The Final Rule prohibits Plaintiff from providing reproductive health services in accordance with medical ethics, professional norms, and with the Baltimore City Health Department's strategy to maximize patient trust and information, and to be pain-stakingly non-directive. This is the strategy that City Health has determined is the most effective delivery strategy for Baltimore's low-income populations.

183. The Final Rule compels Plaintiff to infringe upon the free speech rights of its employee health care providers and its subgrantee health care providers as a condition of securing Title X funds by prohibiting them from referring pregnant patients for abortion and by requiring them to refer pregnant patients for prenatal care, regardless of their patients' needs or requests.

184. The Final Rule intrudes upon the relationship between medical providers (including, but not limited to, doctors), and their patients who receive care in Title-X-funded clinics. The Final Rule dictates the medical advice and referrals for follow-up medical care that providers may deliver and prevents providers from delivering unencumbered medical advice, including referrals, on crucial matters of a deeply personal nature, such as the options available to an individual patient who is pregnant.

185. Injecting the federal government between a provider and her or his patient, the Final Rule by design imposes impermissible content- and viewpoint-based discrimination. The First Amendment protects Plaintiff's and other Title X providers' communications with their patients, including communications concerning safe and legal abortions. The Gag Rule restricts Plaintiff's and other Title X providers' rights to engage in such speech and patients' rights to receive it—imposing, among other things, an express ban on referrals for abortion services even when a patient wants such a referral—and compels Plaintiff and other Title X providers to

espouse the federal government's view of appropriate options for pregnant women.  The federal government has thus chosen one viewpoint over another and seeks to compel the Plaintiff and its medical professionals to espouse only the viewpoint that the federal  government dictates.

186.    The Final Rule also compels Plaintiff and other Title X grantees to infringe upon the free speech rights of health care providers who are not advanced practice providers, such as registered nurses, by prohibiting them from providing to pregnant patients nondirective options counseling that they are fully qualified to provide under the applicable professional practice standards.

187.    The Final Rule imposes these speech restrictions on patients and providers not only when the providers are providing services funded by Title X but also when they are providing services not funded by Title X.  The Final Rule thus compels and controls speech by the recipients of Title X funds and their patients inside and outside the contours of the Title X program.  These speech restrictions are content-and viewpoint-based.

188.    The Final Rule's Separation Requirements impose an unconstitutional condition on the receipt of Title X funding, as the requirements are so restrictive that they effectively prevent the use of non-Title X money to pursue activities protected by the First [and Fifth] Amendments.  *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 133 S. Ct. 2321, 2328, 2330 (2013).

189.    As stated, compliance with the Separation Requirements would, at minimum, require Title X grantees to make unnecessary and prohibitively costly renovations to their health care centers, purchase new facilities, duplicate staff positions, and duplicate administrative systems, such as bookkeeping and health records.  The costs of this requirement would be prohibitively expensive, and the timeframe the Final Rule permits for coming into compliance is

inadequate, so that Plaintiff and other Title X providers will have to choose between exercising their constitutional rights and receiving Title X funding.  If Plaintiff and other Title X providers were to accede to this unconstitutional condition and stop speaking about abortions, it would violate their constitutional rights.

190.    Plaintiff is entitled to an order vacating the Final Rule and declaratory and injunctive relief against Defendants taking any action to implement the Final Rule as contrary to the United States Constitution.

191.    The Final Rule's restrictions on First Amendment rights are not justified by a compelling or important governmental interest.

192.    Even if Defendants have a compelling or important government interest, the Final Rule is not substantially related or narrowly tailored to achieve that interest and/or achieves it in ways that are far more intrusive than necessary.

193.    Absent injunctive and declaratory relief vacating the Final Rule and prohibiting it from going into effect, Plaintiff [and its residents, its physicians, and its patients] will be immediately, continuously, and irreparably harmed by Defendants' illegal actions.

<div align="center">

**COUNT VI**
**VIOLATION OF APA—CONTRARY TO CONSTITUTIONAL RIGHT—**
**EQUAL PROTECTION UNDER FIFTH AMENDMENT**

</div>

194.    Plaintiff re-alleges each and every allegation in paragraphs 1-193 above as if fully set forth herein.

195.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

196.    The Final Rule specifically targets and harms women.  In particular, the Final Rule, by weakening requirements for comprehensive, evidence-based reproductive health care,

adversely targets and invidiously discriminates against women based on the overly broad stereotype that women's proper role is to bear and raise children.

197.    The Final Rule targets individuals for discriminatory treatment based on pregnancy because pregnant individuals will not enjoy the same comprehensive, evidence-based health care information, including accurate and complete referral information, as other individuals who are not pregnant.  The Final Rule targets individuals seeking abortion care, denying them access to accurate and complete referral information even when requested.

198.    The Final Rule targets individuals for discriminatory treatment based on a sex [pregnancy] classification, and thereby discriminates based on sex.

199.    The Final Rule is not substantially related to an important government interest, let alone rationally related to a legitimate government interest.  The reasons offered by Defendants in the preamble of the Final Rule are unfounded and pretextual.

200.    Even if Defendants have an interest, the Final Rule is not tailored to achieve that interest.  The Final Rule would impermissibly impose burdens on women and girls.

201.    By promulgating the Final Rule, Defendants have violated the equal protection guarantee of the Fifth Amendment of the Constitution.

202.    Defendants' violation causes ongoing harm to Plaintiff and its residents, its physicians, and its patients.

<div align="center">

**COUNT VII**
**VIOLATION OF APA—ARBITRARY AND CAPRICIOUS—**
**INADEQUATELY JUSTIFIED**

</div>

203.    Plaintiff re-alleges each and every allegation in paragraphs 1-202 above as if fully set forth herein.

204.    An agency rule or action that is arbitrary or capricious is invalid.  5 U.S.C. § 706(2)(A).  Among other things, agency rules or actions that are not "reasoned" are invalid as

<div align="center">58</div>

arbitrary and capricious. *E.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

205.    The Final Rule reverses a previously settled agency position—one grounded in, among other things, national health care standards and core ethical requirements of the medical profession—on which Plaintiff and other Title X providers have relied for decades.

206.    Yet the Final Rule provides no reasoned explanation for its drastic changes to the Title X program, while it simultaneously disregards or otherwise fails to meaningfully consider and address material facts and evidence submitted during the comment period on the Proposed Rule. *See, e.g.*, *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 516 (2009) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

207.    Moreover, Defendants' justifications for the Final Rule are arbitrary and capricious.

208.    Defendants fail to justify the Gag Rule on legal or practical grounds and fail to account for its many negative health consequences. Those consequences include that it would force health care professionals to violate medical ethics and professional responsibility rules by prohibiting them from providing full information or certain referrals to patients, and thereby would produce worse health outcomes for patients. The Gag Rule also undermines the congressional goal of providing comprehensive family planning services for low-income people by forcing Plaintiff, Planned Parenthood and many other providers out of the program. Even if HHS were able to find providers to take their place (which is highly unlikely), those providers would not have the expertise or ability to provide the same volume and quality of care that the City Health Department, Planned Parenthood and others have provided for decades—meaning

that Baltimore's public health and individual patients will face irreparable harm. And encouraging health care providers who refuse to provide counseling and referrals for abortion—and thus refuse to comply with the ethical principles of the medical profession, the City Health Department delivery strategy, and HHS's own guidelines for quality care—to participate in Title X will only undermine the efficacy of the program and result in the provision of substandard care that will drive vulnerable patients away from care and undermine Baltimore's public health.

209. Moreover, for those providers and practitioners who remain in the Title X program, the Gag Rule leaves practitioners with only two options on referrals: deny abortion referrals entirely or provide patients who request abortion referrals with incomplete and misleading information. As to the latter, as discussed, the Final Rule authorizes only an intentionally misleading and incomplete list of providers. The Final Rule provides no justification for this, and with good reason: there is none. It deceives patients about their provider options and would delay patients' access to wanted medical care.

210. The Gag Rule also adds an unexplained speaker-based ban on any abortion counseling—and going further still, "nondirective *pregnancy* counseling," 84 Fed. Reg. at 7,761 (emphasis added)—by health care providers other than physicians and advanced practice practitioners. As a result, registered nurses and health care assistants, for example, would not be able to provide "nondirective pregnancy counseling," including nondirective counseling on abortion. HHS provided no justification for this ban, much less the speaker-based distinction it draws, and it would cause massive disruption and delays in care. Indeed, by HHS's own estimates, nearly a quarter of all 2017 "family planning encounters"—that is, "documented, face-to-face contact[s] between an individual and a family planning provider"—were with *non*-advanced practice practitioner medical professionals. Christina Fowler et al., Office of

Population Affairs, *Title X Family Planning Annual Report 2017 National Summary*, at 50-51

(Aug. 2018).  And in 2016, the Final Rule acknowledges, non-advanced practitioner

professionals "were involved with 1.7 million Title X family planning encounters[.]" 84 Fed.

Reg. at 7,778.  Yet under the Final Rule, none of these qualified, effective practitioners would be

able to provide "nondirective pregnancy" counseling.

211.    The Gag Rule is also arbitrary and capricious because it provides only a limited

exception for abortion referrals in the case of "emergenc[ies]."  *See* 84 Fed. Reg. at 7,748.  The

Final Rule purports to allow "medically necessary" referrals.  *Id.* at 7,788.  But such referrals

must be "consistent with § 59.14(a)," *id.*—under which referrals for abortions are banned—and

the Final Rule otherwise states that an abortion referral for only an "*emergency* medical

situation" would fall outside the "restrictions concerning abortion as a method of family

planning[,]" *id.* at 7,762 (emphasis added); *see id.* at 7,730 ("may refer for abortion for

documented *emergency* care reasons" (emphasis added)).  At a minimum, the Gag Rule is

unclear whether a Title X project may refer a patient to an abortion provider for a medically

indicated but non-"emergency" abortion, and Title X providers would necessarily have to

assume the worst.  This will needlessly and harmfully cause patients to delay medically

necessary abortions.  Moreover, "in cases involving rape and/or incest," the Gag Rule would

prohibit the Title X project from referring a patient to a specialized abortion provider, permitting

it only to refer her to a "licensed, qualified, comprehensive health services provider who *also*

provides abortion."  *Id.* at 7,747 n.76 (emphasis added).  HHS provided no justification for this.

212.    HHS also failed to account for the economic impact of the Gag Rule, including

the significant health-related costs arising from forcing out of the Title X program Planned

Parenthood and numerous other Title X providers, potentially including Plaintiff.  Indeed,

despite the fact that Planned Parenthood expressly raised in its comments that all its affiliates and numerous States would be forced to withdraw from Title X entirely if the Gag Rule went into effect, HHS nowhere even acknowledged, much less addressed, the point.

213.    With respect to the Separation Requirements, HHS nowhere meaningfully explains why the current rules are inadequate to comply with the statutory mandate that Title X funds not be used to provide abortions.  As discussed, HHS regulations have long made clear that Title X funds may be used "solely for the purpose for which the funds were granted in accordance with … applicable cost principles," 42 C.F.R. § 59.9 (current), and may not be used to "provide abortion," *id.* § 59.5(a)(5) (current).  Moreover, the current regulations have long required that "[n]on-Title X abortion activities … be separate and distinct from Title X project activities."  65 Fed. Reg. at 41,282.  And Title X grantees are already subject to audit and financial risk assessment, and, among other things, must provide quarterly financial reporting.  HHS has not demonstrated that these rules are inadequate, nor has it otherwise justified the additional extreme burden of requiring physical and administrative separation.

214.    Furthermore, HHS has not considered, and indeed, simply ignored many of the harms that would be imposed by the Separation Requirements.  Those requirements would impose enormous costs of renovation, relocation, and duplication.  It would also harm patients by making it more difficult for Title X grantees to provide coordinated care.  It would force many health care providers to leave the Title X program, which would cause many health care centers to close, depriving many patients of access to needed services, and driving patients to seek care, often after costly delays, with local government providers of last resort, like Plaintiff.  HHS has failed to properly account for these and other costs of the rule.  Moreover, misuse of

Title X funds is—as the Final Rule itself concedes—a nonexistent problem.  The costs of the

unjustified Separation Requirement thus vastly outweigh any potential benefit.

215.    Because Defendants' actions are "arbitrary and capricious," "an abuse of

discretion," and in excess of statutory authority and short of statutory right, Defendants have

violated the Administrative Procedure Act.

216.    Absent declaratory and injunctive relief, the Defendants' violations will cause

ongoing harm to Plaintiff.

<div align="center">

**COUNT VIII**
**VIOLATION OF APA—ARBITRARY AND CAPRICIOUS—**
**OBJECTIVELY UNREASONABLE**

</div>

217.    Plaintiff re-alleges each and every allegation in paragraphs 1-216 above as if fully

set forth herein.

218.    The APA requires courts to "hold unlawful and set aside" agency action that is

"arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  Where an agency considers factors it was not

entitled to consider, or fails to consider factors it was required to consider, or where the rule is

contrary to the weight of the evidence and reasonable minds could not differ on the questions

involved, the agency action must be struck down.

219.    The Final Rule is arbitrary and capricious in numerous respects.  It reverses the

Department's longstanding policies and interpretations of Title X with no evidentiary basis or

cogent rationale, requires deviation from evidence-backed standards of care and medical ethical

and fiduciary obligations, needlessly jeopardizes patients' lives, health, and well-being,

disregards and/or is contrary to evidence before the agency, ignores many important aspects of

the problem and the significant new problems it will create, relies on factors Congress did not

intend the agency to consider, and is illogical and counterproductive.  HHS also adds a new,

unsupported and illogical rationale for the Final Rule's mandatory prenatal care referral

requirement without having given the public notice or an opportunity to comment on this new rationale.

220.    In issuing the Final Rule, Defendants ignored impacts of the Rule as a whole that were raised by commenters in public comments.  Defendants' explanation for their decision "runs counter to the evidence before the agency"; it is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983).  Indeed, Defendants ignored evidence that the impact of the Rule would undermine the very purpose of the Title X statute.

221.    By promulgating the Final Rule, Defendants have acted arbitrarily and capriciously and have abused their discretion.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid.

## COUNT IX
## VIOLATION OF APA—WITHOUT OBSERVANCE OF
## PROCEDURE REQUIRED BY LAW

222.    Plaintiff re-alleges each and every allegation in paragraphs 1-221 above as if fully set forth herein.

223.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

224.    The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ."  5 U.S.C. § 553(c); *see also id.* § 553(b).

225.    The regulations as drafted must be set aside as in violation of 5 U.S.C. § 706(2)(D).  The Final Rule is a substantive, legislative regulation.

226.    Such regulations adopted without the notice-and-comment procedure required by 5 U.S.C. § 553 of the APA are invalid.  *See* 5 U.S.C. § 706(2)(D).  HHS has expressly waived

any exemption from Section 553's notice-and-comment rulemaking requirements pursuant to 5 U.S.C. § 553(a)(2).

227.    In addition, Executive Order 12866, Executive Order 13563, and guidance from the White House Office of Management and Budget require that agencies quantify the costs and benefits of their proposed regulations wherever possible.  *See* Exec. Order 12,866 at §§ 1(a), 1(b)(6), 6(a)(3)(C), *Regulatory Planning and Review*, 58 Fed. Reg. 51,735 (Oct. 4, 1993); White House Office of Mgmt. & Budget, Circular A-4 at 18-27 (Sept. 17, 2003); Exec. Order 13,563 at § 1, *Improving Regulation and Regulatory Review*, 76 Fed. Reg. 3,821 (Jan. 21, 2011) ("[E]ach agency is directed to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible.").

228.    The regulatory impact analysis in the Proposed Rule did not sufficiently identify and quantify the costs and benefits of the rulemaking, evading the APA's critical procedural protections that ensure agency regulations are tested through exposure to public comment, and denying affected parties an opportunity to present comment and evidence to support their positions, in violation of 5 U.S.C. § 706(2)(D).

229.    In addition, under the Final Rule, nondirective pregnancy counseling is restricted to that provided only by "physicians or advanced practice providers."  84 Fed. Reg. at 7,789. The Proposed Rule did not disclose that the Department was considering this restrictive ban on nondirective pregnancy counseling, depriving affected parties an opportunity to present comment and evidence opposing this ban.  Because this restriction is not a logical outgrowth of the HHS's Proposed Rule, it was adopted without conforming to procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

230.   HHS adopted the Final Rule without following the process required for notice-and-comment rulemaking concerning its new speaker-based ban on "nondirective pregnancy" counseling.

231.   The Final Rule should be held unlawful and set aside under the APA, 5 U.S.C. §§ 553, 706(2)(D).

## COUNT X
## VIOLATION OF APA—CONTRARY TO CONSTITUTIONAL RIGHT—UNCONSTITUTIONALLY VAGUE

232.   Plaintiff re-alleges each and every allegation in paragraphs 1-231 above as if fully set forth herein.

233.   A court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Final Rule exceeds Defendants' power under the U.S. Constitution because several of its provisions are unconstitutionally vague under the First and Fifth Amendments.

234.   Central standards for the Final Rule's requirements are vague, subjective, and otherwise uncertain, and therefore give the entities regulated by them insufficient guidance and invite inconsistent or biased enforcement by HHS. These include Sections 59.5, 59.7, 59.13 through 59.16, 59.17, 59.18, and 59.19. *See* 84 Fed. Reg. at 7,787-91.

235.   Because current Title X grantees and subrecipients cannot receive ongoing funding under their current grants or be eligible to apply for future competitive funding unless they fully comply with these uncertain standards, and because Title X grantees might be required to pay back funding if they are found to have violated these standards, the Final Rule's vagueness will cause them to self-censor and attempt to strip their Title X projects and the organizations in those projects—including their activities undertaken outside the Title X

program—of any speech, association, or conduct that could conceivably be seen by HHS as running afoul of these ambiguous provisions.

228. By subjecting Plaintiff, its subgrantees and their employee clinicians currently funded by Title X to unduly vague standards in order to continue to receive funds, and establishing eligibility for the current Title X grantees' future funding on vague and subjective grounds, the Final Rule violates the First and Fifth Amendments to the U.S. Constitution.

236.   The Final Rule should be held unlawful and set aside under the APA, 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for the following relief as to all counts:

a.     Declare that the Final Rule is contrary to law, contrary to constitutional right, arbitrary and capricious, and invalid;

b.     Set aside and vacate the Final Rule;

c.     Issue preliminary and permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the Final Rule, by enjoining Defendants, their agents, employees, appointees, or successors, from enforcing, threatening to enforce, or otherwise applying the provisions of the Final Rule against Plaintiff and its subgrantees;

d.     Award Plaintiff reasonable attorneys' fees and costs in pursuing this action under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.     Grant such other or further relief as the Court deems proper.

Dated:  April 12, 2019

By:  */s/ Andre M. Davis*
Andre M. Davis #00362
*City Solicitor*

Suzanne Sangree #26130
*Senior Counsel for Public Safety &*
*    Director of Affirmative Litigation*

CITY OF BALTIMORE
    DEPARTMENT OF LAW
City Hall, Room 109
100 N. Holliday Street
Baltimore, MD 21202
443-388-2190
andre.davis@baltimorecity.gov
suzanne.sangree2@baltimorecity.gov

Priscilla J. Smith (*pro hac vice*
    forthcoming)
Faren M. Tang (*pro hac vice* forthcoming)
REPRODUCTIVE RIGHTS &
    JUSTICE PROJECT
YALE LAW SCHOOL
319 Sterling Place
Brooklyn, NY 11238
priscilla.smith@ylsclinics.org
127 Wall Street
New Haven, CT
faren.tang@ylsclinics.org

Stephanie Toti (*pro hac vice* forthcoming)
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
646-490-1083
stoti@lawyeringproject.org

Respectfully submitted,

**ARNOLD & PORTER**
**    KAYE SCHOLER LLP**

Andrew T. Tutt (*pro hac vice* forthcoming)
Drew A. Harker (*pro hac vice* forthcoming)
Allyson Himelfarb #13929
Kevin M. Toomey (*pro hac vice* forthcoming)
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
andrew.tutt@arnoldporter.com
drew.harker@arnoldporter.com
allyson.himelfarb@arnoldporter.com
kevin.toomey@arnoldporter.com

Marisa A. White (*pro hac vice* forthcoming)
ARNOLD & PORTER
    KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
marisa.white@arnoldporter.com

*Counsel for Mayor and City Council of Baltimore*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendants in accordance with

Fed. R. Civ. P. 4.

*/s/ Allyson Himelfarb*
Allyson Himelfarb
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
allyson.himelfarb@arnoldporter.com