**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, |  |
| *Plaintiff*, |  |
| v. | Case No. 1:19-cv-01103 |
| ALEX M. AZAR II, in his official capacity as the Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; DIANE FOLEY, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; OFFICE OF POPULATION AFFAIRS, |  |
| *Defendants*. |  |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION .....................................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

I.   The Title X Program .........................................................................................................3

    A.  Title X Mandates Nondirective Counseling and NonInterference with Medical Communications, Requires that Services Be Voluntary, and Allows Sharing of Facilities .......................................................................................5

    B.  Baltimore City's Title X Program ...............................................................................7

    C.  HHS's New Rule ........................................................................................................8

        1.  The Gag Rule .....................................................................................................9

        2.  Separation Requirement ...................................................................................12

        3.  The Adolescent Health Restrictions .................................................................14

LEGAL STANDARD ..............................................................................................................14

ARGUMENT .........................................................................................................................15

I.   Plaintiffs are Likely to Succeed on the Merits of Their APA Claims. ..................................15

    A.  The Rule Must Be Set Aside As Not in Accordance with Law. .....................................15

        1.  The ACA Non-Interference Mandate .................................................................15

        2.  Congress's Nondirective Mandate .....................................................................19

        3.  Title X's Voluntariness Requirement .................................................................21

    B.  The Rule is Arbitrary and Capricious. ........................................................................21

    C.  The Rule Is Unconstitutionally Vague. .......................................................................29

II.  Plaintiffs Will Suffer Irreparable Injury Absent an Injunction ...........................................30

    A.  Baltimore Will Suffer Irreparable Harm If It Withdraws from Title X ...........................30

    B.  Baltimore Will Suffer Irreparable Harm If It Complies with the Unlawful Final Rule .........................................................................................................................33

    C.  Baltimore Will Suffer Irreparable Harm Because the Unlawful Final Rule Will Cause Other Providers To Withdraw From the Program .........................................33

III. The Balance of Equities and the Public Interest Favor an Injunction. ..................................34

IV. Relief Requested ...........................................................................................................35

CONCLUSION .......................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action NC v. Strach*,
    216 F. Supp. 3d 597 (M.D.N.C. 2016)................................................................33

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    429 F.3d 1136 (D.C. Cir. 2005)..................................................................19

*Air Transport Ass'n of America v. Nat'l Mediation Board*,
    663 F.3d 476 (D.C. Cir. 2011)..................................................................29

*Allentown Mack Sales & Service, Inc. v. NLRB*,
    522 U.S. 359 (1998)..................................................................15

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
    563 F.3d 847 (9th Cir. 2009)..................................................................31

*Chamber of Commerce v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010)..................................................................31

*Ctr. for Sustainable Econ. v. Jewell*,
    779 F.3d 588 (D.C. Cir. 2015)..................................................................18

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
    707 F.3d 462 (4th Cir. 2013)..................................................................27

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)..................................................................24, 26

*Ergon-W. Virginia, Inc. v. United States Envtl. Prot. Agency*,
    896 F.3d 600 (4th Cir. 2018)..................................................................21

*FCC v. Fox Tel. Stations, Inc.*,
    556 U.S. 502 (2009)..................................................................25, 26, 29, 30

*FDIC v. Meyer*,
    510 U.S. 471 (1994)..................................................................31

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..................................................................18

*Iowa Utils. Bd. v. F.C.C.*,
    109 F.3d 418 (8th Cir. 1996)..................................................................31

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .............................................................................14

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)................................................................................34

*Mfrs. Ry. Co. v. Surface Transp. Bd.*,
676 F.3d 1094 (D.C. Cir. 2012)..........................................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ..................................................................... 15, 21, 22, 28

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
915 F.3d 197 (4th Cir. 2019) .........................................................................30, 31

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ...............................................................................33

*National Fed'n of Indep. Bus. v. Perez*,
2016 WL 3766121 (N.D. Tex. June 27, 2016) ...................................................26

*Natural Res. Def. Council, Inc. v. EPA*,
859 F.2d 156 (D.C. Cir. 1988) ...........................................................................26

*Nken v. Holder*,
556 U.S. 418 (2009) ...........................................................................................34

*North Carolina State Conference of the NAACP v. North Carolina State Board of Elections*,
No. 16-cv-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ..........................33

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
715 F.3d 1268 (11th Cir. 2013)..........................................................................31

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ...............................................................30, 32, 34

*Planned Parenthood of Central North Carolina v. Cansler*,
804 F. Supp. 2d 482 (M.D.N.C. 2011).........................................................31, 32

*Planned Parenthood of Ind. v. Comm'r*,
699 F.3d 962 (7th Cir. 2012) .............................................................................32

*Red Lion Broad. Co. v. F.C.C.*,
395 U.S. 367 (1969) ...........................................................................................18

*Richmond Med. Ctr. for Women v. Gilmore*,
   11 F. Supp. 2d 795 (E.D. Va. 1998) ...................................................................... 33

*Robertson v. Seattle Audubon Soc'y*,
   503 U.S. 429 (1992) ............................................................................................. 19

*Rust v. Sullivan*,
   500 U.S. 173 (1992) ................................................................................. 5, 6, 18

*Senior Executives Ass'n v. United States*,
   891 F. Supp. 2d 745 (D. Md. 2012) ..................................................................... 31

*Sierra Club v. EPA*,
   671 F.3d (9th Cir. 2012) ...................................................................................... 27

*Smoking Everywhere, Inc. v. FDA*,
   680 F. Supp. 2d 62 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*,
   627 F.3d 891 (D.C. Cir. 2010) ............................................................................. 31

*St. Marys Cement v. U.S. E.P.A.*,
   782 F.3d 280 (6th Cir. 2015) ............................................................................... 19

*Temple Univ. v. White*,
   F.2d 201 (3d Cir. 1991) ....................................................................................... 31

*Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017) ........................................................................................ 34

*Turlock Irrigation Dist. v. FERC*,
   903 F.3d 862 (9th Cir. 2018) ............................................................................... 15

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ............................................................................. 33

*Winter v. Nat. Res. Defense Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................................... 14, 30

## <u>Statutes</u>

5 U.S.C. § 705 ...................................................................................................... 35

5 U.S.C. § 706 ...................................................................................................... 15

42 U.S.C. §§ 300 *et seq.* ..................................................................................... 2, 3

42 U.S.C. § 300(a) .................................................................................................. 7

42 U.S.C. § 300a-5 ...................................................................................... 2, 7, 15, 21

42 U.S.C. § 300a-6 ...................................................................................................*passim*

42 U.S.C. § 18114 ....................................................................................................*passim*

Continuing Appropriations Act, 2019, Pub. L. 115–245,
    132 Stat. 2981 (2018) ............................................................................... 7, 15, 19

Family Planning Services & Population Research Act of 1970,
    Pub. L. No. 91-572, 84 Stat. 1504 § 2 (1970) ...................................... 2, 7, 15, 21

Md, Code Ann. Health-Gen. § 20-102(c) ...................................................................14

Public Health Service Act ("PHSA"), 84 Stat. 1506 ...............................................3, 5

**Rules and Regulations**

42 C.F.R. § 59.2 .........................................................................................................11

42 C.F.R. §§ 59.3-4 ......................................................................................................3

42 C.F.R. § 59.5 ...........................................................................................................6

42 C.F.R. § 59.9 .........................................................................................................25

42 C.F.R. § 59.14 .......................................................................................................11

*Compliance With Statutory Program Integrity Requirements,*
    83 Fed. Reg. 25,502 (June 1, 2018) ............................................................................9

*Compliance With Statutory Program Integrity Requirements,*
    84 Fed. Reg. 7714 (Mar. 4, 2019) ................................................................*passim*

*Statutory Prohibition on Use of Appropriated Funds In Programs Where Abortion
    Is a Method of Family Planning; Standard of Compliance for Family Plan-
    ning Services Projects*, 53 Fed. Reg. 2,922 (Feb. 2, 1988) .....................................5

*Standards of Compliance for Abortion-Related Services in Family Planning
    Service Projects*, 58 Fed. Reg. 7462 (Feb. 5, 1993).................................................5

*Standards of Compliance for Abortion-Related Services in Family Planning
    Services Projects*, 65 Fed. Reg. 41270 (July 3, 2000) ..................................*passim*

**Comments on the Proposed Rule**

American Civil Liberties Union ("ACLU") Comment Ltr. (July 31, 2018)
    https://www.regulations.gov/document?D=HHS-OS-2018-0008-190184 ...........................27

Baltimore City Health Department Ltr. (July 30, 2018),
    https://www.regulations.gov/document?D=HHS-OS-2018-0008-161578 .......... 22, 23, 24, 28

Baltimore City Health Department Officers Ltr. (July 30, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-161769 .......... 22, 24, 27, 28

Brindis, Claire, Comment Ltr. (July 31, 2018)
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-204364 ................ 22, 23, 24

Center on Budget and Policy Priorities Comment Ltr. (July 31, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-177696 ............................19

Guttmacher Institute Comment Ltr. (July 31, 2018)
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-178129 ..................... 22, 23

Letter from Frances G. Padilla, President, Universal Health Care Foundation of
  Connecticut, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July
  31, 2018),
   https://www.regulations.gov/document?D=HHS-OS-2018-0008-188772 ...........................18

Letter from James L. Madara, CEO & Exec. Vice President, Am. Med. Ass'n, to
  Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-179739 .......9, 16, 23, 24, 28

Letter from Lisa M. Hollier, President, Am. Coll. of Obstetricians & Gynecol-
  ogists, to Alex Azar, Sec'y , U.S. Dep't of Health & Human Servs.
  (July 31, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-179339 ........................9, 18

Letter from Ana María López, President, Am. Coll. of Physicians, to Alex Azar,
  Sec'y , U.S. Dep't of Health & Human Servs. (July 31, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-184400 ..............................9

Letter from John Meigs, Jr., Bd. Chair, Am. Acad. of Family Physicians, to Alex
  Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-102966 ..............................9

Letter from Karen S. Cox, President, Am. Acad. of Nursing, to Alex Azar, Sec'y,
  U.S. Dep't of Health & Human Servs. (July 26, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-106624 ........................9, 18

Letter from Colleen A. Kraft, President, Am. Acad. of Pediatrics, and Deborah
  Christie, President, Soc'y for Adol. Health & Med., to Alex Azar, Sec'y, U.S.
  Dep't of Health & Human Servs. (July 31, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-181588 ..............................9

National Family Planning & Reproductive Health Association ("NFPHRA")
  Comment Ltr. (July 31, 2018),
  https://www.regulations.gov/document?D=HHS-OS-2018-0008-192227 .....22, 23, 24, 27, 28

New York Abortion Access Fund Comment Ltr. (July 31, 2018),
    https://www.regulations.gov/document?D=HHS-OS-2018-0008-198615 ...........................19

New York State Department of Health Comment Ltr. (July 30, 2018)
    https://www.regulations.gov/document?D=HHS-OS-2018-0008-155772 ............................9

Planned Parenthood ("PPFA") Comment Ltr. (July 31, 2018)
    https://www.regulations.gov/document?D=HHS-OS-2018-0008-198841 ............................9

Puttmann, Mary, Comment (July 31, 2018),
    https://www.regulations.gov/document?D=HHS-OS-2018-0008-30266 ............................18

Ryan Health Comment Ltr. (July 31, 2018)
    https://www.regulations.gov/document?D=HHS-OS-2018-0008-183710 ...........................23

## INTRODUCTION

The City of Baltimore is on the verge of a public health crisis. Only a preliminary injunction from this Court can prevent irreparable harm to the City, its physicians, its residents, and all those who rely on its health system. In three weeks, on May 3, 2019, many of the provisions of a new HHS Final Rule—Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714 (Mar. 4, 2019) ("Final Rule" or "Rule")—take effect. The Final Rule fundamentally alters the grant conditions that attach to grant awards in the "Title X program"—a 50-year-old program that provides pre-pregnancy reproductive health services to four million low income women nationwide. In Baltimore alone, approximately 16,000 women obtain critical reproductive health care from Title X providers each year.

Baltimore is a recipient of Title X funds, and provides Title X services to thousands of its residents and others through direct services and subgrantees. Baltimore also benefits greatly from Title X services provided by Planned Parenthood and other providers that participate in the program as well. Title X centers serve as the final safety net for a third of women in Baltimore who are in need of publicly funded contraceptive services. Those women represent some of the most vulnerable segments of the population, including teens, immigrants and refugees, those struggling with substance abuse, and members of the incarcerated population. The new rule imposes new restrictions so draconian that Baltimore and numerous other Title X providers will be forced to leave the Title X program should they take effect. Two are especially critical.

First, the Final Rule imposes a "Gag Rule" on medical providers who participate in the Title X program. The Rule bars certain medical providers from discussing abortion at all, and places severe limitations on the abortion counseling and "referrals," and compels negative counseling about abortion, by the providers who are allowed to discuss abortion. These speech restrictions apply (1) even if the abortion services would be offered by another provider outside

the Title X program, (2) even if the patient asks directly about where and how to get an abortion, and (3) even if abortion is clinically indicated. Second, the Final Rule imposes a "Separation Requirement" mandating a physical and financial "separation" between a clinic's "prohibited services" and Title X services so needlessly strict that it appears aimed chiefly at forcing Planned Parenthood and other longtime reproductive health providers, like the Baltimore City Health Department out of the Title X program—effectively eliminating access to Title X for tens of thousands of women. The "prohibited services" that must be separate include not just abortions, but also the full and accurate information about a woman's pregnancy options and abortion referrals that are now barred under the program.

The Final Rule is unlawful. It violates three direct limits on HHS's authority contained in federal law: the nondirective mandate rider in HHS's annual appropriations statute, the non-interference mandate in the Affordable Care Act, 42 U.S.C. § 18114 (2012), and the requirement in Title X itself that services be voluntary and not coercive. *See* Family Planning Services & Population Research Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504 § 2 (1970) (codified as amended at 42 U.S.C. §§ 300 et seq. (1991 & Supp. 2000)); 42 U.S.C. § 300a-5.

The Final Rule is also arbitrary and capricious because HHS has no reasonable justification (1) for forcing physicians to withhold vital medical information from their patients, in violation of basic medical ethics, (2) for imposing an extreme physical and financial separation requirement when there is no commingling-of-funds problem for the separation requirement to solve. The Final Rule is especially unreasonable where, as here, it directly contravenes HHS's own factual conclusions about the efficacy of a Gag Rule and Separation Requirement in its 2000 rulemaking, but does not engage in any meaningful way with those prior factual determinations.

This is a textbook case for a preliminary injunction. Baltimore has a strong likelihood of success on the merits, and stands to suffer irreparable harm. If the Final Rule takes effect, Baltimore and countless other Title X providers will be forced to withdraw from the program; Baltimore will lose funds it can never recover; physicians it works with will lose patient relationships they can never recover; and women around Baltimore will experiencing life-endangering health complications. Even if Baltimore stayed in the Title X program, Baltimore's harms will be nearly as great and just as irreparable.

This case cries out for preliminary relief. The existing Title X regulations have worked without incident for nearly half a century. Plaintiff respectfully requests that the Court enter a preliminary injunction as soon as possible to prevent the Rule from taking effect.

## FACTUAL BACKGROUND

### I.    The Title X Program

Fifty years ago, in 1970, Congress created Title X, the only federal program specifically dedicated to funding family planning services. Public Health Service Act ("PHSA"), 84 Stat. 1506, *as amended* 42 U.S.C. §§ 300 to 300a-6. Title X grant money is provided in a lump sum and may be used both to cover the costs of family planning care for the un- or under-insured and to pay for non-service costs like purchasing contraceptives or training staff. *Id.* § 300. Title X funds may not be used to pay for abortion services. *Id.* § 300a-6.

Title X is a competitive grant program, meaning that eligible entities must apply to the Office of Population Affairs ("OPA") in the Department of Health and Human Services ("HHS") to be awarded funds. 42 C.F.R. §§ 59.3-4. There are currently 3,858 sites across the country serving over four million patients. Declaration of Dr. Martha J. Bailey ("Bailey Decl.") ¶¶ 27-28. Site operators include government health departments like the Baltimore City Health Department, hospitals, Planned Parenthood health centers, federally qualified health centers

3

("FQHCs"), and other private non-profit organizations. For over 60% of Title X patients, Title X providers are their only regular source of health care and health education. *Id.* ¶ 27 & n.38.

Title X programs provide quality sexual and reproductive healthcare, including contraceptive supplies and information, to all who need them on a voluntary and confidential basis, with priority given to individuals with low income. Declaration of Dr. Kathryn Kost ("Kost Decl.") ¶ 30. In addition to offering a broad range of effective contraceptive methods, Title X-funded clinics provide contraceptive education and counseling; breast and cervical cancer screening; testing, referral, and prevention education for sexually transmitted infections/diseases (STIs/STDs), including human immunodeficiency virus (HIV), pregnancy diagnosis and counseling. Kost Decl. ¶¶ 15, 52-58. Women prefer Title X-funded clinics over other health care outlets. Bailey Decl. ¶¶ 47-50. These sites offer more effective types of contraception, better contraceptive counseling, provide a greater variety of services on site, and have better appointment availability. *Id.* ¶¶ 36-45.

Government investment in contraception promotes public health. For every dollar invested in publicly funded family planning programs like Title X, federal and state governments saved an estimated $7.09 in 2010 in Medicaid-related costs that would otherwise have been associated with unintended pregnancies as well higher rates of adverse birth effects, STIs, and cervical cancer. Declaration of Dr. Claire D. Brindis ("Brindis Decl.") ¶ 49; Kost Decl. ¶ 66.; Bailey Decl. ¶ 54. One study estimated that in 2015 Title X-funded contraception helped avoid 822,300 unintended pregnancies, which would have resulted in 387,000 unplanned births and 278,000 abortions. Bailey Decl. ¶ 52. The benefits in Baltimore are enormous. Access to contraceptive services benefits women in particular, enabling more women to pursue additional education, helping narrow the gender wage gap. Kost Decl. ¶¶ 62-65.

**A. Title X Mandates Nondirective Counseling and NonInterference with Medical Communications, Requires that Services Be Voluntary, and Allows Sharing of Facilities**

With only one brief and controversial exception thirty years ago, the regulations governing Title X have always allowed Title X projects to share facilities with abortion providers and have consistently required Title X providers to offer "nondirective" options counseling to pregnant women and referrals for abortion services upon request. *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270, 41,272-73 (July 3, 2000) (formalizing these requirements). "Nondirective counseling" is patient-directed counseling that presents neutral and unbiased information regarding options relevant to the patient and consistent with the patient's expressed wishes, including in the context of pregnancy, prenatal care, adoption, and abortion. Declaration of Dr. Matthew Wynia ("Wynia Decl.") ¶ 13; Declaration of Dr. Cynthia Mobley ("Mobley Decl.") ¶¶ 18-19.

In 1988, HHS issued a rule banning abortion options counseling and referral and mandating strict separation between a recipient's Title X programs and any abortion-related services. Statutory Prohibition on Use of Appropriated Funds In Programs Where Abortion Is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects, 53 Fed. Reg. 2,922 (Feb. 2, 1988). HHS justified the Rule under § 1008 of the PHSA, which prohibits Title X funds from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. The 1988 Rule was initially enjoined, but the United States Supreme Court held that HHS could permissibly interpret § 1008 of the PHSA to support the regulations. *Rust v. Sullivan*, 500 U.S. 173, 186, 191 (1992). Despite the *Rust* decision, the 1988 rule was never fully implemented, and was ultimately short-lived. After a series of injunctions and a partial rollback in 1991, HHS completely rescinded the rules in 1993, concluding that they "inappropriately restrict[ed] grantees." 58 Fed. Reg. 7,462, 7,462 (Feb. 5, 1993). Since then,

5

Congress has passed laws resolving the ambiguity that led the *Rust* Court to uphold gag and separation rules.

In 2000, HHS issued regulations protecting women's access to comprehensive and accurate information about their reproductive choices without violating the prohibition on Title X funding in "programs where abortion is a method of family planning," 42 U.S.C. § 300a-6; *see* 65 Fed. Reg. 41,281. Pursuant to those rules, each Title X project had to "provide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including infertility services and services for adolescents)." 42 C.F.R. § 59.5 (2000). Title X family planning grantees have been required to "[o]ffer pregnant women the opportunity to be provided with information and counseling regarding ... [p]regnancy termination," and "provide neutral, factual information and nondirective counseling" if she requests it. *Id.* at § 59.5(a)(5)(i-ii). HHS permitted shared facilities that both host Title X programs and provide for abortion services "so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities," and costs of common waiting rooms, staff, and filing systems were to be properly pro-rated or allocated between Title X projects and other programs. 65 Fed. Reg. 41,282. When a woman became pregnant, under the previous program rules, Title X providers referred all pregnant patients to high-quality, non-Title X programs to handle their pregnancy-related needs, including prenatal care or abortion-related services depending on the woman's choice.

The Title X statute authorizes the Secretary to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services,

and services for adolescents).'' 42 U.S.C. § 300(a). Congress's express purposes demonstrate that lawmakers intended to make the program available, effective, coordinated, and research based: Pub. L. No. 91-572, 84 Stat. 1504 § 2 (1970). Moreover, all Title X services "shall be voluntary." *Id.* § 300a-5.

In 2018, as in every year since 1996, alongside the statement that "amounts provided to [Title X] projects . . . shall not be expended for abortions," Congress has included language in its Title X appropriations bill that emphasizes that "all pregnancy counseling shall be nondirective" (Nondirective Mandate). *See, e.g.*, Continuing Appropriations Act, 2019, Pub. L. 115–245, 132 Stat. 2981, 3070–71 (2018); *see also* 65 Fed. Reg. 41,272-73.

Additionally, in 2010, Congress amended the Public Health and Welfare Act to prevent HHS from interfering in provider-patient communications. Section 1554 of the Patient Protection and Affordable Care Act ("ACA"), codified at 42 U.S.C. § 18114 (2012) ("Non-Interference Mandate"), reads:

> Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114.

## B. Baltimore City's Title X Program

Baltimore City has participated in the Title X program since its inception. The Baltimore City Health Department currently receives $1,430,000 annually in funding subject to Title X

rules through subgrants from the Maryland Department of Health. It directly operates three community clinics and four school-based health centers that provide Title X services, and provides funding to ten additional subgrantees in the city. Planned Parenthood operates additional Title X sites with Baltimore. Declaration of Charlotte Hager ("Hager Decl.") ¶ 5. The Title X program serves as the final safety net for healthcare for one third (1/3) of women living in Baltimore. In 2017, 16,000 patients in Baltimore received care through Title X clinics, including 7,670 patients at clinics with funding overseen by Baltimore City. 99.8% of these patients had incomes at or below 250% of the federal poverty line, and 86% had incomes at or below the line. *Id.* ¶ 7.

The services provided by Baltimore's existing network of qualified Title X providers have a significant, positive impact on family health and well-being, and by extension public health generally. Title X-provided contraceptive services have resulted in lower unintended pregnancy and abortion rates across the United States. Kost Decl. ¶ 35. Baltimore in particular has used Title X funding in its public health efforts, including a 55% reduction in teen pregnancy over the last ten years. Hager Decl. ¶ 11. Baltimore relies on the Title X funding to reduce unintended pregnancy, treat and reduce the spread of sexually transmitted infections, screen for breast and cervical cancer, and ensure healthcare access for its most vulnerable residents. Mobley Decl. ¶ 17. Title X providers in Baltimore work especially hard to earn the trust of their patients who distrust and fear medical institutions. *Id.* ¶ 43.

### C. HHS's New Rule

On May 22, 2018, HHS released a notice of proposed rulemaking ("Proposed Rule"), reversing its longstanding policy and largely reinstating the 1988 Rule, including provisions that severely limited and in many circumstances barred Title X recipients from providing their patients with necessary referral and counseling for abortion services, and provisions that required

strict physical separation between abortion services and Title X services. *Compliance With Statutory Program Integrity Requirements*, 83 Fed. Reg. 25,502 (June 1, 2018) (Proposed Rule). Among many other organizations opposing the Proposed Rule, most major medical associations—including the American Medical Association, the American College of Obstetricians and Gynecologists, the American College of Physicians, the American Academy of Family Physicians, the American Academy of Nursing, and the American Academy of Pediatrics—submitted comments in opposition.[1] Nonetheless, HHS published the final regulations in largely identical form ("Final Rule"). *Compliance With Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019) (*to be codified at* 42 C.F.R. pt. 59) (Final Rule). Most of the Rule, including its gag provisions, goes into effect on May 3, 2019. Compliance with the separation requirement is required by March 4, 2020. *Id.* at 7714.

### 1. The Gag Rule

The Final Rule imposes broad restrictions on what health care providers under the Title X program may inform pregnant patients. The Rule states that "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 84 Fed. Reg. 7,788 (to be codified at 42 C.F.R. §§ 59.5(a)(5), 59.14(a) (abortion-referral ban)). To meet this requirement,

---

[1] Letter from James L. Madara, CEO & Exec. Vice President, Am. Med. Ass'n, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018); Letter from Lisa M. Hollier, President, Am. Coll. of Obstetricians & Gynecologists, to Alex Azar, Sec'y , U.S. Dep't of Health & Human Servs. (July 31, 2018); Letter from Ana María López, President, Am. Coll. of Physicians, to Alex Azar, Sec'y , U.S. Dep't of Health & Human Servs. (July 31, 2018) Letter from John Meigs, Jr., Bd. Chair, Am. Acad. of Family Physicians, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018); Letter from Karen S. Cox, President, Am. Acad. of Nursing, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 26, 2018); Letter from Colleen A. Kraft, President, Am. Acad. of Pediatrics, and Deborah Christie, President, Soc'y for Adol. Health & Med., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018). Hyperlinks to comments are available in the Table of Authorities, *supra*.

the Rule provides that Title X grantees may not provide any information about abortion providers, identified as such, to a patient. *Id.*

At most, The Title X providers may offer a patient asking where she can receive an abortion a list of "comprehensive primary health care providers," "some, but not the majority" of which may "also provide abortion." *Id.* at 7789. The list cannot identify which providers actually provide the abortion services she is requesting. Moreover, the project staff are prohibited from answering even a direct inquiry about which providers provide abortion. *Id.* Moreover, because the list is limited to "comprehensive primary health care providers," specialized reproductive health care providers are excluded. In Baltimore, six of the nine providers to whom patients are routinely referred for abortions are specialized reproductive health care providers, who therefore cannot be included on the list. Mobley Decl. ¶ 60.

Withholding information about the most appropriate and accessible abortion providers will have devastating consequences for Baltimore women. For example, a medication abortion from a specialized reproductive healthcare provider can cost as little as $400, while an abortion at a "comprehensive primary health care provider" like Johns Hopkins can cost *nearly ten times as much*: $3,500 for an abortion with a deposit of $1500. *Id.* For the 86% of Baltimore Title X patients below the federal poverty line, this cost is prohibitive: it is more than *one quarter* of the annual income of such a patient in a single-person household. Because medication abortion is available only very early in pregnancy, women who are delayed by the incomplete and misleading referral list may lose access to this often-preferred and far more affordable option. *Id.* ¶¶ 57-60. The few abortion providers permitted on the list also serve a much narrower geographic region than the current referral list, and some patients will face transportation barriers in getting to those providers. *Id.* ¶ 59.

10

At the same time, Title X providers *must* provide all pregnant patients with a referral for prenatal care, regardless of the patients' wishes, on the grounds that prenatal referrals are "medically necessary." 84 Fed. Reg. 7,789 (to be codified at 42 C.F.R. § 59.14(b)(1) (prenatal referral mandate)). The provider must furthermore counsel a patient seeking an abortion on options she does not wish to pursue, while at the same time delivering the state's message about the "risks and side effects [of abortion] to both [her] and unborn child." *Id.* at 7,747; *see id.* ("abortion must not be the only option presented").

In fact, only "physicians or advanced practice providers" may provide what HHS misleadingly calls "nondirective" "pregnancy counseling." *Id.* at 7,789 (to be codified at 42 C.F.R. § 59.14(b)(1)(i)). The Final Rule defines an "advanced practice provider" ("APP") as "a medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients." *Id.* at 7,787 (to be codified at 42 C.F.R. § 59.2). Meanwhile, medical providers that fall outside the Rule's narrow definition of APP are entirely prohibited from speaking the word "abortion." This means that the qualified registered nurses in Baltimore who currently provide pregnancy counseling to patients, including on days when an APP is not immediately available, will be gagged from discussing pregnancy options at all. Mobley Decl. ¶ 63. When asked direct questions by their patients, these providers will have to withhold accurate, medically relevant information.

These biased "counseling" requirements will do irreparable damage to provider-patient relationships and trust in the medical system in Baltimore, which in turn will deter patients from seeking needed care. *See Id.* ¶¶ 46-49. The risk of harm is especially acute in the Title X patient population in Baltimore: many of those patients have a well-founded distrust of institutional

medical providers, some of which have a history of exploiting the low-income, minority communities they serve. *Id.* ¶ 43.

Finally, the rule permits Title X providers to provide substandard care. First, the Final Rule removes the requirement that Title X providers offer nondirective pregnancy options counseling if requested, and permits providers to withhold information about abortion entirely. 84 Fed. Reg. 7716-17. Second, the "referral" list for patients requesting an abortion may include no abortion providers at all. *Id.* at 7789. Finally, the Final Rule eliminates the requirement that Title X providers offer a broad range of "medically approved" family planning methods. *Id.* at 7787. A facility may, for example, now be eligible for Title X funding despite having no licensed medical providers, and offering only abstinence or adoption as "methods of family planning."

### 2. Separation Requirement

The Rule also requires that Title X activities be "physically and financially separate" (defined as having an "objective integrity and independence") from prohibited activities, such as the provision of abortion services and any referrals for abortion services that do not meet the gag rule requirements. 84 Fed. Reg. at 7789. Whether this criterion is met is to be determined through a "review of facts and circumstances," with relevant factors including but not limited to:

> (a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities; (c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and (d) The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

*Id.* The preamble notes that physical separation at a "free-standing clinic," like one of the Baltimore clinics, "might require more circumstances to be taken into account in order to satisfy

a clear separation between Title X services" and abortion referrals, because having the "same entrances, waiting rooms, signage, examination rooms, and the close proximity between Title X and impermissible services" presents "greater opportunities for confusion" than at a hospital. *Id.* at 7767. The Rule does not specify which additional circumstances would be taken into account.

The Separation Requirement will force Title X providers who do not comply with the gag rule even in their separately funded, non-Title X activities, to leave the Title X program because the Separation Requirement is unworkable and cost-prohibitive. *See* Bailey Decl. ¶¶ 57-59; Kost Decl. ¶¶ 102-09; Hager Decl. ¶ 34. The estimated cost of creating the necessary separate "treatment, consultation, examination and waiting rooms" and "office entrances and exits," 84 Fed. Reg. 7,789 (to be codified at 42 C.F.R. § 59.15(b)) exceeds $536,000 per facility. PPFA Comment 32, http://bit.ly/2Dg5UYi. Grantees like Baltimore City cannot complete such renovations because some facilities are leased and extensive structural renovations are not permitted. Other facilities are not large enough to support two separate operations. These grantees will be forced out of the program unless they can obtain new facilities, at an estimated cost exceeding $1 million each. This cost is out of reach for many grantees, including Baltimore City. *Id.* at 32-33; *see* Hager Decl. ¶ 34. On top of these prohibitive building and renovation costs, these Title X grantees would also be required to incur significant costs to establish and maintain separate health records systems, telephone systems, information technology systems, educational services, and websites, and to hire separate personnel. *See* 84 Fed. Reg. 7,789; *see also, e.g.*, Kost Decl. ¶¶ 102-104; PPFA Comment 32-33.

It is simply not feasible for government and non-profit Title X grantees, including Baltimore City to sustain such enormous costs. For many grantees, the cost of compliance will far exceed the amount of Title X funding they receive. And it will be patients—above all—who

will suffer. Those patients will have to look elsewhere for care, but as the record shows many of them will not find a place to obtain it. Many patients will likely lose access to health care altogether. *See* Hager Decl. ¶¶ 20, 23; Mobley Decl. ¶¶ 15, 20; Kost Decl. ¶¶ 113-17.

### 3. The Adolescent Health Restrictions

The Final Rule requires providers to actively "encourage family participation" in the health services provided to minors, regardless of state laws, such as Maryland's, that explicitly permit minors to consent on their own behalf to treatment for or advice about contraception, pregnancy, sexually transmitted infections, and related care. *See* Md, Code Ann. Health-Gen. § 20-102(c). . Where the provider is aware that family participation would be counter-productive or even dangerous, these inquiries will deter minors from seeking needed health care. Mobley Decl. ¶¶ 50-51. Failure to seek preventative care will in turn increase the risk of unintended pregnancy—undoing Baltimore's tremendous public health accomplishments in the reducing teen pregnancy—as well as the transmission of STDs. *Id.* ¶ 51.

## LEGAL STANDARD

First, a plaintiff seeking a preliminary injunction "must establish '(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 249 (4th Cir. 2014) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Second, the Administrative Procedure Act ("APA") requires that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). The APA also "requires that agencies engage[] in 'reasoned decisionmaking.'" *Turlock Irrigation Dist. v. FERC*, 903 F.3d 862, 873 (9th Cir. 2018)

(quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). The agency's decision-making "must be logical and rational," *Allentown Mack*, 522 U.S. at 374; it must be both "reasonable *and* reasonably explained." *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012) (Kavanaugh, J.) (emphasis added). An agency rulemaking is arbitrary and capricious if, in coming to its decision, the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)

## ARGUMENT

## I.  Plaintiffs are Likely to Succeed on the Merits of Their APA Claims.

### A.  The Rule Must Be Set Aside As Not in Accordance with Law.

The Rule violates three separate statutory provisions: the ACA Non-Interference Mandate, 42 U.S.C. § 18114, the Nondirective Mandate in the Appropriations Act, 132 Stat. at 3070-3071, and Title X itself, 42 U.S.C. § 300a-5, 84 Stat. 1504 § 2. The Final Rule must therefore be "held unlawful and set aside." 5 U.S.C. § 706(2)(A).

#### 1.  The ACA Non-Interference Mandate

The Final Rule violates every provision of the ACA Non-Interference Mandate.

*First*, the Gag Rule squarely violates at least three parts of the Non-Interference Mandate. In relevant part, the mandate bars HHS from promulgating "any regulation" that,

> (3) interferes with communications regarding a full range of treatment options between the patient and the provider. (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5)

> violates the principles of informed consent and the ethical
> standards of health care professionals;

42 U.S.C. § 18114. In direct contravention of the foregoing, the Final Rule prohibits physicians

from counseling patients about abortion. *See* 84 Fed. Reg. 7717. "The Department believes both

the referral for abortion as a method of family planning, and such abortion procedure itself, are

so linked that such a referral makes the Title X project or clinic a program one where abortion is

a method of family planning, contrary to the prohibition against the use of Title X funds in such

programs." *Id.*

At minimum, the prohibition "violates the principles of informed consent and the ethical

standards of health care professionals." 42 U.S.C. § 18114. It is for this reason—that the Final

Rule requires physicians to withhold relevant medical information from patients—that medical

groups and numerous individual physicians have decried the rule as a violation of basic medical

ethics. *See* Wynia Decl. ¶¶ 11-28; Mobley Decl. 21-24; Dzrisa Decl. ¶ 10; AMA Comment 1-3,

http://bit.ly/2Zexyyi. Maryland's own code of ethics also provides that failure to refer a patient to

an appropriate provider "could be construed as abandonment." Wynia Decl. ¶ 29.

*Second*, the Separation Requirement also violates the Non-Interference mandate. The

mandate bars HHS from promulgating "any regulation" that,

> (1) creates any unreasonable barriers to the ability of individuals
> to obtain appropriate medical care; (2) impedes timely access to
> health care services;

42 U.S.C. § 18114. But the Separation Requirement does both. The Final Rule's Separation

Requirement imposes onerous and vague "physical and financial" separation requirements on

Title X providers that engage in so-called "prohibited activities." Kost Decl. ¶ 106; Hager Decl.

¶ 34; Brindis Decl. ¶ 20; Bailey Decl. ¶ 55-63.

The Separation Requirement is almost the definition of an unreasonable barrier to appropriate medical care. HHS has not identified any actual benefits from the Separation Requirement. 84 Fed. Reg. 7765. HHS instead states that the Separation Requirement is designed to "reduce, and potentially eliminate, any confusion—actual or potential—as to" whether Title X funds are used to fund abortions, and to prevent "intentional and unintentional comingling of resources, activities, and services." *Id.* But HHS provides zero evidence to support its claims that either of those were in fact problems with the existing program (in fact, the 2000 regulation squarely stated these were *not* problems, 65 Fed. Reg. 41272). In contrast—and as HHS knew from comments on the Proposed Rule—many existing providers including Baltimore, Planned Parenthood (which serves 40% of Title X patients), and at least four states will be forced to leave the Title X program because of the Separation Requirement, thus erecting a massive barrier to access to appropriate medical care for millions of Americans. *See* PPFA Comment 15. At minimum, the withdrawal of so many Title X providers will "impede[] timely access to health care services." 42 U.S.C. § 18114(2). Moreover, these consequences will unreasonably disrupt care not just for patients who rely on Title X for free or subsidized care, but for all patients served by affected facilities—limiting the patients' information and ability to make informed decisions about their medical care, and impeding or delaying their ability to obtain an abortion.

The Non-Interference Mandate's targeted prohibition on interference controls over HHS's doubtful interpretation of the ambiguous language of § 1008. *Compare* 42 U.S.C. § 300a-6 (Title X may not fund "programs where abortion is a method of family planning"), *with* 42 U.S.C. § 18114 (HHS may not promulgate any regulation that "interferes with communications regarding a full range of treatment options between the patient and the provider"). A more specific statute governs a more general statute, and in *Rust* the Court specifically concluded that

§ 1008 is ambiguous. *See Rust*, 500 U.S. at 184; *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."). The later-in-time statute controls over the earlier-in-time statute where, as here, Congress enacted the provision to clarify ambiguity in the earlier statute. *See Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 380-81 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."). The Non-Interference Mandate does not eliminate § 1008's core limitation on using Title X funds for abortion, but it does limit its scope so that it may not be interpreted broadly enough to "interfere[] with communications" between Title X providers and patients, or require physicians to act unethically, or erect "unreasonable barriers" to access to appropriate medical care.

Commenters raised the noninterference requirement during the notice and comment process "with sufficient precision, clarity, and emphasis to give the agency a fair opportunity to address it." C*tr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 602 (D.C. Cir. 2015). Universal Health Care Foundation of Connecticut noted in its comment that "'gag rule' goes completely against the ethical standards of health care professionals, jeopardizing an open, trusting relationship with their patients." *See* UHCF Comment 1-2, http://bit.ly/2Ul3L3p. The American College of Obstetricians and Gynecologists noted that the gag rule "restricts the ability of physicians to provide clear, direct information to patients, and it even goes so far as to actively require physicians to withhold full and accurate information." ACOG Comment 5, http://bit.ly/2ZjlEDt. An individual commenter stated that the rule "puts unreasonable barriers on general providers." Mary Puttmann Comment, http://bit.ly/2Xl8Han. Numerous other commenters made similar comments. *See* AAN Comment 5, http://bit.ly/2VS2Hpi ("Removes

the guarantee that people get full and accurate information about health care from their health care providers"); NYAAF Comment 2-3, http://bit.ly/2VJantI ( "creates barriers" to accessing necessary medical care); CBPP Comment 3, http://bit.ly/2V29vDy ("oversteps the role of the federal government" by "preventing providers from providing . . . accurate medical information to their patients"). HHS is presumed to know the law it administers, especially the legal restrictions on its authority. Those comments were sufficient to raise the issue of the lawfulness of the Final Rule in light of the Non-Interference Mandate.

In any event, "presentation of issues during a rulemaking proceeding is not a jurisdictional prerequisite to judicial review," *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005) (Edwards, J.), and "[t]he validity of a nationwide rule—and the assurance that it is non-arbitrary—should not turn on the caprice of who happens to challenge it or not challenge it and what arguments are made or not made during the rulemaking process." *St. Marys Cement v. U.S. E.P.A.*, 782 F.3d 280, 288 (6th Cir. 2015) (Sutton, J.).

## 2. Congress's Nondirective Mandate

The Nondirective Mandate enacted by Congress every year since 1996 requires that pregnancy counseling by Title X projects be "nondirective." *E.g.*, Pub. L. No. 115-245, 132 Stat. 2981, 3070-3071 (2018). Congress frequently legislates through appropriations riders, *see, e.g.*, *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992), and HHS admits—as it must—that it is bound by the Mandate, *e.g.*, 84 Fed. Reg. 7,724. HHS further admits that the Mandate requires the presentation of all medically appropriate options without "suggesting or advising one option over another." *Id.* at 7,716. In HHS's own words, this mandate seeks to ensure that patients "take an active role in processing their experiences and identifying the direction of the

interaction," thereby "promot[ing] the [patient's] self-awareness and empower[ing] the [patient]
to be informed about a range of options." *Id.*

The Gag Requirement, however, would require precisely the opposite. It would force
Title X projects to steer women away from one particular option, abortion, while directing them
toward another option, carrying the pregnancy to term. It would do so by banning unencumbered
referrals for abortions while mandating referrals for prenatal care, regardless of what a patient
actually wants. *See* 84 Fed. Reg. 7789 ("Because Title X funds are intended only for family
planning, once a client served by a Title X project is medically verified as pregnant, she shall be
referred to a health care provider for medically necessary prenatal health care."). That is a
paradigmatic example of directive and coercive counseling. *See, e.g.*, Mobley Decl. ¶¶ 21-31;
Kost Decl. ¶ 91; 65 Fed. Reg. 41,275 ("requiring a referral for prenatal care . . . where the client
rejected th[at] option[] would seem coercive and inconsistent with the concerns underlying the
'nondirective' counseling requirement").

The Rule also forces providers to discuss irrelevant information a patient does not wish to
discuss. In particular, the Gag Rule warns that "abortion must not be the only option presented"
and that, in all instances, practitioners must tell pregnant patients—even those interested only in
an abortion—about the "risks and side effects to both [her] and unborn child." 84 Fed. Reg.
7,747. For a patient who is clear that she only wants an abortion, forcing a physician to instruct
her about "side effects" of an abortion to a fetus is inappropriate, irrelevant, and directive.

Finally, HHS touts that the Final Rule authorizes a so-called "list" that a practitioner may
give to patients requesting abortion. But this list is, by requirement, incomplete, misleading, and
again directive. As HHS envisions it, a Title X provider would provide this list "where a
pregnant woman asks for an abortion or an abortion referral." *Id.* at 7,761. But this list is

designed to confuse. It *must* include a majority of providers who do not provide abortion; must *not* identify which, if any, providers actually do provide abortion; must *exclude* abortion providers who do not also provide "comprehensive primary health care;" and *could* include no abortion providers whatsoever. The only apparent purpose of this scavenger-hunt form of a "list" is to direct pregnant patients away from abortion and toward continuing a pregnancy to term.

### 3. Title X's Voluntariness Requirement

For the same reasons the Gag Rule violates the Nondirective Mandate, it also violates Title X itself. The Title X statute itself requires that services be "strictly voluntary" and "never . . . coercive." *Id.* at 7,731; *see* 42 U.S.C. § 300a-5, 84 Stat. 1504 § 2. As HHS previously warned, if providers were to disregard patients' decisions about their health care and, for example, provide information that the patient does not want or need, "there would be a real question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option." 65 Fed. Reg. 41,273. By requiring physicians to make prenatal referrals and withhold abortion counseling, the Rule eliminates the ability of patients to make fully-informed "voluntary" choices about their medical care, in violation of Title X.

## B. The Rule is Arbitrary and Capricious.

The Rule is also arbitrary and capricious. HHS "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. 29, 43 (1983), and "explain[ed] its decision in a manner contrary to the evidence before it." *Ergon-W. Virginia, Inc. v. United States Envtl. Prot. Agency*, 896 F.3d 600, 613 (4th Cir. 2018).

The Gag Rule is arbitrary and capricious for multiple independent reasons. Above all, the Gag Rule is arbitrary and capricious because HHS fails to account for the fact that the Gag Requirement contravenes the ethical and professional commitments of doctors, nurses, and other health care professionals and, as a result, will force Title X providers like Baltimore to withdraw

from the program. Forcing providers like Baltimore out of the program will result in massive disruption and will inevitably hurt patients by making it more difficult for them to obtain affordable, high-quality care. *See* BCHD Comment 3-4, http://bit.ly/2Gho8JF; Brindis Comment, http://bit.ly/2VM9Uag; Kost Decl. ¶ 112. The providers that would continue to participate in Title X will be unable to absorb all of the patients of those that leave the program. *See* BCHD Comment 3; Health Officers Comment 2, http://bit.ly/2V0ES1k; Guttmacher Comment 20 http://bit.ly/2PdgLXO; Brindis Decl. ¶ 55; Kost Decl. ¶¶ 79-80, 109-112. And even if new Title X providers could somehow fill the gap—which is highly unlikely and supported by no evidence and no explanation in the Final Rule—there would be a harmful and costly disruption in care. BCHD Comment 3; Health Officers Comment 2; PPFA Comment 15-16; Guttmacher Comment 9-10; NFPRHA Comment 33, http://bit.ly/2VVVOmw.

HHS said virtually nothing about the decimation of the program caused directly by the Gag Rule. Rather, ignoring the administrative record, HHS asserted its belief that "these final rules will contribute to more clients being served, gaps in service being closed, and improved client care." 84 Fed. Reg. 7,723. That claim is not only "counter to the evidence before the agency" but is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *State Farm*, 463 U.S. at 43. HHS relied on only one single letter as evidence of the existence of providers, specifically "faith-based medical professionals," that might be able to fill gaps in services. *See* 84 Fed. Reg. 7,780. And not even that one letter supports HHS's position. *See* Kost Decl. ¶ 79.

HHS also failed to engage in any serious analysis of the impact of the Final Rule on patients and their health care. For example, if Title X providers are barred from providing referrals for abortion or are permitted to provide counseling that steers patients away from

abortion, patients who want or need to terminate their pregnancy will face delays and disruptions in care and a resulting increased risk of complications from an abortion, *see* BCHD Comment 3; PPFA Comment 14, 20-21; Kost Decl. ¶¶ 73, 123; Mobley Decl. ¶¶ 56-60. Some patients may be deterred or prevented from obtaining an abortion altogether, which can jeopardize a woman's health, including by "obstructing pregnant patients with complicating medical conditions from obtaining potentially life-saving abortions." Guttmacher Comment 8.

HHS ignored these health costs and risks and instead simply assumed away the problem, declaring "[i]nformation about abortion and abortion providers is widely available and easily accessible, including on the internet." 84 Fed. Reg. 7,746. That is an astonishing conclusion for an agency charged with implementing a program specifically designed to reach patients with limited means and to educate them about their options. As the comments explained, many patients of limited means have "low 'health literacy,' meaning the knowledge and ability to navigate the health care system," and "[s]ome patients also lack regular access to communications tools (e.g., internet, phone) that are needed to access and research information on their own." Ryan Health Comment 3, http://bit.ly/2Gpdphs; *see also* Mobley Decl. ¶ 56.

HHS stated that it was "not aware, either from its own sources or from commenters, of actual data that could demonstrate a causal connection between the type of changes to Title X regulations contemplated in this rulemaking and an increase in unintended pregnancies, births, or costs associated with either." 84 Fed. Reg. 7,775. That statement, again, ignores the record. The likely consequences, based on prior experience, were detailed in comments on the proposed rule. *See, e.g.*, NFPRHA Comment 31; AMA Comment 4; Guttmacher Comment 19-20; PPFA Comment 17-19; Brindis Comment 6-7, 12.

For example, when the State of Texas cut back family-planning funding and denied funds to established providers like Planned Parenthood, there was "a 35% decline in women using the most effective methods of family planning and a 27% increase in births among women who had been using ... injectable contraceptive methods prior to Texas's restrictions Brindis Comment 12; PPFA Comment 81. Evidence before the agency also showed that, in 2010, the $2.2 billion in public funds spent on family planning and related sexual and reproductive health services were estimated to have averted approximately 2.2 million unintended pregnancies as well as other adverse health outcomes. Brindis Comment 12. The estimated public costs associated with those unintended pregnancies, had they not been averted, would have been $15.8 billion—virtually all of which ($15.2 billion) would be "attributable to publicly covered maternity and child health care." *Id.* at 12-13; *see also, e.g.*, PPFA Comment 19.

The Gag Rule also flouts the agency's own evidence-based clinical recommendations. *See* PPFA Comment 13; AMA Comment 3; BCHD Comment 4; Health Officers Comment at 2; NFPRHA Comment 6; Kost Decl. ¶¶ 22-28, 73. Guidelines issued by HHS and the CDC in 2014 state that when a health care provider tells a patient that she is pregnant, the provider should provide "[o]ptions counseling . . . in accordance with the recommendations from professional medical associations, such as ACOG and AAP," and discuss "appropriate referrals" with the patient. CDC, Providing Quality Family Planning Services 14 (2014).

HHS also failed to engage with the rationales underlying HHS's earlier conclusion in 2000 that a Gag Rule is unlawful because it violates the nondirective mandate and endangers women's lives. Where, as here, an agency adopts a rule that directly contradicts prior agency conclusions of fact and law, it must acknowledge that it is doing so and give a reasonable justification for the change. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126

(2016); *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009). In its 2000 final rule, HHS concluded that the nondirective mandate limits the scope of § 1008. 65 Fed. Reg. 41,273. HHS further emphasized the importance of ensuring that counseling be governed by what a patient actually wants. "If projects were to counsel on an option even where a client indicated that she did not want to consider that option," HHS warned, "there would be a real question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option." *Id.* Yet, HHS nowhere explains what led the agency to change its position on the crucial factual and legal questions that led the agency to affirmatively disavow a Gag Rule in 2000. That failure alone is severe enough to warrant vacatur.

   The Separation Requirement is also arbitrary and capricious. It lacks any support in the administrative record and HHS failed to consider an important aspect of the problem, namely, the serious reliance interests at stake. HHS nowhere meaningfully explains why the current regulations are inadequate, and—as the record plainly shows—they are not. For decades, those regulations have ensured that Title X funds are not used to provide abortions, and Title X providers have long relied on and complied with them. Longstanding HHS regulations make clear that Title X funds may be used "solely for the purpose for which the funds were granted in accordance with . . . applicable cost principles," 42 C.F.R. § 59.9, and may not be used to "provide abortions," *id.* § 59.5(a)(5). Moreover, the current regulations have long required that Title X providers ensure that "[n]on-Title X abortion activities . . . be separate and distinct from Title X project activities. 65 Fed. Reg. 41,282. And Title X grantees are already subject to audit and financial risk assessment, among other things.

   Indeed, the Final Rule cites no evidence of misuse of funds over the past half-century— underscoring the effectiveness of the regulations the agency now seeks to displace. Instead of

evidence, HHS invoked "risk[s]" of "appearance[s]," "perceptions," and "potential" misuse of funds, 84 Fed. Reg. 7,764-7,765, without pointing to anything to suggest those risks or perceptions are anything more than speculation. In short, HHS devised the Separation Requirement as a solution in search of a nonexistent problem. That does not suffice for reasoned decision-making. *See Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988); *National Fed'n of Indep. Bus. v. Perez*, 2016 WL 3766121, at *29 (N.D. Tex. June 27, 2016) (granting preliminary injunction where agency "has not offered any evidence showing a new alleged need for its dramatically changed rule").

Moreover, the Final Rule failed to take into account the "serious reliance interests" engendered by the prior policy that HHS now seeks to radically change. *See, e.g.*, *Encino Motorcars*, 136 S. Ct. at 2126; *Fox Tel. Stations*, 556 U.S. at 515 (when a prior policy "has engendered serious reliance interests," an agency "must" "provide a more detailed justification than what would suffice for a new policy created on a blank slate"). As explained below, the Final Rule fails to account for the drastic costs of this new policy. But at a more fundamental level, the Final Rule fails to acknowledge that Title X providers have structured their programs in accordance with the current regulations for decades. Thus, relying on HHS's settled interpretation of Title X, Title X providers have, for example, purchased or leased land, built health centers, hired and trained personnel, and purchased and maintained health records systems—knowing that shared facilities, records systems, and personnel are all expressly authorized by HHS. *See, e.g.*, Kost Decl. ¶¶ 102-104.

Additionally, HHS has failed to account properly for the costs the Separation Requirement would impose. HHS drastically underestimates the financial costs of the rule. HHS estimated that affected grantees will incur average costs of $30,000, 84 Fed. Reg. 7,782, but

HHS provides no support for its cost estimate. And the evidence before the agency shows that this unexplained number is nowhere close to the actual cost of compliance: Planned Parenthood estimated average capital costs of nearly $625,000 per affected service site. PPFA Comment 32; *see also* NFPRHA Comment 37. That estimate was based on actual renovation and construction cost estimates in a report produced by a federally funded non-profit organization that works with community health centers and on Planned Parenthood's experience acquiring commercial property. *See* PPFA Comment 31-32. Courts cannot "silently rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled data." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, (4th Cir. 2013) (quoting *Sierra Club v. EPA*, 671 F.3d, 966-68 (9th Cir. 2012)).

Furthermore, HHS fails to account for ongoing (not just one-time) costs, including those associated with required duplication of staff and contracts for goods and services—costs that can reach millions of dollars for some grantees. *See* Health Officers Comment 2; PPFA Comment 32-33; Kost Decl,. ¶¶ 102-04. Those costs will be exacerbated by the fact that the Separation Requirement is both broad and vague, and thus non-profit health providers with scarce resources will be compelled to over-comply to avoid being found in violation. *See* ACLU Comment 9, http://bit.ly/2IpI7cO; PPFA Comment 34-35. HHS also underestimates the number of Title X service sites that will be affected by the Separation Requirement. HHS estimates that only 20% of Title X service sites share resources with non-Title X projects that "offer abortion as a method of family planning." 84 Fed. Reg. 7,781. But HHS apparently disregards that the Separation Requirement's "prohibited activities" are defined by cross-reference to the Gag Requirement and thus would also require separation from projects that speak about abortion—for example, by

providing abortion referrals or even placing abortion-related pamphlets on an office table. HHS's arbitrary cost estimate and disregard of the "relevant data" demonstrates that the Separation Requirement was not "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

HHS also has "entirely failed to consider" the harms to public health caused by the Separation Requirement. *State Farm*, 463 U.S. at 43. As commenters explained, this requirement will result in many health care providers being forced to discontinue their participation in Title X because it is cost-prohibitive for them to physically separate the Title X project from other activities. *See* Health Officers Comment at 2; PPFA Comment at 30-33; NFPRHA Comment 37. The departure of a large number of Title X-funded providers would reduce access to family-planning care and would lead to adverse effects on the health of both Title X and non-Title X patients. *See* BCHD Comment 3; Health Officers Comment 2; PPFA Comment 15-20, 33; AMA Comment 4; Brindis Decl. ¶¶ 52-55. And even if some Title X grantees are able to physically separate their programs, patients will still suffer from uncoordinated care. *See* Health Officers Comment 2; PPFA Comment 33-34. For example, studies show that the required separation of health-records systems would pose a "risk to patient safety." PPFA Comment 34, 84. HHS claims that "because of growing interoperability of [electronic health record systems] and other health IT, it is a simpler matter for one provider to share a patient's [electronic health record] with another provider." 84 Fed. Reg. 7,767. But a patient is unlikely to understand that when she visits a particular provider's Title X project, the notes from her visit will not be accessible at the same provider's other facility that may provide abortions or abortion referrals, and so the patient is unlikely to request that the health record be shared in the first place.

HHS also failed to engage with the rationales underlying HHS's earlier conclusion in 2000 that a Separation Requirement would be counterproductive. Where, as here, an agency

adopts a rule that directly contradicts prior agency conclusions of fact and law, it must

acknowledge that it is doing so and give a reasonable justification for the change. *See Fox*, 556

U.S. at 515. In its 2000 final rule, HHS concluded that a physical separation requirement was

unnecessary and inconsistent "with the efficient and cost-effective delivery of family planning

services." 65 Fed. Reg. 41,276. The 2000 rule expressly authorized the use of "shared facilities,"

"common staff," and "single file system[s]." *Id.* at 41,282. Yet, HHS nowhere explains what led

the agency to change its position on the crucial factual and legal questions that led the agency to

affirmatively disavow a Separation Requirement in 2000.

At bottom, HHS's failure to account for the numerous problems and costs identified by

the commenters underscores yet another flaw with the Final Rule: It is the product of

Defendants' prejudgment and "unalterably closed mind," not a process intended to solicit and

incorporate feedback from interested parties. *See Air Transport Ass'n of America v. Nat'l

Mediation Board*, 663 F.3d 476, 487 (D.C. Cir. 2011). That prejudgment has led HHS to craft a

rule that is fatally arbitrary and capricious.

### C. The Rule Is Unconstitutionally Vague.

Under the Due Process Clause of the Fifth Amendment, a law must "give fair notice of

conduct that is forbidden or required," and provide "precision and guidance" sufficient to prevent

Defendants from acting in "an arbitrary or discriminatory way." *Fox*, 567 U.S. at 253. The Rule

does not meet this test. The Gag Rule offers no guidance on how providers can offer options

counseling on abortion in a manner that does not somehow indirectly "promote" or "support"

abortion. *See* 84. Fed. Reg. 7,761. At the same time, Defendants will have seemingly unbridled

discretion to enforce the Rule in unforeseeable ways. *See, e.g.*, *id.* at 7,789. Similarly, the

Separation Requirement is described through a list of non-exclusive and unclear factors, which

29

provide little guidance on what must be done to ensure compliance (e.g., does compliance require separate entrances and rooms, or entirely separate buildings?). *Id.* at 7,790.

Put simply, if the Rule goes into effect on May 3, Title X providers who stay in the program will have no idea what to do and will be vulnerable to arbitrary enforcement. Because these provisions of the Rule do not give fair notice and lack the "precision and guidance" needed to prevent Defendants from acting in "an arbitrary or discriminatory way," *Fox*, 567 U.S. at 253, the Rule is not just unworkable, it is unconstitutional.

## II.    Plaintiffs Will Suffer Irreparable Injury Absent an Injunction

Absent a preliminary injunction, Plaintiffs and their patients will suffer ongoing and irreparable harm if the Rule takes effect on May 3, 2019. "[A] party seeking a preliminary injunction must prove that he or she is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) (quoting *Winter*, 555 U.S. at 20). The Fourth Circuit recognizes irreparable injury when a movant makes a "clear showing" of "actual and imminent" harm that "cannot be fully rectified by the final judgment after trial," including economic harms if damages are not recoverable or could not undo a permanent harm resulting from a temporary loss of funds. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216-18 (4th Cir. 2019).

If the Rule goes into effect, Baltimore will have two choices: (1) comply with the Rule and force its doctors to engage in the unethical practice of medicine and endanger the lives of patients and residents, or (2) withdraw from Title X. No matter what decision Baltimore makes, the Final Rule will cause it irreparable harm.

### A.   Baltimore Will Suffer Irreparable Harm If It Withdraws from Title X

If Baltimore withdraws from the Title X program, Baltimore stands to lose millions of dollars in federal grant funding: in 2017, Baltimore received $1,430,000 in funds subject to

Title X rules. Even purely economic harm, such as Baltimore's loss of Title X funding here, constitutes irreparable injury for the purposes of preliminary injunction if "monetary damages will be unable to remedy financial losses when litigation ends" or if "temporary delay in recovery somehow translates into permanent injury—threatening a party's very existence by, for instance, driving it out of business." *Mountain Valley Pipeline*, 915 F.3d at 217-18. Both of those factors are present here.

In this case, Baltimore cannot recover damages for its foregone Title X funding because HHS's sovereign immunity precludes monetary recovery. *Id.*; *see also, e.g.*, *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)) (irreparable injury where federal government's sovereign immunity precludes recovery of money damages); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (noting same); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) (same); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 849, 852 (9th Cir. 2009) (same); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) (same); *Temple Univ. v. White*, F.2d 201, 214-15 (3d Cir. 1991) (same); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (same), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

Moreover, the loss of Title X funds will cause permanent injury to the Baltimore health care system. Hager Decl. ¶¶ 5, 9. Because Baltimore's clinics rely on Title X funding to provide services, the loss of that funding threatens their continued existence. As a district court in this circuit noted, irreparable harm is "likely" where a reproductive health clinic is closed, *Planned Parenthood of Central North Carolina v. Cansler*, 804 F. Supp. 2d 482, 499 (M.D.N.C. 2011) (granting preliminary injunction to Planned Parenthood against enforcement of a law that would

have excluded it from receiving funding, including Title X funding, for contraception and teen pregnancy prevention). "[I]t would be extremely difficult, if not impossible, to reopen and re-establish client relationships at some point in the future" after "staff members are laid off and the clinic is closed." *Id.* As the court noted in *Cansler*, the longer the current recipients remain unable to participate in the program, the greater the burdens to eventually reestablishing services. *Id.*; *accord, e.g.*, *Planned Parenthood of Ind. v. Comm'r*, 699 F.3d 962 (7th Cir. 2012).

These clinic closures will immediately result in a loss of medical services available to Baltimore's current patient population, with severe consequences for their health. As the Fourth Circuit has held, irreparable injury occurs when public beneficiaries would lose medical services. *See Pashby*, 709 F.3d at 329 ("[B]eneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care."). These lost medical services include preventive services such as contraception, clinical breast exams, STD testing, referrals to appropriate prenatal care and abortion providers, and pap tests that screen for cervical cancer.

The harms suffered by Baltimore's patients will ultimately also harm Baltimore as a general healthcare provider. As the provider of last resort for up to a full third of Baltimore-area patients, *see* Mobley Decl. ¶¶ 14-15, Baltimore will ultimately end up bearing the long-term increased costs resulting from the loss of patients' timely access to effective Title X preventative healthcare. This will result in a cycle of injuries as Baltimore will need to spend more on care for these patients, diverting resources from some of its other innovative programs to improve the health of its citizens.

As a result, the Final Rule will fundamentally undermine the Health Department's mission to "protect health, eliminate disparities, and ensure the well-being of every Baltimorean

through education, advocacy, and direct service delivery." Hager Decl. ¶ 1. "Ongoing harms to a [plaintiff's] organizational missions" establish a likelihood of irreparable harm. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *see Action NC v. Strach*, 216 F. Supp. 3d 597, 642-43 (M.D.N.C. 2016) (finding irreparable harm where voter restrictions "perceptibly impairs" voting advocacy organization's mission, and it "would have to divert resources in the absence of such relief"); *North Carolina State Conference of the NAACP v. North Carolina State Board of Elections*, No. 16-cv-1274, 2016 WL 6581284, at \*9 (M.D.N.C. Nov. 4, 2016) (similar).

### B. Baltimore Will Suffer Irreparable Harm If It Complies with the Unlawful Final Rule

Even if Baltimore chose to accept the Title X funding and comply with the Final Rule, it would still suffer irreparable injury because its medical providers would be forced to contravene their ethical obligations to provide patient-centered, nondirective care. The harm to the provider-patient relationship inherent in forcing a medical provider to give—and a patient to receive—care that falls below the standard required by professional ethics and best practices is irreparable. *See, e.g.*, *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("permanent loss of customers to a competitor or loss of goodwill" is irreparable harm), *abrogated on other grounds by Winter*, 555 U.S. at 7; *see also, e.g.*, *Richmond Med. Ctr. for Women v. Gilmore*, 11 F. Supp. 2d 795, 809 (E.D. Va. 1998) (irreparable injury where physicians would be "constrained to alter their medical advice to, and their medical care of, their patients contrary to their best judgments").

### C. Baltimore Will Suffer Irreparable Harm Because the Unlawful Final Rule Will Cause Other Providers To Withdraw From the Program

Baltimore's health department will be irreparably harmed if the Final Rule goes into effect, whether Baltimore withdraws from Title X or not, because *other* current Title X recipients and subrecipients—both in Baltimore City and in the surrounding areas—will drop out of the

program or reduce the quality of the care they provide. Hager Decl. ¶¶ 34-35. Decreased access

to preventative care elsewhere will drive patients to the Baltimore City health system as provider

of last resort. *See* Mobley Decl. ¶ 14. Funding that would have gone to serve Baltimore's current

and future Title X patients will be stretched beyond capacity as the City tries to fill the unmet

need for preventative healthcare, and for longer-term adverse health outcomes subsequent to

foregone preventative care. *See* Brindis Decl. ¶¶ 31, 47, 52-55. The immediate unrecoverable

economic loss that will follow from the Final Rule is quintessentially "irreparable harm."

## III.    The Balance of Equities and the Public Interest Favor an Injunction.

When a preliminary injunction is sought against the government, the balance-of-the-

equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public

interest "lies with safeguarding public health," *Pashby*, 709 F.3d at 331. In particular, the Fourth

Circuit recognizes the "robust public interest in safeguarding access to health care for those

eligible for Medicaid," i.e., low income individuals. *Id.* at 330-31.

Baltimore has demonstrated that, absent an injunction, Baltimore and its patients will

suffer irreparable injury. By contrast, Defendants face no injury from an injunction; it will

merely preserve the longstanding status quo of the existing Title X program while questions

about the lawfulness of the Rule's drastic changes to the Title X program are adjudicated. *See*

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) ("[T]he purpose of such

interim equitable relief is not to conclusively determine the rights of the parties, but to balance

the equities as the litigation moves forward."). "There is generally no public interest in the

perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in

having governmental agencies abide by the federal laws that govern their existence and

operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

## IV.    Relief Requested

Baltimore requests a preliminary injunction broad enough to protect its interests. Given that several major Title X providers throughout Maryland, including Planned Parenthood, have said that they will leave the Title X program if the Final Rule goes into effect, we request the Court issue an injunction against enforcement of the Rule in Maryland. We point out that this scope of relief would exclude clinics just across the border, in York, PA, for example, whose patients are likely to travel to Baltimore to obtain services, placing increased pressure on our clinics. At minimum, the Court should stay the rule's effective date pursuant to 5 U.S.C. § 705.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Preliminary Injunction.

Dated: April 16, 2019

By: */s/ Andre M. Davis*

Andre M. Davis #00362
*City Solicitor*

Suzanne Sangree #26130
*Senior Counsel for Public Safety &
   Director of Affirmative Litigation*

CITY OF BALTIMORE
   DEPARTMENT OF LAW
City Hall, Room 109
100 N. Holliday Street
Baltimore, MD 21202
443-388-2190
andre.davis@baltimorecity.gov
suzanne.sangree2@baltimorecity.gov

Priscilla J. Smith (*pro hac vice* pending)
Faren M. Tang (*pro hac vice* pending)
REPRODUCTIVE RIGHTS &
   JUSTICE PROJECT
YALE LAW SCHOOL
319 Sterling Place
Brooklyn, NY 11238
priscilla.smith@ylsclinics.org
127 Wall Street
New Haven, CT
faren.tang@ylsclinics.org

Stephanie Toti (*pro hac vice* pending)
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
646-490-1083
stoti@lawyeringproject.org

Respectfully submitted,

**ARNOLD & PORTER
   KAYE SCHOLER LLP**

Andrew T. Tutt (*pro hac vice* pending)
Drew A. Harker (*pro hac vice* pending)
Allyson Himelfarb #13929
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
andrew.tutt@arnoldporter.com
drew.harker@arnoldporter.com
allyson.himelfarb@arnoldporter.com

Marisa A. White (*pro hac vice* pending)
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
marisa.white@arnoldporter.com

*Counsel for Mayor and City Council of Baltimore*

**CERTIFICATE OF SERVICE**

I certify that on April 16, 2019, I filed the foregoing with the Clerk of the Court using

the ECF System which will send notification of such filing to the registered participants identi-

fied on the Notice of Electronic Filing.

*/s/ Andre M. Davis*
Andre M. Davis
*City Solicitor*

CITY OF BALTIMORE
  DEPARTMENT OF LAW
City Hall, Room 109
100 N. Holliday Street
Baltimore, MD 21202
443-388-2190
andre.davis@baltimorecity.gov