IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MAYOR AND CITY COUNCIL<br>OF BALTIMORE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: RDB-19-1103 |
| | * | |
| ALEX M. AZAR II, Secretary of Health<br>and Human Services, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

This case involves the challenge by the Mayor and City Council of Baltimore ("Baltimore City") to a rule promulgated by the United States Department of Health and Human Services that would amend federal regulations with respect to the funding of family planning services. It has been preceded by similar lawsuits in United States District Courts in the states of Washington, California, Oregon, and Maine. Now pending before this Court is Baltimore City's Motion for a Preliminary Injunction seeking to prevent the federal government from putting these amended regulations into effect. The City has wisely *not* sought a nationwide injunction. Wisely so, as this Court most respectfully is not inclined to join the cascade of nationwide injunctions issued by United States District Judges across the country with respect to many administrative policies of the federal government. It is not the role of this Court to become involved in these policy questions. Quite simply, the executive branch of government is entitled to deference with respect to its administrative orders.

However, the executive branch of government is not entitled to circumvent by administrative order existing laws passed by the United States Congress. When the executive branch seeks to do so, it must be constrained by the federal judiciary.[1] Accordingly, for the reasons that follow, a Preliminary Injunction shall be entered in this case enjoining the United States Department of Health and Human Services from implementing these new federal regulations in the State of Maryland until this matter is resolved on the merits.

Specifically, Baltimore City brings a ten-Count Complaint pursuant to the Administrative Procedures Act ("APA") against Alex M. Azar II, in his official capacity as the Secretary of Health and Human Services; United States Department of Health and Human Services ("HHS"); Diane Foley, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; and Office of Population Affairs (collectively, "Defendants" or "the Government"). (Compl., ECF No. 1.) Baltimore City challenges the final rule ("Final Rule") promulgated on March 4, 2019 by HHS amending the regulations developed to administer Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a-6, which provides federal funding for family-planning services. (*Id.* at ¶¶ 1, 3.) Baltimore City's motion seeks a preliminary injunction to prevent the Government from putting into effect certain provisions of the Final Rule that had been scheduled to go into effect on May 3, 2019.[2]

---

[1]     *See* The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961) ("[T]he constant aim is to divide and arrange the several offices in such a manner as that each may be a check on the other . . . ."); *see also Sierra Club v. Trump*, — F. Supp. 3d —, 2019 WL 2247689, at *1 (N. D. Cal. May 24, 2019) ("The underlying policy debate is not our concern . . . . Our more modest task is to ensure, in justiciable cases, that agencies comply with the law as it has been set by Congress." (quoting *In re Aiken Cty.*, 725 F.3d 255, 257 (D.C. Cir. 2013))).

[2]     Two United States District Courts issued nationwide injunctions prior to the May 3, 2019 implementation date. *See State of Oregon v. Azar*, 6:19-cv-00317-MC (Lead Case), 6:19-cv-00318-MC (Trailing Case), 2019 WL 1897475 (D. Or. April 29, 2019); *State of Washington v. Azar*, No. 1:19-cv-03040-SAB, 2019 WL 1868362 (E.D. Wash. Apr. 25, 2019). The District of Oregon and the Eastern District of Washington decisions

(Pl.'s Mot., ECF No. 11.) This Court held a hearing on April 30, 2019, has heard the arguments of counsel, and has reviewed the submissions of the parties.

For the reasons that follow, this Court holds that the Final Rule likely violates provisions of the Affordable Care Act, 42 U.S.C. § 18114, enacted in 2010, and Congress' nondirective mandate in the Continuing Appropriations Act, 2019, Pub. L. 115–245, 132 Stat. 2981, 3070–71 (2018), which has been consistently included by Congress with respect to Title X appropriations funding every year since 1996. Accordingly, this Court shall GRANT Plaintiff's Motion for Preliminary Injunction (ECF No. 11) against enforcement of the Final Rule in Maryland. The Government shall be enjoined from implementing or enforcing any portion of the Final Rule in the State of Maryland during the pendency of this litigation and until this matter is resolved on the merits.[3]

## BACKGROUND

### I.     Title X History

#### A.     Inception of Title X

Almost fifty years ago, in 1970, Congress enacted Title X, the only federal program specifically dedicated to funding family planning services. Public Health Service Act, 84 Stat. 1506, *as amended* 42 U.S.C. §§ 300 to 300a-6. Title X addresses low-income individuals' lack

---

have been appealed, and the Government also moved for stays of both injunctions pending appeal. *See* Mot. to Stay, ECF No. 58, *State of Washington v. Azar*, Nos. 1:19-cv-3040-SAB; 1:19-cv-3045-SAB (E.D. Wash. May 3, 2019); Defs.' Mot. for a Stay, ECF No. 150, *State of Oregon v. Azar*, Consolidated Civil Action Nos. 6:19-cv-00317-MC (Lead Case), 6:19-cv-00318-MC (D. Or. May 3, 2019).

[3]     Regardless of the effect of the nationwide injunctions issued by the Oregon and Washington Courts, Baltimore City requests that this Court issue an injunction against enforcement of the Final Rule in Maryland. (Pl.'s Mot. Mem. 35, ECF No. 11-1; Reply 29, ECF No. 34.) As Judge Chen stated in *California v. Azar*, a nationwide injunction "does not obviate this Court's duty to resolve the dispute before it." Case No. 19-cv-01184-EMC, Case No. 19-cv-01195-EMC, 2019 WL 1877392, at *2 (N.D. Cal. Apr. 26, 2019) (citations omitted).

of equal access to family planning services by authorizing the Secretary of Health and Human Services ("the Secretary") to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." *Id.* § 300(a). Title X grant money is provided in a lump sum and may be used both to cover the costs of family planning care for those with incomes below or near the federal poverty level and to pay for non-service costs like purchasing contraceptives or training staff. *Id.* § 300. Through this mechanism, low-income families have free or low-cost access to clinical professional contraceptive methods and devices, and testing and counseling services related to reproductive health, including pregnancy testing and counseling.

All grants and contracts must "be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4. Section 1008 of the Act provides that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a–6. Consistent with this restriction, HHS has never permitted Title X grantees to use Title X funds to perform or subsidize abortions. *See* 42 C.F.R. §§ 59.5(a)(5), 59.9 (1986). The initial regulations, issued in 1971, stated that Section 1008 simply required that a Title X "project will not provide abortions as a method of family planning." 36 Fed. Reg. 18,465, 18,466 (1971) (codified at 42 C.F.R. § 59.5(9) (1972)). "During the mid-1970s, HHS General Counsel memoranda made a further distinction between directive ('encouraging or promoting' abortion) and nondirective ('neutral') counseling on abortion, prohibiting the former and permitting the latter." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992). In 1981, HHS issued "Program

Guidelines" that mandated nondirective abortion counseling by Title X projects upon a patient's request. *Id.*

## B.    The 1988 Regulations

In 1988, HHS promulgated new regulations "designed to provide 'clear and operational guidance' to grantees about how to preserve the distinction between Title X programs and abortion as a method of family planning." *Rust v. Sullivan*, 500 U.S. 173, 179 (1991) (quoting 53 Fed. Reg. 2923–2924 (1988)). The 1988 regulations established a much broader prohibition on abortion counseling and referrals. They included a "gag rule"[4] that prohibited Title X projects from counseling or referring clients for abortion as a method of family planning; a "separation requirement" that required grantees to separate their Title X project physically and financially from prohibited abortion-related activities; established compliance standards; and prohibited certain activities that promote, encourage, or advocate abortion, such as using funds for performance of pro-abortion lobbying, materials, or legal action. *See* 42 C.F.R. § 59 (1991).

Title X grantees and doctors who supervised Title X funds promptly challenged the facial validity of the regulations and sought injunctive relief to prevent implementation. *Rust*, 500 U.S. at 181. The regulations were challenged on the grounds that they were not authorized

---

[4]    Generally, referring to "a rule saying that people are not allowed to speak freely or express their opinions about a particular subject." "gag rule." *Merriam-Webster.com*, 2019. https://www.meriam-webster.com (20 May 2019). The term has been used by courts to describe the 1988 regulation prohibiting abortion counseling. *See, e.g., Nat'l Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992) ("In 1988, HHS promulgated by notice and comment rulemaking new regulations that established a much broader prohibition on abortion counseling or referrals including a "gag rule" applicable to all Title X project personnel against informing or discussing with clients the availability of abortion as an option for individual planning or treatment needs.").

by Title X and that they violated the First and Fifth Amendment rights of the Title X clients and the First Amendment rights of the health providers. *Id.* A preliminary injunction was initially granted. *Id.* Ultimately, the challenge came before the United States Supreme Court, which held in *Rust v. Sullivan*, 500 U.S. at 185, that the legislative history was ambiguous with respect to Congress' intent in enacting Title X and the prohibition of Section 1008. Applying *Chevron*[5] deference to the agency's interpretation, *id.* at 186-87, the Supreme Court therefore held that the 1988 regulations were a permissible construction of Title X and did not violate either the First or Fifth Amendments to the Constitution. *Id.* at 185, 203.

These 1988 regulations, however, were never fully implemented. In 1991, President George H. W. Bush issued a memorandum to the HHS Secretary, directing adherence to four principles "compatible with free speech and the highest standards of medical care." *Nat'l Family Planning*, 979 F.2d at 230. "In a press conference, President George H.W. Bush asserted: '[U]nder my directive, they can go ahead—patients and doctors can talk about absolutely anything they want, and they should be able to do that.'" *Id.* The 1988 regulations were suspended by the Secretary in 1993, resulting in Title X grantees returning to operating under the 1981 guidelines. *See* 58 Fed. Reg. 7462, 7462 (1993). These 1981 guidelines mandated nondirective abortion counseling upon a patient's request. *See California v. Azar*, Case No. 19-cv-01184-EMC, Case No. 19-cv-01195-EMC, 2019 WL 1877392, at *3 (N.D. Cal. Apr. 26, 2019) (quoting 53 Fed. Reg. 2922, 2923 (1988)).

---

[5]  In *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, the United States Supreme Court held that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. 837, 843 (1984).

For over 20 years, beginning in 1996, and every year since, Congress has always added a clarifying statement regarding Section 1008 in its Title X appropriations bill. Alongside the statement that "amounts provided to [Title X] projects . . . shall not be expended for abortions," Congress has included language that emphasizes that "all pregnancy counseling shall be nondirective" ("Nondirective Mandate"). *See, e.g.*, Continuing Appropriations Act, 2019, Pub. L. 115–245, 132 Stat. 2981, 3070–71 (2018); *see also* 65 Fed. Reg. 41,272-73.

### C. The 2000 Regulations

New regulations were finalized in 2000, 65 Fed. Reg. 41270 (Jul. 3, 2000), *codified at* 42 C.F.R. Pt. 59, revoking the 1988 regulations, and these regulations remain in effect today. The Final Rule, promulgated on March 4, 2019, and at issue in this case, would replace the 2000 regulations. Under the 2000 regulations, Title X grantees are required to "provide neutral, factual information and nondirective counseling on each of the options, and referral" upon request. 42 C.F.R. § 59.5(a)(5) (July 3, 2000). The options include: "(A) Prenatal care and delivery; (B) Infant care, foster care, or adoption; and (C) Pregnancy termination." 65 Fed. Reg. at 41,279. Grantees' non-Title X abortion activities must be "separate and distinct" from Title X activities, but "[c]ertain kinds of shared facilities are permissible, so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities." 65 Fed. Reg. at 41281.

### D. The Affordable Care Act

In 2010, Congress passed the Affordable Care Act ("ACA") and included language in section 1554 that limited the rulemaking authority of HHS as follows:

Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—

(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;

(2) impedes timely access to health care services;

(3) interferes with communications regarding a full range of treatment options between the patient and the provider;

(4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;

(5) violates the principles of informed consent and the ethical standards of health care professionals; or

(6) limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114.

### E.    The Final Rule

On June 1, 2018, HHS published the Final Rule in the Federal Register.[6] During the

60-day public comment period, HHS received more than 500,000 comments, including

comments from most major medical associations. Certain revisions were made to the

proposed rule, and HHS published the Final Rule in the Federal Register on March 4, 2019.

The Rule had an implementation date of May 3, 2019.[7] The Final Rule contains two key

---

[6]    Administrative agencies are required, under the Administrative Procedures Act, to provide notice of proposals to create, amend, or repeal a rule and afford an opportunity for interested persons to comment on the proposal. *See* 5 U.S.C. §§ 551(4)-(5), 553(a)-(c). Generally, notice of proposed rule making must be published in the Federal Register, as well as the final version of the rule, together with a statement of its basis and purposes. *See* 5 U.S.C. § 553.

[7]    *See* n.1 *infra*, noting that two United States District Courts issued nationwide injunctions prior to the May 3, 2019 implementation date.

provisions that are essentially a reversion back to the 1988 Regulations. These two provisions are central to Baltimore City's claims in this case:

### 1.      The Gag Rule

The Final Rule imposes broad restrictions on what health care providers under the Title X program may inform pregnant patients. It provides that a "Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 84 Fed. Reg. at 7788-89 (to be codified at 42 C.F.R. § 59.14(a)). Even if a client specifically requests a referral to an abortion provider, the Title X grantee can at most offer a a list of "comprehensive primary health care providers," "some, but not the majority" of which may "also provide abortion." *Id.* at 7789. The list cannot identify which providers provide the abortion services she is requesting. The project staff are prohibited from answering a direct inquiry about which providers provide abortion. *Id.* Moreover, because the list is limited to "comprehensive primary health care providers," specialized reproductive health care providers are excluded.

At the same time, Title X providers must provide all pregnant patients with a referral for prenatal care, regardless of the patients' wishes, on the basis that prenatal referrals are "medically necessary." 84 Fed. Reg. 7,789 (to be codified at 42 C.F.R. § 59.14(b)(1)). Furthermore, the provider must counsel a patient seeking an abortion on options she may not wish to pursue, while providing information about the "risks and side effects [of abortion] to both mother and unborn child." *Id.* at 7,747; *see id.* ("abortion must not be the only option presented").

## 2.    The Separation Requirement

The Final Rule also contains a Separation Requirement, i.e., that Title X activities be "physically and financially separate" (defined as having an "objective integrity and independence") from prohibited activities, such as the provision of abortion services and any referrals for abortion services that do not meet the Gag Rule requirements. 84 Fed. Reg. at 7789. "Mere bookkeeping separation of Title X funds from other monies is not sufficient." *Id.* The Secretary will determine whether such objective integrity and independence exist by looking to relevant factors that include: "The existence of separate, accurate accounting records"; "[t]he degree of separation [of] facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites)"; "[t]he existence of separate personnel, electronic or paper-based health care records, and workstations"; and the "extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent." *Id.* The deadline for physical separation is March 4, 2020.

## II.    Baltimore City Health Services

Baltimore City has participated in the Title X program since its inception in 1970, receiving its funding as subgrants through the Maryland Department of Health. (Compl. ¶ 57, ECF No. 1.)   The Baltimore City Health Department, formed in 1793, is the oldest continuously operating health department in the United States. (*Id.* at ¶ 33.)   It has wide-ranging responsibilities for providing health services to the residents of Baltimore, including prevention of chronic disease, sexually-transmitted disease prevention, maternal-child health, including pregnancy prevention, and school health services. (*Id.*)   In collaboration with other

city agencies, health care providers, community organizations and funders, the Baltimore City Health Department's mission is to ensure the well-being of every Baltimorean through education, advocacy, and direct service delivery.  (*Id.* at ¶¶ 34-35.)

The Baltimore City Health Department currently receives $1,430,000 annually from the Government in funding subject to Title X rules.  (*Id.* at 7.)  It directly operates three community clinics and four school-based health centers that provide Title X services and provides funding to ten additional subgrantees in the city. (*Id.*)  Planned Parenthood operates additional Title X sites with Baltimore. (*Id.* at 8.)  Baltimore City's Title X program serves as the final safety net for healthcare for one third of women living in Baltimore.  (*Id.*)

The Baltimore City health clinics served 7,670 Title X clients in 2017, of which nearly one in five were under the age of 18, and almost 84% were female.  (*Id.* at ¶ 36.)  Eighty-six percent of the women served in Title X centers in Baltimore had incomes below the poverty line.  (*Id.*) Baltimore City directly operates three community clinics and four school-based health centers that provide Title X services, and it oversees the Title X grant for ten other subgrantee health clinics in the community, including clinics at John Hopkins University, Baltimore Medical System, Family Health Centers of Baltimore, and the University of Maryland, as well as clinics that offer comprehensive care in middle and high schools.  (*Id.* at ¶ 59.)

Baltimore City contends that the Final Rule is at odds with its mission and its "patient centered" strategy as a best practice for health care delivery in Baltimore.  (*Id.* at ¶ 37.)  Baltimore City asserts that if the Final Rule goes into effect, it will effectively be forced to withdraw from Title X, or abandon its long-standing mission, either of which choice will place

the most vulnerable Baltimore City residents at risk. (*Id.* at ¶¶ 37, 63.) For example, Baltimore

City has used Title X funding in its public health efforts and has achieved a 55% reduction in

teen pregnancy over the last ten years.[8] (Pl.'s Mot. Mem. 8, ECF No. 11-1.) Baltimore City

filed this lawsuit on April 12, 2019 asserting ten causes of action:

- I – Violation of Administrative Procedures Act ("APA"), 5 U.S.C. § 706—Contrary to Law—Contrary to Affordable Care Act ("ACA")'s Non-Interference Provision, 42 U.S.C. § 18114.

- II – Violation of APA § 706—Contrary to Law—Contrary to Nondirective Mandate of the Consolidated Appropriations Act of 2018

- III – Violation of APA § 706—Contrary to Law—Contrary to Tile X, 42 U.S.C. §§ 300(a), 300a(a)

- IV – Violation of APA § 706—Contrary to Law—Contrary to Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1(a).

- V – Violation of APA § 706—Contrary to Constitutional Right—First Amendment

- VI – Violation of APA—Contrary to Constitutional Right—Equal Protection Under Fifth Amendment

- VII – Violation of APA—Arbitrary and Capricious—Inadequately Justified

- VIII – Violation of APA—Arbitrary and Capricious—Objectively Unreasonable

---

[8]     Charlotte Hager, the Health Program Administrator at the Baltimore City Health Department provided statistics regarding the number of patients served, the ages, sex, and socio-economic status of the patients, cases of sexually transmitted diseases, and savings from preventing unintended pregnancies through access to birth control. (Hager Decl., ECF No. 11-7.) In her declaration, she states that "over the last ten years, through our efforts we have seen a 55% reduction in teen pregnancy." (*Id.* at ¶ 11.) These results are consistent with a 2017 study, which "estimated that in 2015 the contraceptive care delivered by Title X-funded providers in the U.S. helped women avoid 822,300 unintended pregnancies, which would have resulted in 387,200 unplanned births and 277,800 abortions." (Bailey Decl. 18, ECF No. 11-2 (citing Jennifer J. Frost et al., Guttmacher Inst., *Publicly Funded Contraceptive Services at U.S. Clinics, 2015* (Apr. 2017), https://www.guttmacher.org/report/ publicly-funded-contraceptiveservices-us-clinics-2015.) The study concluded that the unintended pregnancy rate among teens would have been 44% higher in the absence of this reduction. (*Id.* at 19.)

- IX – Violation of APA—Without Observance of Procedure Required by Law

- X – Violation of APA—Contrary to Constitutional Right—Unconstitutionally Vague

Baltimore City requests that this Court enjoin the enforcement of the Final Rule in Maryland during the pendency of this lawsuit. It does not seek a nationwide injunction.

## III.    Procedural Setting

This case is one of multiple cases that have been filed across the nation seeking to maintain the Title X status quo while the courts consider the legal challenges to the Government's new regulations. *See California v. Azar*, 3:19-cv-01184--EMC (N.D. Cal.), and related case *Essential Access v. Azar*, 3:19-cv-01195-EMC (N.D. Cal.); *Oregon v. Azar*, 6:19-cv-00317-MC (D. Ore.), and related case *Am. Med. Ass'n v. Azar*, 6:19-cv-00318-MC (D. Ore.); *Washington v. Azar*, 1:19-cv-03040-SAB (E.D. Wash.) (consolidated); *Family Planning Ass'n v. U.S. HHS*, 1:19-cv-00100-LEW (D. Me.). Hearings were held in all cases, and decisions have been issued in all but the Maine case.

On April 25, 2019, Judge Stanley A. Bastian, of the United States District Court, Eastern District of Washington, issued an injunction, which enjoins the Government from implementing or enforcing the Final Rule on a nationwide basis. *State of Washington v. Azar*, No. 1:19-cv-03040-SAB, 2019 WL 1868362 (E.D. Wash. Apr. 25, 2019). On April 26, 2019, Judge Edward M. Chen, United States District Court, Northern District of California, enjoined enforcement of the Final Rule in the state of California, stating: "The recent injunction issued against Defendants' implementation of the Final Rule by Judge Bastian in *State of Washington v. Azar* . . . does not obviate this Court's duty to resolve the dispute before it." *California v. Azar*,

Case No. 19-cv-01184-EMC, Case No. 19-cv-01195-EMC, 2019 WL 1877392 (N.D. Cal. Apr. 26, 2019). At the end of the hearing on April 23, 2019, Judge Michael J. McShane, of the United States District Court, District of Oregon, stated that an injunction would issue, with an order to follow that would reveal the scope of the injunction. On April 29, 2019, Judge McShane also issued a nationwide injunction. *State of Oregon v. Azar*, 6:19-cv-00317-MC (Lead Case), 6:19-cv-00318-MC (Trailing Case), 2019 WL 1897475 (D. Or. April 29, 2019). Finally, on the basis that a nationwide injunction had been issued by Judge Bastian, the Maine Plaintiffs chose to withdraw their motion as moot (without prejudice to their right to renew the motion if circumstances warranted). *See* Not. of Withdrawal, ECF No. 65, *Family Planning Ass'n of Maine v. Azar*, Case No. 1:19-cv-00100-LEW (D. Me. Apr. 26, 2019).

Most recently, the Government has advised this Court that it is appealing the District of Oregon and the Eastern District of Washington decisions, and it moved for stays of both injunctions pending appeal. *See* Mot. to Stay, ECF No. 58, *State of Washington v. Azar*, Nos. 1:19-cv-3040-SAB; 1:19-cv-3045-SAB (E.D. Wash. May 3, 2019); Defs.' Mot. for a Stay, ECF No. 150, Consolidated Civil Action Nos. 6:19-cv-00317-MC (Lead Case), 6:19-cv-00318-MC (D. Or. May 3, 2019).

In the instant case, Baltimore City filed a Motion for Preliminary Injunction (ECF No. 11) on April 16, 2019, seeking to enjoin the Government from "putting into effect certain provisions" of the HHS Final Rule. More specifically, Baltimore City requests that this Court issue an injunction against enforcement of the Final Rule in Maryland. (Pl.'s Mot. Mem. 35, ECF No. 11-1; Reply 29, ECF No. 34.) An accelerated briefing schedule completed with Plaintiff's Reply on Monday, April 29, 2019, and a hearing was held on Tuesday, April 30,

2019. This Court has considered the parties' arguments, reviewed the decisions issued by its sister courts, and finds the reasoning in those decisions persuasive. For the reasons that follow, this Court shall grant Plaintiff's Motion for Preliminary Injunction (ECF No. 11) and shall enjoin the Government from enforcing the Final Rule in the State of Maryland.

## STANDARD OF REVIEW

As the United States Court of Appeals for the Fourth Circuit stated in *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013), "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." 720 F.3d at 524 (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ). In determining whether to issue a preliminary injunction, a court must follow the test set forth by the United States Supreme Court in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), which requires that the plaintiff show that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors the movant; and (4) that an injunction is in the public interest. 555 U.S. at 20. While a plaintiff need not establish a "certainty of success," he or she must make a "clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017); *Int'l Brotherhood of Teamsters v. Airgas, Inc.*, 239 F. Supp. 3d 906, 912 (D. Md. 2017) ("Because a preliminary injunction is 'an extraordinary remedy,' it 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" (quoting *Winter*, 555 U.S. at 22).

## ANALYSIS

## I.    Likelihood of Success on the Merits

To satisfy the showing for a preliminary injunction, Baltimore City does not need to demonstrate that it is likely to succeed on the merits of all ten causes of action. The City focuses its arguments on the Final Rule violating three separate statutory provisions: (1) The Affordable Care Act Non-Interference Mandate, 42 U.S.C. § 18114, (2) the Nondirective Mandate in the Appropriations Act, 132 Stat. at 3070-3071, and (3) Title X itself, 42 U.S.C. § 300a-5, 84 Stat. 1504 § 2. (Pl.'s Mot. Mem. 15, ECF No. 11-1.) Baltimore City asserts that because the Final Rule is not in accordance with law, it must be set aside pursuant to 5 U.S.C. § 706(2)(A). (*Id.*) Baltimore City also argues that the Rule is arbitrary and capricious and unconstitutionally vague. (*Id.* at 21, 29.)

The Government argues that the Supreme Court's 1991 decision in *Rust v. Sullivan* controls. (Defs.' Resp. 8, ECF No. 25 (citing *Rust*, 500 U.S. 173).) The Government contends that the 1988 regulations that were upheld in *Rust* were materially identical to the conditions contained in the Final Rule. It further contends that Section 1008 has not changed since *Rust*, and that the Supreme Court rejected the same arguments that Baltimore City is now advancing. (*Id.*) However, Baltimore City is not relying on its constitutional claims to demonstrate likelihood of success on the merits, but rather, it relies on the Final Rule's violations of laws passed by Congress and enacted after *Rust* was decided. Therefore, this Court must determine whether the Final Rule likely violates these later-enacted laws.

## A.       The Affordable Care Act Non-Interference Mandate

Baltimore City contends that the Gag Rule violates at least three parts of the ACA

Non-Interference Mandate, specifically:

> (3) interferes with communications regarding a full range of treatment options between the patient and the provider. (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care professionals;

42 U.S.C. § 18114.  The Gag Rule prohibits physicians in Title X facilities from counseling

patients about abortion.  *See* 84 Fed. Reg. 7717.  It requires physicians to withhold relevant

medical information from patients, which the City contends violates principles of informed

consent.  Importantly, the Final Rule's restrictions permit a Title X project to give a patient

who specifically requests a referral for abortion a referral list that contains no abortion

providers, requires that the compiled list contain a majority of providers that are not

responsive to the patient's request, and does not allow the Title X project to identify which

providers are responsive to the patient's request.  *See* § 59.14(c)(2).  This reflects a government

policy to circumvent and ignore the ACA Non-Interference Mandate, which is still existing

law.[9]

Medical groups and numerous individual physicians have denounced the rule as a

violation of basic medical ethics.  *See, e.g.*, American Medical Association ("AMA") Comment

1-3 (expressing opposition to the Proposed Rule, the AMA stated, "We are very concerned

---

[9]      *See Nat'l Fed. of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (upholding the constitutionality of the ACA).  While still being challenged, *see Texas v. United States*, 352 F. Supp. 3d 665 (N.D. Tex. 2018) (currently under appeal), it is valid law, and until such time as Congress enacts new law, or the United States Supreme Court declares it unconstitutional, HHS may not ignore it.

that the proposed changes, if implemented, would undermine patients' access to high-quality medical care and information, dangerously interfere with the patient-physician relationship and conflict with physicians' ethical obligations, exclude qualified providers, and jeopardize public health." (available at http://bit.ly/2Zexyyi)).  The AMA strongly opposed the proposed rule as interfering with and undermining the patient-physician/provider relationship.  *Id.*

The Government contends that the prefatory language in ACA Section 1554, "[n]otwithstanding any other provision of this Act," limits the scope of Section 1554 to the ACA.  (Defs.' Resp. 16, ECF No. 25 (quoting 42 U.S.C. § 18114).)  However, this Court agrees with Judge Chen's reasoning that the plain text does not limit its application to the ACA.  *See California v. Azar*, 2019 WL 1877392, at *21-22.  Rather, its express language prohibits the HHS Secretary from promulgating "any regulation" violative of the stated principles.  42 U.S.C. § 18114.

Accordingly, Baltimore City has shown that the Final Rule likely violates the ACA § 1554 by creating unreasonable barriers for patients to obtain appropriate medical care, interfering with communications between the patient and health care provider, and restricting full disclosure, which violates the principles of informed consent.  Baltimore City adds that the Separation Requirement also violates the ACA Non-Interference Mandate by creating unreasonable barriers and by impeding timely access to health care services.

### B.    Appropriations Nondirective Mandate

Every year since 1996, including the current year, Congress has added a directive to Title X appropriations funding, specifying that pregnancy counseling must be "nondirective." *See, e.g.*, Pub. L. No. 115-245, 132 Stat. 2981, 3070-3071 (2018).  Baltimore City argues that the

Final Rule would force Title X projects to steer women away from one particular option, abortion, while directing them toward another option, carrying the pregnancy to term, regardless of the patient's stated desires. (Pl.'s Mot. Mem. 20, ECF No. 11-1.) Baltimore City contends that requiring a referral for prenatal care, even when the client has rejected that option, is coercive and directive, and thus, in direct violation of Congress' mandate. (*Id.*) Baltimore City further asserts that Title X itself is violated for the same reasons, i.e., the Title X statute requires that services be "strictly voluntary" and "never . . . coercive." 84 Fed. Reg. 7731. Requiring physicians to disregard a patient's wishes and provide information that the patient does not want or need eliminates the ability of patients to make fully informed "voluntary" choices about their medical care.

The Government argues that there is a distinction between consulting and referrals, and Congress did not silently supplant *Rust* and repeal part of Title X with its appropriations language. (Defs.' Resp. 18-20, ECF No. 25.) There is, however, no "silent repeal" at issue because the nondirective counseling provision is not inconsistent with *Rust*. The *Rust* Court did not purport to interpret Section 1008 as requiring directive counseling, but rather, it held that the 1988 rule was one permissible interpretation of Section 1008. *See* 500 U.S. at 184 ("The language of § 1008—that '[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning'—does not speak directly to the issues of counseling, referral, advocacy, or program integrity."). The Government does not dispute that HHS has an obligation to comply with Congress' Nondirective Mandate.

This Court finds persuasive the reasoning in *California v. Azar*, in which Judge Chen found that "nondirective counseling" encompasses referrals, "as indicated by statute,

regulations, and industry practice." 2019 WL 1877392, at *16. "Congress' use of the identical term 'nondirective counseling' should be read consistently across the [Public Health Service Act] and the HHS Appropriations Acts to include referrals as part of counseling." *Id.* Also, HHS itself characterizes referrals as part of counseling throughout the Final Rule as well in its earlier Title X Guidelines. *Id.* Finally, accepted usage of the term within the medical field supports the interpretation that the term is used to include referrals. *Id.*

The Final Rule is likely to violate the Nondirective Mandate, because to be nondirective, "the medical professional must 'present[ ] the options in a factual, objective, and unbiased manner . . . rather than present[ ] the options in a subjective or coercive manner." 84 Fed. Reg. at 7747. Requiring providers to refer a patient to prenatal health care even when the patient has expressly stated that she does not want prenatal care is coercive, not "nondirective." Requiring providers to provide a referral list that is limited to those that do not provide abortion, even if the client specifically requests an abortion referral, is coercive, not "nondirective." Requiring providers to exclude abortion as one of multiple options available to a client facing an unwanted pregnancy, especially if she has asked about that option, is coercive, not "nondirective." Therefore, Baltimore City is likely to succeed on the merits of its claim that the Final Rule violates the Nondirective Mandate.

## C. Administrative Procedures Act Review

Baltimore City also argues that the promulgation of the Final Rule was arbitrary and capricious. (Pl.'s Mot. Mem. 21, ECF No. 11-1.) Under the Administrative Procedures Act, when a court reviews an agency decision, the court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706. Of course, the standard of review is narrow, and "a court is not to substitute its judgment for that of the agency." *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 513 (2009). As the United States Court of Appeals for the Fourth Circuit has recently noted in *Casa De Maryland v. U.S. Department of Homeland Security,* "we must engage in a searching and careful inquiry of the [administrative] record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." — F.3d —, 2019 WL 2147204, at *12 (4th Cir. 2019) (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).

An agency rulemaking is arbitrary and capricious if, in coming to its decision, the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. E.P.A.*, — U.S. —, 135 S. Ct. 2699, 2706 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* An agency must also consider and respond to significant comments received during the period for public comment. *Perez v. Mortgage Bankers Ass'n*, — U.S —, 135 S. Ct. 1199, 1203 (2015).

Further, where, as here, an agency adopts a rule that directly contradicts prior agency conclusions of fact and law, it must acknowledge that it is doing so and give a reasonable

justification for the change. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016); *Fox*, 556 U.S at 515. Baltimore City asserts that the Final Rule failed to consider the "serious reliance interests" engendered by the prior policy that HHS now seeks to abruptly and radically change with little notice. *See, e.g.*, *Encino Motorcars*, 136 S. Ct. at 2126 ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'").

The Government argues that the Final Rule easily satisfies the deferential standard that courts must apply. (Defs.' Resp. 25-26, ECF No. 25 (citing *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).) According to the Government, HHS simply read Title X as it did in 1988, determined that the intervening 2000 regulations were inconsistent, and decided that the Final Rule was necessary to properly implement Section 1008. (*Id.* at 26.) The Government further contends that the Supreme Court's rejection of the arbitrary-and-capricious challenges in *Rust* controls this Court now, and in response to the many comments received, HHS simply explained that the Supreme Court had already upheld a materially indistinguishable Gag Rule and Separation Requirement, which it regards as sufficient justification. (*Id.* at 26-27.)

However, simply because the Supreme Court in *Rust* found that the then-Secretary had amply justified the change in interpretation with a reasoned analysis, does not mean that the current Secretary has also done so. The ensuing changes in the societal landscape and in the law over the past 30 years means that HHS cannot rely on the same justifications as it did in 1988. *See California v. Azar*, 2019 WL 1877392, at *27. The Government adds that regardless whether this Court accepts that *Rust* controls, HHS's promulgation of the Final Rule satisfies

the arbitrary and capricious standard and that it adequately explained why the policy change was appropriate.

This Court notes that the California, Oregon, and Washington courts determined that the Final Rule's promulgation was likely arbitrary and capricious. *See California v. Azar*, 2019 WL 1877392, at *28-41; *Oregon v. Azar*, 2019 WL 1897475, at *15; *Washington v. Azar*, 2019 WL 1868362, at *8. However, in the context of a preliminary injunction based on the limited record before it, this Court is uncomfortable with making such a finding. The "searching and careful inquiry of the [administrative] record" that is required to determine if it is likely that HHS's rule-making in this instance was arbitrary and capricious would be more prudently handled on a fully-developed record. *Casa de Maryland*, 2019 WL 2147204, at *12. This Court need not undertake that analysis at this time in the context of a preliminary injunction. Having found that the Final Rule likely violates provisions of the Affordable Care Act and the Continuing Appropriations Act, the threshold inquiry on the merits has been established. Therefore, it is unnecessary to continue with analysis of the remaining claims. Indeed, Baltimore City does not rely on its constitutional claims to support its request for a preliminary injunction. Therefore, this Court declines to reach a conclusion at this time on whether Baltimore City is likely to succeed in demonstrating that the Final Rule's promulgation was arbitrary and capricious.

## II.     Irreparable Harm

"[A] party seeking a preliminary injunction must prove that he or she is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) (quoting *Winter*, 555 U.S. at 20). The Fourth Circuit recognizes irreparable injury

when a movant makes a "clear showing" of "actual and imminent" harm that "cannot be fully rectified by the final judgment after trial," including economic harms if damages are not recoverable or could not undo a permanent harm resulting from a temporary loss of funds. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216-18 (4th Cir. 2019). Baltimore City asserts that if the Final Rule goes into effect, it will be forced to choose between complying and forcing its doctors to engage in the unethical practice of medicine, thus endangering the lives of patients and residents, or to withdraw from Title X and forego its financial support. (Pl.'s Mot. Mem. 30, ECF No. 11-1.) Either choice results in irreparable harm.

Should Baltimore City lose Title X funding, which represented $1,430,000 in 2017, the lost funds could not be recovered should it ultimately succeed with this litigation, because HHS enjoys sovereign immunity that precludes monetary recovery. *See Mountain Valley Pipeline*, 915 F.3d at 217-18; *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012). Baltimore City's clinics rely on Title X funding to provide services, and the loss of that funding threatens their continued existence. Clinic closures will result in a loss of medical services available to Baltimore City residents. The Fourth Circuit has held that irreparable injury occurs when the public loses medical services. *See Pashby*, 709 F.3d at 329 ("[B]eneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care.").

Should Baltimore City choose to comply with the Final Rule in order to retain Title X funding, its medical providers would be forced to contravene their ethical obligations to provide patient-centered, nondirective care. *See Richmond Med. Ctr. for Women v. Gilmore*, 11 F.

Supp. 2d 795, 809 (E.D. Va. 1998) (finding irreparable injury where physicians would be "constrained to alter their medical advice to, and their medical care of, their patients contrary to their best judgments"). Further, if the Final Rule goes into effect, Baltimore City will be impacted by the inevitable withdrawal of other current Title X recipients,[10] which will drive patients to Baltimore City health systems, placing greater demands on their capacity and ability to provide service.

This Court finds that Baltimore City has established a likelihood of irreparable harm unless the Final Rule is enjoined. The Government argues that there is no imminent threat of irreparable harm because a nationwide injunction has already been issued. However, the Government has also advised this Court that it is appealing the nationwide injunctions and has requested stays of the injunctions pending appeal. Should the stays be granted or the appeals successful, Baltimore City remains at risk and is not a party to the other cases. The earlier granting of a nationwide injunction does not prevent this Court from entering an overlapping injunction if all of the preliminary injunction factors are met in this case. *See Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018); *California v. Azar*, 2019 WL 1877392, at *2 n.1.

III.    **Balance of Equities and Public Interest**

When a preliminary injunction is sought against the government, and "the government's interest is the public interest," the last two factors merge. *Kravitz v. United States Dep't of Commerce*, — F. Supp. 3d —, Case No.: GJH-18-1041, Case No.: GJH-18-1570, 2019

---

[10]    For example, Planned Parenthood has stated that it will withdraw if the Final Rule goes into effect. (Pl.'s Mot. Mem. 34, ECF No. 11-1.)

WL 1510449, at *54 (D. Md. 2019) (quoting *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009)). In this case, the public interest and balance of equities favors the Plaintiff.

Baltimore City seeks to avoid potentially costly and harmful public health problems as well as protect the health and welfare of its citizens, especially women. It is in the public interest to continue the existing structure and network of healthcare that Baltimore City currently provides while this Court addresses legal challenges to the Final Rule. On the other hand, should the Government ultimately succeed in this litigation, it will suffer only a delay in implementation of the Final Rule. It is in the public's interest to ensure that government agencies abide by federal laws such as the ACA Non-Interference Mandate and the Appropriations Nondirective Mandate passed by Congress and still binding law.

Therefore, the balance of equities and public interest weighs in favor of Baltimore City and the issuance of a preliminary injunction.

## IV.    Scope of Injunction

Having found that Baltimore City is likely to succeed on the merits of at least some of its claims, it is likely to be irreparably harmed absent an injunction, and the balance of equities and public interest weigh in favor of an injunction, this Court shall issue a preliminary injunction.[11] Baltimore City requests that the injunction be broad enough to protect its interests and asks this Court to issue the injunction against enforcement of the Final Rule in Maryland. Baltimore City notes that it is close in proximity to multiple other States and

---

[11]    Noting that "preliminary injunctions are by [their] very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by [their] for-the-time-beingness." *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573–74 (7th Cir. 1999) (citation omitted).

municipalities whose people make use of its health system. Loss of funding in neighboring states will put pressure on Baltimore's health system, as mobile patients come from neighboring communities to make use of Baltimore's resources.

As noted above, two other United States District Courts have issued injunctions on a nationwide basis. In those cases, the courts had to consider nationwide plaintiffs, such as the National Family Planning and Reproductive Health Association, Planned Parenthood Federation, and the American Medical Association, who are not present in this case.[12] In this case, a preliminary injunction that is limited to Maryland is narrowly tailored to avoid irreparable harm to the sole Plaintiff, Baltimore City.

---

[12] This Court notes that there also exists some skepticism regarding the increased issuance of nationwide injunctions by United States District Judges. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–25 (2018) ("'[U]niversal' or 'nationwide' injunctions . . . have become increasingly common. District courts . . . have begun imposing universal injunctions without considering their authority to grant such sweeping relief. These injunctions are beginning to take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.") (Thomas, J., concurring); *California v. Azar*, 2019 WL 1877392, at *43 noting the Ninth Circuit's instruction regarding broad relief: "[d]istrict judges must require a showing of nationwide impact or sufficient similarity to the plaintiff states to foreclose litigation in other districts." (quoting *California v. Azar*, 911 F.3d 558 (9th Cir. 2018)). This Court further cautions against the danger of nationwide injunctions leading to forum shopping. It is clear that most of the nationwide injunctions issued against the federal government in the past two years have come from United States District Courts in states less favorably inclined politically to the current administration. It is also clear that most of the nationwide injunctions against the federal government in the years before also came from United States District Courts in states less favorably inclined politically to the previous administration. It is important that the federal judiciary not allow itself to become part of "underlying policy debate." *Sierra Club v. Trump*, 2019 WL 2247689, at *1 (quoting *In re Aiken Cty.*, 725 F.3d at 257).

## CONCLUSION

For the foregoing reasons:

1.     Plaintiff's Motion for Preliminary Injunction (ECF No. 11) is GRANTED;

2.     The Health and Human Services Final Rule, entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7,714 (Mar. 4, 2019), *to be codified at* 42 C.F.R. Part 59, is ENJOINED as to enforcement in the State of Maryland.

A separate order follows.

Dated: May 30, 2019.

\_\_\_\_/s/_____
Richard D. Bennett
United States District Judge