IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, | * |
| Plaintiff, | * |
| v. | *  Civil Action No.: RDB-19-1103 |
| ALEX M. AZAR II, Secretary of Health and Human Services, *et al.*, | * |
| Defendants. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

As has been discussed at length in this Court's Memorandum Opinion of May 30, 2019 (ECF No. 43), the Plaintiff Mayor and City Council of Baltimore ("Baltimore City" or "the City") challenges a rule promulgated by the United States Department of Health and Human Services ("HHS" or "the Government") that would amend federal regulations with respect to the funding of family planning services.[1]  This Court granted a Preliminary Injunction against HHS with respect to Counts I and II, alleging violations of the Non-Interference Provision of the Affordable Care Act, 42 U.S.C. § 18114, and the Non-Directive Mandate of the Continuing Appropriations Act, 2019, Pub. L. 115-245, 132 Stat. 2981, 3070-71 (2018).  For the reasons set forth in that Memorandum Opinion of May 30, 2019, this Court held that there was a likelihood of success on the merits with respect to those claims.

---

[1] It has been preceded by similar lawsuits in United States District Courts in the states of California, Oregon, Washington, and Maine.  *California v. Azar*, Case Nos. 19-cv-1184-EMC, 19-cv-1195-EMC (N. D. Cal. filed Mar. 4, 2019); *Oregon v. Azar*, Case Nos. 6:19-cv-0317-MC, 6:19-cv-0318-MC (D. Or. filed Mar. 5, 2019); *Washington v. Azar*, Case No. 1:19-cv-3040-SAB (E.D. Wash. Filed Mar. 5, 2019); *Family Planning Ass'n of Maine v. HHS*, Case No. 1:19-cv-0100-LEW (D. Me. filed Mar. 6, 2019).

On July 2, 2019, a divided panel of the United States Court of Appeals for the Fourth Circuit granted a stay of that injunction pending appeal. (*See* ECF No. 58.)[2] Subsequently, the Fourth Circuit heard oral argument on the interlocutory appeal of the preliminary injunction on September 18, 2019, and a decision has not been rendered. In the interim, community clinics and health centers in Baltimore have been adversely affected as the rule promulgated by HHS has been implemented and remains in effect. Subsequently, this Court dismissed Count IV and Count X of the original ten-count Complaint without prejudice. (ECF No. 74.)

This Court has adhered to a briefing schedule as to the remaining six counts, with Baltimore City and HHS having filed cross-motions for summary judgment. After having held a hearing on January 27, 2020 and having heard the arguments of counsel, this Court has conducted a thorough review of the Administrative Record in this matter. While the Defendant HHS is entitled to Summary Judgment with respect to some of the remaining six counts, specifically Counts III, V, VI, and IX, Baltimore City is entitled to Summary Judgment with respect to Counts VII and VIII. Specifically, after a thorough review of the Administrative Record in this case, this Court holds that the proposed rule as promulgated violates the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, in that it is arbitrary and capricious, being inadequately justified and objectively unreasonable. The Administrative Record reflects that literally every major medical organization in the United States has opposed implementation of this rule. There is almost no professional support for its implementation.

---

[2] While the dissenting opinion adopted the position of this Court, the majority ruled: "Upon consideration of submissions relative to appellants' motion to stay the district court's preliminary injunction pending appeal, the court grants the motion for stay." (ECF No. 58.)

Baltimore City originally brought a ten-Count Complaint pursuant to the Administrative Procedure Act ("APA") against Alex M. Azar II, in his official capacity as the Secretary of Health and Human Services; United States Department of Health and Human Services; Diane Foley, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; and Office of Population Affairs. (Compl., ECF No. 1.) The City challenges the final rule ("Final Rule" or "Rule") entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019), *codified at* 42 C.F.R. Part 59. The Final Rule amends the regulations developed to administer Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a-6, which provides federal funding for family-planning services. (*Id.* at ¶¶ 1, 3.)

After an April 30, 2019 hearing, this Court entered a preliminary injunction on May 30, 2019 as to Counts I and II, enjoining enforcement of the Final Rule in the State of Maryland. (*See* ECF Nos. 43, 44.) Injunctive relief was based on this Court's holding that the Final Rule likely violated provisions of the Affordable Care Act, 42 U.S.C. § 18114, enacted in 2010 (as alleged in Count I), and Congress' Non-Directive Mandate in the Continuing Appropriations Act, 2019, Pub. L. 115-245, 132 Stat. 2981, 3070-71 (2018) (as alleged in Count II). In short, this Court held that existing laws passed by the United States Congress cannot be circumvented by administrative orders of the executive branch of government. On July 2, 2019, a divided panel of the United States Court of Appeals for the Fourth Circuit granted the Government's Motion to Stay the Injunction Pending Appeal. (*See* ECF No. 58.) That appeal remains pending and therefore, at this time, the preliminary injunction that this Court granted is stayed, and the Final Rule is in effect. The Fourth Circuit held oral argument on the

interlocutory appeal of the preliminary injunction on September 18, 2019, and a decision has not yet been issued. *See Mayor and City Council of Baltimore v. Azar*, No. 19-1614 (4th Cir. filed June 6, 2019).

On September 12, 2019, this Court dismissed without prejudice Count IV (Violation of APA § 706—Contrary to Law—Contrary to Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1(a)) and Count X (Violation of APA—Contrary to Constitutional Right—Unconstitutionally Vague), and allowed Counts I, II, III, V, VI, VII, VIII, and IX to proceed on the merits. (ECF No. 74.) Presently pending are the parties' cross-motions for summary judgment on the remaining Counts. (ECF Nos. 81, 82.) This Court held a hearing on January 27, 2020, has heard the arguments of counsel, has reviewed the submissions of the parties, and has reviewed the expansive Administrative Record in this case.

The executive branch of government is not entitled to promulgate administrative rules where an agency's explanation "runs counter to the evidence before the agency." *See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, for the reasons that follow, summary judgment IS ENTERED in favor of Plaintiff on Counts VII and VIII. Specifically, after a thorough review of the Administrative Record in this case, this Court holds that the proposed rule as promulgated violates the Administrative Procedure Act in that it is arbitrary and capricious, being inadequately justified and objectively unreasonable. However, summary judgment IS ENTERED in favor of Defendants on Counts III, V, VI, and IX, alleging that the rule as promulgated is contrary to Title X's voluntariness requirement, contrary to constitutional right pursuant to the First Amendment and Equal Protection under the Fifth Amendment, and without observance of

procedure required by law.  Accordingly, the Government shall be permanently enjoined from implementing or enforcing any portion of the Final Rule in the State of Maryland.

## BACKGROUND

The background of this case was discussed at length in this Court's prior Memorandum Opinion of May 30, 2019 granting Plaintiff's Motion for Preliminary Injunction and this Court's prior Memorandum Order of September 12, 2019, granting in part and denying in part Defendants' Motion to Dismiss.  (*See* ECF Nos. 43, 74.)   In brief, almost fifty years ago, in 1970, Congress enacted Title X, the *only* federal program specifically dedicated to funding family planning services.  Public Health Service Act, 84 Stat. 1506, *as amended* 42 U.S.C. §§ 300 to 300a–6; (Pl.'s Exhibit 4 at PEP109, ECF No. 81-2.)

Title X addresses low-income individuals' lack of equal access to family planning services by authorizing the Secretary of Health and Human Services to "make grants and to enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."  *Id.* § 300(a).  Section 1008 of the Act provides that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning."  *Id.* § 300a–6.  Consistent with this restriction, HHS has never permitted Title X grantees to use Title X funds to perform or subsidize abortions.  *See* 42 C.F.R. §§ 59.5(a)(5), 59.9 (1986).

Title X programs provide sexual and reproductive healthcare with priority given to low-income individuals.  (Pl.'s Exhibit 4 at PEP112, ECF No. 81-2.)  Services include a broad range of contraceptive options; contraceptive education and counseling; breast and cervical

cancer screening; testing, referral, and prevention education for sexually transmitted infections/diseases ("STIs/STDs"), including human immunodeficiency virus ("HIV"); and pregnancy diagnosis and counseling. (*Id.* at PEP109, PEP118-120.)

## I.  The Final Rule.

On May 22, 2018, HHS posted on its website a notice of proposed rulemaking entitled *Compliance With Statutory Program Integrity Requirements*, 83 Fed. Reg. 25,502 ("Proposed Rule"). *See* 84 Fed. Reg. 7714, 7726 (Mar. 4, 2019). The Proposed Rule was published in the Federal Register on June 1, 2018. *Id.*; 83 Fed. Reg. 25,502 (June 1, 2018). During the 60-day public comment period, HHS received more than 500,000 comments.[3] On March 4, 2019, HHS published the Final Rule in the Federal Register. 84 Fed. Reg. 7714 (Mar. 4, 2019), *codified at* 42 C.F.R. Part 59. The Final Rule contains two key provisions that are central to Baltimore City's claims in this case: (1) the counseling restriction or "Gag Rule" that prohibits health professionals from providing their patients with abortion referral information even when requested, except "[i]n cases in which emergency care is required"; and (2) the separation requirement, which requires that all abortion services, and any medical services not complying with the Gag Rule, be physically separated from clinics that provide Title X services. 84 Fed. Reg. at 7747-48, 7788-89. Most of the Rule's provisions, including the counseling restriction, had an implementation date of May 3, 2019 and are now in effect nationwide.[4] *Id.* at 7714. Compliance with the separation requirement is required by March 4, 2020. *Id.*

---

[3] Discussed *infra* on page 7.
[4] *See infra* at page 9, discussing the status of injunctions.

## A. Gag Rule.

The Gag Rule provision of the Final Rule provides that a "Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 84 Fed. Reg. at 7788-89 (codified at 42 C.F.R. § 59.14(a)). If a client specifically requests a referral to an abortion provider, the Title X grantee can at most offer a list of "comprehensive primary health care providers … some, but not the majority" of which may "also provide abortion." *Id.* at 7789. The list cannot identify which providers provide the abortion services she is requesting. The project staff are prohibited from answering a direct inquiry about which providers provide abortion. *Id.* Specialized reproductive health care providers are excluded because the list is limited to "comprehensive primary health care providers." *Id.* At the same time, Title X providers must provide all pregnant patients with a referral for prenatal care, regardless of the patients' wishes, on the basis that prenatal referrals are "medically necessary." *Id.*

The Final Rule does permit referrals for abortion "in cases in which emergency care is required." *Id.* at 7789 (codified at 42 C.F.R. § 59.14(b)(2)). However, the example provided for such emergency is when a "Title X project discovers an ectopic pregnancy in the course of conducting a physical examination of a client." *Id.* (codified at 42 C.F.R. § 59.14(e)(2)). The Rule also explains that "in cases involving rape and/or incest, it would not be considered a violation of the prohibition on referral for abortion as a method of family planning if a patient is provided a referral to a licensed, qualified, comprehensive health service provider who also provides abortion." 84 Fed. Reg. at 7747 n.76.

**B.  Separation requirement.**

The separation requirement mandates that Title X activities be "physically and financially separate" (defined as having an "objective integrity and independence") from prohibited activities, such as the provision of abortion services and any referrals for abortion services that do not meet the Gag Rule requirements.  84 Fed. Reg. at 7789 (codified at 42 C.F.R. § 59.15)).  "Mere bookkeeping separation of Title X funds from other monies is not sufficient."  *Id.*  Whether a Title X provider meets this requirement is determined by the Secretary based on "a review of facts and circumstances," including but not limited to the following relevant factors:

> (a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities; (c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and (d) The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

*Id.*

The Preamble to the Final Rule explains, "[a]s long as the Title X clinic and the hospital facilities where abortions are performed are not collocated or located adjacent to each other within a hospital building or complex, it is highly likely that the hospital is not violating the requirement."  *Id.* at 7767.  However, at a "free-standing clinic, physical separation might require more circumstances to be taken into account in order to satisfy a clear separation between Title X services and abortion services," and such a clinic "would likely present greater opportunities for confusion between Title X and abortion services, including, for example, the

same entrances, waiting rooms, signage, examination rooms, and the close proximity between Title X and impermissible services." *Id.* The deadline for physical separation is March 4, 2020. *Id.* at 7714.

## II.     Administrative Record.

The Administrative Record ("Record" or "AR") contains more than 500,000 comments submitted during the 60-day comment period. The Record comprises more than 400,000 pages and was provided to the Court on two CDs. (*See* ECF Nos. 78, 80.) The Final Rule garnered comments from the American Medical Association (AR 269330); American Academy of Family Physicians (AR 104075); American Academy of Nursing (AR 107970); American College of Obstetricians and Gynecologists (AR 268836); American Academy of Pediatrics (AR 277786); and the American College of Physicians (AR 281203). Literally every major medical organization in the United States has noted its opposition to the Final Rule. In addition, comments were submitted from the Baltimore City Health Department (AR 245402); City Health Department Leaders from Kansas City, Boston, San Antonio, Chicago, Los Angeles, Cleveland, and Baltimore City (AR 245623); State Attorneys General from the States of Washington, Oregon, Vermont, and the Commonwealth of Massachusetts (AR 278551); Planned Parenthood (AR 316400); Guttmacher Institute (AR 264415); and the American Civil Liberties Union (AR 305722), among many others.

In addition to public comments, the Administrative Record contains previous HHS Title X rules and regulations, executive orders, Supreme Court cases, statutes including the Affordable Care Act and the HHS Appropriations Act of 2018, reports from the United States Congress, and internet news and journal articles. (*See* AR 397110 – AR 407171.)

### III. Title X in Baltimore City.

Title X has been providing $1,430,000 each year to the City of Baltimore and serves over 16,000 patients per year. (Pl.'s Exhibit 7 at PEP365, ECF No. 81-2.) As of 2019, the City directly has operated three community clinics and four school-based health centers that provide Title X services, and it has overseen Title X funding to ten subgrantee health clinics in the community, including clinics at Johns Hopkins University, Baltimore Medical System, Family Health Centers of Baltimore, and University of Maryland, in addition to clinics offering comprehensive care in middle and high schools. (Pl.'s Exhibit 8 at PEP380-81, ECF No. 81-2.) Planned Parenthood operated additional Title X sites in Baltimore City until it withdrew its Title X participation in August of 2019 as a result of the Final Rule. (Pl.'s Mot. at 4-5, ECF No. 81-1; Pl.'s Exhibit 8 at PEP390, ECF No. 81-2; Amicus Brief at 14 n.44, ECF No. 89.)

Of the 16,000 women, men, and minors who received care from Title X clinics in Baltimore City in 2017, 86% had incomes at or below the federal poverty line. (*Id.* at PEP381.) Title X centers serve one third of women in Baltimore City who need publicly funded contraceptive services. (*Id.*) Baltimore City has experienced a 55% reduction in teen pregnancy over the last ten years, which its public health officials attribute to the assistance of Title X funding. (*Id.* at 383; Pl.'s Exhibit 9 at PEP 396-97, ECF No. 81-2.)

### IV. Procedural Setting.

This case is one of multiple cases that have been filed across the nation challenging HHS's Final Rule. *See California v. Azar*, Case Nos. 19-cv-1184-EMC, 19-cv-1195-EMC (N. D. Cal. filed Mar. 4, 2019); *Oregon v. Azar*, Case Nos. 6:19-cv-0317-MC, 6:19-cv-0318-MC (D. Or. filed Mar. 5, 2019); *Washington v. Azar*, Case No. 1:19-cv-3040-SAB (E.D. Wash. Filed

Mar. 5, 2019); *Family Planning Ass'n of Maine v. HHS*, Case No. 1:19-cv-0100-LEW (D. Me. filed Mar. 6, 2019). Preliminary injunctions were issued by the California, Oregon, and Washington courts. *California v. Azar*, 385 F. Supp. 3d 960 (N.D. Cal. 2019); *Oregon v. Azar*, 389 F. Supp. 3d 898 (D. Or. 2019); *Washington v. Azar*, 376 F. Supp. 3d 1119 (E.D. Wash. 2019). On June 20, 2019, the United States Court of Appeals for the Ninth Circuit granted a stay of the preliminary injunctions that were granted in the California, Oregon, and Washington State cases. *California v. Azar*, 927 F.3d 1068 (9th Cir. 2019) (per curiam). An *en banc* rehearing of the stay decision was held on September 23, 2019 and remains pending. *See* 927 F.3d 1045 (9th Cir. July 3, 2019). In the Maine case, the District Court denied the plaintiff's motion for a nation-wide injunction, which it had previously withdrawn and renewed after the stay of the nation-wide injunctions was granted. *Family Planning Ass'n of Maine v. HHS*, 404 F. Supp. 3d 286 (D. Me. 2019).

In the instant case, Plaintiff originally asserted ten causes of action: (I) Violation of Administrative Procedure Act ("APA"), 5 U.S.C. § 706—Contrary to Law—Contrary to Affordable Care Act ("ACA")'s Non-Interference Provision, 42 U.S.C. § 18114; (II) Violation of APA § 706—Contrary to Law—Contrary to Nondirective Mandate of the Consolidated Appropriations Act of 2018; (III) Violation of APA § 706—Contrary to Law—Contrary to Tile X, 42 U.S.C. §§ 300(a), 300a(a); (IV) Violation of APA § 706—Contrary to Law— Contrary to Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1(a); (V) Violation of APA § 706—Contrary to Constitutional Right—First Amendment; (VI) Violation of APA—Contrary to Constitutional Right—Equal Protection Under Fifth Amendment; (VII) Violation of APA—Arbitrary and Capricious—Inadequately Justified;

(VIII) Violation of APA—Arbitrary and Capricious—Objectively Unreasonable; (IX) Violation of APA—Without Observance of Procedure Required by Law; and (X) Violation of APA—Contrary to Constitutional Right—Unconstitutionally Vague. (Compl., ECF No. 1.)

Baltimore City also filed a Motion for Preliminary Injunction (ECF No. 11), which this Court granted on May 30, 2019, enjoining enforcement of the Final Rule in the State of Maryland. (*See* ECF Nos. 43, 44.) The Court's decision addressed the likelihood of success on the merits of only Counts I and II. (ECF No. 43.) The Court declined to address the likelihood of success on the merits of Plaintiff's arbitrary and capricious claims (Counts VII and VIII) because "[t]he 'searching and careful inquiry of the [administrative record]' that is required to determine if it is likely that HHS's rule-making in this instance was arbitrary and capricious would be more prudently handled on a fully-developed record." (*Id.* at 23 (quoting *Casa de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 703 (4th Cir. 2019)).)

On June 6, 2019, Defendants filed a Notice of Interlocutory Appeal (ECF No. 48; USCA No. 19-1614) and a Motion to Stay the Injunction Pending Appeal (ECF No. 49). This Court denied the stay motion (ECF No. 56), but a divided panel of the Fourth Circuit granted Defendants' motion to stay pending appeal (ECF No. 58). Baltimore City filed an Emergency Motion for Rehearing *en banc* to vacate the stay of injunction, and that motion was denied on September 3, 2019. (*See* ECF No. 73.) Oral argument on the interlocutory appeal of this Court's preliminary injunction was held on September 18, 2019, and a decision has not yet been issued.

Defendants also filed a Motion to Stay Proceedings Pending Appeal (ECF No. 62) and a Motion to Dismiss (ECF No. 67). This Court denied the Motion to Stay Proceedings (ECF No. 70) and granted in part and denied in part the Motion to Dismiss (ECF No. 74). Specifically, the Court dismissed without prejudice Count IV (Violation of APA § 706— Contrary to Law—Contrary to Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1(a)) and Count X (Violation of APA—Contrary to Constitutional Right— Unconstitutionally Vague), and allowed Counts I, II, III, V, VI, VII, VIII, and IX to proceed on the merits. (ECF No. 74.)

On October 17, 2019, Defendants filed separately two CDs containing the Administrative Record. (ECF No. 80.) Subsequently, the parties filed cross-motions for summary judgment on the remaining Counts, for which a hearing was held on Monday, January 27, 2020. (ECF Nos. 81, 82, 91.) The Court has considered the submissions of the parties, has heard the arguments of counsel, and has conducted a careful and searching inquiry of the Administrative Record. For the reasons that follow, Defendant HHS is entitled to Summary Judgment with respect to some of the remaining six counts, specifically Counts III, V, VI, and IX. Baltimore City is entitled to Summary Judgment with respect to Counts VII and VIII. Specifically, after a thorough review of the Administrative Record in this case, this Court holds that the proposed rule as promulgated violates the Administrative Procedure Act in that it is arbitrary and capricious, being inadequately justified and objectively unreasonable.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, in conjunction with the federal-question jurisdiction statute, provides the statutory basis for a court to review a

final agency action. Claims seeking review of an agency action under the APA "are adjudicated without a trial or discovery, on the basis of an existing administrative record … [and accordingly] are properly decided on summary judgment." *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 659 (D. Md. 2007). The standard set forth in Rule 56 of the Federal Rules of Civil Procedure governing summary judgment, however, "does not apply because of the limited role of a court reviewing the administrative record." *Hospira, Inc. v. Burwell*, No. GJH-14-2662, 2014 WL 4406901, at *9 (D. Md. Sept. 5, 2014) (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62-63 (D.D.C Mar. 23, 2012); *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 197-98 (D.D.C. 2011)). Rather, summary judgment is the mechanism by which the court decides as a matter of law whether "the administrative record permitted the agency to make the decision it did." *Id.* (quoting *Kaiser Found. Hosps.*, 828 F. Supp. 2d at 198).

The APA requires a reviewing court to:

> hold unlawful and set aside agency action … found to be … (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law….

5 U.S.C. §§ 706(2)(A)-(D).

The arbitrary and capricious standard requires a reviewing court to consider whether the agency:

> Relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A court must uphold an action if the record shows that the agency had a rational basis for the decision; the court may not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43; *Defenders of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014). This is a "highly deferential standard which presumes the validity of the agency's action," *Natural Resources Defense Council v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993), and an agency's decision should only be overruled upon a finding that the agency has "failed to consider relevant factors and committed a clear error of judgment." *Md. Dep't of Health & Mental Hygiene v. Ctrs. for Medicare & Medicaid Servs.*, 542 F.3d 424, 428 (4th Cir. 2008) (citation omitted); *see also Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

When reviewing an agency decision, the Court "must engage in a searching and careful inquiry of the [administrative] record, so that [it] may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Casa de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 703 (4th Cir. 2019) (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).

## ANALYSIS

This case presents a unique procedural posture. Counts I and II are on appeal in conjunction with the United States Court of Appeals for the Fourth Circuit's review of this Court's state-wide preliminary injunction.[5] In addition, Counts IV and X of the original ten-

---

[5] In its Memorandum Opinion and Order granting Plaintiff's Motion for Preliminary Injunction, the Court found that Plaintiff was likely to succeed on the merits of Count I (Violation of Administrative Procedure Act ("APA"), 5 U.S.C. § 706—Contrary to Law—Contrary to Affordable Care Act ("ACA")'s Non-

count Complaint were dismissed without prejudice. (ECF No. 74.) The remaining six Counts, specifically Count III (Violation of APA § 706—Contrary to Law—Contrary to Tile X, 42 U.S.C. §§ 300(a), 300a(a)), Count V (Violation of APA § 706—Contrary to Constitutional Right—First Amendment), Count VI (Violation of APA—Contrary to Constitutional Right—Equal Protection Under Fifth Amendment), Count VII (Violation of APA—Arbitrary and Capricious—Inadequately Justified), Count VIII (Violation of APA—Arbitrary and Capricious—Objectively Unreasonable), and Count IX (Violation of APA—Without Observance of Procedure Required by Law) are ripe for review.

## I.     The Gag Rule and the Separation Requirement provisions of the Final Rule are arbitrary and capricious (Counts VII and VIII).

This Court declined to join with its sister courts in undertaking an arbitrary and capricious analysis in the context of its preliminary injunction finding because such an analysis "would be more prudently handled on a fully-developed record." (ECF No. 43 at 23.) Having carefully reviewed the Administrative Record in this case, this Court is compelled to find that

---

Interference Provision, 42 U.S.C. § 18114) and Count II (Violation of APA § 706—Contrary to Law—Contrary to Nondirective Mandate of the Consolidated Appropriations Act of 2018). (ECF Nos. 43, 44.) The Court determined that the Final Rule likely violates the Affordable Care Act's non-interference provision "by creating unreasonable barriers for patients to obtain appropriate medical care, interfering with communications between the patient and health care provider, and restricting full disclosure, which violates the principles of informed consent." (ECF No. 43 at 18.) The Court also determined that the Final Rule likely violates the non-directive mandate of the 2018 appropriations act because "[r]equiring providers to refer a patient to prenatal health care even when the patient has expressly stated that she does not want prenatal care is coercive, not 'nondirective.'" (*Id.* at 20.) The Court rejected Defendants' arguments that *Rust v. Sullivan*, 500 U.S. 173 (1991), foreclosed Plaintiff's claims under Counts I and II because Plaintiff relies on "violations of laws passed by Congress and enacted after *Rust* was decided." (*Id.* at 16.)

This Court will not dispose of Counts I and II as they remain on appeal in connection with the Fourth Circuit's review of this Court's preliminary injunction. *See Allstate Ins. Co. v. McNeill*, 382 F.2d 84, 88 (4th Cir. 1967) ("an appeal from an order granting or refusing an injunction brings before the appellate court the entire order, not merely the propriety of the injunctive relief…the appellate court may consider and decide the merits"); *see also* 11A Wright & Miller, Fed. Prac. & Proc. § 2962 (3d ed. 2019) ("If an interlocutory appeal is taken, the appellate court may consider the merits of the case, to the extent they relate to the propriety of granting the injunctive relief... .").

HHS's promulgation of the Final Rule was arbitrary and capricious for three key reasons.[6] First, HHS has inadequately explained its decision to "disagree" with comments by every major medical organization regarding the Final Rule's contravention of medical ethics. Second, HHS inadequately considered the "reliance interests" that would be disrupted by its change in policy. Finally, HHS inadequately considered the likely costs and benefits of the physical separation requirement.

### A. HHS failed to explain how the Final Rule is consistent with medical ethics.

A "searching and careful inquiry" of the record reveals that literally all of the nation's major medical organizations have grave medical ethics concerns with the Final Rule. HHS had before it comments from the American College of Obstetricians and Gynecologists, the American Medical Association ("AMA"), the American Academy of Family Physicians, the American Academy of Nursing, the American Academy of Pediatrics, and the American College of Physicians. (*See* AR 268836; AR 269330; AR 104075; AR 107970; AR 277786; AR 281203.) Every single one of these organizations stated that the Final Rule would violate the established principles of medical ethics. (*Id.*) The American College of Obstetricians and Gynecologists, which comprises 90% of the nation's obstetricians and gynecologists cautioned

---

[6] Plaintiff asserted two additional grounds supporting its arbitrary and capricious claims. Specifically, Plaintiff argued that HHS failed to explain its departure from HHS's prior interpretation of the non-directive mandate that non-directive pregnancy counseling includes pregnancy referrals, and that HHS inadequately explained the limitation requiring only advanced practice providers ("APPs"). These arguments are unpersuasive because HHS did indeed recognize and explain its departure from its prior interpretations and also explained that "APPs are qualified, due to their advanced education, licensing, and certification to diagnose and treat patients while advancing medical education and clinical research." *See* 84 Fed. Reg. at 7716-17, 7728 & n.41-42. HHS's explanation of its departure is consistent with the principle from *Encino Motorcars LLC v. Navarro*, 136 S.Ct. 2117, 2126 (2016) that an agency acts arbitrarily and capriciously where it fails to "display awareness that it is changing position" and "show that there are good reasons for the change." In any event, Plaintiff's claims do not rise and fall on these arguments.

that the Rule "would put the patient-physician relationship in jeopardy by placing restrictions on the ability of physicians to make available important medical information, permitting physicians to withhold information from pregnant women about the full range of their options, and erecting greater barriers to care, especially for minority populations." (AR 268838.) The American College of Obstetricians and Gynecologists further noted that the prenatal referral requirement "would further limit the care options offered to patients, and is not consistent with evidence-based medicine." (AR 268840.)

The AMA, citing to its *Code of Medical Ethics*, explained that the gag rule "would not only undermine the patient-physician relationship, but also could force physicians to violate their ethical obligations … to counsel patients about all of their options in the event of a pregnancy." (AR 269332.) The American Academy of Family Physicians, the American Academy of Nursing, the American Academy of Pediatrics, and the American College of Physicians raised similar concerns. (*See* AR 104075; AR 107970; AR 277786; AR 281203.) Planned Parenthood Federation of America and four states (Washington, New York, Hawaii, and Oregon) all notified HHS that they would have to exit the Title X program because the restrictions are "fundamentally at odds with the professional and ethical obligations of health care professionals." (AR 316414.) The American Academy of Nursing commented that "these rules prioritize ideology over evidence-based professional recommendations and the government's own independent evaluations," and urged HHS "to remain religiously and morally neutral in its funding, policies, and activities to ensure that individuals [] do not receive a limited scope of services and that the ethical obligations of healthcare providers are not compromised." (AR 107975.)

In the face of these grave concerns from all of the nation's leading medical organizations, HHS declared that it "disagrees with commenters contending the proposed rule … infringes on the legal, ethical, or professional obligations of medical professionals." 84 Fed. Reg. at 7724. With absolutely no support from any significant leading medical association in the United States, HHS has responded that, "the Department believes that the final rule adequately accommodates medical professionals and their ethical obligations while maintaining the integrity of the Title X program." *Id.* Further, "[t]he Department believes that medical ethics, regulations concerning the practice of medicine, and malpractice liability standards are not inconsistent with this final rule," because "[t]he Supreme Court upheld similar conditions and restrictions in *Rust* as a constitutionally permissible exercise of Congress's Spending Power." *Id.* at 7748. Finally, Defendants argue that HHS noted that the restrictions are necessary to ensure compliance with the federal conscience statutes, including the Church Amendment, the Coats-Snowe Amendment, and the Weldon Amendment. *Id.* at 7716.

The arbitrary and capricious standard requires this Court to consider whether the agency:

> Relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the

choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)). None of Defendants' explanations square with what is required of the agency under *State Farm*. There is no question that HHS has "offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* It has indeed rendered an opinion for which there is no evidentiary support.

As a preliminary matter, Defendants' argument that the conscience statutes explain HHS's decision that the Final Rule is consistent with medical ethics is misplaced. In HHS's explanation for its disagreement with the comments on medical ethics, it does not mention the conscience statutes. 84 Fed. Reg. at 7724, 7748. Accordingly, the Court will not "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

HHS's entire justification for disagreement with the comments regarding medical ethics is that *Rust* would not have upheld similar regulations if they were inconsistent with medical ethics. *Rust*, however, never addressed the implications of the 1988 regulations on medical ethics and noted only in dicta that "[u]nder the Secretary's regulations … a doctor's ability to provide, and a woman's right to receive, information concerning abortion and abortion-related services outside the context of the Title X project remains unfettered." 500 U.S. at 203. Furthermore, *Rust* did not evaluate the 2019 Final Rule and the Administrative Record that HHS considered in promulgating it. As the United States District Court for the Northern District of California explained, "[t]he justifications supporting the 1988 regulations

upheld in *Rust* cannot insulate the Final Rule from review now, almost three decades later." *California v. Azar*, 385 F. Supp. 3d 960, 1001 (N.D. Cal. 2019).

Nowhere in the Final Rule does the HHS provide a reasoned basis for its disagreement with the medical ethics concerns outlined by the nation's major medical organizations. HHS did not identify any code of medical ethics, any medical organization, or any medical provider who could confirm HHS's belief that medical ethics permit healthcare providers to comply with the gag rule's restrictive counseling on abortion. At the summary judgment motions hearing of January 27, 2020, Defendants conceded as much in response to this Court's questioning whether there was anything in the record that counters the medical ethics concerns raised by the professional organizations. (*See* Jan. 27, 2020 Hr'g Tr. at 25:23-26:4, ECF No. 92 ("**The Court**: We looked through the record. I can find no record of any professional organization of any kind that has disputed the position taken by those organizations I've just mentioned with respect to the matter of the medical ethics. But if I'm wrong, tell me. **Counsel for HHS**: No, you're right about that point, Your Honor.").)

To be sure, HHS was not required to demonstrate that any professional organization supported the Rule, but it was required to provide a reasoned explanation for its disagreement with the medical ethics concerns of every major medical association in the country, while simultaneously finding the Final Rule consistent with medical ethics. *See State Farm*, 463 U.S. at 43 ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)). This, it did not do. At the motions hearing, Defendants asserted, without

explanation, that "the agency unquestionably addressed concerns about medical ethics, it considered them and it came to a different conclusion as to whether medical ethics would be violated." (*See* Jan. 27, 2020 Hr'g Tr. at 33:3-6, ECF No. 92.)  It may well be that the agency considered the concerns, but the agency has failed to articulate a satisfactory explanation for its "different conclusion" from the nation's leading medical organizations.  Such agency action is plainly arbitrary and capricious.

### B.  HHS did not account for reliance interests.

HHS also failed to adequately consider how the Rule would disrupt access for many who rely on Title X services.  HHS "conclude[d] these final rules will contribute to more clients being served, gaps in service being closed, and improved client care," and stated that "commenters did not provide evidence that the rule will negatively impact the quality or accessibility of Title X services."  84 Fed. Reg. at 7723, 7780.  In stark contrast to HHS's assertions, the administrative record is replete with comments by both Title X grantees and non-grantees alike who provided evidence that the Final Rule would leave millions with reduced access to healthcare.  HHS had before it evidence from the Baltimore City Health Department, City Health Department Leaders, Planned Parenthood, Guttmacher Institute, National Family Planning & Reproductive Health Association, and the American Medical Association, among others, all of which detailed how the Rule would limit access to Title X care and force a large number of providers out of the Title X program.  (*See* AR 245402; AR245623; AR316400; AR 264415; AR 308011; AR 269330.)  Indeed, Planned Parenthood withdrew its Title X participation in August of 2019 as a result of the Final Rule.  (Pl.'s Mot.

at 4-5, ECF No. 81-1; Pl.'s Exhibit 8 at PEP390, ECF No. 81-2; Amicus Brief at 14 n.44, ECF No. 89.)

For example, the AMA commented that the Final Rule places Title X patients at risk because "[i]n states that have excluded certain providers from their family planning programs, research shows serious public health consequences." (AR 269333.) To support this assertion, the AMA cited a study published in the *New England Journal of Medicine* that found that blocking patients from Planned Parenthood in Texas resulted in a 35% decline in women in publicly-funded programs using the most effective form of birth control and denying women access to the contraceptive care they needed resulted in a 27% increase in births among women who had previously used the most effective form of birth control. (*Id.*)

A public health researcher and professor in the Departments of Pediatrics and Obstetrics, Gynecology & Reproductive Sciences at the University of California, San Francisco, provided HHS with data reflecting the impact of the Rule on Title X providers, concluding that the Rule "radically underestimates the costs that it will impose on patients, providers, and society." (*See* AR 388063-388065.) In addition, the Guttmacher Institute provided a detailed chart showing the state-by-state impact if Planned Parenthood alone withdrew from the Title X program. (AR 264435-264436.) The chart shows that, as of 2015, 39% of women receiving Title X services in Maryland were served at Planned Parenthood centers. (*See* AR 264435.)

HHS, contrary to the overwhelming evidence in the record, decided that more clients would be served and gaps in service would be closed, resulting in improved client care. HHS cited only one comment that suggested a support for that position. The Christian Medical

Association contends that new providers who do not support the provision of abortion services may enter the program. *See* 84 Fed. Reg. at 7780 n.138. However, HHS entirely ignored the evidence that raised concerns about the Final Rule's reducing access to Title X services nationwide.

### C. HHS did not account for compliance costs.

HHS did not adequately consider the likely costs of the physical separation requirement. HHS estimated that a Title X provider would face a compliance cost of $30,000.[7] 84 Fed. Reg. at 7782. HHS reasoned that there were uncertainties associated with the requirement and that "entities will usually choose the lowest cost method to come into compliance." *Id.* at 7781-82. In contrast, the administrative record reflects comments estimating the likely cost of the requirement far exceeds HHS's estimate of $30,000. Comments from City Health Department Leaders, the Center for Reproductive Rights, the Family Planning Council of Iowa, Planned Parenthood, and the Guttmacher Institute, among others, all estimated costs well beyond $30,000 to comply with the separation requirement. (*See* AR 245623; AR 315959; AR 279351; AR 316400; AR 264415.)

A comment by City Health Department Leaders from Baltimore, Kansas City, Boston, San Antonio, Chicago, Los Angeles, and Cleveland, estimated that the Rule would impose ongoing compliance costs, such as the administrative cost of maintaining separate accounts for funding streams and associated staffing needs. (AR 245623-245624.) Planned Parenthood estimated average capital costs of nearly $625,000 per affected service site. (AR 316430-316431.) The Center for Reproductive Rights noted that hiring one additional full-time staff

---

[7] The estimate in the Proposed Rule was $20,000. *See* 83 Fed. Reg. 25502, 25525 (June 1, 2018.)

member would cost well more than the proposed rule's $20,000 estimate.  (AR 315994.)  The Family Planning Council of Iowa explained, "it typically costs hundreds of thousands, or even millions, of dollars to locate and open any health care facilities (and would also cost much more than $10,000-30,000 to establish even an extremely simple and limited office), staff it, purchase workstations, set up record-keeping systems, etc."  (AR 279362.)

After reviewing the administrative record, this Court concurs with its sister court in the Northern District of California that "HHS's conclusory response to commenters' evidence-backed concerns about the serious problems the physical separation requirement will cause flies in the face of established APA principles." *California v. Azar*, 385 F. Supp. 3d at 1010. Under the arbitrary and capricious standard, the Court may not "substitute its judgment for that of the agency." *State* Farm, 463 U.S. at 43. The Court must, however, set aside agency action that it finds to be arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*  In this case, for all of the reasons explained above, the Court is compelled to set aside the Final Rule as arbitrary and capricious. Thus, summary judgment is entered in favor of Plaintiff on Counts VII and VIII.

### D. Injunctive Relief.

Plaintiff seeks declaratory and permanent injunctive relief restraining the enforcement, operation, and execution of the Final Rule by enjoining Defendants, their agents, employees, appointees, or successors, from enforcing, threatening to enforce, or otherwise applying the provisions of the Final Rule against Baltimore City and its subgrantees.  (Compl. at 67, ECF

No. 1.)  For the reasons explained *supra* as to Counts VII and VIII, Baltimore City shall be granted declaratory relief and a permanent injunction of the Final Rule in the State of Maryland.  As the Court acknowledged previously in granting the preliminary injunction (ECF No. 43), Baltimore City is close in proximity to multiple other States and municipalities whose people make use of its health system.  Loss of funding in neighboring states will put pressure on Baltimore's health system, as mobile patients come from neighboring communities to make use of Baltimore's resources.  In this case, a permanent injunction that is limited to Maryland is narrowly tailored to avoid irreparable harm to the sole Plaintiff, Baltimore City.[8]

## II.      HHS complied with the APA's rule-making procedures (Count IX).

Plaintiff's challenge to HHS's compliance with the APA's rule-making procedures fails. Administrative agencies are required, under the APA, to comply with certain procedures before issuing a rule.  5 U.S.C. § 553; *North Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012).  "Generally stated, the APA's rulemaking provisions require that the agency publish a notice of proposed rule-making in the Federal Register; permit interested parties the opportunity to comment on the proposed rule; and, after considering the submitted comments, issue a concise general statement of the rule's purpose along with the final rule."  *Mayor and City Council of Baltimore v. Trump*, Civil Action No. ELH-18-3636,

---

[8] As noted in its Memorandum Opinion granting Plaintiff's preliminary injunction, this Court is cognizant of the skepticism regarding the increased issuance of nationwide injunctions by United States District Judges. (*See* ECF No. 43 at 27 n.12 (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–25 (2018); *California v. Azar*, 385 F. Supp. 3d 960, 1021 (N.D. Cal. 2019)).  In his recent concurrence granting a stay of a nationwide injunction, Justice Gorsuch addressed "the increasingly common practice of trial courts ordering relief that transcends the cases before them."  *Dep't of Homeland Security, et al. v. New York, et al.*, No. 19A785, 589 U.S. ____ (Jan. 27, 2020) (Gorsuch, J., concurring).  He explained, "these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case," but "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."  *Id.*  Here, the Court has provided only the necessary relief for the particular Plaintiff in this case, Baltimore City.

2019 WL 4598011, at *22 (D. Md. Sept. 20, 2019) (citing 5 U.S.C. § 553; *N.C. Growers' Ass'n, Inc.*, 702 F.3d at 763)). The Fourth Circuit has instructed that courts "must be strict in reviewing an agency's compliance with procedural rules." *Id.* (quoting *N.C. Growers Ass'n, Inc.*, 702 F.3d at 764).

When a party challenges the adequacy of notice of a change in a proposed rule occurring after the comment period, the Fourth Circuit applies the "logical outgrowth test." *See Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1105 (4th Cir. 1985). "Notice is 'adequate' if the changes in the original plan 'are in character with the original scheme,' and the final rule is a 'logical outgrowth' of the notice and comments already given." *Id.* If the final rule "substantially departs from the terms or substance of the proposed rule," then the notice is inadequate. *Id.* (quoting *Rowell v. Andrus*, 631 F.2d 699, 702 n.2 (10th Cir. 1980)).

Plaintiff argues that HHS's 60-day comment period deprived the public of a meaningful opportunity to comment on the Rule and that the advanced practice provider ("APP") requirement was not a logical outgrowth of the proposed rule. As Plaintiff concedes, however, 60 days is generally accepted as the "reasonable minimum time for comment" on a typical rule. (ECF No. 81-1 at 24 (citing *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Despite Plaintiff's belief that this Rule warranted an extension of the comment period because the proposal was "complex or based on scientific or technical data," Plaintiff cites no authority finding a 60-day comment period unreasonable. Plaintiff's reliance on *Hollingsworth v. Perry*, 558 U.S. 183 (2010) is misplaced, as *Hollingsworth* did not involve a comment period under the APA, but instead addressed the propriety of a thirty-day comment period for amendments to a federal court's local rules, pursuant to 28 U.S.C. § 2071(b) and Federal Rule of Civil

Procedure 83(a). *See* 558 U.S. at 191-93. Moreover, this Court does not have authority to "impose upon the agency its own notion of which procedures are best." *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978). Simply put, HHS did not violate APA's rule-making procedures by implementing a 60-day comment period.

With respect to the APP requirement, HHS has contended that this requirement was a logical outgrowth of the proposed rule because HHS clearly indicated in the proposed rule that it was considering limiting which professionals would be qualified to perform counseling. In fact, the proposed rule contained an even stricter limitation that only physicians could perform counseling. *See* 83 Fed. Reg. 25502, 25507, 25518, 25531 (June 1, 2018). Thus, the change from allowing only physicians to allowing advanced practice providers to perform counseling was not a substantial departure from the terms of the proposed rule. *See California v. Azar*, 385 F. Supp. 3d 960, 1019-21 (N.D. Cal. 2019) (holding that HHS did not violate the APA's notice and comment procedures because the APP requirement was a logical outgrowth of the proposed rule). Accordingly, summary judgment is entered in favor of Defendants on Count IX.

### III.    The Final Rule does not violate Title X (Count III).

Plaintiff asserts that the gag rule violates Title X's voluntariness requirement and that *Rust* never addressed this particular argument. Title X provides in relevant part that:

> The acceptance by any individual of [Title X] family planning services or … information (including educational materials) … shall be voluntary and shall not be a prerequisite to eligibility for or receipt of any other service or assistance from, or to participation in, any other program of the entity or individual that provided such service or information.

42 U.S.C. § 300a-5.  Plaintiff relies on HHS's January 2001 "Program Guidelines for Project Grants for Family Planning Services," which explained that "[u]se by any individual of project services must be solely on a voluntary basis.  Individuals must not be subjected to coercion to receive services or to use or not to use any particular method of family planning." (*See* Pl.'s Exhibit 41 at PEP904, ECF No. 81-2.)  The Final Rule reaffirms this principle:  "This final rule continues the historical Title X emphasis that family planning must be voluntary—the definition of 'family planning' adopted by the final rule, and thus, applicable to the Title X program explicitly states that 'family planning methods and services are never to be coercive and must always be strictly voluntary.'"  84 Fed. Reg. at 7724.

Plaintiff's argument must fail because the voluntariness requirement predates the Supreme Court's decision in *Rust*, which, contrary to Plaintiff's assertion, had before it the argument that the 1988 regulations violated Title X.  *See* Reply Br. For State Petitioners at 6-7, *Rust v. Sullivan* (No. 89-1392), 1990 WL 505761 (Oct. 15, 1990).  The petitioners in *Rust* argued that "Title X itself provides that '[t]he acceptance by any individual of family planning services…shall be voluntary.'  By withholding relevant information from Title X beneficiaries, the Secretary prevents them from making the informed, voluntary family planning decisions that Congress intended to facilitate."  *Id.*  Despite this argument, the Supreme Court found that "[t]he broad language of Title X plainly allows the Secretary's construction of the statute." 500 U.S. at 184.  While Plaintiff urges this Court to find the gag rule violates Title X in the same way that this Court found the rule likely violates the ACA and the 2018 appropriations act, the Court made clear that its preliminary injunction finding was based on the "Final Rule's violations of laws passed by Congress and enacted *after Rust* was decided." (ECF No. 43 at 16

(emphasis added).) In contrast, Title X's voluntariness requirement predates *Rust*, and the Supreme Court found the same rule at issue to be consistent with Title X. Accordingly, summary judgment is entered in favor of Defendants on Count III.

## IV. *Rust v. Sullivan* **forecloses Plaintiff's constitutional claims (Counts V and VI).**

Plaintiff argues that the Final Rule violates both the First Amendment to the United States Constitution and the equal protection component of the Due Process Clause of the Fifth Amendment. The Supreme Court's decision in *Rust* forecloses both arguments. This Court notes that its earlier ruling that *Rust* does not foreclose Plaintiff's claims as to the Affordable Care Act (Count I) and the Appropriations Act (Count II) should not be taken to mean that the Final Rule is unconstitutional, as asserted by the Plaintiff.

### A. First Amendment claim (Count V).

The First Amendment to the United States Constitution states in pertinent part that "Congress shall make no law … abridging the freedom of speech." U.S. CONST. amend. I. It is undisputed that the 1988 regulations, considered in *Rust*, established a broader prohibition on abortion counseling than the 2019 regulations. *Compare* 53 Fed. Reg. 2922, 2945 (Feb. 2, 1988) ("a Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning"), *with* 84 Fed. Reg. 7714, 7788-89 (Mar. 4, 2019) ("A title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take nay other affirmative action to assist a patient to secure such an abortion.").

In *Rust*, the Supreme Court upheld the 1988 regulations and found that they did not violate the First Amendment. 500 U.S. at 192-200. Specifically, the Supreme Court explained

that the 1988 regulations "refus[ed] to fund activities, including speech, which are specifically excluded from the scope of the project funded," and the Constitution generally permits "the Government [to] choose not to subsidize speech." *Id.* at 194-95, 200. The Court noted that the Government is "simply insisting that public funds be spent for the purposes for which they were authorized." *Id.* at 196.

Despite Plaintiff's efforts to distinguish the constitutional arguments made here with those presented to the *Rust* Court, this Court is bound by the Supreme Court's finding that an even stricter abortion counseling provision is consistent with the First Amendment. First, the Supreme Court in *Rust* clearly stated that the "Title X program regulations do not significantly impinge upon the doctor-patient relationship." 500 U.S. at 200. Plaintiff asserts, without support, that Title X patients have become more reliant on their doctors since *Rust.* Consequently, Plaintiff insists that the Supreme Court's decision in *Legal Services Corporation v. Velazquez*, 531 U.S. 533 (2001), finding that the government cannot interfere with traditional relationships like the attorney-client relationship, should govern here to find that the 2019 regulations interfere with the doctor-patient relationship. Plaintiff relies on Justice Scalia's dissent in *Velazquez* suggesting that *Rust*'s finding as to the doctor-patient relationship was in serious doubt. *See* 531 U.S. at 553-54 (Scalia, J., dissenting). However, the majority in *Velazquez* distinguished *Rust* and the doctor-patient relationship, explaining, "[t]he advice from the attorney to the client and the advocacy by the attorney to the courts cannot be classified as governmental speech even under a generous understanding of the concept. In this vital respect this suit is distinguishable from *Rust*." 531 U.S. at 543.

Second, Plaintiff's argument that the Supreme Court's decision in *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995), rather than *Rust*, controls here, because Title X is not a "government-messaging program" anymore. In *Rosenberger*, Supreme Court applied strict scrutiny to a government program that was intended to fund the private speech of students, not to fund a government message. 515 U.S. at 830-37. Again, the Court distinguished *Rust*, explaining, "[t]here [in *Rust*], the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program." *Id.* at 833. Plaintiff cites no authority that Congress intended to change the nature of the Title X program, nor has the Supreme Court so indicated.

Finally, Plaintiff argues that *Rust* did not address the withholding of information from patients and patients' rights to receive truthful information. Whether the *Rust* Court addressed this specific argument is of no significance, as the Court ultimately upheld as consistent with the First Amendment an even stricter form of the gag rule that required providers to withhold *all* information regarding abortion. *See* 500 U.S. at 193-94 ("[A] doctor employed by the project may be prohibited in the course of his project duties from counseling abortion or referring for abortion. This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope."). Defendants are granted summary judgment on Count V.

## B. Fifth Amendment claim (Count VI).[9]

---

[9] Defendants briefly argue that Plaintiff lacks standing to bring its equal protection claim. At the dismissal stage, the Court determined that Plaintiff's allegations sufficed to establish standing. (ECF No. 74 at 11-12.) There is no reason for the Court to find otherwise at the summary judgment stage, as Plaintiff has provided ample citation to the record to support its allegations of injury to Baltimore City as a result of the Rule, including comments from the City's Health Commissioner and, more specifically, the fact of Planned Parenthood's departure from the Title X program.

Plaintiff's Fifth Amendment arguments are equally unsuccessful. The equal protection component of the Due Process Clause of the Fifth Amendment "prohibits the government from intentionally treating one group differently than other similarly situated groups where no rational basis exists for doing so." *Mayor and City Council of Baltimore v. Trump*, Civil Action No. ELH-18-3636, 2019 WL 6970631, at *9 (D. Md. Dec. 19, 2019) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)); *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Classifications based on sex must survive heightened scrutiny and the burden of justification for the classification lies with the government defendant. *See Goulart v. Meadows*, 345 F.3d 239, 260 (4th Cir. 2003); *United States v. Virginia*, 518 U.S. 515 (1996). The government must show that the challenged classification "serves important government objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533.

When reviewing a restriction on abortion funding, the Supreme Court has explained that the "constitutional test applicable to government abortion-funding restrictions is not the heightened-scrutiny standard that our cases demand for sex-based discrimination, but the ordinary rationality standard." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273 (1993) (citing *Maher v. Roe*, 432 U.S. 464 (1977); *Harris v. McRae*, 448 U.S. 297 (1980)).

Plaintiff asserts that the Final Rule is subject to heightened scrutiny because it is based on stereotypes rather than physical differences between women and men. *See Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730-31 (2003). Plaintiff argues that the Rule reflects "different sex-role expectations of male and female patients," because the Rule requires referral for prenatal care of a pregnant woman visiting a Title X clinic, but it does not place

the same requirement on a man visiting a Title X clinic who discloses that his wife is pregnant. (ECF No. 81-1 at 33.)

Try as it may, Plaintiff cannot escape the fact that the restrictions at issue here are promulgated under a program that prohibits federal funds to be used to refer for abortion, and as the Fourth Circuit has explained, "[t]he rationality of distinguishing between abortion services and other medical services when regulating physicians or women's healthcare has long been acknowledged by Supreme Court precedent." *Greenville Women's Clinic v Bryant*, 222 F.3d 157, 173 (4th Cir. 2000). The distinction the regulations make based on sex is the result of the simple fact that only women can get pregnant. Under *Bray*, Defendants need only provide a rational basis for the Rule, which is satisfied by HHS's determination that prenatal care is medically necessary for a pregnant woman and unborn child, a consideration that does not apply to non-pregnant Title X patients, whether they are non-pregnant women or men. Accordingly, summary judgment is granted in favor of Defendants on Count VI.

## V.     Severability

Defendants urge the Court not to vacate the Final Rule in its entirety. The APA requires that courts "set aside agency action" "not in accordance with law." 5 U.S.C. § 706(2)(A). "Whether an administrative agency's order or regulation is severable…depends on the issuing agency's intent." *North Carolina v. FERC*, 730 F.2d 790, 795-96 (D.C. Cir. 1984) (citing *FPC v. Idaho Power Co.*, 344 U.S. 17, 20-21 (1952)). "[T]he ultimate determination of severability will rarely turn on the presence or absence" of a severability clause. *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (quoting *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968)).

The test for severability of a subsection of an agency's regulations turns on "whether severance of the subsection would 'impair the function of the statute as a whole,' so that 'the regulation would not have been passed but for its inclusion.'" *West Virginia Ass'n of Community Health Ctrs., Inc. v. Sullivan*, 737 F. Supp. 929, 942 (S.D. W. Va. 1990) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). This "two-part inquiry involv[es] (1) an examination of the functional independence of the section to determine whether it is an 'integral' part of the whole, and (2) an examination of the agency's intent in enacting the regulations." *Id.* (citations omitted). If there is "substantial doubt" that the issuing agency would have promulgated the rule in the absence of the challenged portion, then "partial affirmance is improper." *North Carolina v. FERC*, 730 F.2d at 795-96.

The Final Rule contains a severability clause providing, "[t]o the extent a court may enjoin any part of the rule, the Department intends that other provisions or parts of the provisions should remain in effect." 84 Fed. Reg. 7714, 7725 (Mar. 4, 2019). There is authority in this circuit finding that similar provisions in the 1988 Title X regulations, specifically the prohibition on abortion counseling and referral and the physical separation requirement, could be severed from the regulations as a whole, because the remaining provisions were "functionally independent of the other[s] in that [they are] directed at specific conduct as varied as pro-abortion lobbying and the use of Title X project funds for payment of dues to groups advocating abortion as a method of family planning." *See West Virginia Ass'n of Community Health Ctrs., Inc.*, 737 F. Supp. at 943 (S.D. W. Va. 1990). That holding is distinguishable because that court set aside the agency action on the basis that certain provisions were constitutionally impermissible, not because the agency acted arbitrarily and

capriciously in promulgating the rule. *See id.* at 941 n.10 ("the court concludes that HHS provided a reasoned basis for promulgating the new regulations").

Here, the Final Rule labels the gag rule and the physical separation requirement as "[m]ajor [p]rovisions," 84 Fed. Reg. at 7715, while the 1988 regulations made no such representation. *See* 53 Fed. Reg. 2922 (Feb. 2, 1988). Moreover, the remaining provisions either incorporate by reference the gag rule and/or the physical separation requirement provisions or include language similar to that used in those provisions such that the Court is unable to delineate which remaining provisions could or should survive. For example, subsection 59.5 entitled "What requirements must be met by a family planning project?", uses the same language from the gag rule: "provide, promote, refer for, or support abortion as a method of family planning." 42. U.S.C. § 59.5.

Apart from relying on the severability provision, Defendants have not explained how the provisions should be severed. Indeed, in the summary judgment motions hearing, Defendants relied only on the severability provision in arguing that Defendants would "prefer" that the entire Rule not be vacated if the Court granted summary judgment in favor of Plaintiff. (*See* Jan. 27, 2020 Hr'g Tr. at 43:23-44:1, ECF No. 92.) The Court finds that the gag rule and the physical separation requirement are not functionally independent provisions, and indeed, has substantial doubts that HHS would have promulgated the rule in the absence of the challenged portions. Accordingly, the Court will permanently enjoin the entirety of the Final Rule in the State of Maryland.

## CONCLUSION

For the foregoing reasons:

1. Plaintiff's Motion for Summary Judgment (ECF No. 81) is GRANTED IN PART AND DENIED IN PART;

2. Defendants' Motion for Summary Judgment (ECF No. 82) is GRANTED IN PART AND DENIED IN PART;

3. JUDGMENT IS ENTERED in favor of Plaintiff with respect to Counts VII and VIII;

4. JUDGMENT IS ENTERED in favor of Defendants with respect to Counts III, V, VI, and IX;

5. The Defendants, and all other officers, agents, employees and attorneys of the Department of Health and Human Services, are PERMANENTLY ENJOINED in the State of Maryland from implementing or enforcing the Health and Human Services Final Rule, entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7,714 (Mar. 4, 2019), *codified at* 42 C.F.R. Part 59.

A separate Order follows.

Dated: February 14, 2020.

                               _____/s/_____

                               Richard D. Bennett
                               United States District Judge