## ON REHEARING EN BANC

### PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

### No. 19-1614

―――――――――――

MAYOR AND CITY COUNCIL OF BALTIMORE,

Plaintiff – Appellee,

v.

ALEX M. AZAR, II, in his official capacity as the Secretary of Health and Human Services; DIANE FOLEY, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES; OFFICE OF POPULATION AFFAIRS,

Defendants – Appellants.

--------------------------------------------------------------

OHIO; ALABAMA; ARKANSAS; INDIANA; KANSAS; LOUISIANA; NEBRASKA; OKLAHOMA; SOUTH CAROLINA; SOUTH DAKOTA; TENNESSEE; TEXAS; UTAH; WEST VIRGINIA,

Amici Supporting Appellants,

NEW YORK, NEW YORK CITY HEALTH + HOSPITALS AND 10 LOCAL GOVERNMENTS; NATIONAL HEALTH LAW PROGRAM; ADVOCATES FOR YOUTH; AMERICAN MEDICAL STUDENT ASSOCIATION; AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE; COMMUNITY CATALYST; THE ENDOCRINE SOCIETY; FAMILIES USA; IN OUR OWN VOICE: NATIONAL BLACK WOMEN'S REPRODUCTIVE JUSTICE AGENDA; JUVENILE LAW CENTER; THE LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS; NATIONAL COUNCIL OF JEWISH WOMEN; NARAL PRO-CHOICE AMERICA; NATIONAL ABORTION FEDERATION; NATIONAL IMMIGRATION LAW CENTER; NATIONAL INSTITUTE FOR REPRODUCTIVE HEALTH; NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH; NATIONAL PARTNERSHIP FOR WOMEN &

FAMILIES; NATIONAL WOMEN'S HEALTH NETWORK; NATIONAL
WOMEN'S LAW CENTER; NORTHWEST HEALTH LAW ADVOCATES;
POSITIVE WOMEN'S NETWORK-USA; POWER TO DECIDE; UNION FOR
REFORM JUDAISM; CENTRAL CONFERENCE OF AMERICAN RABBIS;
WOMEN OF REFORM JUDAISM; MEN OF REFORM JUDAISM; UNITE FOR
REPRODUCTIVE & GENDER EQUITY; WHITMAN-WALKER HEALTH;
WOMENHEART; YWCA OF THE USA; NATIONAL CENTER FOR LESBIAN
RIGHTS; GLMA: HEALTH PROFESSIONALS ADVANCING LGBT
EQUALITY; THE LGBT MOVEMENT ADVANCEMENT PROJECT;
NATIONAL LGBTQ TASK FORCE; EQUALITY FEDERATION; SEXUALITY
INFORMATION AND EDUCATION COUNCIL OF THE UNITED STATES;
FAMILY EQUALITY COUNCIL; THE   NATIONAL CENTER FOR
TRANSGENDER EQUALITY; HIV MEDICINE ASSOCIATION; GLBTQ
LEGAL ADVOCATES & DEFENDERS; LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INCORPORATED; THE HUMAN RIGHTS CAMPAIGN;
TRANSGENDER LAW CENTER; BAY AREA LAWYERS FOR INDIVIDUAL
FREEDOM; THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK
UNIVERSITY SCHOOL OF LAW; NATIONAL CENTER FOR YOUTH LAW;
AMERICAN ACADEMY OF PEDIATRICS; AMERICAN COLLEGE OF
OBSTETRICIANS AND GYNECOLOGISTS; AMERICAN COLLEGE OF
PHYSICIANS; AMERICAN MEDICAL ASSOCIATION; SOCIETY FOR
ADOLESCENT HEALTH AND MEDICINE; SOCIETY FOR MATERNAL-
FETAL MEDICINE; ZACHARY D. CLOPTON; AMANDA FROST; SUZETTE
MALVEAUX; MILA SOHONI; ALAN TRAMMELL; CALIFORNIA; NEVADA;
COLORADO; CONNECTICUT; DELAWARE; HAWAII; ILLINOIS; MAINE;
MARYLAND; MASSACHUSETTS; MICHIGAN; MINNESOTA; NEW JERSEY;
NEW MEXICO; NEW YORK; NORTH CAROLINA; OREGON;
PENNSYLVANIA; RHODE ISLAND; VERMONT; VIRGINIA; WASHINGTON;
DISTRICT OF COLUMBIA,

Amici Supporting Appellee.

⸻

**No. 20-1215**

⸻

MAYOR AND CITY COUNCIL OF BALTIMORE,

Plaintiff – Appellee,

v.

2

ALEX M. AZAR, II, in his official capacity as the Secretary of Health and Human Services; DIANE FOLEY, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES; OFFICE OF POPULATION AFFAIRS,

Defendants – Appellants.

-------------------------------------------------------------

KENTUCKY; ALABAMA; ARKANSAS; INDIANA; LOUISIANA; NEBRASKA; OHIO; OKLAHOMA; SOUTH CAROLINA; SOUTH DAKOTA; TENNESSEE; TEXAS; UTAH; WEST VIRGINIA,

Amici Supporting Appellants.

AMERICAN MEDICAL ASSOCIATION; ZACHARY D. CLOPTON; AMANDA FROST; SUZETTE MALVEAUX; MILA SOHONI; ALAN TRAMMELL; CALIFORNIA; NEVADA; COLORADO; CONNECTICUT; DELAWARE; DISTRICT OF COLUMBIA; HAWAII; ILLINOIS; MAINE; MARYLAND; MASSACHUSETTS; MICHIGAN; MINNESOTA; NEW JERSEY; NEW YORK; NORTH CAROLINA; OREGON; PENNSYLVANIA; RHODE ISLAND; VERMONT; VIRGINIA; WASHINGTON; NEW MEXICO,

Amici Supporting Appellee.

———————

Appeals from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge.  (1:19-cv-01103-RDB)

———————

Argued:  May 7, 2020                          Decided:  September 3, 2020

———————

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

———————

19-1614 dismissed, and 20-1215 affirmed by published opinion.  Judge Thacker wrote the opinion, in which Chief Judge Gregory and Judges Motz, King, Keenan, Wynn, Floyd, and Harris joined.  Judge Diaz filed a separate opinion concurring in the judgments.  Judge

Wilkinson wrote a separate dissenting opinion. Judge Richardson wrote a dissenting opinion, in which Judges Wilkinson, Niemeyer, Agee, Quattlebaum, and Rushing joined.

--------

**ARGUED:**     Jaynie Lilley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Andrew Tutt, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellee. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Hashim M. Mooppan, Deputy Assistant Attorney General, Brinton Lucas, Senior Counsel, Michael S. Raab, Joshua Dos Santos, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Andre M. Davis, City Solicitor, Dana Petersen Moore, Acting City Solicitor, Suzanne Sangree, Senior Counsel for Public Safety & Director of Affirmative Litigation, CITY OF BALTIMORE DEPARTMENT OF LAW, Baltimore, Maryland; Drew A. Harker, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C.; Stephanie Toti, LAWYERING PROJECT, New York, New York; Priscilla J. Smith, Brooklyn, New York, Faren M. Tang, REPRODUCTIVE RIGHTS & JUSTICE PROJECT AT YALE LAW SCHOOL, New Haven, Connecticut, for Appellee. Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Stephen P. Carney, Deputy Solicitor General, Jason D. Manion, Deputy Solicitor General, Shams H. Hirji, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Curtis T. Hill, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana. Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas. Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Doug Peterson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Mike Hunter, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Jason Ravnsborg, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH DAKOTA, Pierre, South Dakota, for Amicus State of South Dakota. Herbert H. Slatery III, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE, Nashville, Tennessee, for Amicus State of Tennessee. Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Sean Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia.

4

Zachary W. Carter, Corporation Counsel, Richard Dearing, Claude S. Platton, Jamison Davies, Melanie C.T. Ash, MacKenzie Fillow, THE CITY OF NEW YORK, New York, New York; Mark A. Flessner, Corporation Counsel, Benna Ruth Solomon, Deputy Corporation Counsel, CITY OF CHICAGO, Chicago, Illinois; Michael N. Feuer, City Attorney, Danielle L. Goldstein, Deputy City Attorney, CITY OF LOS ANGELES, Los Angeles, California; Philippa M. Guthrie, Corporation Counsel, Legal Department, CITY OF BLOOMINGTON, Bloomington, Indiana; Angela Wheeler, City Attorney, FLINT CITY ATTORNEY'S OFFICE, Flint, Michigan; Zack Klein, City Attorney, CITY OF COLUMBUS, Columbus, Ohio; Dennis J. Herrera, City Attorney, CITY AND COUNTY OF SAN FRANCISCO, San Francisco, California; Ronald C. Lewis, City Attorney, Judith L. Ramsey, Chief, General Litigation Section, Collyn Peddie, Senior Assistant City Attorney, CITY OF HOUSTON, Houston, Texas; James R. Williams, County Counsel, COUNTY OF SANTA CLARA, San Jose, California; Barbara J. Parker, City Attorney, CITY OF OAKLAND, Oakland, California; Peter S. Holmes, City Attorney, CITY OF SEATTLE, Seattle, Washington, for Amici The City of New York, New York City Health + Hospitals, and 10 Local Governments. Aaron D. Ford, Attorney General, Heidi Parry Stern, Solicitor General, Jeffrey M. Conner, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Las Vegas, Nevada, for Amicus State of Nevada. Xavier Becerra, Attorney General, Renu R. George, Senior Assistant Attorney General, Kathleen Boergers, Supervising Deputy Attorney General, Ketakee Kane, Deputy Attorney General, Karli Eisenberg, Deputy Attorney General, CALIFORNIA DEPARTMENT OF JUSTICE, Oakland, California, for Amicus State of California. Phil Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Clare E. Connors, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, Hawaii, for Amicus State of Hawaii. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Gurbir S. Grewal, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey.

Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, Albany, New York, for Amicus State of New York. Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Amicus State of North Carolina. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Josh Shapiro, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Harrisonburg, Pennsylvania, for Amicus Commonwealth of Pennsylvania. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Martha Jane Perkins, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina, for Amici National Health Law Program, Advocates for Youth, American Medical Student Association, American Society for Reproductive Medicine, Community Catalyst, The Endocrine Society, Families USA, In Our Own Voice: National Black Women's Reproductive Justice Agenda, Juvenile Law Center, The Leadership Conference on Civil and Human Rights, National Council of Jewish Women, NARAL Pro-Choice America, National Abortion Federation, National Immigration Law Center, National Institute for Reproductive Health, National Latina Institute for Reproductive Health, National Partnership for Women & Families, National Women's Health Network, National Women's Law Center, Northwest Health Law Advocates, Positive Women's Network—USA, Power to Decide, Union for Reform Judaism, Central Conference of American Rabbis, Women of Reform Judaism, Men of Reform Judaism, Unite for Reproductive & Gender Equality, Whitman-Walker Health, WomenHeart, and YWCA USA. Shannon Minter, Julianna Gonen, Amy Whelan, Julie Wilensky, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California; James E. Hough, New York, New York, Andre Fontana, MORRISON & FOERSTER LLP, San Francisco, California, for Amici National Center for Lesbian Rights, Bay Area Lawyers for Individual Freedom, Equality Federation, Family Equality Council, GLMA: Health Professionals Advancing LGBTQ Equality, The HIV Medicine Association, The National Center for Transgender Equality, The National LGBTQ Task Force, The Sexuality Information and Education Council of the United States (SIECUS), THE LGBT Movement Advancement Project, Lambda Legal Defense and Education Fund, Inc., GLBTQ Legal Advocates & Defenders, The Human Rights Campaign, and Transgender Law Center. Madison Condon, Bethany A. Davis Noll, Richard L. Revesz, Jason Schwartz, Institute for Policy Integrity, NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York, for Amicus Institute for Policy Integrity at New York University School of Law. Bina G. Patel, David D. Doak, QUINN EMANUEL URQUHART &

SULLIVAN, LLP, San Francisco, California, for Amicus National Center for Youth Law. Thomas N. Bulleit, Andrew J. Sutton, Washington, D.C., Lisa H. Bebchick, Catherine J. Djang, Amy W. Malone, New York, New York, Daniel W. Richards, East Palo Alto, California, Haley Eagon, ROPES & GRAY LLP, Boston, Massachusetts for Amici American College of Obstetricians and Gynecologists, American Academy of Pediatrics, American College of Physicians, Society for Adolescent Health and Medicine, and Society for Maternal-Fetal Medicine. Ruth E. Harlow, Jennessa Calvo-Friedman, Hillary Ledwell, Brigitte Amiri, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amicus National Family Planning & Reproductive Health Association. James R. Sigel, MORRISON & FOERSTER LLP, San Francisco, California, for Amici Professors Zachary Clopton, Amanda Frost, Suzette Malveaux, Mila Sohoni, and Alan Trammell. Leonard A. Nelson, Kyle A. Palazzolo, AMERICAN MEDICAL ASSOCIATION, Chicago, Illinois, for Amicus American Medical Association.

---

THACKER, Circuit Judge:

In these consolidated appeals, we address the propriety of the district court's preliminary and permanent injunctions. These injunctions halt implementation of a Health and Human Services ("HHS") rule that, inter alia, prohibits physicians and other providers in Title X programs from referring patients for an abortion, even if that is the patient's wish. Instead, it requires them to refer the patient for prenatal care. *See Compliance With Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714-01 (March 4, 2019) (the "Final Rule"). The Final Rule also requires entities receiving Title X funds, but offering abortion-related services pursuant to another source of funds, to physically separate their abortion-related services from the Title X services.

The Mayor and City Council of Baltimore ("Baltimore" or "Appellee") filed suit against Alex Azar II; Dr. Diane Foley; HHS; and the Office of Population Affairs, the office that administers Title X (collectively, "Appellants" or the "Government"), alleging, in pertinent part, that the Final Rule violates the Administrative Procedure Act ("APA") because it is arbitrary, capricious, and not in accordance with law. The district court first issued a preliminary injunction, concluding that the Final Rule is likely not in accordance with law, and the Government appealed. While the appeal of the preliminary injunction was pending and after discovery, the district court issued a permanent injunction on different grounds -- specifically, the promulgation of the Final Rule was arbitrary and capricious -- and the Government appealed from that judgment as well. We consolidated the appeals, and a majority of the full court voted to hear both cases en banc.

We affirm in part and dismiss in part.  We uphold the grant of the permanent injunction on two grounds.  First, the Final Rule was promulgated in an arbitrary and capricious manner because it failed to recognize and address the ethical concerns of literally every major medical organization in the country, and it arbitrarily estimated the cost of the physical separation of abortion services.  Second, the Final Rule contravenes statutory provisions requiring nondirective counseling in Title X programs and prohibiting interference with physician/patient communications.  Because we affirm the permanent injunction in Case No. 20–1215, the appeal of the preliminary injunction in Case No. 19–1614 is moot, and we, therefore, dismiss it.

I.

Congress enacted Title X in 1970 "[t]o promote public health and welfare by expanding, improving, and better coordinating the family planning services and population research activities of the Federal Government[.]" Pub. L. No. 91-572, 84 Stat. 1504 (Dec. 24, 1970).  Under Title X, the Secretary of HHS ("Secretary") is

> authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents).

42 U.S.C. § 300(a).  "Grants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate," *id*. § 300a-4(a), and

HHS has never allowed grantees to use Title X funds to "provide" abortions as a method of family planning, *e.g.*, 42 C.F.R. § 59.5(a)(5) (2000); *see id.* § 59.9 (2000).[1]

The parties disagree about the propriety of HHS's interpretation of the following provision in Title X: "None of the funds appropriated under this subchapter shall be used in *programs where abortion is a method of family planning*."   42 U.S.C. § 300a-6 (emphasis supplied) (also referred to as "Section 1008" of the Public Health Service Act). HHS's interpretation of this provision has morphed over the last 50 years.

A.

HHS's Changing Interpretation of Section 1008

1.

1970–1988

For the first 18 years of the Title X program, HHS interpreted Section 1008 "not only as prohibiting the provision of abortion but also as prohibiting Title X projects from in any way promoting or encouraging abortion as a method of family planning." *Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Servs. Projects*, 53 Fed. Reg. 2922-01, 2923 (Feb. 2, 1988) (explaining history of Section 1008 interpretation); *see also* 36 Fed. Reg. 18465, 18466 (Sept. 15, 1971); 42 C.F.R. § 59.5(9) (1972).   Further,

---

[1] Reading Judge Wilkinson's dissenting opinion, one would think this court invalidated a congressional prohibition on federal funding of abortion.  Not so. The Final Rule *itself* is a change from previous policy.  And nothing in this opinion requires -- or even allows -- federal funding of abortions.

HHS "interpreted [S]ection 1008 as requiring that the Title X program be 'separate and distinct' from any abortion activities of a grantee." 53 Fed. Reg. at 2923. In its advisory opinions, the Office of General Counsel of HHS "generally took the view that activity which did not have the immediate effect of promoting abortion or which did not have the principal purpose or effect of promoting abortion was permitted." *Id.*

Then, in 1981, HHS "went a step further" and

> required Title X projects to engage in abortion-related activities under certain circumstances. These guidelines for the first time required nondirective "options counseling" on pregnancy termination (abortion), prenatal care, and adoption and foster care when a woman with an unintended pregnancy requests information on her options, followed by referral for these services if she so requests. These guidelines were premised on a view that "non-directive" counseling and referral for abortion were not inconsistent with the statute and were justified as a matter of policy in that such activities did not have the effect of promoting or encouraging abortion.

53 Fed. Reg. at 2923. This approach was maintained until 1988.

2.

<u>1988–1991</u>

In 1988, the Secretary issued new regulations, which prohibited Title X projects from promoting, encouraging, advocating, or providing counseling on, or referrals for, abortion as a method of family planning. *See Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Servs. Projects*, 53 Fed. Reg. 2922 (Feb. 2, 1988) (hereinafter, the "1988 Rule"). The 1988 Rule provided:

- "[A] Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning.";

- "Because Title X funds are intended only for family planning, once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child.";

- "A Title X project may not use prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by 'steering' clients to providers who offer abortion as a method of family planning.";

- "Nothing in this subpart shall be construed as prohibiting the provision of information to a project client which is medically necessary to assess the risks and benefits of different methods of contraception in the course of selecting a method; provided, that the provision of this information does not include counseling with respect to or otherwise promote abortion as a method of family planning."

*Id*. at 2945. The aspect of the 1988 Rule that prohibited counseling on and referrals for abortion came to be referred to as the "Gag Rule." *See Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992) (explaining that the 1988 Rule "established a much broader prohibition on abortion counseling or referrals including a 'gag rule' applicable to all Title X project personnel against informing or discussing with clients the availability of abortion as an option for individual planning or treatment needs").

12

In 1991, the Supreme Court upheld the 1988 Rule in the face of administrative and constitutional challenges. *See Rust v. Sullivan*, 500 U.S. 173 (1991).

First, the *Rust* plaintiffs challenged the 1988 Rule as exceeding the Secretary's authority, and as arbitrary and capricious. *See Rust*, 500 U.S. at 183. The Court applied the familiar two-step test pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), which asks (1) if the statute is silent or ambiguous with respect to the issue; and (2) if so, whether the agency's interpretation is "based on a permissible construction of the statute." *Rust*, 500 U.S. at 184 (quoting *Chevron*, 467 U.S. at 842–43). The Court determined that at *Chevron* step one, Section 1008's language -- "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning" -- was ambiguous. *Id*. At step two, the Court -- citing the "substantial deference" accorded to the agency authorized with administering the statute -- decided that HHS interpreted Section 1008 in a "permissible" way. *Id*. at 184–85. The Court explained,

> Title X does not define the term "method of family planning," nor does it enumerate what types of medical and counseling services are entitled to Title X funding. Based on the broad directives provided by Congress in Title X in general and § 1008 in particular, we are unable to say that the Secretary's construction of the prohibition in § 1008 to require a ban on counseling, referral, and advocacy within the Title X project is impermissible.

*Id*. at 185. The Court explained that HHS sufficiently justified a "revised approach" to Section 1008 by explaining that the 1988 Rule was "more in keeping with the original

intent of the statute"; "justified by client experience under the prior policy"; and "supported by a shift in attitude against" abortion.  *Id*. at 187.

Second, the *Rust* plaintiffs brought constitutional attacks, claiming that the 1988 Rule violated the First Amendment "by impermissibly discriminating based on viewpoint" because the Rule "prohibit[s] all discussion about abortion as a lawful option . . . while compelling the clinic or counselor to provide information that promotes continuing a pregnancy to term."  *Rust*, 500 U.S. at 192 (internal quotation marks omitted).  They also asserted that the 1988 Rule violated a woman's Fifth Amendment right "to choose whether to terminate her pregnancy."  *Id*. at 201.  The Court rejected both claims.  On the First Amendment claim, the Court reasoned, "Nothing in [the 1988 Rule] requires a doctor to represent as his own any opinion that he does not in fact hold."  *Id*. at 200.  On the Fifth Amendment claim, the Court "reaffirmed the long-recognized principle," that the Due Process Clause does not "generally confer . . . [an] affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  *Id*. at 201 (internal quotation marks omitted).

### 3.

### 1991–2010

In the wake of *Rust*, President George H.W. Bush, addressing "widespread concern" that the 1988 Rule would interfere with the physician-patient relationship, issued a memo to the Secretary on November 5, 1991, "urging that the confidentiality of the doctor-patient relationship be preserved and that operation of the Title X program be compatible with free

14

speech and the highest standards of medical care." *Nat'l Family Planning*, 979 F.2d at 230 (internal quotation marks omitted). President Bush then issued four "directives" to which HHS was to adhere in implementing the 1988 Rule, including that referrals "may be made by Title X programs to full-service health care providers that perform abortions," but not if that is the provider's "principal activity." *Id*.

Before the 1988 Rule could be fully implemented, Congress passed a bill that would have prohibited the Secretary from awarding Title X funds to an applicant unless the applicant agreed to provide "nondirective counseling and referrals" concerning specific options upon request, including "termination of pregnancy." *Family Planning Amendments Act of 1992*, S. 323, 102d Cong. § 2 (1991). However, President Bush vetoed the legislation on September 25, 1992. *See* Actions Overview, S.323 – 102nd Congress (1991-1992), https://www.congress.gov/bill/102nd-congress/senate-bill/323/actions (saved as ECF opinion attachment). He explained that, although he had "reiterated [his] commitment to preserving the confidentiality of the doctor/patient relationship," he had "repeatedly informed Congress that [he] would disapprove any legislation that would transform this program into a vehicle for the promotion of abortion." *Veto – S. 323: Message from the President of the United States* at 1, available at https://www.senate.gov/reference/Legislation/Vetoes/Messages/BushGHW/S323-Sdoc-102-28.pdf (Sept. 26, 1992) (saved as ECF opinion attachment).

In 1993, HHS suspended the 1988 Rule, and the 1981 Guidelines went back into effect on an interim basis. *See* 58 Fed. Reg. 7462 (Feb. 5, 1993). President William J. Clinton explained in a Memorandum to the Secretary, "The Gag Rule endangers women's

lives and health by preventing them from receiving complete and accurate medical information and interferes with the doctor-patient relationship by prohibiting information that medical professionals are otherwise ethically and legally required to provide to their patients." Mem., *The Title X "Gag Rule,"* 58 Fed. Reg. 7455 (Jan. 22, 1992). Then in 1996, Congress added a rider to its annual HHS appropriations act that stated: "[A]mounts provided to [Title X] projects . . . shall not be expended for abortions, [and] *all pregnancy counseling shall be nondirective*." *Omnibus Consol. Rescissions and Appropriations Act of 1996*, Pub. L. No. 104–134, 110 Stat. 1321, 1321-221 (April 26, 1996) (emphases supplied) (the "Nondirective Mandate").

The Nondirective Mandate has appeared in every annual HHS appropriations bill since 1996. *See, e.g.*, *Further Consol. Appropriations Act, 2020*, Pub. L. No. 116-94, 133 Stat. 2534, 2558 (Dec. 20, 2019).

In 2000, HHS issued a new rule which, like the 1981 Guidelines, required Title X projects to offer and provide "information and counseling" regarding "pregnancy termination," and "referral upon request," if the patient desires. *Standards of Compliance for Abortion-Related Servs. in Family Planning Servs. Projects*, 65 Fed. Reg. 41270, 41279 (July 3, 2000). Providers were not to offer information or counseling "with respect to any option(s) about which the pregnant woman indicates she does not wish to receive such information and counseling." *Id.* The agency explained, "If [Title X] projects were to counsel on an option even where a client indicated that she did not want to consider that option, there would be a real question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option." *Id.* at 41273.

16

4.

<u>2010</u>

Congress enacted the Affordable Care Act ("ACA") in 2010. In Subchapter VI, the

ACA provides:

> Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—
>
> (1)    creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
>
> (2)    impedes timely access to health care services;
>
> (3)    interferes with communications regarding a full range of treatment options between the patient and the provider;
>
> (4)    restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;
>
> (5)    violates the principles of informed consent and the ethical standards of health care professionals; or
>
> (6)    limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114 (the "Noninterference Mandate").

5.

<u>2018–2020: The Final Rule</u>

On June 1, 2018, HHS issued a notice of proposed rulemaking "to ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning and related statutory requirements." *Proposed Rules: Compliance with Statutory Program Integrity Requirements*, 83 Fed. Reg. 25502, 25502 (June 1, 2018). The notice provided a deadline for comments of July 31, 2018 -- a little over eight weeks. Even within this short time period, HHS received more than 500,000 comments.

On March 4, 2019, HHS issued the Final Rule. HHS explained that it was amending the Title X regulations "to clarify grantee responsibilities under Title X, to remove the requirement for nondirective abortion counseling and referral, to prohibit referral for abortion, and to clarify compliance obligations with state and local laws." 84 Fed. Reg. at 7714. Parts of the Final Rule essentially revive the Gag Rule provisions of the 1988 Rule:

- "A Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 84 Fed. Reg. at 7788–89.

- "[O]nce a client served by a Title X project is medically verified as pregnant, she shall be referred to a health care provider for medically necessary prenatal health care." *Id.* at 7789.

- A Title X provider "may . . . choose to provide" "[a] list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care)," but that list "may be limited to those that do not provide abortion, or may include licensed, qualified, comprehensive primary

18

health care providers (including providers of prenatal care), some, but not the majority, of which also provide abortion as part of their comprehensive health care services. Neither the list nor project staff may identify which providers on the list perform abortion." *Id*.

- A Title X provider "may . . . choose to provide" "[n]ondirective pregnancy counseling, when provided by physicians or advanced practice providers [(APPs)[2]]" but "is not required to." *Id*. at 7789, 7760. As part of nondirective counseling, "abortion must not be the only option presented by physicians or APPs." *Id*. at 7747.

- "Each option discussed in [pregnancy] counseling must be presented in a nondirective manner. This involves presenting the options in a factual, objective, and unbiased manner and (consistent with other Title X requirements and restrictions) offering factual resources that are objective, rather than presenting the options in a subjective or coercive manner." Physicians or APPs "should discuss the possible risks and side effects to both mother and unborn child" of any option, including abortion. *Id*.

- "Referrals for abortion as a method of family planning may not be offered. If the patient is provided a list or the contact information of licensed, qualified, comprehensive primary health care service providers (including providers of prenatal care), the list -- and the Title X staff -- must not identify to the woman which, if any, providers on the list offer abortion." *Id*.

---

[2] An APP is defined in the Final Rule as a "medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients." 84 Fed. Reg. at 7787.

The Government posits that the discretion to provide nondirective counseling actually makes it "less restrictive than the 1988 [Rule]." Appellants' Br. 9.[3] In the Final Rule, HHS likewise explained:

> In response to commenters who contend the rule will be challenged in court, [HHS] believes the Supreme Court's decision in *Rust* provides broad support for the approach taken in this rule. Although the rule differs in some respects from the 1988 [Rule] upheld in *Rust*, some of those differences arise from the [HHS]'s desire to implement statutory provisions that did not exist at the time the 1988 [Rule was] adopted. Other differences, such as the permission for nondirective pregnancy counseling -- which implements an appropriations rider that was adopted as early as 1996 and has been regularly included in HHS's appropriations through fiscal year 2019 -- are more permissive than the 1988 [Rule] and less susceptible to the type of challenges that plaintiffs brought (unsuccessfully) in *Rust*.

84 Fed. Reg. at 7725 (footnote omitted). Putting all of this together, under the Final Rule, Title X physicians and APPs can technically *counsel* on abortion, but abortion cannot be "the only option presented," even if the patient does not want to receive counseling about other options; the patient's options must be presented in a "factual, objective, and unbiased manner"; and for any option presented, the provider must discuss the "risks and side effects to both mother and unborn child." *Id.* at 7747. And physicians and APPs may not *refer* the patient for an abortion, even if that is her desire during the course of nondirective counseling.

---

[3] References to "Appellants' Br." and "Appellee's Br." refer to the initial briefs filed in Case No. 19–1614. References to "Appellants' Supp. Br." and "Appellee's Supp. Br." refer to the briefs filed in furtherance of the consolidated en banc proceedings in Case Nos. 19–1614 and 20–1215.

B.

On April 12, 2019, Baltimore filed a "Complaint for Vacatur of Unlawful Agency Rule and Declaratory and Injunctive Relief" (the "Complaint") against the Government. Baltimore then sought a preliminary injunction on April 16, 2019.  On May 30, 2019, the district court granted the preliminary injunction.  The Complaint contained ten counts, and the district court based its preliminary injunction on the likelihood of success on the merits on the first two:

- Count I -- The Final Rule violates § 706 of the APA[4] because it is contrary to the Noninterference Mandate;

- Count II -- The Final Rule violates § 706 of the APA because it is contrary to the Nondirective Mandate;

- Count III -- The Final Rule exceeds HHS's authority under the Title X statute;

- Count IV -- The Final Rule is contrary to the Religious Freedom Restoration Act of 1993;

- Count V -- The Final Rule is contrary to the First Amendment;

- Count VI -- The Final Rule is contrary to the Equal Protection Clause of the Fifth Amendment;

- Count VII -- The Final Rule is arbitrary and capricious because it is inadequately justified;

- Count VIII -- The Final Rule is arbitrary and capricious because it is objectively unreasonable;

---

[4] Section 706 of the APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise *not in accordance with law*."  5 U.S.C. § 706(2)(A) (emphasis supplied).

21

- <u>Count IX</u> -- The Final Rule violates the APA because HHS did not observe procedure required by law;

- <u>Count X</u> -- The Final Rule is unconstitutionally vague.

On June 6, the Government filed a notice of interlocutory appeal and a motion to stay the injunction in the district court, the latter of which was denied on June 19, 2019. A stay was granted by a divided panel of this court on July 2, 2019. *See* Order, *Mayor & City Council of Baltimore v. Azar*, No. 19-1614 (4th Cir. filed July 2, 2019), ECF No. 23. A panel of this court heard argument in September 2019.[5]

While the appeal of the preliminary injunction as to Counts I and II was pending, the district court continued with proceedings on Counts III, V, VI, VII, VIII, and IX. On February 14, 2020, the district court granted summary judgment to the Government as to Counts III, V, VI, and IX, and it granted summary judgment to Baltimore on Counts VII and VIII. The district court then issued a permanent injunction for the entire state of Maryland, enjoining the Government from implementing or enforcing the Final Rule. The Government filed a notice of appeal and a motion for stay of the permanent injunction in the district court. The district court denied the motion to stay on March 4, 2020. In this court, the Government filed a motion to consolidate and a motion for stay of the permanent injunction. Baltimore filed a motion for initial en banc consideration of the permanent injunction appeal. On March 30, 2020, we granted the Government's motion to consolidate

---

[5] Meanwhile, on September 12, 2019, the district court dismissed without prejudice Counts IV and X.

and Baltimore's motion for initial en banc review, and we denied the Government's motion

for stay.

Meanwhile, on February 24, 2020, the same day the Government filed its notice of

appeal, Baltimore filed a motion to clarify the judgment, asking the district court to "clarify

that the [Final] Rule is VACATED by entering a minute order on the docket so specifying."

Mot. to Clarify at 1, *Mayor & City Council of Baltimore v. Azar*, No. 1:19-cv-1103 (filed

Feb. 24, 2020), ECF No. 96. Two days later, the district court issued an order explaining

the "Final Rule is VACATED AND SET ASIDE in the State of Maryland." Mem. Order

at 1, *Azar*, No. 1:19-cv-1103 (filed Feb. 26, 2020), ECF No. 99.

Then, on March 13, 2020, Baltimore filed a motion to alter or amend the judgment

pursuant to Federal Rule of Civil Procedure 59(e), claiming, "the remedy awarded by the

[district court] is incorrect in one respect," that is, the district court "purported to vacate

and set aside the challenged agency action only within the State of Maryland. The [APA]

requires, however, that agency action found to be unlawful at the final judgment stage of a

case be vacated and set aside *on a nationwide basis*." Mot. to Alter or Amend at 1, *Azar*,

No. 1:19-cv-1103 (filed March 13, 2020), ECF No. 103 (emphasis supplied). On April 15,

2020, the district court denied the Rule 59(e) motion, explaining that Baltimore was

seeking a "nationwide injunction" of the Final Rule, instead of "the state-wide injunction

[the district court] had ordered." Mem. Op. at 5, *Azar*, No. 1:19-cv-1103 (filed April 15,

2020), ECF No. 115. Further, the district court reasoned, "[T]he APA does not require a

reviewing court vacating a rule to do so on a nationwide basis. There is no authority in

either Fourth Circuit or Supreme Court jurisprudence that mandates such a finding." *Id.* at

7. Baltimore did not file a notice of appeal of this April 15 order, and the time to do so has expired. Therefore, as explained below, we do not consider it.

## II.

A party seeking a permanent injunction must demonstrate "actual success" on the merits, rather than a mere "likelihood of success" required to obtain a preliminary injunction. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). The party must demonstrate (1) "it has suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.* We review the district court's legal conclusions de novo, and any factual findings for clear error. *See Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011). In this case, even though "the district court did not discuss the test for granting a permanent injunction, we discern no abuse of discretion in the court's decision to issue the injunction." *Id.* at 302.[6]

---

[6] We primarily discuss herein the district court's conclusions that the Final Rule is arbitrary, capricious, and not in accordance with law and therefore, it violates the APA. In other words, Baltimore has demonstrated "actual success" on the merits. As for the remaining permanent injunction factors, the district court decided to issue an injunction, rather than monetary damages, so that Baltimore would "avoid irreparable harm." S.J.A. 1317. And Baltimore has clearly shown irreparable harm, hardship, and that the public interest favors an injunction in this case. The record is replete with support. For example, Dr. Cynthia Mobley, board-certified pediatrician and a medical director at the Baltimore

III.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  In reviewing a rule, courts "must engage in a searching and careful inquiry of the administrative record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Casa de Maryland v. Dep't of Homeland Sec.*, 924 F.3d 684, 703 (4th Cir. 2019) (alterations and internal quotation marks omitted).  We ask whether the agency:

> [r]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

City Health Department, attested that in 2017, Title X clinics in Baltimore served over 16,000 patients in more than 22,000 clinical visits. *See* S.J.A. 953.  Title X services include contraceptive services; breast and cervical cancer screenings; testing, referral, and prevention education for sexually transmitted infections and HIV; and pregnancy diagnosis and counseling. *See id.* at 954.  According to Dr. Mobley, one in three women in Baltimore City need publicly-funded health care in order to access contraception.  In addition, "[l]ow-income women often rely on Title X providers as their sole health care provider." *Id.*  But the Final Rule "force[s] the City of Baltimore to provide substandard care to the patients in [the] community," and "subject[s] the City to potential liability for any complications from this substandard care." *Id.* at 964.

Citations to the "J.A." refer to the Joint Appendix, and citations to the "S.J.A." refer to the Supplemental Joint Appendix, filed by the parties in these consolidated appeals.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  An

agency "must examine the relevant data and articulate a satisfactory explanation for its

action including a 'rational connection between the facts found and the choice made.'"  *Id.*

(quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

    In these appeals,[7] Baltimore contends the Final Rule is arbitrary and capricious, and

also not in accordance with law.  We agree on all counts, and even though the district

court's permanent injunction relied only on the arbitrariness and capriciousness of the Final

Rule, we see fit to rest our decision affirming the permanent injunction on all of these

grounds.  *See Strawser v. Atkins*, 290 F.3d 720, 728 n.4 (4th Cir. 2002) ("[W]e may affirm

on any ground revealed in the record.").  The Government itself recognized the legal issues

underlying the preliminary injunction "present potential alternative grounds to affirm the

permanent injunction."  Appellants' Supp. Br. 15.

---

    [7] We note that this decision only concerns appeals of the preliminary and permanent
injunctions issued by the district court, which we possess jurisdiction to entertain pursuant
to 28 U.S.C. § 1292(a)(1).  We do not speak to the validity of the district court's grant of
summary judgment on Counts VII and VIII because the district court has yet to resolve
Counts I and II on the merits, and it dismissed Counts IV and X without prejudice; thus,
there is no final appealable order over which we may exercise our appellate jurisdiction on
that issue.  *See* 28 U.S.C. § 1291; *Domino Sugar Corp. v. Sugar Workers Local Union* 392,
10 F.3d 1064, 1067 (4th Cir. 1993). However, "an appeal from an order granting or refusing
an injunction brings before the appellate court the entire order, not merely the propriety of
injunctive relief, and [we] may consider and decide the merits of the case," *Allstate Ins.
Co. v. McNeill*, 382 F.2d 84, 88 (4th Cir. 1967), "to the extent they relate to the propriety
of granting the injunctive relief," 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2962 (3d
ed.); *see also Pashby v. Delia*, 709 F.3d 307, 318 (4th Cir. 2013).  Thus, we address the
merits arguments made in furtherance of summary judgment, but only as they bear on the
propriety of the permanent injunction.

A.

The Final Rule was Promulgated in an Arbitrary and Capricious Manner

In issuing the permanent injunction on Counts VII and VIII, the district court concluded that the Final Rule was arbitrary and capricious for three reasons:  HHS (1) inadequately explained its decision "to disagree with comments by every major medical organization regarding the Final Rule's contravention of medical ethics"; (2) inadequately considered the "reliance interests that would be disrupted by its change in policy"; and (3) inadequately considered the "likely costs and benefits of the physical separation requirement."  S.J.A. 1309 (internal quotation marks omitted).  We affirm on the first and third grounds.

1.

Medical Ethics

First, the district court, after a "searching and careful inquiry of the record," found that "literally all of the nation's major medical organizations have grave medical ethics concerns with the Final Rule."  S.J.A. 1309 (internal quotation marks omitted).  In the face of "grave concerns" from the medical community, HHS merely stated -- with no support -- that it "disagrees with the commenters contending the [Final Rule] infringes on the legal, ethical, or professional obligations of medical professionals."  *Id.* at 1311 (alteration and internal quotation marks omitted).  Further, HHS stated it "believes" the Final Rule accommodates medical ethical obligations, and "believes" the rule is "not inconsistent" with medical ethics.  *Id.* (internal quotation marks omitted).

27

These reasons fall flat. An agency, although entitled to deference, cannot simply state it "believes" something to be true -- against the weight of all the evidence before it -- without further support. Indeed, it is the "agency's responsibility" to offer an explanation why it made a certain decision, when "every indication in the record points the other way." *State Farm*, 463 U.S. at 56–57 (internal quotation marks omitted). The arbitrary and capricious standard of review is not a carte blanche for agencies to issue a rule, and then defend it only by saying, "because we said so." As explained below, HHS lacks a satisfactory explanation for disagreeing with every major medical association, and thus, it has not "articulate[d] a satisfactory explanation for its action." *Id.* at 43.

a.

<u>No Satisfactory Reasoning</u>

Several medical organizations submitted comments to HHS about the Final Rule, and *all of them* stated that the Final Rule would violate the established principles of medical ethics. For example, the American College of Obstetricians and Gynecologists ("ACOG") -- which comprises 90% of the nation's obstetricians-gynecologists -- cautioned that the Final Rule "would put the patient-physician relationship in jeopardy by placing restrictions on the ability of physicians to make available important medical information, permitting physicians to withhold information from pregnant women about the full range of their options, and erecting greater barriers to care, especially for minority populations." S.J.A. 171. It further explained that because Title X projects "do not have to provide any referrals to abortion providers, even if directly requested by the patient," the Final Rule "represent[s] an improper intrusion into the patient-physician relationship." *Id.* at 173.

The American Medical Association ("AMA"), citing to its Code of Medical Ethics, explained that the prohibition on abortion referrals and restrictions on counseling "would not only undermine the patient-physician relationship, but also could force physicians to violate their ethical obligations . . . to counsel patients about all of their options in the event of a pregnancy and to provide any and all appropriate referrals." S.J.A. 189. The American Academy of Family Physicians, the American Academy of Nursing, the American Academy of Pediatrics, and the American College of Physicians raised similar concerns. *See id.* at 32–35; 48–53; 192–202; 247–55. Planned Parenthood Federation of America and four states (Washington, New York, Hawaii, and Oregon) all notified HHS that they would have to exit the Title X program because the restrictions are "fundamentally at odds with the professional and ethical obligations of health care professionals." *Id.* at 371. The American Academy of Nursing likewise stated the Final Rule "prioritize[s] ideology over evidence-based professional recommendations," and urged HHS "to remain religiously and morally neutral in its funding, policies, and activities to ensure . . . the ethical obligations of healthcare providers are not compromised." *Id.* at 53. Indeed, the Government itself now concedes that no "professional organization of any kind" takes the position that the Final Rule's restrictions on referrals are in line with medical ethics. *Id.* at 1263–64 (summary judgment hearing on January 27, 2020).

In response to these comments, HHS merely stated that it "disagrees" that the Rule "infringes on the legal, ethical, or professional obligations of medical professionals" and it "believes" the Rule is "not inconsistent" with medical ethics. 84 Fed. Reg. at 7724. Notwithstanding, HHS clearly recognizes that "medical ethics obligations require the

29

medical professional to share *full and accurate* information with the patient, in response to her specific medical condition and circumstance." *Id.* (emphasis supplied).  But, it fails to address head-on the arguments of all of these medical organizations that the Rule *prohibits* physicians from sharing full and accurate information.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) ("An agency cannot simply disregard . . . inconvenient facts[.]").[8]

HHS unsuccessfully attempts to rely on *Rust v. Sullivan* as its silver bullet.  It explains,

> In *Rust*, the Supreme Court upheld the prohibition in the 1988 regulations on both referral for, and counseling about, abortion in the Title X program.  The Department does not believe the Court in *Rust* upheld a rule that required the violation of medical ethics, regulations concerning the practice of medicine, or malpractice liability standards.

84 Fed. Reg. at 7748.  It also argues that *Roe v. Wade* "favorably quoted the proceedings of the American Medical Association House of Delegates 220 (June 1970), which declared 'Neither physician, hospital, nor hospital personnel shall be required to perform any act

---

[8] The primary dissent accuses the majority of "disregard[ing] inconvenient agency analysis."  Richardson Dissenting Op. at 113.  But just because an agency puts words to a page does not mean it has provided a "sufficiently reasoned basis." *Id.*  Here, the agency fails to respond to (or in some cases, even acknowledge) the medical community's concerns.  Rather, HHS simply repeats how its Final Rule permits nondirective pregnancy counseling -- it does not explain how nondirective pregnancy counseling allows physicians to share full and accurate information, such as, for example, a complete list of outside physicians who may perform abortions.  And the agency does not respond at all to the myriad other ethical concerns of the medical community, i.e., erecting barriers to care, especially to minorities, and the inability of physicians to refer a patient for an abortion even when she asks for one.  In our view, this "analysis" is nothing but a long-winded "because we said so."

30

violative of personally-held moral principles.'" *Id.* (quoting *Roe v. Wade*, 410 U.S. 113, 144 n.38 (1973)).

But *Rust* never discussed medical ethics, nor did it make any suggestion or presumption as to whether the 1988 Rule was supported by the views of the medical community at that time. The Supreme Court held only that the 1988 Rule did not so "significantly impinge upon the doctor-patient relationship" that it rose to the level of a First Amendment violation. *Rust*, 500 U.S. at 200. Thus, *Rust* did not purport to speak to medical ethics requirements.

In briefing, the Government contends that HHS "did not need to identify a professional medical organization that espoused the same view." Appellants' Supp. Br. 13. It also notes that "[t]he majority of incumbent providers have remained in the program without any apparent ethical sanction." *Id.* at 30. Even if the Government is correct,[9] that is not the end of the story.

---

[9] Of note, as of late February 2020, roughly one in every four Title X service sites had withdrawn from the Title X program in response to the Final Rule, which slashed the national patient capacity in half, "jeopardizing care for 1.6 million female patients nationwide." Ruth Dawson, *Domestic Gag Rule Has Slashed the Title X Network's Capacity by Half*, Guttmacher Institute (Feb. 26, 2020), http://bit.ly/3csjZle (saved as ECF opinion attachment). Planned Parenthood, which alone served roughly 40 percent of Title X patients, has also withdrawn on the basis that "withhold[ing] important information from patients" is "unethical and dangerous." Sarah McCammon, *Planned Parenthood Officials Say They've Halted Use Of Title X Family Planning Funds* (July 17, 2019), https://www.npr.org/2019/07/17/742841170/planned-parenthood-officials-say-theyvehalted-use-of-title-x-family-planning-fu (saved as ECF opinion attachment). More than 20 states and the District of Columbia sued HHS to enjoin the Final Rule before it took effect. *See California by & through Becerra v. Azar*, 950 F.3d 1067, 1082 (9th Cir. 2020) (en banc), 950 F.3d 1067 (9th Cir. 2020).

First, even if HHS did not need to identify a particular medical organization that supported its view, it nonetheless cannot easily brush off the swell of evidence in the record before the agency that the medical community finds this Rule to be repugnant to the ethical rules governing the profession. Thus, by announcing that HHS merely "disagrees" with every major medical organization in the country, without more, the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action" and "offer[] an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43; *see also Sierra Club, Inc. v. United States Forest Serv.*, 897 F.3d 582, 594 (4th Cir. 2018); *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (The APA "require[s] more of the agency" than a "rubber-stamp.").

Second, the fact that some providers have remained in the Title X program says nothing about the reasonableness of the Final Rule at the time it was issued. *See, e.g.*, *Secs. & Exch. Comm'n v. Chenery*, 318 U.S. 80, 87 (1943) (explaining courts can uphold an agency decision only on the basis "upon which the record discloses that its action was based"); *accord State Farm*, 463 U.S. at 50 ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action.").

b.

Conscience Statutes

The Government also contends that HHS "observed that the various conscience statutes reveal there is no absolute ethical imperative upon physicians to counsel or refer for abortion." Appellants' Supp. Br. 30 (internal quotation marks omitted). The Final

Rule likewise explains, "Federal and State conscience laws, in place since the early 1970s, have protected the ability of health care personnel to not assist or refer for abortions in the context of HHS funded or administered programs (or, under State law, more generally)." 84 Fed. Reg. at 7748. HHS believes the Final Rule's restrictions are necessary "to ensure compliance with [the] federal conscience laws," such as the Church Amendments,[10] Coats-Snowe Amendment,[11] and Weldon Amendment.[12] *Id.* at 7746.

To the extent HHS relies on the federal conscience statutes (or state statutes, for that matter)[13] to support the ethical nature of the Final Rule, this reliance is of no moment. Conscience statutes are not relevant to the question of whether the Final Rule's restrictions are ethical. Allowing a physician with a conscience objection to decline to refer a patient

---

[10] The Church Amendments, first enacted in the 1970s, are statutes that, inter alia, prohibit requiring an entity to make its facilities available for abortion if abortion "is prohibited by the entity on the basis of religious beliefs or moral convictions," 42 U.S.C. § 300a-7(b), and prohibit federal grant recipients from discriminating against individuals who refused to assist with abortion because of their "religious beliefs or moral convictions," *id.* § 300a-7(c).

[11] The Coats-Snowe Amendment, enacted in 1996, prohibits the Government from discriminating against a health care entity because it refuses to engage in certain abortion-related activities, such as training. *See* 42 U.S.C. § 238n(a).

[12] The Weldon Amendment, an appropriations rider first included in health care bills in 2004, prohibits discrimination by recipients of federal grants against health care entities that refuse to "provide, pay for, provide coverage of, or provide referrals for abortions." *Consolidated Appropriations Act*, 2005, Pub. L. No. 108-447, 118 Stat. 2809, Sec. 211 (Dec. 8, 2004).

[13] The district court reasoned, "In HHS's explanation for its disagreement with the comments on medical ethics, it does not mention the conscience statutes." J.A. 1312. But because the Final Rule *does* rely on conscience statutes throughout the text, even if perhaps not in the precise context of ethics, we will proceed to address the Government's substantive arguments on this point.

33

for abortion is quite different from *prohibiting* a physician from providing full and accurate

information about and referring for abortion, when that physician feels ethically bound to

do so.  Indeed, as the ACOG Committee on Ethics states,

> Conscientious refusals that conflict with patient well-being
> should be accommodated only if the primary duty to the patient
> can be fulfilled. All health care providers must provide
> accurate and unbiased information so that patients can make
> informed decisions. Where conscience implores physicians to
> deviate from standard practices, they . . . have the duty to refer
> patients in a timely manner to other providers if they do not
> feel that they can in conscience provide the standard
> reproductive services that patients request.

*The Limits of Conscientious Refusal in Reproductive Medicine*, No. 385, at 1 (Nov. 2007),

*reaffirmed* 2019, http://bit.ly/2XRZZ4I (saved as ECF opinion attachment); *see also* S.J.A.

41 (Comment, Nat'l Ass'n of Catholic Nurses) (explaining that if a patient determines that

her chosen course is abortion, and a provider is unable to offer an abortion referral for

conscience reasons, the provider should "offer[] a transfer of care to the client").  The Final

Rule fails to recognize or appreciate this distinction.

c.

## The Ninth Circuit Decision is Unpersuasive and Inapposite

The Government relies on the Ninth Circuit's recent en banc decision in *California*

*by & through Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (en banc), which vacated

preliminary injunctions of the Final Rule issued by three district courts.  The Ninth Circuit

decided as a matter of law that the Final Rule was "not arbitrary and capricious,"

*California*, 950 F.3d at 1104, but we find this decision unpersuasive and inapposite.

34

First, the Ninth Circuit did not have the full administrative record before it, *see California*, 950 F.3d at 1082–84 & n.11, and so could not "engage in a searching and careful inquiry of the administrative record" that is necessary before a court can adequately "consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Casa de Maryland*, 924 F.3d at 703 (alteration and internal quotation marks omitted); *see California*, 950 F.3d at 1112 (Paez, J., dissenting) ("We do not have the complete administrative record before us, and neither did the district courts when they issued the preliminary injunctions. Deciding the merits of Plaintiffs' arbitrary and capricious claim is therefore premature.").

Second, the Ninth Circuit's discussion of medical ethics nowhere mentions the precise issue raised here: HHS's failure to justify or explain its conclusion that the Final Rule is consistent with medical ethics in the face of overwhelming contrary evidence. *See California*, 950 F.3d at 1101–03 & n.34. Moreover, the Ninth Circuit failed to recognize that HHS did not cite any evidence supporting its conclusion regarding medical ethics, and HHS provided no reason for its decision to "disagree" with the AMA's conclusion. 84 Fed. Reg. at 7724.[14]

---

[14] The Government also relies on a recent district court case, which granted the Government's motion to dismiss a complaint challenging the Final Rule in Maine on, inter alia, arbitrary and capricious grounds. *See The Family Planning Ass'n of Me. v. U.S. Dep't of Health and Human Servs.*, --- F. Supp. 3d ---, 2020 WL 3064426 (D. Me. June 9, 2020). We likewise find this decision to be of no moment to the particular arbitrary and capricious arguments made here. First, the Maine district court opined that the Supreme Court had "already deemed [the Final Rule's] rationale" to be "acceptable and reasonable" in *Rust*. *Id.* at *5. Not so. As explained above, *Rust* did not decide the precise challenges presented here: that every major medical organization finds the Final Rule to violate medical ethics, and the agency fails to explain its disagreement. Second, the Maine court misstates the

d.

Therefore, because HHS failed to satisfactorily explain its disagreement with the proliferation of negative comments from the medical community, and failed to appreciate the distinction between conscience laws as a shield for physicians -- rather than a sword for the government to wield as it shoves its way inside the examination room with a woman and her physician -- its decision that the Final Rule is "not inconsistent" with medical ethics is arbitrary and capricious.

2.

Physical Separation

The Final Rule also states that by March 4, 2020, Title X providers were to ensure "clear physical and financial separation between a Title X program and any activities that fall outside the program's scope."  84 Fed. Reg. at 7715.  In particular, the separation rule is meant to "protect the statutory integrity of the Title X program, to eliminate the risk of co-mingling or misuse of Title X funds, and to prevent the dilution of Title X resources." *Id.*  Specifically as to the physical separation requirement, the Final Rule "preclude[s] shared physical space and staff with respect to abortion."  *Id.* at 7725.

---

plaintiff's argument in saying HHS's views of medical ethics are not "arbitrary and capricious just because they are not preferred by industry experts."  *Id.* at *6.  Rather, the argument made in that case and by Baltimore in this case is that HHS "inexplicably and unreasonably disregarded the views of every major professional medical organization." Baltimore Letter at 1–2, *Mayor & City Council of Baltimore v. Azar*, No. 20–1215 (4th Cir. filed June 15, 2020), ECF No. 83; *accord* Am. Compl. ¶ 94, *The Family Planning Ass'n of Me. v. U.S. Dep't of Health and Human Servs.*, No. 1:19-cv-100 (D. Me. filed Nov. 22, 2019), ECF No. 99.

The Final Rule estimates that a Title X provider would face a cost of $30,000 "to come into compliance with physical separation requirements in the first year following publication of a [F]inal [R]ule in this rulemaking." 84 Fed. Reg. at 7782.[15] However, the district court found this to be arbitrary and capricious because "the administrative record reflects comments estimating the likely cost of the requirement far exceeds HHS's estimate of $30,000." S.J.A. 1316. Again, the district court determined that HHS made a "conclusory response" to these "evidence-backed concerns about the serious problems the physical separation requirement will cause," and as such, "'fail[ed] to consider an important aspect of the problem, offer[ed] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). The Government challenges the district court's conclusion that "HHS did not adequately consider the likely costs of the physical separation requirement." *Id.*; *see* Appellants' Supp. Br. 40–43.

In the administrative record, there are multiple comments estimating the likely cost to comply with the physical separation requirement to be much higher than $30,000. For example, a comment by City Health Department Leaders from Baltimore, Kansas City, Boston, San Antonio, Chicago, Los Angeles, and Cleveland estimated that the Final Rule would impose ongoing compliance costs, such as the "needless administrative cost of maintaining separate accounts for [] funding streams" and associated staffing needs. S.J.A.

---

[15] The first version of the Rule estimated the cost would be $20,000 per provider. *See* 84 Fed. Reg. at 7782.

112. Moreover, the "burden imposed upon Title X providers will lead to the shuttering of a number of invaluable clinics across the nation." *Id.* Planned Parenthood estimated average capital costs of nearly $625,000 per affected service site. *Id.* at 387–88. The Family Planning Council of Iowa explained, "it typically costs hundreds of thousands, or even millions, of dollars to locate and open any health care facility (and would also cost much more than $10–30,000 to establish even an extremely simple and limited office), staff it, purchase workstations, set up record-keeping systems, etc." *Id.* at 242.

Yet, here again, HHS has no response. There is no justification in the Final Rule for the $30,000 amount, as evidenced by counsel's vague answer at oral argument. Oral Arg. at 2:45–3:15, *Mayor & City Council of Baltimore*, Nos. 20-1215 & 19-1614 (4th Cir. May 7, 2020) (When asked, "What studies were done by HHS to arrive at the $30,000 estimate for the physical separation?" Government counsel replied, "The agency considered the costs associated with complying with the physical separation requirement and arrived [at the amount] using its expertise at a quantitative as well as qualitative assessment of those costs."). And the Rule itself likewise refers to vague "updated quantitative estimates" made "in response to the[] comments," but does not explain what those estimates are or where they come from. 84 Fed. Reg. at 7781. For all we can tell, this number was pulled from thin air.

We are not requiring a "false precision," as the primary dissent suggests. Richardson Dissenting Op. at 121. Rather, we expect a figure that makes at least some modicum of sense. In sum, HHS certainly did not provide the "hard and reasoned look"

for which the primary dissent gives it credit.  *Id.* at 117.[16]  HHS failed to consider "an important aspect of the problem," and failed to "offer[] an explanation for its decision that runs counter to the evidence before the agency."  *State Farm*, 463 U.S. at 43.

The Government does not contend that the cost of such drastic measures is not "an important aspect of the problem."  Nor could it.  Indeed, in some cases the physical separation provision would require clinics to hire new staff, engage in construction, and set up new bookkeeping methods, all of which would easily cost multiples of $30,000.  *See California*, 950 F.3d at 1115 n.16 (Paez, J., dissenting) ("[E]ven just hiring a *single* front desk staff member to staff a new entrance to a facility would exceed [$30,000], not to mention all the other costs that would accompany[] creating and maintaining such a facility." (emphasis in original)). These facilities are entitled to more explanation than a passing reference to unspecified assessments. "If judicial review is to be more than an

---

[16] The primary dissent takes the view that HHS did not have to accept the "pessimistic" estimates from some commenters who believed they would have to build new facilities, as long as the agency provided "a reason."  Richardson Dissenting Op. at 119.  But surely that cannot mean that *any* reason will suffice -- for example, blindly assuming those facilities "operate multiple physically separated facilities" and can simply "shift their abortion services."  *Id.* at 120.  Indeed, the dissent seems to suggest that Title X clinics and a provider who perform or refers for abortion could share a building, *see id.* at 120 n.29, something that the Final Rule indicated is likely impermissible, *see* 84 Fed. Reg. at 7767 ("As long as the Title X clinic and the hospital facilities where abortions are performed are *not collocated or located adjacent to each other within a hospital building or complex*, it is highly likely that the hospital is not violating the requirement that there be physical separation between the Title X funded activities and activities related to abortion as a method of family planning." (emphasis supplied)).  Moreover, the Final Rule requires separation not only from clinics where abortions are performed, but also from clinics that engage in other "prohibited activities," which under the Final Rule, include *referring* for abortion or even telling a patient which providers on a list of providers offer abortion.  84 Fed. Reg. 7763.

empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2576 (2019).

<div align="center">B.</div>

<div align="center">The Final Rule is Not in Accordance with Law</div>

We not only conclude that the Final Rule is arbitrary and capricious, but we also hold that the Final Rule is "not in accordance with law," that is, the Nondirective and Noninterference Mandates.  5 U.S.C. § 706(2)(A).  *Rust* establishes that the phrase "in programs where abortion is a method of family planning" is ambiguous under step one of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because it "does not speak directly to the issues of counseling, referral, advocacy, or program integrity." *Rust*, 500 U.S. at 184.  Thus, our discussion of the merits is cabined to an analysis of whether HHS's interpretation of Section 1008 in the Final Rule is "permissible" or "reasonable" at *Chevron* step two.  467 U.S. at 843–44.  A regulation cannot survive at step two if it is in excess of an agency's authority or contrary to law pursuant to the APA.  *See Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (noting the overlap in *Chevron* step two and the APA standard).

<div align="center">1.</div>

<div align="center">Nondirective Mandate</div>

The Nondirective Mandate dictates that in order for a family planning program to receive Title X funding, "all pregnancy counseling shall be nondirective." *Further Consol. Appropriations Act, 2020*, Pub. L. No. 116-94, 133 Stat. 2534, 2558 (Dec. 20, 2019).  HHS defines "[n]ondirective pregnancy counseling" as "the meaningful presentation of options

<div align="center">40</div>

where the physician or [APP] is not suggesting or advising one option over another." 84

Fed. Reg. at 7716 (internal quotation marks omitted).  Baltimore argues that the Final Rule

would force Title X projects to steer women away from one option -- abortion -- while at

the same time directing them toward another option -- carrying the pregnancy to term --

***regardless of the patient's stated desires***, which would run contrary to the Nondirective

Mandate.  The district court agreed:

> Requiring providers to refer a patient to prenatal health care
> even when the patient has expressly stated that she does not
> want prenatal care is coercive, not "nondirective." Requiring
> providers to provide a referral list that is limited to those that
> do not provide abortion, even if the client specifically requests
> an abortion referral, is coercive, not "nondirective." Requiring
> providers to exclude abortion as one of multiple options
> available to a client facing an unwanted pregnancy, especially
> if she has asked about that option, is coercive, not
> "nondirective."

J.A. 266.  We agree with the district court and the dissenting judges in the Ninth Circuit,

who reasoned, "The [Final] Rule is nothing but directive.  By its very terms, it requires a

doctor to refer a pregnant patient for prenatal care, even if she does not want to continue

the pregnancy, while gagging her doctor from referring her for abortion, even if she has

requested specifically such a referral."  *California*, 950 F.3d at 1107 (Paez, J., dissenting).

The Government does not dispute that HHS has an obligation to comply with the

Nondirective Mandate, but it raises a scattershot argument in an attempt to demonstrate

that the mandate is inapplicable here.  None of the arguments lobbed by the Government

are convincing.

a.

<u>Counseling Versus Referrals</u>

The Government first contends -- and the primary dissent agrees -- that although the Final Rule prohibits referrals to abortion providers, the Nondirective Mandate uses the word "counseling," and, the Government asserts, "counseling" is distinct from "referrals." Appellants' Br. 24. In other words, the Government argues, referrals are categorically excluded from the Nondirective Mandate.

First and foremost, *nowhere* in the Final Rule does HHS state that counseling and referrals are two separate Title X services, such that the Mandate applies only to the former. To the contrary, in the Rule itself, counseling and referrals are discussed as part of the same course of service, with the "nondirective" term applying to **both**. *See, e.g.*, 84 Fed. Reg. at 7747 ("*Nondirective counseling and referrals* for postconception services . . . are the appropriate approach in the context of pregnancy, so long as they do not include referral for abortion as a method of family planning." (emphasis supplied)); *id.* ("Title X projects should not use nondirective pregnancy counseling, or *referrals* made for prenatal care or adoption *during such counseling*, as an indirect means of encouraging or promoting abortion as a method of family planning." (emphasis supplied)); *id.* ("[Providers] should not use [nondirective pregnancy] *counseling or referrals* to steer clients to abortion . . . ." (emphasis supplied)); *id.* at 7733 ("Congress has expressed its intent that postconception adoption information and *referrals be included as part of any nondirective counseling* in Title X projects . . . ." (emphasis supplied)).

42

Thus, the idea that referrals are not subject to the Nondirective Mandate is nothing but a convenient litigation position which does not support the validity of the Final Rule. *See Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020) ("We consider the record made before the agency at the time the agency acted, so post-hoc rationalizations have traditionally been found to be an inadequate basis for review." (alteration and internal quotation marks omitted)).

The Government's argument and the primary dissent's view are also contrary to Congress's view that nondirective counseling actually includes "referrals." *See, e.g.*, 42 U.S.C. § 254c-6(a)(1) ("The Secretary shall make grants to . . . adoption organizations for the purpose of . . . providing adoption information and *referrals* to pregnant women on an equal basis with *all other courses of action included in nondirective counseling* to pregnant women.").[17]  It is difficult to fathom how, if Congress has clearly stated "adoption . . . referrals" are considered to be "part of any nondirective [pregnancy] counseling" on *adoption*, HHS nonetheless believes abortion referrals are not part of nondirective pregnancy counseling on *abortion*.  The only explanation for this inconsistency is that the

---

[17]  We disagree with the primary dissent's invocation of the nearest reasonable referent canon on this point.  *See* Richardson Dissenting Op. at 94–95.  First, the dissent relies on the faulty premise that "referral" is not a "course[] of action," a claim made with scattershot references to a 1985 congressional report and a 2012 ACOG opinion on adoption.  *See id.* at 94 n.17.  In any event, we need not resort to such linguistic contortions.  The Final Rule itself explains how HHS views the phrase "courses of action included in nondirective counseling."  *See* 84 Fed. Reg. at 7733 (in interpreting this very phrase, explaining, "Congress has expressed its intent that postconception adoption information *and referrals* be included as part of any nondirective counseling in Title X projects . . . ." (emphasis supplied)).

agency implicitly defines nondirective as "anything but abortion" -- rather than the definition the agency purports to give, "not suggesting or advising one option over another," 84 Fed. Reg. at 7716.  In other words, the Final Rule views certain *types* of referrals as nondirective and other *types* of referrals as directive.[18]  The practical result of this approach is anything but "factual, objective, and unbiased."  *Id.* at 7747.  This trickery becomes crystal clear when the Final Rule attempts to eschew the Nondirective Mandate under the guise of protecting a woman in the face of a medical "diagnosis."  *See id.* at 7748 ("Where care is medically necessary, as prenatal care is for pregnancy, referral for *that care* [as opposed to abortion] is not directive because the need for care preexists the direction of the counselor, and is, instead, the result of a woman's pregnancy diagnosis.").

Finally, we employ the rule of common sense.  In reality, a physician cannot make a referral without first speaking with and counseling a patient.  In their amicus brief to this court, ACOG, which as noted above represents more than 90% of all obstetrician-

---

[18] The analogies in the primary dissent miss the point in two ways.  First, as noted, Congress and HHS have indicated that referrals are included in nondirective counseling, so rather than hot dogs and hamburgers, we should use ground beef and hamburgers; and rather than dinner and dessert, we should use the side dish and dinner.  Second, even putting this aside and accepting the analogies of the dissent, it does not so much matter whether counseling and referrals have meanings as widely accepted as stop and go, as distinct as hot dogs and hamburgers, or as rule-based as dinner and dessert.  The issue is whether the agency meant for the Nondirective Mandate to apply to both counseling and referrals. Clearly, it did.

44

gynecologists in the United States, and other reputable and nonpartisan medical organizations[19] echo the commonsense notion that,

> As commonly understood by medical practitioners and in daily medical practice, counseling patients may include and, in some cases, must include, providing referrals. Well-established medical ethical principles not only recognize referrals as part of counseling, but impose obligations on practitioners to provide patients with appropriate and necessary health care, including information about their treatment options and referrals.

Amicus Br., Am. Coll. of Obstetricians & Gynecologists, at 5. It follows, then, that where a patient has made her preferences known to her physician or APP, and those preferences are rejected by a referral for a service she does not want, the physician or APP has acted in a directive manner. Yet, this is precisely what the Final Rule requires Title X providers to do.

b.

Permissive Nondirective Counseling

Next, in an attempt to cast the Final Rule as benign, the Government and the primary dissent point out that the Final Rule (unlike the 1988 Rule) "*allows, but does not require*, 'nondirective pregnancy counseling, which may discuss abortion,' provided it does 'not encourage, promote or advocate abortion as a method of family planning.'" Appellants' Br. 9 (quoting 84 Fed. Reg. at 7789, 7745–46; 42 C.F.R. §§ 59.16(a); 59.14(e)(5); 59.14(b)(1)(i)) (emphasis supplied); *see* Richardson Dissenting Op. at 79 & n.6. Critically,

---

[19] Specifically, the American Academy of Pediatrics, American College of Physicians, Society for Adolescent Health and Medicine, and the Society for Maternal-Fetal Medicine.

however, this provision was added to "protect the conscience rights of individuals and entities who decline to perform, participate in, or refer for, abortions," not to protect those women who are seeking information about or have decided to have an abortion. 84 Fed. Reg. at 7716.

But the Government insists "[t]he [Final] Rule expressly permits 'nondirective pregnancy counseling, *which may discuss abortion*.'" Appellants' Br. 28 (quoting 84 Fed. Reg. at 7789 (emphasis supplied)). However, an application of this concept reveals how constrained a physician can be in his or her discussion. *See California*, 950 F.3d at 1107 (Paez, J., dissenting) ("What can a doctor even say when confronted with her patient's questions about abortion?").

For example, in a hypothetical example set forth in the Final Rule, a provider "offers [the client] nondirective pregnancy counseling," even though the provider "[cannot] refer for, nor encourage[], abortion." 84 Fed. Reg. at 7789. (And according to earlier parts of the Final Rule, the provider may discuss the "risks and side effects" of abortion, but may not "encourage" abortion. *Id.* at 7724.) Further, in the Final Rule's hypothetical "counseling" session, the Title X physician "tells the client that the project can help her to obtain prenatal care and necessary social services and offers her the list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), assistance, and information for pregnant women," but "**[n]one of the providers on the list provide abortions**." *Id.* (emphasis supplied). In this hypothetical, which is "consistent with" the Final Rule, *id.*, a patient may come in seeking an abortion, but the only counseling done is on prenatal care, and on the list provided, none of the physicians

46

perform abortions. And according to other parts of the Final Rule, even if a physician offers a list of primary health care providers who *do* provide abortions, it cannot indicate which ones provide abortions, and no more than half of the providers on the list can perform abortions. *See id.* at 7761. Thus, HHS's attempt to *appear* nondirective is deceptive and at odds with reality. Notably, it is also at odds with HHS's *own* statements made in 2000. *See* 65 Fed. Reg. at 41279 ("If [Title X] projects were to counsel on an option even where a client indicated that she did not want to consider that option, there would be a real question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option.").

c.

### Failure to Refer

Next, the Government is of the view that "[a] Title X provider's *failure* to *refer* a patient for an abortion . . . neither *counsels* nor *directs* the patient to do anything; it simply declines to facilitate an abortion with taxpayer dollars, consistent with the best reading of § 1008." Appellants' Br. 14 (emphases in original). But it is not a "failure" to refer when a provider is *directed* not to do so. Moreover, Congress' use of "nondirective" means that patients are entitled to *neutral* counseling. Being required to refuse (not failing) to refer a patient to a physician who performs abortions when the patient has requested as much, and instead, referring her for prenatal care, is far from neutral.

47

d.

### *Rust v. Sullivan*

The Government's final argument with respect to the Nondirective Mandate is that because the Nondirective Mandate appeared continually in an appropriations rider beginning in 1996, it could not have supplanted *Rust v. Sullivan* to accomplish an "implied repeal[]" of "HHS's statutory authorization for these regulations." Appellants' Br. 22. This argument is a paper tiger.

To be clear, Baltimore is not making an implied repeal argument. On Counts I and II, Baltimore is bringing an APA challenge to an agency action that is "not in accordance with the law," as the law now stands. J.A. 48, 50.

In any event, *Rust* was decided before Congress enacted the Nondirective Mandate. As a result, *Rust* simply does not speak to the specific challenges in this case. In *Rust*, the Supreme Court entertained a challenge to the facial validity of the 1988 Rule. *See* 500 U.S. at 181. Applying *Chevron*, the Court held first that the phrase "shall be used in programs where abortion is a method of family planning" in Section 1008 is ambiguous because it "does not speak directly to the issues of counseling, referral, advocacy, or program integrity." *Id.* at 184. Then, the Court turned to whether "the agency's answer [wa]s based on a permissible construction of the statute." *Id.* (internal quotation marks omitted). The Court reasoned:

> Title X does not define the term "method of family planning," nor does it enumerate what types of medical and counseling services are entitled to Title X funding. Based on the broad directives provided by Congress in Title X in general and § 1008 in particular, we are unable to say that the Secretary's

48

> construction of the prohibition in § 1008 to require a ban on
> counseling, referral, and advocacy within the Title X project is
> impermissible.

*Id*.  The Court also relied on the lack of "clear and operational guidance to [Title X grantees]"; "client experience under the prior policy"; and "a shift in attitude against the elimination of unborn children by abortion." *Id*. at 187 (internal quotation marks omitted).

This holding has no applicability in HHS's interpretation in 2019.  Because HHS had changed its interpretation of Section 1008, the *Rust* Court determined whether the change was supported by a "reasoned analysis," which involved looking to the Secretary's determinations about "client experience under the prior policy" and "a shift in attitude against" abortion.  *Rust*, 500 U.S. at 187.  These "justifications" -- changes in client trends and attitudes in 1988 -- were "sufficient to support the Secretary's revised approach." *Id*.; *see also id*. at 186–87 ("An agency is not required to establish rules of conduct to last forever, but rather must be given ample latitude to adapt its rules and policies to the *demands of changing circumstances*." (alterations and internal quotation marks omitted) (emphasis supplied)).

These justifications cannot legally control a step two analysis of a *new* agency change in policy 30 years later.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("At the time a statute is enacted, it may have a range of plausible meanings.  Over time, however, subsequent acts can shape or focus those meanings.").  And crucially, HHS made this regulatory change in 2019 against the backdrop of newly enacted prohibitions on directive pregnancy counseling and interference with communications regarding patient treatment options.

49

The Court could not have decided whether the content of the 1988 Rule contravened a provision passed eight years later. Indeed, as pointed out by the Government, the 1988 Rule prohibited nondirective (or any) counseling on abortion, whereas the Final Rule makes it permissive. *See* Appellants' Br. 21 (Unlike the "1988 regulations," the Final Rule "permits, but does not require, nondirective pregnancy counseling."). The legal and factual background in *Rust* is inapposite.

e.

For these reasons, the Final Rule violates the Nondirective Mandate that has appeared in every HHS appropriations rider since 1996.

2.

<u>The Noninterference Mandate</u>

The Final Rule is also contrary to law because it violates the Noninterference Mandate, a provision in the ACA. The Noninterference Mandate provides that, notwithstanding other ACA provisions, HHS "shall not promulgate" any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care"; "impedes timely access to health care services"; "interferes with communications regarding a full range of treatment options between the patient and the provider"; "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions"; and "violates the principles of informed consent and ethical standards of health care professionals." 42 U.S.C. § 18114(1)–(5).

Prohibiting Title X health care providers from referring a woman for an abortion when she requests it, as the Final Rule does, quite clearly "interferes with communications" about medical options between a patient and her provider.  42 U.S.C. § 18114(3); *see Stuart v. Camnitz*, 774 F.3d 238, 253 (4th Cir. 2014) ("Transforming the physician into the mouthpiece of the [government] undermines the trust that is necessary for facilitating healthy doctor-patient relationships and, through them, successful treatment outcomes.").  What is worse, the Final Rule requires health care providers to hide the ball from their patients by giving them a list of providers without telling them which ones actually perform abortions.  This is not "full disclosure of all relevant information." 42 U.S.C. § 18114(4).  Moreover, considering the time-sensitive nature of pregnancy and access to legal abortion, this attempt to hoodwink patients creates "unreasonable barriers" to "appropriate medical care," and "impedes timely access" to health care services.  *Id*. § 18114(1), (2).  As the district court noted, the AMA has strongly opposed this rule for its interference in the patient-physician relationship and violation of ethical standards, *id*. § 18114(5), as have over 20 amici in their filings with this court.[20]

---

[20] These amici include the City of New York and Local Governments; National Health Law Program; Advocates for Youth; American Medical Student Association; Community Catalyst; The Endocrine Society; Families USA; National Center for Lesbian Rights; Bay Area Lawyers for Individual Freedom; Equality Federation; Family Equality Council; GLMA: Health Professionals Advancing LGBT Equality; The National LGBTQ Task Force; The LGBT Movement Advancement Project; Institute for Policy Integrity at New York University School of Law; National Center for Youth Law; American Academy of Pediatrics; American College of Obstetricians and Gynecologists; American College of Physicians; Society for Adolescent Health and Medicine; and Society for Maternal-Fetal Medicine.

In a distressingly poignant hypothetical, the primary dissent posits that a "failure to act" by an expert swimmer does not impede or interfere with a nearby drowning person's position, and in the same way, HHS may choose to fund projects that meet its requirements without impeding or interfering with others that do not. Richardson Dissenting Op. at 106. But this case is not about a failure to act. Rather, this case is about placing limits on the ability to act -- that is, providing funds on which Title X providers rely to continue serving their low-income patients, but with ethically questionable strings attached. Therefore, rather than the expert swimmer merely failing to act by walking past the drowning person, this case is more akin to the swimmer jumping in to offer aid to the person, but instead, only assisting the person halfway to shore, or, worse yet, blocking the person from being rescued by someone else.

a.

### *Rust v. Sullivan*

Here again, the Government attempts to rely on *Rust v. Sullivan*, quoting from that case: "The difficulty that a woman encounters when a Title X project does not provide abortion counseling or referral . . . leaves her in no different position than she would have been if the Government had not enacted Title X." Appellants' Br. 20 (quoting *Rust*, 500 U.S. at 202). But this quotation has nothing to do with the challenge here -- that is, an APA challenge to the legality of an agency rule promulgation. Rather, the quoted language comes from *Rust*'s analysis of whether the 1988 Rule violated a woman's Fifth Amendment right to choose whether to terminate her pregnancy. That inquiry involved

52

due process questions of whether the Government had a "constitutional duty to subsidize an activity merely because the activity is constitutionally protected." *Rust*, 500 U.S. at 201.

As it did with the Nondirective Mandate, the Government also contends that the ACA cannot act as an implied repeal of HHS's authority to promulgate the Final Rule. But as explained above, the Government wholly misconstrues the issue. Again, *Rust* does not control here because the ACA Noninterference Mandate was enacted after that decision. Moreover, since *Rust*, Congress has explicitly recognized in the ACA the importance of removing barriers to full disclosure in a health care setting and preserving a private and plenary consultation between a patient and her health care provider. In addition,

> as a factual matter, the Final Rule's referral list restrictions go far beyond anything in the 1988 [Rule]. The new restrictions: (1) permit a Title X project to give a patient who *specifically requests* a referral for abortion a referral list that contains *no* abortion providers; (2) require the project to compile a list of providers, a majority of whom are not responsive to the patient's request; (3) prevents the project from identifying which providers on the list *are* responsive to the patient's needs; and (4) *does not require the project to even alert the patient that the list is incomplete and non-responsive*. Because of these provisions, patients in need of time-sensitive medical care will be delayed or altogether prevented from obtaining that care because they will receive referrals that they do not realize are not for the services they requested. In other words, under the Final Rule, the Government would be subsidizing the misdirection of unsuspecting patients. Unlike in *Rust*, the Final Rule may well make patients worse off than if they had not sought help from a Title X project to begin with.

*California v. Azar*, 385 F. Supp. 3d 960, 997–98 (N.D. Cal. 2019) (citations omitted) (emphases in original), *vacated and remanded*, 950 F.3d 1067.[21]

b.

<u>Waiver</u>

The Government also argues that the argument that the Final Rule contravenes the ACA Noninterference Mandate was not raised to the agency during the comment period and therefore, it is waived. *See* Appellants' Br. 34. Not so.

"As a general matter, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved." *1000 Friends of Md. v. Browner*, 265 F.3d 216, 227 (4th Cir. 2001) (internal quotation marks omitted). To do otherwise would "usurp[] the agency's function" and would "deprive[] the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Comp. Comm'n v. Aragon*, 329 U.S. 143, 155 (1946). However, if the public's comments "sufficiently raised the question" that is challenged in court, the issue is not waived. *Browner*, 265 F.3d at 228. In *Browner*, the comments "[did] not include a separately delineated section devoted to" the claim at issue,

---

[21] The Government believes that Congress's use of the phrase "[n]otwithstanding any other provisions of this Act," 42 U.S.C. § 18114 -- rather than "notwithstanding any other law" -- means that it intended to eclipse HHS's rulemaking authority as to the ACA, but it did not intend to do so regarding provisions outside of the ACA. We disagree. Read literally, that provision does not limit the scope of the Noninterference Mandate. Rather, the phrase simply means that the Mandate cannot be narrowed by other provisions *of the ACA*. In considering a provision outside the ACA, the directive stands that HHS "shall not promulgate *any regulation*" that interferes with patient communications, etc. 42 U.S.C. § 18114 (emphasis supplied).

and were "perhaps . . . phrased somewhat generally," but they "nonetheless refer[red]  (at least implicitly) to" the issue on appeal.  *Id*.

Like in *Browner*, the concerns raised in this lawsuit regarding the ACA Noninterference Mandate were sufficiently raised at the administrative level.  There were multiple comments raised about the authority to interfere with medical conversations between physicians and patients.  *See, e.g*., Comment HHS-OS-2018-0008-69480, https://www.regulations.gov/document?D=HHS-OS-2018-0008-69480 (July 23, 2018) (saved as ECF opinion attachment) ("There is no legitimate medical or legal justification for the proposed rule, which is contrary to the standards of the medical profession, an invasion of patient privacy, and clearly discriminatory in both intent and effect.  It is therefore plainly contrary to the public interest and likely unlawful.").

Commenters also told HHS that the Rule would erect unreasonable barriers to care, impede timely access to care, interfere with physician-patient communications, deny patients access to medically relevant information, and require doctors to violate medical ethics. *See, e.g*., HHSOS-2018-0008-30266, http://bit.ly/2Xl8Han (saved as ECF opinion attachment) ("Patient's [sic] have a right to unbiased, informed consent about all of their options. This rule does a great disservice to women and puts unreasonable barriers on general providers of care and hurts the honest, open conversation that healthcare providers should be having with their patients." (June 29, 2018)); HHS-OS-2018-0008-198615, http://bit.ly/2VJantI (saved as ECF opinion attachment) (Final Rule "creates barriers to receiving the information needed to obtain abortion care" (Aug. 1, 2018)); HHS-OS-2018-0008-179339, http://bit.ly/2ZjlEDt (saved as ECF opinion attachment) (from ACOG: "The

Proposed Rule would interfere with the patient-physician relationship, restrict the information available to patients, and hinder the ability of physicians to practice medicine in accordance with their ethical obligations." (Aug, 1, 2018)); HHS-OS-2018-0008-106624, https://bit.ly/2Yd6opK (saved as ECF opinion attachment) (from the American Academy of Nursing: "[T]he proposed rule would inject politics and ideology into the examination room by prohibiting providers from giving patients information on how and where to access abortion.  This restriction would undermine the health professional's ethical obligations and hinder open and honest conversations between patients and their providers." (July 27, 2018)); HHS-OS-2018-0008-188772, http://bit.ly/2Ul3L3p (saved as ECF opinion attachment) (from the Universal Health Care Foundation of Connecticut: "[The] 'gag rule' goes completely against the ethical standards of health care professionals, jeopardizing an open, trusting relationship with their patients." (Aug. 1, 2018)).

Significantly, HHS responded to these comments, fully recognizing that "medical ethics obligations require the medical professional to share full and accurate information with the patient, in response to her specific medical condition and circumstance."  84 Fed. Reg. at 7724; *see also id.* (The Final Rule "adequately accommodates medical professionals and their ethical obligations.").   Moreover, HHS listed the ACA as one of the statutes it considered in promulgating the Final Rule, *see* Reply Add., *Mayor & City Council of Baltimore v. Azar,* No. 19–1614 (4th Cir. filed May 30, 2019), ECF No. 43-2, at 3 (No. 29), and stated that it "consulted upon" this list in drafting the Final Rule, *see id.* at 1.  It also noted other ACA provisions implicated by the Final Rule.  *See* 84 Fed. Reg. at 7737 & n.65 (quoting 42 U.S.C. 300gg-13(a)(4) as added by the Affordable Care Act,

Public Law 111-148, 124 Stat. 119, 131, sec. 1001). For these reasons, HHS was clearly aware (1) of the Noninterference Mandate; (2) that the ACA can affect the provisions of the Final Rule; and (3) of specific challenges to the protections set forth in that statute. This issue is not waived.[22]

c.

Thus, we conclude that the district court was correct in holding that, on the merits, the Final Rule violates the ACA Noninterference Mandate.

3.

The primary dissent relies heavily on *Rust*, a case decided before the Nondirective and Noninterference Mandates, both of which altered the landscape of health care funding and patient privacy and protection. The dissent downplays these Mandates, describing Baltimore as "scour[ing] the congressional record for some other statute that might preclude the regulations." Richardson Dissenting Op. at 86. But the dissent does not, and cannot, argue these laws are any less "lawful" than any other statute or appropriation passed

---

[22] To the extent our conclusion means HHS considered the Noninterference Mandate and thus, we must afford due deference to HHS's interpretation of the Noninterference Mandate in the Final Rule, we would nonetheless find the interpretation of the Noninterference Mandate to be unreasonable and impermissible for the reasons stated in Section III.A., *supra*. Indeed, HHS has demonstrated, and continues to demonstrate, a contradictory view of medical ethics. *Compare* 84 Fed. Reg. at 7724 ("[M]edical ethics obligations require the medical professional to share full and accurate information with the patient, in response to her specific medical condition and circumstance."), *with id*. at 7760 (Title X staff must "not identify which providers on the list, if any, perform abortions"), *and* S.J.A. 1263–64 (in summary judgment hearing on January 27, 2020, Government counsel conceding that no "professional organization of any kind" takes the position that the Final Rule's restrictions on referrals are in line with medical ethics).

by Congress. And by describing HHS as a "democratically responsive agency" and an "expert and accountable agency," the dissent skirts dangerously close to elevating agency action to congressional edict. Richardson Dissenting Op. at 82, 110; *see also id.* at 84–85, 108.

## C.

### Scope and Vacatur

The parties also disagree about the proper substantive and physical scope of the injunction.

### 1.

### Severability Statement

First, the Government points to a severability statement in the Final Rule, which provides, "The Department believes that each component of the rule is legally supportable, individually and in the aggregate. To the extent a court may enjoin any part of the rule, the Department intends that other provisions or parts of provisions should remain in effect." 84 Fed. Reg. at 7725. Thus, the Government contends that, should the court find the referral and counseling restrictions and physical separation requirements to be contrary to law or arbitrary and capricious, we should only enjoin those aspects of the Final Rule. We disagree and uphold the injunction of the entire Final Rule.

The Supreme Court has held that the inclusion of a severability clause in a statute "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the . . . offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). "In such a case, unless there is strong evidence that Congress

intended otherwise, the objectionable provision can be excised from the remainder of the statute." *Id.*; *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (Unless "it is evident that the [lawmaking body] would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.").

To determine whether we should merely excise the offending section of the Final Rule, we ask, "Would the [rulemaking body] have passed the statute without the [offending] section?" *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). "Severance and affirmance of a portion of an administrative regulation is improper if there is substantial doubt that the agency would have adopted the severed portion on its own." *North Carolina v. Envtl. Prot. Agency*, 531 F.3d 896, 929 (D.C. Cir. 2008) (internal quotation marks omitted); *see also MD/DC/DE Broadcasters Ass'n v. Fed. Commc'ns Comm'n*, 253 F.3d 732, 739 (D.C. Cir. 2001) (Tatel, J., dissenting from denial of rehearing en banc) (explaining, "[a]gency intent has always been the touchstone of our inquiry into whether an invalid portion of a regulation is severable").

Despite the severability clause, the Final Rule is not severable because it is clear HHS "intended the [Final Rule] to stand or fall as a whole," and the agency desired "a single, coherent policy, the predominant purpose of which" is to reinstitute the 1988 Rule. *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 191. We have "substantial doubt" that HHS would have adopted the remaining portions of the Final Rule without the prohibitions on abortion counseling and referrals, restrictions on referral lists, physical separation requirement, and exclusion of abortion as one of multiple options available to a client

facing an unwanted pregnancy. *See North Carolina*, 531 F.3d at 929. This conclusion is supported by the language of the Final Rule itself. It labels the prohibition of abortion referrals and physical separation requirement as "[m]ajor [p]rovisions." 84 Fed. Reg. at 7715. It also states:

> The primary purpose of this rule is to finalize, with changes in response to public comments, revisions to the Title X family planning regulations proposed on June 1, 2018. *This rule, promulgated pursuant to the Department's authority, will ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning*, as well as related statutory requirements.

*Id.* (footnotes omitted) (emphasis supplied). Without the challenged provisions, the Final Rule loses its primary purpose.

For these reasons, the substantive scope of the district court's injunction is proper.

## 2.

## Physical Scope

Next, the Government challenges the district court's decision to enjoin enforcement of the Final Rule throughout the state of Maryland, rather than limiting relief to Baltimore City and its subgrantees. The Government contends, "Neither Baltimore nor the district court articulated a tenable justification for that sweeping relief." Appellants' Supp. Br. 44.

The scope of injunctive relief "rests within the 'sound discretion' of the district court." *South Carolina v. United States*, 907 F.3d 742, 753 (4th Cir. 2018) (quoting *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002)). But its "powers are not boundless." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). The district court's choice of

relief "should be carefully addressed to the circumstances of the case," *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544 (4th Cir. 2012), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

A district court abuses its discretion if its injunctive order "is guided by erroneous legal principles or rests upon a clearly erroneous factual finding," or it "otherwise acts arbitrarily or irrationally in its ruling." *South Carolina*, 907 F.3d at 753 (internal quotation marks omitted). "As with any equity case, the nature of the violation determines the scope of the remedy." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971).

The district court offered the following explanation in support of a statewide injunction:

> Baltimore City is close in proximity to multiple other States and municipalities whose people make use of its health system. Loss of funding in neighboring states will put pressure on Baltimore's health system, as mobile patients come from neighboring communities to make use of Baltimore's resources. In this case, a permanent injunction that is limited to Maryland is narrowly tailored to avoid irreparable harm to the sole Plaintiff, Baltimore City.

S.J.A. 1318. This finding is based on a declaration submitted to the district court by Charlotte Hager, Health Administrator for the Baltimore City Health Department, who stated:

> Baltimore's public health services will have to spend more non-Title X funds due to the loss of Title X funds by providers

61

> in Maryland and neighboring states. Because the Baltimore
> City Health Department serves as the final safety net for the
> community, loss of Title X services for residents of Baltimore
> and surrounding areas would mean further strain on city funds
> in order to meet the health care needs of residents as well as
> non-residents who use the city health care system.

Decl. Charlotte Hager ¶ 19, S.J.A. 972. Thus, the district court reasoned that if Title X providers elsewhere in Maryland or in nearby states are forced to exit the Title X program or must offer a limited array of reproductive health services, women in Maryland and other nearby states -- who would have sought services elsewhere -- will necessarily be funneled to Title X providers in Baltimore. For example, without the statewide injunction, a Virginia woman seeking an abortion referral would be obliged to travel to a Title X provider in Baltimore. By contrast, with the statewide injunction, she could obtain a referral from a Maryland Title X provider located closer to the Virginia–Maryland border.

Importantly, the district court's conclusion is buttressed by other evidence in the record, including:

- Title X providers must accept all patients, regardless of their ability to pay for services, and "are already stretched thin trying to meet the demand for services in their communities," S.J.A. 722;

- For 60% of Title X patients, their Title X provider was their only source of medical care in the last year, *see id.* at 708;

- Some nationwide providers and several states notified the Department of Health and Human Services that they would be forced to exit the Title X program if the Final Rule went into effect, *see id.* at 371;

- In 2017, Baltimore's Title X network served 16,000 people -- 86% of whom had incomes at or below the federal poverty line, *see id.* at 969;

- Of those persons served in Baltimore, 7,670 people were served by Title X providers that receive funding from Baltimore City's grant, *see id.* at 970;

- Title X providers are already "the final safety net" for one-third of women in Baltimore City, *id.* at 969; and

- Maryland's Title X providers are often some of the only family planning providers in Maryland that accept Medicaid, and 22% of Maryland residents are enrolled in Medicaid or the Children's Health Insurance Program, *see id.* at 970.

Therefore, in concluding that a statewide injunction is necessary to afford Baltimore complete relief, the district court was not guided by erroneous legal principles or factual findings, nor did it otherwise act arbitrarily or irrationally in its ruling. We affirm the statewide scope of the permanent injunction as a permissible exercise of the district court's broad discretion.

3.

<u>Vacatur</u>

Finally, in its supplemental response brief in Case No. 20–1215, Baltimore argues that as to the district court's February 14, 2020 opinion, "The district court erred . . . by purporting to limit the geographic scope of the vacatur to Maryland. It does not make sense to speak of 'vacatur' in party-based or geographic terms" because vacatur "does not operate like an injunction." Appellee's Supp. Br. 52, 51. We reject this argument. Baltimore essentially requests that we amend the judgment of the district court to expand the vacatur

of the Final Rule on a program-wide basis. It may not seek this relief without filing a cross-appeal.

"A cross-petition is required . . . when the respondent seeks to alter the judgment below." *Nw. Airlines, Inc. v. Cty. of Kent, Mich.*, 510 U.S. 355, 364 (1994); *see also El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) ("Absent a cross-appeal, an appellee . . . may not attack the [lower court] decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." (internal quotation marks omitted)); *JH ex rel. JD v. Henrico Cty. Sch. Bd.*, 326 F.3d 560, 567 n.5 (4th Cir. 2003) (explaining that, without a cross appeal, the prevailing party may not present an argument that would "lead to a reversal or modification of the judgment" (alteration and internal quotation marks omitted)).

The district court was clear in its February 14, 2020 opinion that it was "set[ting] aside the Final Rule" as arbitrary and capricious, and enjoining enforcement of the Rule in Maryland. S.J.A. 1317. Its clarifying orders explained that the Rule was "vacated . . . in the State of Maryland," and reasoned, "[w]hile the Court did not explicitly state that the Final Rule was vacated and set aside in Maryland, vacatur in the State of Maryland was the precise effect of the ruling." *Id.* at 1336; *see also* Mem. Op. at 11, *Mayor & City Council of Baltimore v. Azar*, No. 1:19-cv-1103 (D. Md. filed April 15, 2020), ECF No. 115 ("While vacatur and injunctive relief may be distinct remedies, in this case, their result is the same: the proscription of enforcement of the HHS Final Rule in the State of Maryland.").

Now, in its supplemental response brief, Baltimore asks us to "correct [this] error" because "an order vacating agency action under [the APA] cannot be restricted geographically or to the parties." Appellee's Supp. Br. 55, 53. But if we were to adopt Baltimore's argument and remove the geographic scope from the district court's vacatur of the Final Rule, it "would require us to modify the court's judgment below and enlarge [Baltimore's] rights thereunder." *Rosenruist-Gestao E Servicos LDA v. Virgin Enterprises Ltd.*, 511 F.3d 437, 447 (4th Cir. 2007). Baltimore has not cross-appealed from the district court's February 26 clarification order, nor its April 15 denial of Baltimore's 59(e) motion. Indeed, the time to do so has passed.[23] *See* Fed. R. App. Proc. 4. Therefore, we decline to consider this argument.

## D.

### Preliminary Injunction Appeal and Permanent Injunction Appeal

Finally, in Case No. 19–1614, Baltimore has filed a motion to dismiss the appeal as moot. We grant the motion. Because we have affirmed the district court's grant of the permanent injunction on the ground that the Final Rule is not in accordance with law, its preliminary injunction -- which was based on the same ground -- is moot. "Generally, an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999). Indeed, now that we

---

[23] Baltimore recognizes the potential propriety of filing a cross-appeal, but first notes it would "make this case more complex," and then, places the impetus on this court to instruct them to do so. Appellee's Supp. Br. 56 n.8. We are not so inclined as to advise one party over the other about strategic litigation choices.

have affirmed the permanent injunction, vacatur of the preliminary injunction would offer the Government no relief. *See id.* at 314–15 ("[E]ven if the preliminary injunction was wrongly issued . . . its issuance would in any event be harmless error."); *cf. Int'l Bhd. Of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 236 (4th Cir. 2018) ("A party may recover damages for a preliminary injunction wrongfully entered if and only if the injunction prevented it from doing something that it had the legal right to do.").

## IV.

For the foregoing reasons, we affirm the district court's grant of the permanent injunction in Case No. 20–1215. Because we affirm the permanent injunction, we dismiss the appeal of the preliminary injunction in Case No. 19–1614 as moot.

*19–1614 – DISMISSED;*
*20–1215 – AFFIRMED*

DIAZ, Circuit Judge, concurring in the judgments:

For the reasons ably explained in the majority opinion, I agree that the Final Rule runs afoul of both the Nondirective and the Noninterference Mandates.  And because this conclusion is sufficient to affirm the district court's grant of a permanent injunction, I decline to join that portion of the majority opinion holding that the Final Rule was promulgated in an arbitrary and capricious manner.   In all other respects, I concur in the judgments.

WILKINSON, Circuit Judge, dissenting:

Section 1008 of the Public Health Service Act reads as follows: "None of the funds appropriated under [the Title X program] shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.

The one medical procedure mentioned in the above provision is that of abortion. No other was referenced. There was, for example, no bar to federal funding of cancer screenings or STD treatments. The purpose of singling out this one procedure could only have been Congress's desire not to subsidize the performance of abortion with the federal fisc. The Rule in question permissibly seeks to further this purpose. It may not be the only permissible means of effectuating what was Congress's apparent intent, but, as *Rust v. Sullivan* noted, it was certainly one permissible way of doing so. 500 U.S. 173, 184 (1991). The provision allows agencies some latitude in this regard without running afoul of the statute or the arbitrary and capricious test in the Administrative Procedure Act.

This latitude stems from a distinct sort of ambiguity. Often a statute has an undeniable purpose, but ambiguity exists on how to effectuate that purpose. Such is the case here. Section 1008 is intended to prevent federal subsidization of abortion through the Title X program, and, by doing so, "ensure that Title X funds [are] used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Rust*, 500 U.S. at 178-79 (quotation omitted); *see also id.* at 198.

While its purpose is clear, Section 1008 is ambiguous on the means that should be used to prevent subsidization. *Rust*, 500 U.S. at 184. Due to this ambiguity, various

68

constructions of the statute—and, by extension, various methods of accomplishing its purpose—are permissible. *Id.* As long as an agency's construction is plausible and furthers "Congress' expressed intent" of preventing subsidization of abortion-related activities, the courts may not interfere. *Id.* at 184, 198.

Rather, as Judge Richardson explains in his fine dissent, we must respect the authority of the administrative agency, Congress, and not incidentally, the Supreme Court's role in delineating the same. Here, in a perfect trifecta, all three have been simultaneously snubbed. Before us is a milder version of a rule that the Supreme Court has already upheld, *see Rust*, 500 U.S. 173, and I cannot understand why the result here, out of simple respect for our highest Tribunal, would not be open and shut.

Federal funding has been the quintessential point of compromise between the opposing factions in this fraught and volatile area. We are not talking about a constitutional issue here: a woman's right to choose does not "carr[y] with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices." *Harris v. McRae*, 448 U.S. 297, 316-17 (1980); *see also Rust*, 500 U.S. at 201-203. What we are talking about is the possibility of a statutory compromise through the political process.[*]

---

[*] My friends in the majority state that "nothing in this opinion requires—or even allows—federal funding of abortions." Maj. Op. at 10 n.1. Its own opinion, however, notes that the Rule it enjoins is one that "prohibits physicians and other providers in Title X programs from referring patients for an abortion." *Id.* at 8.

The self-evident purpose of the statute is to bar federal funding for abortions. The Rule seeks to ensure that this purpose is respected. Invalidating the Rule frees Title X recipients to refer patients directly to abortion providers, who thereupon realize the resulting revenue. Section 1008 certainly affords the implementing agency, here HHS, the

The elements of the compromise may vary in their detail, but the overall components of compromise have remained quite consistent and clear. Congress, on the one hand, does not seek to bar or directly restrain the right established by the Supreme Court in *Roe v. Wade* and its progeny. Congress, on the other hand, seeks to respect those who hold moral or religious objections to the contested practice by withholding federal funds from it. Like all compromises, this one may not be fully acceptable to the heartfelt and passionate views on either side of this debate. But perhaps it is for that very reason that the compromise on federal funding should be respected.

The court today does not respect it. It jettisons the Rule and, in so doing, proceeds to cut the middle from out of the abortion debate. Here too, as Yeats feared, the center may no longer hold. In rejecting statutory compromises such as that before us, the court cedes the field to more absolute forces. This is the last direction in which a torn country needs to travel, and I respectfully note my dissent.

---

latitude to shape Title X counseling in a manner that minimizes such taxpayer subsidies of abortion with federal funds.

RICHARDSON, Circuit Judge, with whom Judges WILKINSON, NIEMEYER, AGEE, QUATTLEBAUM, and RUSHING join, dissenting:

This appeal raises two familiar questions of administrative law. We first ask whether a regulation promulgated by the Department of Health and Human Services ("HHS")—an executive agency accountable to the elected President—reflects a permissible statutory construction. We next ask whether that regulation is a product of reasoned decisionmaking. Although the regulation's subject matter—public funding for abortion—rouses the passions of the public, the judicial role requires us to apply established law just as we would for any other regulation.

In 2019, HHS promulgated a Final Rule amending the regulatory scheme that governs Title X of the Public Health Service Act. Title X authorizes HHS to administer a limited federal-grant system for preconception family-planning programs. HHS's Final Rule interprets § 1008 of Title X, in which Congress barred the use of grant funds "in programs where abortion is a method of family planning." Seeking to bring "much needed clarity" to the scope of Title X, the Final Rule imposes two bright-line requirements on Title X providers. First, it requires Title X programs to be physically and financially separate from abortion providers ("separation requirement"). Second, it prohibits Title X programs from referring clients for abortions or to abortion centers, and it requires them to provide pregnant women with a list of prenatal caregivers ("referral regulations"). At the same time, the Final Rule also carves out a safe harbor for discussions about abortion: Title X grantees may offer "nondirective pregnancy counseling," meaning objective, free-

flowing discussions about any course of action available to a pregnant woman, including abortion.

The Mayor and City Council of Baltimore sued to set aside the Final Rule under the Administrative Procedure Act ("APA"). First, Baltimore argues that the Final Rule exceeds HHS's statutory authority. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Second, Baltimore argues that the Final Rule is not a cogent product of agency expertise. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The district court agreed with Baltimore and now so does the majority. Both are wrong.

In my view, the Final Rule falls well within HHS's established statutory authority, and the record shows that it was a product of reasoned decisionmaking. At the outset, Baltimore's statutory challenge faces a significant problem: The Supreme Court has already ruled that the regulations fall inside the scope of Title X's broad mandate. The 'new' Rule substantially returns the Title X regulations to the version that HHS adopted in 1988, and which the Supreme Court upheld as a permissible interpretation of Title X in *Rust v. Sullivan*, 500 U.S. 173 (1991). *Rust* remains binding precedent, and the relevant text of Title X has not changed. In response to this roadblock, Baltimore asserts that two post-*Rust* congressional enactments require us to deviate from the Supreme Court's holding. But neither renders HHS's interpretation unreasonable. So precedent dictates the same result for the same *Chevron* challenge to the same requirements.

Baltimore's arbitrary-and-capricious challenge similarly fails. In *Rust*, the Supreme Court rejected an arbitrary-and-capricious challenge to remarkably similar regulations,

justified on remarkably similar rationales.  Yet, in the majority's view, HHS capriciously dismissed commenters' ethical objections to the referral regulations and arbitrarily estimated the costs of the separation requirement.  Again, I disagree.  Whatever courts or commenters think about the wisdom of an agency's regulations are of no moment.  We must uphold regulations against allegations of arbitrariness, capriciousness, whimsicality, or temperamentality so long as the record shows that the agency gave a hard look and a reasonable response to the problem at hand.  And because I conclude that the agency considered the issues and drew a rational line from the facts it found to the choices it made, I would reject Baltimore's arbitrary-and-capricious challenge.

In reaching the opposite conclusion, the majority not only thumbs its nose at the Supreme Court but substitutes its own judgment for that of an executive agency accountable to the elected President.  Then, brushing aside the traditional limits on our remedial authority, the majority enjoins enforcement of the *entire* Final Rule throughout *all* of Maryland.  And since we are the first Circuit bold enough to skirt *Rust* and enjoin the Final Rule, our decision rips open a circuit split.  *See California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (en banc).  Today's decision ignores text, abandons administrative-law principles, and forsakes the limited role of courts, particularly inferior ones, in our constitutional structure.  Because I disagree with the majority's faulty analysis and flawed result, I respectfully dissent.

## I.    Background

The issue we face today is not whether abortions are permitted.  We instead face legal issues surrounding rules issued to address the use of federal funds for preconception family-planning programs.

In 1970, Congress enacted Title X of the Public Health Service Act.  Pub. L. No. 91-572, 84 Stat. 1504 (codified at 42 U.S.C. §§ 300–300a-6).  Title X establishes a limited federal-grant system for preconception family-planning programs.  *See* § 300(a); *see also Rust*, 500 U.S. at 179.  Charged with administering Title X, the Secretary of HHS may "make grants to and enter into contracts with" public and nonprofit providers to achieve Title X's objectives.  42 U.S.C. § 300(a).  To advance this responsibility, Congress has authorized the Secretary to promulgate regulations that govern the eligibility for and use of public funds in Title X programs.  *See* § 300a-4(a).

In various Title X provisions, Congress outlines the scope of the Secretary's grant-making authority.  For instance, § 300b specifies various factors that the Secretary "shall take into account" to determine awards.  And § 300a requires state-health authorities to submit plans for a "comprehensive program of family planning services" before they may receive Title X funds.

Section 1008 of Title X likewise limits the scope of taxpayer funding for family-planning programs:

> None of the funds appropriated under [Title X] shall be used in programs where abortion is a method of family planning.

42 U.S.C. § 300a-6.  In 1988, HHS explained that § 1008 "clearly creates a wall of separation between Title X programs and abortion."  53 Fed. Reg. at 2922.  And relying on its rulemaking authority, HHS promulgated regulations to "clarify" the § 1008 prohibition and "preserve the distinction between Title X programs and abortion."  *Id.* at 2923, 2925.[1]

These 1988 regulations placed three key limitations on the use of Title X funds. First, HHS required physical and financial separation between Title X projects and abortion activities.  42 C.F.R. § 59.9(a) (1988).  This separation mandated discrete recordkeeping, facilities, personnel, and identifying materials.  Second, the regulations limited "counseling and referral for abortion services."  § 59.8 (1988).  Among other requirements, providers could not refer for abortions as a method of family planning, and they had to refer pregnant women to a list of providers offering "appropriate prenatal and/or social services." § 59.8(a)(1), (a)(2) (1988).[2]  Last, the 1988 Rule barred Title X grant programs from encouraging, promoting, or advocating for abortion as a method of family planning. § 59.10(a) (1988); *see also Rust*, 500 U.S. at 178–81 (describing these limitations).

---

[1] The 1988 regulations were only one installment in a long-running saga of agency amendments to Title X regulations.  *See, e.g.*, 36 Fed. Reg. 18465 (1971); 45 Fed. Reg. 37433 (1980); 53 Fed. Reg. 2922 (1988); 58 Fed. Reg. 7462 (1993); 65 Fed. Reg. 41270 (2000); 81 Fed. Reg. 91852 (2016); 84 Fed. Reg. 7714 (2019).

[2] This list could not "steer[]" clients to providers who offered abortion.  § 59.8(a)(3). So providers could not "weigh[] the list of referrals" in favor of health-care providers that performed abortions, include providers who mainly provided abortions, or exclude providers who did not offer abortions.  *Id.*

Providers challenged the 1988 Rule on statutory and constitutional grounds. And in *Rust*, the Supreme Court considered, among other claims, whether the 1988 HHS regulations "exceed[ed] the Secretary's authority under Title X" or were "arbitrary and capricious." *Id.* at 183.

Applying the familiar *Chevron* framework, the Supreme Court first held that "[t]he broad language of Title X plainly allows the Secretary's construction of the statute." *Id.* at 184. The Court explained that the text of § 1008 is ambiguous because it "does not speak directly to the issues of counseling, referral, advocacy, or program integrity." *Id.*[3] The Court then reasoned that "the broad directives . . . in Title X in general and § 1008 in particular," coupled with a lack of specific definitions for key terms, such as "method of family planning," placed the HHS regulations well within the range of permissible interpretations. *Id.*

The Supreme Court next held that the regulations were not "arbitrary and capricious" under *State Farm*. The Secretary, the Court explained, "amply justified" the regulations "with a 'reasoned analysis.'" *Id.* at 187 (quoting *State Farm*, 463 U.S. at 41). The Court credited the Secretary's determinations that the 1988 referral regulations were "necessary to provide clear operational guidance to grantees," "justified by client experience," and "supported by a shift in attitude against the elimination of unborn children by abortion." *Id.* (internal quotations and citations omitted). And, as for the 1988

---

[3] The Supreme Court also noted (unsurprisingly) that Title X's legislative history "is ambiguous and unenlightening." *Rust*, 500 U.S. at 186.

separation requirements, the Secretary determined that they "assure[d] that Title X grantees [would] apply federal funds only to federally authorized purposes and [] grantees [would] avoid creating the appearance that the Government is supporting abortion-related activities." *Id.* The Supreme Court "deferred" to this "reasoned determination that the [separation] requirements are necessary to implement the prohibition" of § 1008. *Id.* at 190.[4]

After the Supreme Court upheld the 1988 regulations in *Rust*, they remained in force until 1993. *See* 58 Fed. Reg. 7462 (1993) (interim rule); 65 Fed. Reg. 41270 (2000) (finalized rule). And while the Title X regulations have changed over time, the statutory

---

[4] The Supreme Court in *Rust* also examined—and rejected—challenges that the regulations violated the First and Fifth Amendments. 500 U.S. at 198–99, 201–03.

The First Amendment challenge failed because the regulations were "designed to ensure that the limits of the federal program are observed," and such limits were permissible because of the "basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy," *id.* (cleaned up). The regulations did not affect actions outside the Title X program, and, even within the program, the "regulations do not significantly impinge upon the doctor-patient relationship." *Id.* at 193–201.

The Fifth Amendment challenge failed because "[t]he Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and may validly choose to fund childbirth over those relating to abortion." *Id.* at 201. So "its decision to fund childbirth but not abortion places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy." *Id.* Instead, "unequal subsidization" merely "encourages alternative activity deemed in the public interest." *Id.* at 201 (cleaned up). Title X clients whose access was otherwise limited by indigency were "in no worse position than if Congress had never enacted Title X" because these "financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortion, but rather of her indigency." *Id.* at 203 (cleaned up).

text has not.[5]  Relying on that text, in 2018 HHS published a proposed rule that would substantially return the regulations to the 1988 framework.  83 Fed. Reg. 25502 (2018).  HHS considered over half-a-million public comments and adapted its proposal in response.  84 Fed. Reg. 7714, 7722 (2019).

In March 2019, HHS adopted the Final Rule at issue in this appeal.  As in 1988, HHS promulgated the 2019 Final Rule to "provide much needed clarity regarding the Title X program's role as a family planning program that is statutorily forbidden from paying for abortion and funding programs/projects where abortion is a method of family planning." *Id.* at 7721.  HHS now imposes some of the same limitations on the use of Title X funds as in 1988 to support the separation mandated by § 1008:  The 2019 Final Rule again requires that a "Title X project must be organized so that it is physically and financially separate . . . from activities which are prohibited under Section 1008."  42 C.F.R. § 59.15.  Similarly, a "Title X project may not perform, promote, refer for, or support abortion as a method of family planning." 42 C.F.R. § 59.14(a).  And like the 1988 regulation, a Title X project may not lobby for or otherwise advocate for abortion as a method of family planning.  42 C.F.R. § 59.16.

_____

    [5] Baltimore describes a so-called "all-out war" following the 1988 regulations, with Congress "often coming within a handful of votes" of amending Title X in one way or another.  Appellee Br. 20; *see also* Majority Op. 14–15.  From their read of this history, Baltimore and the majority seem to infer the 1988 regulations were politically unpopular.  Maybe.  Maybe not.  I see no need to recount that history.  What matters here is that the relevant text of Title X was not amended.  *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[R]epeal of statutes, no less than enactment, must conform with Article I.") (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 954 (1983)).

78

The new regulations differ from the 1988 regulations in one significant respect. While the 1988 regulations *prohibited* any family-planning counseling about abortion, 42 C.F.R. § 59.8 (1988), the 2019 regulations now *permit* "nondirective pregnancy counseling" that discusses abortion, 84 Fed. Reg. at 7746. In other words, Title X grantees today may present neutral information about all available options—including abortion.[6]

Baltimore's facilities refer patients for abortions as a method of family planning and seek to require the federal government to continue to subsidize that practice. Disagreeing with the Final Rule as "burdensome and unnecessary," J.A. 12, Baltimore launched a two-pronged attack on the 2019 Final Rule under the Administrative Procedure Act. First, Baltimore alleged that the Final Rule exceeded HHS's statutory authority under Title X. *See Chevron*, 467 U.S. at 843. And as its challenge proceeded, Baltimore moved for a preliminary injunction to prevent the Final Rule from taking effect in Maryland. Because the district court found that Baltimore was likely to succeed on the merits of this argument and that other equitable factors supported the preliminary injunction, it granted Baltimore's motion. HHS appealed, and a panel of this Circuit heard oral argument.

---

[6] Many commenters who oppose the regulations, and the majority, embrace the political label given to the 1988 regulations: the "Gag Rule." Majority Op. 18 ("[T]he Final Rule essentially revive[s] the Gag Rule."). But this terminology—whether by design or lack of care—ignores the very reason for the "Gag Rule" label.

Political foes, as the majority explains, used the adjective "Gag" because the 1988 Rule withheld Title X funding from programs that discussed the "availability of abortion as an option for individual planning." Majority Op. 12 (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992)). The 2019 Final Rule contains no such prohibition. To the contrary, it *permits* Title X providers to provide nondirective pregnancy counseling that includes discussion about abortions.

But while that appeal was pending, Baltimore continued to advance on the second front. In that portion of the case, Baltimore argued that the 2019 Final Rule was "arbitrary and capricious." *See State Farm*, 463 U.S. at 43. The district court agreed, and it granted a permanent injunction before we could rule on the preliminary injunction. Again, HHS appealed, and in a "sharp break with settled practice," we consolidated the cases for this initial-en-banc review. *See Mayor & City Council of Baltimore v. Azar*, 799 F. App'x 193, 195 (4th Cir. 2020) (Richardson, J., dissenting from the order denying the motion to stay).[7]

## II.    Discussion

Every agency regulation must be supported by two pillars of administrative law. If one pillar crumbles, the regulation falls. Each pillar embodies fundamental legal tenets and functional assumptions that rationalize the modern administrative state. Challengers of agency action often call on the federal courts to inspect the integrity of these pillars. And when called on, ours is a familiar, two-part inquiry.

The first pillar rises from the supposition that the President—and thus executive agencies—execute the will of Congress. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (The Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity."). As executors of congressional will, executive agencies must ground regulations in "a permissible construction of [a] statute." *Chevron*, 467 U.S. at 843; *City of Arlington v. F.C.C.*, 569 U.S. 290, 304 n.4 (2013). The reason is simple: An agency's "power to make rules that

---

[7] As I would decide each appeal on the legal arguments, I see no need to consider the equitable factors necessary for either a preliminary or permanent injunction.

affect substantial individual rights and obligations carries with it the responsibility . . . to remain consistent with the governing legislation" that authorizes the agency to act. *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). And so an agency's regulatory authority reaches only as far as its congressional mandate reasonably extends. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

Accordingly, when called on to examine this first pillar, a court asks whether regulations exceed an agency's statutory authority. Thus, the scope of the congressional text is the touchstone for our inquiry. *See Chevron*, 467 U.S. at 843. In reviewing the text, we examine "whether the agency's construction of the statute is faithful to its plain meaning, or if the statute has no [one] plain meaning, whether the agency's interpretation 'is based on a permissible construction.'" *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (citing *Chevron*, 467 U.S. at 843); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). If the regulation survives this scrutiny, the first pillar stands firm. But as "the final authorities on issues of statutory construction," the federal courts need not tolerate a regulation "inconsistent with [the agency's] statutory mandate." *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745–46 (1973) (internal quotations and citations omitted); *see also* 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions.").

The second pillar holds that agencies are subject-matter experts accountable to the elected President, and they bring their reasoned expertise to bear when adopting regulations. *See State Farm*, 463 U.S. at 52–53; *see also Baltimore Gas & Elec. Co. v.*

81

*Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). With the "enlightenment gained from administrative experience," the Supreme Court teaches that agencies are "often in a better position than [] courts" to determine the best way to fulfill their statutory mandates. *F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 385 (1965). So when the administrative record shows that an agency employed that expertise by formulating reasoned regulatory policy, its judgment is to be respected by the courts—even when we disagree as to a policy's propriety. *See id.*

So a second question for reviewing courts is whether the administrative record shows that a democratically responsive agency employed its expertise by conducting a "reasoned analysis." *State Farm*, 462 U.S. at 42; *Rust*, 500 U.S. at 187. If the agency has "cogently explain[ed]" its regulations in a reasoned manner, we will assume its regulation a product of expertise, and give it the deference that expertise is due. *See State Farm*, 462 U.S. at 48. But when an agency fails to provide the necessary reasoned analysis, we lack confidence that the agency applied its expertise. We will then find the regulation "arbitrary" or "capricious," additional grounds by which we may set it aside. *Id.* at 52; *see also* 5 U.S.C. § 706(2)(A).

Baltimore takes a page from the book of Judges, wraps its arms around both these pillars of administrative law, and pulls with all its might. Our inquiry today is limited to whether the pillars that support the 2019 Final Rule survive the strain. So first, we ask whether HHS permissibly construed § 1008—here a classic *Chevron* question. Second, we turn to whether the Final Rule is supported by a reasoned analysis—a record-centric

82

inquiry governed by *State Farm*. As in *Rust*, I would answer both questions in the affirmative. Baltimore is no Samson. The pillars stand firm. Or at least they should.

### A. Pillar one: The Final Rule is a permissible construction of the statute

When HHS speaks with the force of law, we generally defer to its reasonable legal interpretation of a genuinely ambiguous statute. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *see also Chevron*, 467 U.S. at 843–44. Of course, a *reasonable* agency interpretation within the zone of ambiguity may differ from the *best* judicial interpretation of a statute. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *see also Michigan v. E.P.A.*, 576 U.S. 743, 760 (2015) (Thomas, J., concurring). Rather, it offers one permissible way that an agency might read the law—sometimes one of several. And where an agency interprets the ambiguous text of a "broad mandate," one reasonable interpretation may "sharp[ly] break" from another. *Rust*, 500 U.S. at 186; *see also Chevron,* 467 U.S. at 862. Here, the Title X regulations have been subject to three such breaks: in 1988,[8] in 1993,[9] and now in 2019.[10]

Whether or not interpretive discontinuities are wise as a matter of policy, *see* Jonathan Masur, *Judicial Deference and the Credibility of Agency Commitments*, 60 Vand.

---

[8] *See Rust*, 500 U.S. at 178–81; *compare* 45 Fed. Reg. 37433 (1980), *with* 53 Fed. Reg. 2922 (1988).

[9] *Compare* 53 Fed. Reg. 2922 (1988), *with* 58 Fed. Reg. 7462 (1993); *see also Nat'l Family Planning & Reprod. Health Ass'n, Inc.*, 979 F.2d at 230.

[10] C*ompare* 65 Fed. Reg. 41270 (2000), *with* 84 Fed. Reg. 7714 (2019).

L. REV. 1021, 1037–60 (2007),[11] they *are* permitted as a matter of law.  An agency may revise its interpretation of an ambiguous statute so long as the new interpretation is reasonable, *Brand X*, 545 U.S. at 980, and the change itself is reasoned, *State Farm*, 463 U.S. at 42.  The Supreme Court justifies this administrative flexibility on structural and policy grounds—regulatory elasticity allows an agency responsive to the elected President to "consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863–64; *see also Brand X*, 545 U.S. at 981 (relying on *State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part)).  Our role as an inferior court is simply to apply this legal framework as given.

HHS has once again reinterpreted Title X, and the reasonableness of this interpretation is the first question before us.  Far from "irrelevant," Appellee Br. 42, *Rust* serves as the starting point for the *Chevron* analysis.  Today, as in 1988, HHS spoke with the force of law when it engaged in the notice-and-comment rulemaking authorized by Congress.  *See* 42 U.S.C. § 300a-4; *Mead*, 533 U.S. at 226–27.  And the relevant question in this case—whether HHS has permissibly interpreted § 1008 of Title X—has already

---

[11] Even the Founders questioned the wisdom of rapid policy change:

> The internal effects of a mutable policy are still more calamitous.  It poisons the blessing of liberty itself.  It will be of little avail to the people, that the laws are made by men of their own choice, if the laws be so voluminous that they cannot be read, or so incoherent that they cannot be understood; if they be repealed or revised before they are promulgated, *or undergo such incessant changes that no man, who knows what the law is to-day, can guess what it will be to-morrow*.  Law is defined to be a rule of action; but how can that be a rule, which is little known, and less fixed?

THE FEDERALIST NO. 62, at 381 (Madison) (C. Rossiter ed., 1961) (emphasis added).

been resolved by the Supreme Court. As described above, *Rust* held that the interpretation at issue today was well within the broad scope of Title X's ambiguous statutory text.

To reach this conclusion, *Rust* applied the now-familiar *Chevron* two-step framework. In step one, we ask whether a statute is genuinely ambiguous. If applying the traditional tools of statutory interpretation provides an unambiguous answer, the statute has one—and only one—reasonable interpretation. *Chevron*, 467 U.S. at 842–43 & n.9; *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019). The analysis thus ends. Either the agency adopts that interpretation, or its administrative action is prohibited. In contrast, where the traditional tools of interpretation fail to resolve a statute's ambiguity, we go to step two. There, we consider whether the agency's interpretation falls "'within the bounds of reasonable interpretation,'" meaning an interpretation "within the zone of ambiguity." *Kisor*, 139 S. Ct. at 2416 (quoting *City of Arlington*, 569 U.S. at 296).

*Rust* proceeded through both *Chevron* steps, and its holdings at both steps inform the decision today. At step one, the Supreme Court found that it "agree[d] with every court to have addressed the issue that *the language is ambiguous*." *Rust*, 500 U.S. at 184 (emphasis added). The Court explained that the ambiguity arises because § 1008 "does not speak directly to the issues of counseling, referral, advocacy, or program integrity." *Id*. And at step two, the Court held that HHS's interpretation was a reasonable one, falling within the "broad directives" of "Title X in general and § 1008 in particular." *Id.* Title X's language has not changed, and *Rust* remains good law.

*Rust* thus requires that we find the materially identical regulations to be a reasonable interpretation of § 1008 of Title X. *Accord Becerra*, 950 F.3d at 1084–85. Recognizing

the *Rust* roadblock, Baltimore scours the congressional record for some other statute that might preclude the regulations.  Baltimore claims to have discovered two such provisions: (1) an appropriations rider and (2) a "Miscellaneous Provisions" subtitle of the Affordable Care Act ("ACA").  Baltimore argues that these laws, enacted after *Rust*, abrogate HHS's authority to adopt otherwise reasonable regulations under Title X.  Appellee Br. 44 ("[T]he legislative and regulatory landscape has shifted since *Rust* such that the new Rule is not a permissible interpretation of § 1008.").  I disagree.

### 1.    The appropriations rider does not prohibit the Final Rule

The first statutory provision that allegedly abrogates HHS's authority to issue the Final Rule is an annual appropriations rider.  Congress has attached this rider to the appropriation of funds for HHS to carry out Title X in every appropriations act since 1996.  The Fiscal Year 2019 rider provides:

> For carrying out the program under [T]itle X of the [Public Health Service] Act to provide for voluntary family planning projects, $286,479,000: Provided, [t]hat amounts provided to said projects under such title shall not be expended for abortions, *that all pregnancy counseling shall be nondirective*, and that such amounts shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office.

Pub. L. No. 115–245, 132 Stat. 2981, 3070–71 (2018) (emphasis added).  The majority coins the label "Nondirective Mandate" for the emphasized clause of the rider.

At first glance, the rider's ban on expending funds "for abortions" *reinforces* § 1008's separation between Title X funds and "programs *where abortion is a method of family planning*."  And it requires any pregnancy counseling to be "nondirective."  132 Stat. at 3071.  So for instance, a program cannot steer a pregnant woman toward or away

from obtaining an abortion. *Accord* 84 Fed. Reg. at 7747. And the rider's final clause again forbids the use of public money in political endeavors. *Accord* 42 C.F.R. § 59.16(a)(2). Thus construed, the appropriations rider appears fully compatible with the regulations. And the question here is only whether this construction is permissible.

But Baltimore asks that we squint at the second clause of the rider: "[A]ll pregnancy counseling shall be nondirective." 132 Stat. at 3070–71. In Baltimore's view, this "nondirective counseling mandate" prohibits the 2019 Final Rule's (a) restrictions on referrals for abortion or to abortion centers and (b) required referrals for prenatal care.[12]

---

[12] The regulations state:

"A Title X project may not . . . refer for . . . abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 42 C.F.R. § 59.14(a).

"[O]nce a client served by a Title X project is medically verified as pregnant, she shall be referred to a health care provider for medically necessary prenatal health care." 42 C.F.R. § 59.14(b)(1).

Baltimore also challenges how the regulations regulate the list of referral options. As in the 1988 regulations, the 2019 regulations prohibit providers from steering a pregnant woman to an abortion provider. 42 C.F.R. § 59.14(c). So the referral regulations permit grantees to provide pregnant women with a list that includes abortion providers:

"A Title X project may not use the provision of any prenatal, social service, emergency medical, or other referral, of any counseling, or of any provider lists, as an indirect means of encouraging or promoting abortion as a method of family planning." 42 C.F.R. § 59.14(c)(1).

"The list of licensed, qualified, comprehensive health care providers . . . may be limited to [facilities] that do not provide abortion, or may include licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some, but not the majority, of which also provide abortion as part of their comprehensive health care services. Neither the list nor

According to Baltimore, each of these *referral* regulations is impermissible "directive" *counseling*.

To begin, I note that HHS spoke with the force of law when it interpreted the appropriations rider. HHS analyzed and considered the rider as part of its statutorily authorized notice-and-comment rulemaking. *See* 42 U.S.C. § 300a-4(a); *see also* 84 Fed. Reg. at 7745 ("The Department has carefully considered the provision of counseling and information about abortion . . . in light of Section 1008 [and] the appropriations riders in place since 1996 . . . ."). And in these circumstances, we expect HHS to understand and administer this rider. *See Sherley v. Sebelius*, 644 F.3d 388, 393–97 (D.C. Cir. 2011) (giving *Chevron* deference to HHS's interpretation of an appropriations rider). So for Baltimore to prevail, the rider must unambiguously preclude the regulations based on the traditional tools of statutory interpretation (*Chevron* step 1) or HHS's construction of the ambiguous rider must be unreasonable (*Chevron* step 2). To determine the regulations' conformity with the rider, we employ our traditional tools of statutory interpretation. *See Kisor*, 139 S. Ct. at 2415.

We start with the relevant text of the rider: "all pregnancy counseling shall be nondirective." 132 Stat. at 3070–71; *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 376 (2013) (statutory interpretation starts with the text). By its own terms, this clause applies only to "counseling." And, as HHS emphasizes, the challenged regulations govern

---

project staff may identify which providers on the list perform abortion." 42 C.F.R. § 59.14(c)(2).

This challenge similarly turns on whether "nondirective counseling" includes "referrals."

"referrals"—not "counseling." *See* 42 C.F.R. § 59.14; *see also* 84 Fed. Reg. at 7716–17, 7724, 7730 (distinguishing between counseling and referrals).   Baltimore's argument requires that Congress must have statutorily equated "referrals" and "counseling" so that regulatory differentiation would be an unreasonable interpretation of law. *See Chevron*, 467 U.S. at 843.  But I would conclude that "nondirective counseling" and "referral" have distinct meanings as reflected in their usage, the Title X context, and the broader statutory structure.  And so HHS's interpretation is permissible.

Counseling is "the giving of advice, opinion, and instruction to direct the judgment or conduct of another." *Counseling*, STEDMAN'S MEDICAL DICTIONARY 451 (28th ed. 2005); *see also, e.g.*, *Counseling*, 3 OXFORD ENGLISH DICTIONARY 1013 (2d ed. 1989); *accord* Appellee Br. 50–51.[13]   Although "[o]rdinarily, a word's usage accords with its dictionary definition," *Yates v. United States*, 574 U.S. 528, 537 (2015), "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'"  *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Comm'r v. Nat'l Carbide Corp.*, 167 F.2d 304, 306 (2d Cir. 1948), *aff'd*, 336 U.S. 422 (1949) (Hand, J.) ("[W]ords are chameleons, which reflect the color of their environment.").

Here, the rider's "nondirective" requirement bears directly on the meaning of counseling.  Directive means "[h]aving the quality or function of directing, authoritatively

---

[13] For this discussion, we set aside the specialized meaning of psychological counseling.  No party invokes that usage here—nor do we believe it to apply.

89

guiding, or ruling." *Directive*, 4 OXFORD ENGLISH DICTIONARY 705; *see also* 84 Fed. Reg.

at 7716.  So "nondirective counseling" is "the giving of advice, opinion, and instruction"

*without* "direct[ing] judgment or conduct."    *Counseling*, STEDMAN'S MEDICAL

DICTIONARY 451.  Indeed, this ordinary meaning of nondirective counseling matches the

use of that term in the medical context.  HHS has explained—and Baltimore agrees—that

nondirective counseling is "the meaningful presentation of options where the physician or

advanced practice provider is 'not suggesting or advising one option over another.'" 84

Fed. Reg. at 7716; Appellee Br. 47.[14]

        In contrast with "nondirective counseling," "referral" is "the process of directing or

redirecting (as a medical case or a patient) to an appropriate specialist or agency for

definitive treatment." *Referral*, Merriam-Webster's Medical Dictionary Online (2020); *see*

*also Referral*, 13 OXFORD ENGLISH DICTIONARY 467 ("[T]he directing (usu[ally] by a

general practitioner) of a patient to a medical consultant for specialist treatment.");

*Referral*, BLACK'S LAW DICTIONARY 1533 (11th ed. 2019) ("The act or an instance of

sending or directing to another for information, service, consideration, or decision.").  In

medicine, a "definitive treatment" is "the treatment plan . . . that has been chosen as the

best one for a patient after all the other choices have been considered."   *Definitive*

*Treatment*, National Cancer Institute Dictionary of Cancer Terms Online (2020); *see also*

*Definitive*, 4 OXFORD ENGLISH DICTIONARY 385 ("Having the function of finally

---

        [14] Of course, the adjective "pregnancy" limits the subject-matter scope of the
nondirective counseling provision.

deciding.").  As Baltimore concedes based on many of the same sources:  "Referral is 'giving advice to' a patient about where to go for appropriate treatment."  Appellee Br. 51.

Consistent with HHS's interpretation, these definitions suggest that nondirective counseling and referral are two different—each important—stages of a physician-patient relationship.  *Accord* Majority Op. 44 (noting that "a referral" must follow "speaking with and counseling a patient").  While nondirective counseling involves an exchange of information and discussion of options, a referral is the directing of a patient to an appropriate specialist to pursue her chosen next steps.  Far from one in the same, a doctor may provide counseling without referral, or referral without counseling.  *See* 84 Fed. Reg. at 7748 (Prenatal referral is "the result of the woman's pregnancy diagnosis" and the need "preexists" any discussion with a counselor.).  In other words, nondirective counseling involves discussing with the patient the options for *what to do*; referrals concern the provider's direction about *who to see* to have it done.[15]

Moreover, HHS's distinction between the two recognizes the different hats a provider must wear in each stage of the physician-patient relationship.  In a nondirective counseling role, a physician aims to "empower the client" by informing her "about a range of options."  84 Fed. Reg. at 7716; *accord* Appellee Br. 48, 50.  By refraining from "suggesting or advising one option over another," the provider encourages "clients [to]

---

[15] *Compare* Appellee Br. 48 ("Non-directive counseling is commonly understood in medicine to mean patient-directed counseling that *presents neutral and unbiased information regarding all options*.") (emphasis added and citation omitted), *with* Appellee Br. 51 ("Referral is 'giving advice to' a patient *about where to go for appropriate treatment*.") (emphasis added).

91

take an active role in processing their experiences" and to select the appropriate path in a uniquely personal context. 84 Fed. Reg. at 7716.

In contrast, when making a referral, physicians are expected to take an active role in directing a patient to one or more recommended providers. Once the patient has selected a definitive treatment with the counselor's assistance, there is no need for the neutrality of nondirective counseling. Although always entitled to change her mind tomorrow, the patient has reached her decision today. Thus, if consistent with the congressional and regulatory restrictions, a provider may affirmatively direct a patient to the best specialist to pursue her decision. *See* 42 C.F.R. § 59.14(a) (characterizing "referral" as an "affirmative action").

In any event, equating referrals with nondirective counseling would lead to anomalous legal results. Although Title X pregnancy counseling must be nondirective, referrals are *directive*—they are the *directing of a patient*. So if nondirective pregnancy counseling encompasses referrals, the rider would preclude Title X grantees from referring, or "directing," their pregnant clients anywhere. If Congress intended to bring about such a broad result, it would have said so.

Indeed, Congress often distinguishes between counseling and referrals, and when it means to affect counseling *and* referrals, it so says. *See, e.g.*, 42 U.S.C. § 300z-10(a) ("abortion counseling or referral"); 18 U.S.C. § 248(e)(5) ("counselling or referral services"); 42 U.S.C. § 300z-1(a)(4)(B) ("counseling and referral services"); 42 U.S.C. § 300z-3(b)(1) ("counseling and referral services"); 42 U.S.C. § 300z-3(b)(2) ("counseling and referral services"); 42 U.S.C. § 1395w-22(j)(3)(B) ("counseling or referral service");

92

42 U.S.C. § 1396u-2(b)(3)(B) ("counseling or referral service"); 7 U.S.C. § 5936(b)(1) ("counseling and referral for other forms of assistance").[16]   Ignoring this distinction here would render Congress's other references to counseling "*and referrals*" superfluous.  But we generally interpret statutes to avoid this consequence.  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001).

For these reasons, I would find that the rider's "nondirective counseling" requirement does not impact the referral regulations.  This is the best interpretation of the rider, making it at least reasonable under *Chevron*.

Despite all of this, Baltimore (and the majority) points to a statement of purpose in the Children's Health Act of 2000 to suggest that "referrals" may be "included in" "nondirective counseling."  Appellee Br. 51–52; Majority Op. 43–44.  There, Congress described the "purpose of developing and implementing programs to train the designated staff of eligible health centers in providing adoption information and referrals to pregnant women on an equal basis with all other courses of action included in nondirective counseling to pregnant women."  Pub. L. No. 106–310, 114 Stat. 1101, 1132, § 1201 (Oct.

---

[16] Reflecting this distinction, the Supreme Court has similarly distinguished between counseling and referrals when interpreting statutes.  *See, e.g.*, *Rust*, 500 U.S. at 193 (enumerating "counseling" and "referral" separately); *Bowen v. Kendrick*, 487 U.S. 589, 594 (1988) ("pregnancy testing and maternity counseling, adoption counseling and referral services, prenatal and postnatal health care, nutritional information, counseling, child care, mental health services, and . . . 'educational services relating to family life.'") (quoting 42 U.S.C. § 300z-1(a)(4)); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("counseling and referral services for low-and moderate-income homeseekers").  That distinction matters for how we interpret the appropriations rider.  *See W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 92 (1991).

17, 2000). According to Baltimore, this language points to referrals as one "course[] of action included in nondirective counseling." Appellee Br. 51–52.

This argument is unpersuasive. To begin with, "counseling" and "referrals" are not treated as one and the same throughout the Children's Health Act. *See, e.g.*, 114 Stat. at 1160, § 2401 ("counsel, refer, or treat patients"). And even were this statement read in isolation, it would not require Baltimore's interpretation. A doctor's "referral" is not itself a "course of action." Rather, a referral is the directing of a patient to the next steps in pursuit of her chosen course of action—*e.g.*, abortion, adoption, or keeping the child.[17] So the nearest reasonable referent of "other courses of action included in nondirective counseling" is "adoption" not "referrals." *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 152–53 (2012) (discussing "the nearest-reasonable-referent" canon). Thus, the Children's Health Act instructs programs to train staff to discuss adoption as a course of action on par with abortion and keeping the child. *See* 84 Fed. Reg. at 7733 ("Congress clearly intended Title X to support family planning through more than preventive services . . . and adoption is one method by which a Title X client who is not pregnant may seek to have children."). It does not suggest that

---

[17] For related examples linguistically using "courses of action" to refer not to information or referrals from a doctor, but to the action of a patient, *see, e.g.*, H.R. Rep. No. 99-403 at 6 (1985) ("[T]hose requesting information on options for the management of an unintended pregnancy are to be given non-directive *counseling* on the following alternative *courses of action*, *and referral* upon request: a. *prenatal care and delivery*; b. *infant care, foster care or adoption*; c. *pregnancy termination*.") (emphasis added); The American College of Obstetricians and Gynecologists, Committee Opinion No. 528: Adoption 3 (June 2012) ("when discussing the option of adoption with patients, physicians should guard against advocating for a particular course of action").

"referrals" are "nondirective counseling." In any event, to the extent there is doubt over how to best read this portion of the Children's Health Act, the other times that Congress has distinguished counseling from referrals in that Act (and other acts) persuade us that the distinction between counseling and referrals in ordinary speech is also reflected in their statutory usage.

Next, the majority takes a different tack, asserting that HHS itself never distinguished counseling and referrals in its Final Rule. Frankly, this assertion boggles the mind. "First and foremost," the majority reasons, "*nowhere* in the Final Rule does HHS state that counseling and referrals are two separate Title X services." Majority Op. 42. So they must be one in the same service. *See id.* And, the majority asserts, HHS's contention to the contrary is just a "convenient litigation position." Majority Op. 43.

There are three apparent problems with this argument. First, the majority improperly imposes a burden of proof where none exists. We give words in statutes and regulations their plain meaning in context. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). And where (as here) the plain meanings of two terms differ, we do not require a legal text to state the obvious. Traffic codes, for instance, instruct drivers to take different actions when a light changes from red to green. There is no need to state that red and green are different colors. *See, e.g.*, Md. Code, Transp. § 21-202. Yet the majority

95

never wrestles with the plain meanings of these different terms, and it instead concludes that HHS has failed its alleged burden to state the obvious.[18]

Second, the context and usage of these terms within the Final Rule show that HHS considered them distinct.  Consider, for example, the following sentence from the Rule: "Unlike abortion referral, nondirective pregnancy counseling would not be considered encouragement, promotion, support, or advocacy of abortion."  84 Fed. Reg. at 7745. "Unlike" in common usage means, "Not like something else . . . ; different from, dissimilar to."  *Unlike*, 19 OXFORD ENGLISH DICTIONARY 102.  So this reasonably indicates that "abortion referral" is "different from" "nondirective pregnancy counseling."  Indeed, the very purpose of contrasting two terms is to highlight a difference.  Yet this juxtaposition escapes the majority.

HHS again signals that counseling and referrals are distinct by the very act of imposing disjunctive requirements.  *See, e.g.*, 84 Fed. Reg. at 7730 ("[T]he Department has concluded that Title X projects may allow a physician or [medical professional] to provide nondirective counseling on abortion generally as a part of nondirective pregnancy counseling, . . . but may not refer for abortion as a method of family planning.").  Of course, two (in the majority's view) conflicting requirements cannot be imposed on a singular

---

[18] At times the majority appears to believe that the possibility that counseling and referrals could overlap or encompass one another suffices.  But the issue at hand is not whether the meanings of the two terms *may* overlap, but whether they *must* completely overlap so that HHS adopted an unreasonable interpretation by distinguishing between them.  In other words, identifying an interpretation that may be possible bears on the permissible scope of a regulation—but it does not tell us whether a particular interpretation is reasonable under *Chevron* step two.

element.  This would be contradictory and thus impossible with which to comply.  So equating counseling and referrals cannot be correct in context.  On the contrary, I would find it abundantly clear that counseling and referrals are distinct within the Final Rule.[19]

And third, even if the Final Rule were ambiguous, we might need to give credence to the agency's interpretation of its own regulation.  *See Kisor*, 139 S. Ct. at 2408; *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413−14 (1945).  This may include the agency's positions advanced for the first time in litigation as long as they reflect the agency's "fair and considered" judgment, *Auer v. Robbins*, 519 U.S. 452, 462 (1997); *Kisor*, 139 S. Ct. at 2417 n.6, and do not create "unfair surprise," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007); *Kisor*, 139 S. Ct. at 2418.  The mere assertion that HHS advances only a litigating position is yet another example of the majority glossing over what deference HHS may be due.

The majority also asserts that HHS failed to distinguish counseling and referrals because they are discussed together as part of the same course of service suggesting that the 'nondirective' term applies to both.  Majority Op. 42.  Yet again, this analysis is less than persuasive for four reasons.

---

[19] The Final Rule also describes the type of conversation that may take place in counseling about abortion without providing a referral:  "A pregnant woman requests information on abortion and asks the Title X project to refer her for an abortion.  The counselor tells her that the project does not consider abortion a method of family planning, and therefore, does not refer for abortion.  The counselor offers her nondirective pregnancy counseling, which may discuss abortion, but the counselor neither refers for, nor encourages, abortion."  42 C.F.R. § 59.14(e)(5).

Start with the majority's contention that because counseling and referrals are often discussed together, HHS has not adequately distinguished them. First, discussing two items together does not suggest a lack of distinction. On the contrary, it suggests each has independent meaning. *See Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) ("[W]e must give effect to every word of a statute wherever possible."). Hotdogs and hamburgers, for instance, are often discussed together. But a hotdog is not a hamburger. And, if they were the same, there would be no need to mention them both.

Second, while these two items are often discussed together, sometimes they are not. This makes the times that the terms are used individually (*e.g.*, where the Final Rule describes "nondirective pregnancy counseling" without reference to referrals, *see* 84 Fed. Reg. at 7747, or prohibits "referrals for abortion" without reference to counseling, *id.*) all the more significant. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (When items "are members of an associated group or series," we give force to the inference that "items not mentioned were excluded by deliberate choice, not inadvertence.") (cleaned up).

Third, consider the majority's implication that because two items are part of the "same course of service" the same restrictions must apply to both. Majority Op. 42. Again, I am not persuaded. Standing in line and riding a roller coaster are part of the same course of service at an amusement park. But different restrictions apply: One must wear restraints on the roller coaster and stay seated, but one need not wear restraints while standing in line. Dinner and dessert are part of the same course of service at a restaurant. But a child might be prevented from selecting a sugary dessert while given free rein of the main menu. Different rules often accompany different steps in the same process.

98

And fourth, take the majority's assertion that in the phrase, "nondirective counseling and referrals," the adjective nondirective must apply to both counseling and referrals. Majority Op. 42. Again, I disagree. When a sentence takes the form of 'adjective noun$_1$ and noun$_2$,' the result is generally ambiguous. *See, e.g.*, Maurice B. Kirk, *Legal Drafting: The Ambiguity of "And" And "Or,"* 2 TEX. TECH. L. REV. 235, 238–39 (1971). The adjective may modify noun$_1$ alone or modify both noun$_1$ and noun$_2$. Context resolves the ambiguity, and the context here is clear: "Nondirective counseling" has its own unit of meaning. It means "presenting the options in a factual, objective, and unbiased manner and (consistent with other Title X requirements and restrictions) offering factual resources that are objective, rather than presenting the options in a subjective or coercive manner." 84 Fed. Reg. at 7747. This is confirmed by how 'nondirective' is used throughout the Final Rule. "Nondirective" is consistently used directly before "counseling" and never before "referral" alone. Because "nondirective counseling" itself has a discrete meaning, the adjective nondirective limits "counseling," not "referral."

In sum, the rider is limited to "nondirective counseling" and does not impact the referral regulations. The majority's arguments to the contrary fail, and they do not establish that HHS has adopted an impermissible interpretation of Title X.

## 2.    Section 1554 of the ACA does not prohibit the Final Rule

The second statutory provision that Baltimore argues overcomes HHS's authority to issue the Final Rule is a "Miscellaneous Provisions" subtitle within the ACA:

Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—

(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
(2) impedes timely access to health care services;
(3) interferes with communications regarding a full range of treatment options between the patient and the provider;
(4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;
(5) violates the principles of informed consent and the ethical standards of health care professionals; or
(6) limits the availability of health care treatment for the full duration of a patient's medical needs.

Pub. L. No. 111-148, 124 Stat. 119, 259, § 1554 (Mar. 23, 2010) (codified at 42 U.S.C. § 18114).

These provisions were never mentioned in any of the half-million public comments offered during the rulemaking—including the comments by Baltimore.[20]  But Baltimore now argues that § 1554's provisions prohibit the Final Rule's referral regulations and separation requirement.  Appellee Br. 23–24.  As discussed above, the Final Rule's referral regulations restrict Title X program referrals for abortions or to abortion centers and instruct grantees to provide a regulated list of prenatal caregivers to pregnant clients while

---

[20] HHS argues that Baltimore's § 1554 argument has been waived because it was not raised during notice-and-comment rulemaking.  Appellants Br. 34–35; *see Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994) ("As a general matter, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved.").  I need not decide whether the issue-waiver doctrine bars Baltimore's § 1554 argument because § 1554 does not prohibit the Final Rule on the merits.

To avoid this waiver doctrine, the majority finds that § 1554 was raised and considered in the rulemaking.  Majority Op. 54–57.  I disagree.  But if so, then HHS would be due *Chevron* deference.  Yet the majority inadequately considers the deference due.

permitting grantees to provide nondirective pregnancy counseling. And for its part, the

Final Rule's separation requirement provides:

> A Title X project must be organized so that it is physically and financially
> separate, as determined in accordance with the review established in this
> section, from activities which are prohibited under section 1008 . . . . Factors
> relevant to [determining whether a project is separate] shall include:
>
> > (a) The existence of separate, accurate accounting records;
> > (b) The degree of separation from facilities (*e.g.*, treatment,
> > consultation, examination and waiting rooms . . .) in which
> > prohibited activities occur and the extent of such prohibited
> > activities;
> > (c) The existence of separate personnel, electronic or paper-based
> > health care records, and workstations; and
> > (d) The extent to which signs and other forms of identification of the
> > Title X project are present, and signs and material referencing or
> > promoting abortion are absent.

42 C.F.R. § 59.15.

Baltimore has failed to demonstrate that § 1554 prohibits these portions of the Final

Rule. First, Baltimore has failed to show that § 1554's prohibitions eclipse the Secretary's

authority under § 1008 of Title X. Second, even if § 1554 limits HHS's authority under

Title X, Baltimore has failed to show that § 1554's provisions prohibit the Final Rule on

the merits. Thus, § 1554 does not prohibit the Final Rule, and Baltimore's second effort to

show a likelihood of success on the merits also fails.

### a.    Section 1554 does not eclipse HHS's authority under § 1008

The first reason that Baltimore's § 1554 argument fails is because Baltimore cannot

show that § 1554 overcomes the statutory authority recognized in *Rust*. That authority

allowing HHS to issue the Final Rule remains intact. Section 1554 of the ACA cabins the

Secretary's rulemaking authority, "[n]otwithstanding any other provision of *this Act* [*i.e.*, the ACA]." § 1554 (emphasis added). "The ordinary meaning of 'notwithstanding' is 'in spite of.'" *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (internal citation omitted). So here, Congress's use of the term "notwithstanding" reflects its intent to "override conflicting provisions of any other section" of the ACA. *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993).

In the context of the ACA, a "notwithstanding" clause makes good sense. The ACA is a major piece of legislation with "10 titles stretch[ing] over 900 pages and contain[ing] hundreds of provisions" that provide copious new rulemaking authority. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538–39 (2012). By limiting HHS's power to regulate the healthcare and insurance industries pursuant to expansive new grants of authority, Congress mitigated the chance of unintended consequences in yet-to-be-promulgated rules.

And critically, Congress used "notwithstanding" clauses liberally within the ACA, 124 Stat. 119, specifying the application at different levels of generality—from sentences (§§ 1341, 2101), to paragraphs (§ 1313), to subsections and sections (§ 3105), to subtitles (§ 7003(b)), to titles (§ 1303), to the ACA itself (§ 1554), and to "any other law or rule of law" (§ 4377), as well as to specific provisions in *other* laws (§ 2022(h)).

In § 1554, Congress chose to apply the six provisions notwithstanding any other provision *of the ACA*—not in spite of "any other law," nor Title X specifically. And we must give effect to the level of generality that Congress has specified—particularly where Congress has repeatedly taken such care in its application of notwithstanding clauses. *See Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018).

102

Even though it only discovered this position at the eleventh hour, Baltimore now claims the "notwithstanding" clause overcomes even Title X. But if Congress, in the ACA, wished to overcome HHS's existing rulemaking authority from other congressional acts, Congress knew precisely what to do. In fact, it did so in other provisions of the ACA. For instance, in § 10325, Congress limited the Secretary's rulemaking authority relating to billing for Skilled Nursing Facilities "[n]otwithstanding *any other provision of law*." Pub. L. No. 111-148, 124 Stat. at 960 (emphasis added). In contrast, its use of the Act-specific provision in § 1554 signals the opposite—an intention not to eclipse existing rulemaking authority outside the ACA. *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018). The Secretary's authority to set forth standards for Title X grants is "the engine that drives nearly all of Title [X]," and as such, we would expect Congress to amend or abrogate it clearly. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see also Morton v. Mancari*, 417 U.S. 535, 549–50 (1974). "Congress," the Supreme Court has held, "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman*, 531 U.S. at 468. I would therefore conclude that § 1554's general miscellaneous provisions do not overcome the specific authority recognized in *Rust* under § 1008 of Title X.

### b.    The Final Rule does not violate § 1554

Baltimore also fails to show that the Final Rule actually conflicts with § 1554. The Final Rule's referral regulations and separation requirement do not "create any unreasonable barriers," "impede[] . . . access," "interfere[] with communications," or otherwise violate § 1554. As I noted early on, the Final Rule is not about the legality of

103

abortions. It simply decides which Title X programs the government will *subsidize*, rather than a decision on what conduct to *prohibit*. So grant recipients may either accept the conditions, or they remain in the same position as they were before. *See Rust*, 500 U.S. 201–03.

The verbs used in subsections (1) through (6) of § 1554 ("creates," "impedes," "interferes," "restricts," "violates," and "limits") show that this provision is concerned with affirmative interference rather than a decision not to offer a subsidy. The Oxford English Dictionary defines those verbs: **create** means "[t]o make, form, constitute, or bring into legal existence (an institution, condition, action, mental product, or form, not existing before)"; **impede** means "[t]o retard in progress or action by putting obstacles in the way; to obstruct; to hinder; to stand in the way of"; **interfere** means "[o]f persons: To meddle *with*; to interpose and take part in something, esp[ecially] without having the right to do so; to intermeddle"; **restrict** means "[t]o confine (some person or thing) *to* or *within* certain limits; to limit or bound"; **violate** means "[t]o break, infringe, or transgress unjustifiably; to fail duty to keep or observe . . . [a] law, commandment, rule, etc."; **limit** means "[t]o confine within limits, to set bounds to (*rarely* in material sense); to bound, restrict." Oxford English Dictionary.[21]

These verbs are striking: *each* relates to *affirmative* interference. *See United States v. Williams*, 553 U.S. 285, 294–95 (2008) (interpreting the "string of operative verbs" in

---

[21] Similarly the list of nouns in § 1554—"barriers," "access," "communications," "ability," and "principles"—suggest that affirmative interference involves imposing an obstacle.

104

18 U.S.C. § 2252A(a)(3)(B)); *see also Yates*, 574 U.S. 528 (Alito, J., concurring) (interpreting the "list of verbs" in 18 U.S.C. § 1519).  In contrast, a choice to subsidize certain services *incentivizes* those services, it does not affirmatively interfere with others. *See generally* ERIK DEAN ET AL., PRINCIPLES OF MICROECONOMICS: SCARCITY AND SOCIAL PROVISIONING 96 (2016) ("Government subsidies reduce the cost of production and increase supply at every given price.").  So when the Secretary of HHS exercises the authority to limit the use of Title X's finite funds, he has targeted certain preexisting barriers *to reduce*.  And when the use of this authority subsidizes some services or programs and not others, HHS does not create any new barriers for unsubsidized programs.[22]

Baltimore asks us to equate limits on the use of subsidies with affirmative interference.  Appellee Br. 62.  In other words, Baltimore contends that HHS's regulations "'create[] … unreasonable barriers,' 'impede[] timely access to health care services,' 'interfere[] with communications,' 'restrict[] the ability of health care providers to provide full disclosure,' and 'violate[] the principles of informed consent,'" all by imposing limits on "access to grant funds."  *Id.* (quoting 42 U.S.C. § 18114).

---

[22] Baltimore suggests that the Final Rule has put Title X program beneficiaries in a worse position than they would have otherwise been because they have come to *rely* on the program.  Even if Baltimore can assert the reliance interests of other parties, I would conclude that Baltimore's invocation of the reliance interests of those benefiting from its administration of the program is ultimately unpersuasive.  Reasonable individuals who benefit from the result of government funding do so with the knowledge that those programs may be discontinued—or, as is the case here, simply return to an earlier iteration. *Compare* 53 Fed. Reg. 2922 (1988), *with* 84 Fed. Reg. 7714 (2019).  That is particularly true when, as here, the regulation of Title X funding has been repeatedly changed.

But the distinction between action (subsidies) and omissions (non-subsidies) is well-recognized in the law.  We do not say that an expert swimmer who sees but walks past a drowning person has in any sense "imped[ed]," "interfer[ed]," or "creat[ed] unreasonable barriers" to that person's rescue.  *See Osterlind v. Hill*, 263 Mass. 73, 76 (1928); *see also, e.g.*, *Sidwell v. McVay*, 282 P.2d 756, 758−59 (Okla. 1955) (failure to stop a child from playing with explosives); *Hurley v. Eddingfield*, 156 Ind. 416, 416 (1901) (failure of physician to respond to a call for aid).  Whatever the virtues or vices of failing to act, it is clear that a failure to act (or an offer to act only upon the satisfaction of certain conditions)—without a preexisting duty to act—does not affirmatively interfere with the position in which the drowning person would have otherwise been.

So too here.  HHS may choose to fund only those projects that meet the program's requirements without "impeding" others.  Service providers have no preexisting right to public grant funds, and the choice to limit the use of those funds does not "interfere" with providers' services.  A prospective Title X program grantee may make its own choice to refuse funds (or decline to apply for them).  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds.").  This creates no unreasonable barrier, impediment of access, interference with communications, restriction on disclosure, or violation of informed consent.

Baltimore's argument to the contrary repackages constitutional assertions that the Supreme Court rejected in *Rust*.  There, the Supreme Court explained that HHS's decision to subsidize childbirth but not abortion "places no governmental obstacle in the path of a

106


woman who chooses to terminate her pregnancy," simply "leav[ing] her in no different position than she would have been in if the Government had not enacted Title X." *Rust*, 500 U.S. at 201–02;[23] *see also Harris v. McRae*, 448 U.S. 297, 326–27 (1980) (holding that the Hyde Amendment creates no obstacle to an abortion but encourages alternative activity through differential subsidization); *Maher v. Roe*, 432 U.S. 464, 474 (1977) (explaining that Connecticut's decision not to subsidize elective abortions "places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion").[24]  So *Rust* confirms that we assess whether a barrier has been created from an unsubsidized baseline, not in comparison to the current scheme of subsidies.

The majority distinguishes the Supreme Court's explanation in *Rust* on the grounds that the Court was addressing a Fifth Amendment claim concerning the right to an abortion. Majority Op. 52–53; *Rust*, 500 U.S. at 201.  But this supposed distinction—based on only the source of challenge—misses the logical point.  The Supreme Court ultimately rejected the Fifth Amendment arguments based on the general principle that "unequal

---

[23] The *Rust* Court explained that this conclusion held even if "most Title X clients are effectively precluded by indigency and poverty from seeing a health-care provider who will provide abortion-related services" outside Title X.  500 U.S. at 203.

[24] Indeed, the Supreme Court has "held in several [other] contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983) (subsidies for lobbying); *see, e.g.*, *Buckley v. Valeo*, 424 U.S. 1 (1976) (subsidies for political candidates); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality) (subsidies for libraries).  This "basic difference between direct state interference . . . and state encouragement of an alternative activity consonant with legislative policy," *Maher*, 432 U.S. at 475, is "scarcely [a] novel principle[]," *Regan*, 461 U.S. at 549; *see also* U.S. CONST. art. I, § 8, cl. 1 (authorizing Congress to tax and spend to provide for the general welfare).

subsidization" is not an obstacle. *Rust*, 500 U.S. at 201. This argument carries just as much force in the statutory as in the constitutional context, so I see no reason to deviate from *Rust*'s logic. *Cf. Agency for Intern. Dev.*, 570 U.S. at 213, 216–17 (affirming *Rust*'s principle that Congress's power to allocate funds for public purposes includes "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends").

In any event, Baltimore's argument proves too much. And its implications are far reaching. If the withdrawal of a subsidy "creates" an affirmative obstacle, then healthcare subsidies become a one-way ratchet: The government may not later reduce what it once offered without violating § 1554. I doubt Congress intended such sweeping consequences. Rather, § 1554 is best interpreted to prevent the government from *affirmative* interference.

In sum, the Final Rule does not conflict with § 1554—and it certainly does not do so with sufficient certainty to overcome the canons favoring the Final Rule's consistency with § 1554 in cases of doubt.

<center>*          *          *</center>

When an agency speaks with the force of law, the Supreme Court has carefully delineated the scope of judicial review. As the Supreme Court held in *Rust*, HHS has reasonably interpreted Title X's ambiguous text. And Baltimore has failed to identify a post-*Rust* enactment that renders that interpretation impermissible. *See generally Becerra*, 950 F.3d at 1085–95. Thus, Baltimore does not show that it is likely to succeed on the merits. So I would vacate the district court's preliminary injunction.

<center>108</center>

### B.    Pillar two:  HHS's Rule is reasoned

Baltimore has also failed in its attempt to pull down the second pillar of administrative law.  When agencies responsive to the elected President promulgate regulations, they must "engage in 'reasoned decisionmaking.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan*, 576 U.S. at 750).  "[T]he agency has latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest.  The function of the court is to assure that the agency has given *reasoned consideration* to all the material facts and issues."  *Greater Bos. Television Corp. v. F.C.C.*, 444 F.2d 841, 851 (D.C. Cir. 1970) (emphasis added); *see Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).  Only then will courts be assured that the course taken by the agency is a product of its judgment and thus worthy of respect.  *See Michigan*, 576 U.S. at 749−50; *see also Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

Accordingly, "an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made.'"  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (An "agency must give adequate reasons for its decisions.").  Otherwise, the APA directs that we "set aside" an agency action as "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).

Although we are to engage in a careful review of the facts and record, our ultimate standard of review is narrow and deferential:  "[A] court is not to substitute its judgment for that of the agency."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)

(cleaned up); *see also Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (Our review is "highly deferential, with a presumption in favor of finding the agency action valid."). Rather than substituting our inexpert and unaccountable views for those of an expert and accountable agency, we are limited to confirming that "the agency has [] really taken a 'hard look' at the salient problems." *Greater Bos. Television Corp.*, 444 F.2d at 851; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). As long as "the agency's explanation is clear enough that its path may reasonably be discerned," *Encino Motorcars, LLC*, 136 S. Ct. at 2125, we must respect its policy choice.

The requirement of reasoned decisionmaking applies whether the agency launches a policy for the first time, or—as here—decides to change course. When changing course, the agency "must show that there are good reasons for the new policy," but it "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." *Fox*, 566 U.S. at 515; *see also Dep't of Homeland Sec.*, 140 S. Ct. at 1905.

The Supreme Court in *Rust* found nearly identical regulations to be the rational product of reasoned decisionmaking. *Rust*, 500 U.S. at 187. The Court credited the Secretary's reasonable determination that the referral regulations were "necessary to provide clear operational guidance to grantees about how to preserve the distinction between Title X programs and abortion as a method of family planning," "more in keeping with the original intent of [§ 1008]," "justified by client experience," and "supported by a

110

shift in attitude against the elimination of unborn children by abortion." *Id.* (internal quotations and citations omitted). And for the 1988 separation requirements, the Supreme Court "deferred" to this "reasoned determination that the [separation] requirements are necessary to implement the prohibition" of § 1008, keeping Title X funds "separate and distinct from abortion-related activities." *Id.* at 190.

HHS relied on *Rust*, and its rationales, throughout in justifying the Final Rule. *See, e.g.*, 84 Fed. Reg. at 7721, 7747, 7766. As in *Rust*, the agency determined that the better interpretation of § 1008's prohibition on spending Title X funds on programs "where abortion is a method of family planning" barred programs accepting those funds from making "*referrals* for abortion as a method of family planning." 84 Fed. Reg. at 7761 (emphasis added); *see also id.* at 7717, 7746. So too for the Final Rule's separation requirement, which HHS found best complied with the statutory command of § 1008. 84 Fed. Reg. at 7764–65; *see also* 84 Fed. Reg. at 7714–15, 7718, 7783. And the Supreme Court recently confirmed that an agency may justify its policy choices by explaining why those choices best comply with the statutory mandate. *Encino Motorcars*, 136 S. Ct. at 2127; *see also Rust*, 500 U.S. at 187 (finding that HHS's conclusion that the restrictions were "more in keeping with the original intent of the statute" supported the agency's regulations implementing § 1008); *see also id.* at 190 (deferring to HHS's reasoned determination that the statutory mandate and congressional intent necessitated the regulations).

Despite *Rust* and HHS's reasoning, the majority finds the Final Rule is arbitrary and capricious on two grounds. First, the majority agrees with Baltimore that HHS's

111

conclusion that the referral regulations are consistent with medical ethics "is unsupported by the evidence in the Record and inadequately explained." Appellee Supp. Br. 5. Second, the majority determines that HHS inadequately assessed the costs of the separation requirement. Neither ground suffices to overcome *Rust* and permits us to second guess the predictions and policy judgments made by HHS.

### 1.   Medical ethics

Baltimore first argues that HHS inadequately considered medical ethics. The majority agrees, holding that the Final Rule is arbitrary and capricious because "HHS merely stated that it 'disagrees' that the Rule 'infringes on the legal, ethical, or professional obligations of medical professionals' and it 'believes' the Rule is 'not inconsistent' with medical ethics." Majority Op. 29 (citing 84 Fed. Reg. at 7724). Of course, this would not be enough: When "the agency decision" about an important element of a problem "is not accompanied by any explanation, let alone a satisfactory one," its action is arbitrary and capricious. *Sierra Club*, 899 F.3d at 293; *see also, e.g.*, *Fred Meyer Stores, Inc. v. N.L.R.B.*, 865 F.3d 630, 638 (D.C. Cir. 2017).

Yet the majority's analysis mows down a straw man. By focusing on only the first two sentences of HHS's explanation, it does not surprise me that the majority finds the agency's explanation deficient. But a topic sentence is not the entire explanation—it "set[s] up the point to be developed in the paragraph." ROBERT E. BACHARACH, LEGAL WRITING: A JUDGE'S PERSPECTIVE ON THE SCIENCE AND RHETORIC OF THE WRITTEN WORD 104 (2020). So although HHS stated that it "disagrees" with commenters and "believes" the Rule "not inconsistent" with medical ethics, Majority Op. 29, this is merely

how HHS introduced its analysis—not the entirety of it. If an agency "cannot simply disregard . . . inconvenient facts," *Fox*, 556 U.S. at 537, I think judges may not similarly disregard inconvenient agency analysis.

I would find that the agency provided a sufficiently reasoned basis for deciding that the Final Rule did not violate medical ethics. First, the record shows that HHS described what medical ethics generally require: "[S]haring full and accurate information with the patient, in response to her specific medical condition and circumstance." 84 Fed. Reg. at 7724. Quoting from the American Medical Association's *Code of Ethics*, the agency elaborated that it would be "ethically unacceptable" for a provider to "withhold[] information without [a] patient's knowledge or consent." *Id.* at 7745. And HHS acknowledged the "[m]any commenters" claiming that "prohibitions on abortion counseling and referral would directly conflict with" medical ethics. *Id.*; *see also* Majority Op. 28–29 (collecting comments).

Then, HHS explained *why* it believed that the regulations are consistent with medical ethics, despite the objections. *See Fox*, 556 U.S. at 515 ("[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better."). HHS disagreed with the commenters' premise—the regulations do not require providers to withhold information from patients without their knowledge:

> Under the terms of the final rule, a physician or [provider] may provide nondirective pregnancy counseling to pregnant Title X clients on the patient's pregnancy options, including abortion. Although this occurs in a postconception setting, Congress recognizes and permits pregnancy counseling within the Title X program, so long as such counseling is nondirective. The permissive nature of this nondirective pregnancy counseling affords the physician or APP the ability to discuss the risks and

113

> side effects of each option, so long as this counsel in no way promotes or
> refers for abortion as a method of family planning. It permits the patient to
> ask questions and to have those questions answered by a medical
> professional. Within the limits of the Title X statute and this final rule, the
> physician or APP is required to refer for medical emergencies and for
> conditions for which non-Title X care is medically necessary for the health
> and safety of the mother or child.

84 Fed. Reg. at 7724.

Simply put, during nondirective counseling, a Title X provider is free to discuss
with a patient the full range of options, including abortion. *See also id.* at 7747
(Nondirective counseling "involves presenting the options in a factual, objective, and
unbiased manner. . . . Physicians or [providers] should discuss the possible risks and side
effects to both mother and unborn child of any pregnancy option presented, consistent with
the obligation of health care providers to provide patients with accurate information to
inform their health care decisions."). If a patient seeks a referral for a non-emergency
abortion, the Title X provider is free to explain that "the project does not consider abortion
a method of family planning and, therefore, does not refer for an abortion." 84 Fed. Reg.
at 7789; *see also id.* at 7748 (Title X is "a matter of Congress's choice of what activities it
will fund, not about what all clinics or medical professionals may or must do outside the
context of the federally funded project.").[25] So as HHS explains, there is no withholding
of information without the patient's knowledge and thus no violation of medical ethics.

---

[25] HHS relied on the limited nature of the Title X federal grant program providing
preconception family planning services. In the agency's view, this limitation meant that
the agency could, without violating its view of medical ethics, reasonably place limits on
what activities to fund (or not fund), while leaving doctor-patient communication outside
the non-comprehensive program unaffected. *See* 84 Fed. Reg. at 7724, 7748. And, as HHS

I find the agency's explanation clear enough to discern its reasons for rejecting the commenters' contentions. *See Encino Motorcars*, 136 S. Ct. at 2125. And that reasoning shows that HHS took a hard look at those comments, but it disagreed with the premise on which they were based. Whether or not I (or the commenters) agree with the agency's conclusion,[26] HHS has adequately set forth its reasons, and so the Final Rule is neither arbitrary nor capricious on the grounds that it disregarded medical ethics. *See Fox*, 566 U.S. at 515; *see also Dep't of Homeland Sec.*, 140 S. Ct. at 1905.

But the agency did not stop there. In response to "commenters who contend the rule will require health care professionals to violate medical ethics," the agency also looked to "Federal and State conscience laws" as probative of what ethics require. 84 Fed. Reg. at 7748; *see also* Majority Op. 32–33. Those laws, the agency explained, "have protected the ability of health care personnel to not assist or refer for abortions in the context of HHS funded or administered programs," 84 Fed. Reg. at 7748, and reflect "personally-held moral principles" of providers, *id.* (quoting *Roe v. Wade*, 410 U.S. 113, 144 n.38 (1973)

_____

noted, "Information about . . . abortion providers is widely available and easily accessible, including on the internet." *Id.* at 7746.

[26] Indeed, many commenters expressed vociferous disagreement with the agency. *See* Majority Op. 28–30 (quoting from the disagreement of various commenters). But organizations may reasonably disagree with an agency on what ethics ultimately require. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018). And as long as the agency explains its reasons, the agency is free to disagree with commenters. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019). As the district court acknowledged (and the majority does not dispute), HHS was not required to show that any particular organization endorsed its Final Rule. *See* Majority Op. 31–32; *see also Dep't of Commerce*, 139 S. Ct. at 2569 (refusing to penalize the agency for departing from the inferences, assumptions, and predictions of others).

(quoting American Medical Association House of Delegates 220 (June 1970))). Thus, HHS reasoned, if ethics *permit* providers to decline to refer for abortions, then ethics cannot simultaneously *require* referrals for abortions. *See id.* (citing *Nat'l Inst. of Fam. & Life Advocates*, 138 S. Ct. at 2371–76).[27]

The majority disagrees, arguing that conscience-based restrictions are "not relevant" to "whether the Final Rule's restrictions are ethical." Majority Op. 33. But I think it manifestly reasonable for the agency to consider laws reflecting "moral principles" as probative of what ethics require. What are "ethics" if not a system "relating to morals[?]" *Ethics*, 5 OXFORD ENGLISH DICTIONARY 421. And it is "well known" that the moral principles that form legitimate ethical theories must be "internally consistent." Richard T. De George, *Ethics and Coherence*, 64 Proceedings and Addresses of the American Philosophical Association 39 (1990). So it was fully reasonable for HHS to draw upon conscience laws as probative of what ethics require and to evaluate its Final Rule accordingly. Whether I (or the American College of Obstetricians and Gynecologists) agree is of no moment.

The Final Rule bars Title X grantees from making abortion referrals as a method of family planning (while permitting referrals for emergency abortions). HHS reasoned that a program that makes referrals for an abortion as a method of family planning is a program

---

[27] Take, for example, Maryland's law. It ensures that any doctor for any reason may "refus[e]" to "refer" for an abortion unless the refusal would cause the patient to die, result in serious injury, or be "contrary to the standards of medical care." Md. Code, Health-Gen. §20-214(a), (d). Thus, at least in Maryland's view, declining to refer for a non-emergency abortion does not inherently violate the standards of medical care.

"where abortion is a method of family planning, contrary to the [§ 1008] prohibition against the use of Title X funds in such programs." *See* 84 Fed. Reg. at 7717; *see also id.* at 7729, 7745–46, 7759, 7761–62. In doing so, the agency adequately considered the objection that limiting the Title X program in this way violated medical ethics and thus acted neither arbitrarily nor capriciously.

## 2.    Costs of the separation requirement

Next, the parties dispute whether HHS adequately considered the likely cost of the separation requirement. Appellants Supp. Br. 40–43. The majority, like the district court, finds that HHS did not because "the administrative record reflects comments estimating the likely cost of the requirement far exceeds HHS's estimate of $30,000." Majority Op. 37 (quoting S.J.A. 1316).

First, I must address the standard by which we determine whether an agency has adequately considered costs. The Supreme Court has explained that agencies generally "must consider cost—including, most importantly, cost of compliance—before deciding whether [a] regulation is appropriate." *Michigan*, 576 U.S. at 759. But, at the same time, agencies are not required (unless Congress says otherwise) "to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Id*. Yet if an agency chooses to account for cost, a reviewing court need only be satisfied that the agency gave a hard and reasoned look at the problem to uphold the regulation. *See Minisink Residents for Envtl. Pres. & Safety v. F.E.R.C.*, 762 F.3d 97, 112 (D.C. Cir. 2014); *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987); *Sierra*

117

*Club v. Sigler*, 695 F.2d 957, 977 n.15 (5th Cir. 1983).[28]  In doing so, we must give an

agency's predictive judgments about uncertain future events particular deference.  *See Fox*,

556 U.S. at 521; *Baltimore Gas*, 462 U.S. at 103.

HHS rightly began its cost analysis by assessing the scope of the separation

requirement.  The agency first anticipated that the compliance costs for the separation

requirement would only apply to a fraction of the existing providers.  *See* 84 Fed. Reg. at

7781–82; *id.* at 7781 (estimating, based on a Congressional Research Service Report, that

around 10 percent of existing providers offered abortion as a method of family planning);

*id.* (estimating that around 20 percent of all Title X service sites had "their Title X services

and abortion services . . . currently collocated" in violation of the separation requirement).

In HHS's view, the compliance costs—difficult to predict in any generalized fashion—

would have only "minimal effect on the majority of current Title X providers."  *Id.*; *see*

*also Becerra*, 950 F.3d at 1098.

Next, the agency turned to the extent of the costs for the providers that would be

affected.  It determined that "10% to 20%" of Title X sites would be affected, "with a

central estimate of 15%."  84 Fed. Reg. at 7781.  It then estimated the costs to each

---

[28] *Compare* ADRIAN VERMEULE, LAW'S ABNEGATION 177–78 (2016) ("[W]hile
rationality may require paying attention to the advantages and disadvantages of agency
decisions, that is not the same as requiring quantification of the advantages and
disadvantages.") (internal citations and quotations omitted), *with* Johnathan S. Masur and
Eric A. Posner, *Cost-Benefit Analysis and the Judicial Role* 34–35, U. of Chicago Pub. L.
Working Paper No. 614 (2017) ("The only way for an agency (or court) to compare costs
and benefits is to quantify them and translate them into comparable units—in effect, to
monetize them."), *and* JONATHAN BERK ET AL., FUNDAMENTALS OF CORPORATE FINANCE
64 (2d. ed. 2012) ("To evaluate the costs and benefits of a decision, we must value the
options in the same terms—cash today.").

impacted site.  On average, HHS explained, it would require forty hours of work, divided between management and lawyers, for each impacted grantee to determine how to proceed. *Id*. at 7782.  And HHS "estimate[ed] that an average of between $20,000 and $40,000, with a central estimate of $30,000, would be incurred to come into compliance." *Id.* Tallying up these costs, HHS found that the separation requirement would impose "costs of $36.08 million in the first year following publication of a final rule." *Id.*

Acknowledging "the substantial uncertainty regarding the magnitude of these effects," *id.* at 7781, HHS emphasized that the Final Rule permitted "case-by-case determinations on whether physical separation is sufficiently achieved to take the unique circumstances of each program into consideration" and that the agency would "help grantees successfully implement the Title X program" and develop "workable plan[s]" for complying with the separation requirement, *id.* at 7766; *see also Becerra*, 950 F.3d at 1098. And HHS "encourage[d] grantees to contact the program office with questions, discuss ways to comply with the physical separation requirement, and put a workable plan in place to meet the [one-year] compliance deadline." 84 Fed. Reg. at 7766.

Baltimore and the majority object to this analysis in two ways.  First, they claim that "HHS made a 'conclusory response' to [the commenters'] 'evidence-backed concerns'" about HHS's cost estimates.  Majority Op. 37 (quoting S.J.A. 1316).  Indeed, as HHS acknowledged, some commenters "provided extremely high cost estimates based on assumptions that they would have to build new facilities to comply." 84 Fed. Reg. at 7782. But HHS did not have to accept these pessimistic estimates as long as it provided a reason. *See Dep't of Commerce*, 139 S. Ct. at 2571.  And HHS did just that:

>The Department does not anticipate that entities will necessarily engage in construction of new facilities to comply with the new requirements, rather that entities will usually choose the lowest cost method to come into compliance.

84 Fed. Reg. at 7781. HHS then explained how providers could avoid building new facilities:

>For example, Title X providers which operate multiple physically separated facilities and perform abortions may shift their abortion services, and potentially other services not financed by Title X, to distinct facilities, a change which likely entails only minor costs.

*Id.* at 7781.[29] And for providers unavoidably and severely impacted, HHS anticipated that they would drop out of the program rather than incur high costs, allowing for other providers—not subject to those costs—to take their place. *See id.* at 7782, 7766 ("If certain grantees and/or subrecipients choose not to continue in the Title X program because they elect not to comply with the physical separation requirements . . . the Department will be in a position to continue to fulfill the purpose of Title X by funding projects sponsored by entities that will comply with the physical separation requirement and provide a broad range of family planning methods and services to low income clients.").[30]

___

[29] HHS also highlighted circumstances where programs may be in the same building and still comply with the separation requirement. 84 Fed. Reg. at 7767 ("As long as the Title X clinic and the hospital facilities where abortions are performed are not collocated or located adjacent to each other within a hospital building or complex, it is highly likely that the hospital is not violating the requirement that there be physical separation between the Title X funded activities and activities related to abortion.").

[30] The departure of these high-compliance-cost providers would, in the agency's predictive judgment, be replaced by the expansion of programs offered by existing providers, *see* Fed. Reg. at 7764, 7766, and by the entry of new providers into the program, *see id.* at 7744, 7764, 7780–83. *See also id.* at 7717, 7722.

Second, Baltimore and the majority fault HHS for its $30,000 cost estimate for facilities to come into compliance. In the majority's view, HHS had to perform "studies" rather than rely on "qualitative" and "quantitative" assessments. Majority Op. 38 (quoting Oral Arg. at 2:45–3:15). But here, the majority misses the point by seeking a false precision that is not required by law. The Supreme Court has repeatedly explained that agencies implicitly employ their expertise when making predictive judgements. "A forecast . . . necessarily involves deductions based on the expert knowledge of the agency," *FPC v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961), making "complete factual support in the record . . . not possible or required." *F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978) (citing *FPC*, 365 U.S. at 29). And so, "even in the absence of evidence," the Supreme Court has explained that "predictive judgments" of an agency require deference. *Fox*, 556 U.S. at 521; *see also Dep't of Commerce*, 139 S. Ct at 2569–71; *BNSFR Ry. Co. v. Surface Transport Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008).[31]

And here, the record provides a basis where none is required. The record shows that the agency appropriately recognized and considered the uncertainty surrounding the $30,000 number. First, HHS identified the specific challenges that it faced in reaching a more precise number: insufficient data, vastly different circumstances of grantees that

---

[31] And while HHS recognized that "cost is an important consideration in any rulemaking," it ultimately rejected less costly alternatives to the separation requirement because "compliance with statutory program integrity provisions is of greater importance and none of the alternatives suggested by commenters guarantees such program integrity." 84 Fed. Reg. at 7783; *see also id.* at 7714. Explaining why a regulation is more consistent with the statutory mandate is enough to justify a policy choice. *See Encino Motorcars*, 136 S. Ct. at 2127; *Rust*, 500 U.S. at 187, 190.

make generalizations difficult, and an expectation that high-cost grantees will be replaced by new applicants. *See* 84 Fed. Reg. at 7766, 7781. Second, HHS updated its estimates in response to submissions from commenters. *Id.* at 7782 ("This estimate is an increase from . . . the proposed rule."). Third, HHS explained why it found competing estimates too high and noted that the data submitted by commenters was insufficient. *Id.* at 7781. Fourth, HHS broke down the remaining elements of the problem into its constituent parts to reach an overall cost estimate. *Id.* at 7781–82; *see also Becerra*, 950 F.3d at 1101 n.32.

In HHS's view, § 1008 "require[s] clear physical separation between Title X projects and places 'where' abortion is a method of family planning." 84 Fed. Reg. at 7765. Prioritizing statutory program integrity, the agency adopted the separation requirement. *Id.* at 7714, 7783. And in the process took a hard and serious look at costs and made a predictive point estimate. HHS's analysis was neither arbitrary nor capricious.

\*                    \*                    \*

Rationality is the touchstone of arbitrary and capricious review. Whether or not I agree with the agency's policy choices, this Court may not disturb its regulations so long as the agency has made a rational connection between the facts found and the choices made. Here, the agency has done what is required of it. So I would vacate the district court's permanent injunction.

## C.    Remedial overbreadth

Although I believe the law requires us to uphold the regulations in full, I would be remiss if I did not object to the overbroad remedy approved by the majority. My colleagues

enjoin enforcement of the entire Final Rule throughout the whole State of Maryland.  That remedy is overbroad in at least two respects.

First, the majority improperly enjoins enforcement of the *entire* Final Rule (rather than just the unlawful provisions).  The doctrine of severability and judicial restraint ordinarily counsel against such sweeping relief.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294–95 (1988).  A court should refrain from enjoining more of a regulation than is necessary:  "[W]henever a [regulation] contains unobjectionable provisions separable from those found to be un[lawful], it is the duty of [the] court to so declare, and to maintain the [regulation] in so far as it is valid."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684– 86 (1987) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)).  And the standard for severability is well established.  Unless it is evident that the regulations would not have been promulgated without the unlawful provisions, the remainder is not to be impaired.  *See Buckley*, 424 U.S. at 108.

This inquiry is straightforward when, as here, a regulation contains a severability clause.  The Final Rule provides, "To the extent a court may enjoin any part of the rule, the Department intends that other provisions or parts of provisions should remain in effect." 84 Fed. Reg. at 7726.  Despite this explicit statement, the majority purports to divine a clear intent that HHS "intended the [Final Rule] to stand or fall as a whole."  Majority Op. 59.  We must presume HHS means what it says and says what it means when interpreting its Final Rule.  *See Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992).  Absent "strong evidence" to the contrary, the unlawful provisions are severable.  *Alaska Airlines*,

480 U.S. at 686. I find no such evidence in the Federal Register. Thus, any injunction should be limited to those provisions found unlawful.

Second, the majority improperly enjoins enforcement of the Final Rule throughout the *whole* State of Maryland (rather than just within the City of Baltimore). But the judicial Power is limited to affording necessary relief only to those parties in the case or controversy before us. *See, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999). Compounding my doubts that equity permits today's result, *see Dep't of Homeland Sec.*, 140 S. Ct. at 600 (Gorsuch, J., concurring); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994), the district court identified little actual evidence that justifies extending injunctive relief to the entire state, *see* Majority Op. 61–63. And so, were an injunction proper, I believe it must be limited to the City of Baltimore.

<div align="center">*           *           *</div>

The judicial role in reviewing agency action is modest. When an agency responsive to the elected President has spoken with the force of law, as judges, we must defer to the agency's reasonable interpretation of an ambiguous statute. And we are forbidden from second guessing the analysis and policy judgments that undergird the agency's regulations. Yet the majority oversteps its role and fails to give HHS the deference it is due. Today's decision is wrong, and the resulting circuit split is needless. I respectfully dissent.